Davor Rukavina, Esq.
Texas Bar No. 24030781
J. Kyle Jaksa, Esq.
Texas Bar No. 24120923
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard St., Ste. 4000
Dallas, TX 75201
Telephone:   (214) 855-7500
E-mail:   drukavina@munsch.com
            kjaksa@munsch.com

PROPOSED COUNSEL TO THE
DEBTORS

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FCI SAND OPERATIONS, LLC, *et al.*, | § | Case No. 25-80481-mvl-11 |
| | § | |
| Debtors.[1] | § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL APPROVAL OF SUPERPRIORITY AND FIRST PRIORITY SECURED POSTPETITION FINANCING**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:30 P.M. (CT) ON AUGUST 1, 2025.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HYBRID HEARING WILL BE CONDUCTED ON THIS MATTER ON AUGUST 1, 2025 AT 1:30 P.M. (CT) IN COURTROOM 1424, FLOOR 14, 1100 COMMERCE ST., DALLAS, TEXAS 75242. YOU MAY PARTICIPATE IN THE HEARING EITHER IN PERSON OR BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 1.650.479.3207 ACCESS CODE: 2301-476-1957. VIDEO COMMUNICATION WILL BE BY THE USE OF CISCO WEBEX PLATFORM. CONNECT VIA THE CISCO WEBEX APPLICATION OR CLICK THE LINK ON JUDGE LARSON'S HOME PAGE. THE MEETING CODE IS 2301-476-1957. CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.**

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: FCI Sand Operations, LLC (2539) and FCI South, LLC (4193) (the "Debtors"). The location of the Debtors' service address is 606 County Rd. 121, Marble Falls, TX 78654.

> **HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF ELECTRONIC HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE LARSON'S HOME PAGE OR BELOW. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.**
>
> **[ELECTRONIC APPEARANCES | NORTHERN DISTRICT OF TEXAS | UNITED STATES BANKRUPTCY COURT](#)**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COME NOW FCI Sand Operations, LLC ("FCI Sand") and FCI South, LLC ("FCI South," and together, the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file this their *Emergency Motion for Interim and Final Approval of Superpriority and First Priority Secured Postpetition Financing* (the "Motion"), respectfully stating as follows:

## I. RELIEF REQUESTED

1. The Debtors seek entry of an order authorizing the Debtor to obtain new postpetition financing on a superpriority and first priority secured basis, including on a priming basis, on the budget attached hereto as **Exhibit A** and with the protections to the DIP Lender (defined below) as outlined below. While the key terms of the DIP Financing (defined below) are disclosed and discussed herein, the Debtors and the DIP Lender continue to finalize all related documents and instruments, which the Debtors will file with the Court as soon as they are able to.

## II. JURISDICTION & VENUE

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). The Debtors expressly consent to such a final disposition by this Court. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

### III. BACKGROUND

3. On July 30, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division to be jointly administered. The Debtors continue to operate their business and to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No committee, trustee, or examiner has been appointed.

4. Together, the Debtors own and run several sand mines and production plants for high quality (98% quartz) sand used primarily in hydraulic fracking in the Eagle Ford Shale. Because of the high quality of their sand and proximity to drilling operations, the Debtors' customers include major drilling and E&P companies, including Halliburton, Conoco, EOG, BPX, BJ Energy. FCI Sand owns 187 acres and leases 1,450 acres, from which it mines and processes its sand at two plants. FCI South owns 32 acres and a processing plant, at which it processes sand purchased from third parties or mined from FCI Sand. Thus, the Debtors own three sand processing plants. The second plant at FCI Sand, which will greatly increase capacity, was just completed and is about to come on line. However, while it was being built, production necessarily greatly diminished, leading to a substantial loss in revenue. Then, as the plant was coming on line, the Debtors' customers significantly reduced their orders due to a slowdown in drilling (which has since passed). Combined, these developments led to a liquidity crisis.

5. The Debtors' senior secured lender is FCI-SLG, LLC (the "Lender"), who represents various participants owed approximately $26 million. To address its liquidity crisis and keep the Lender current, the Debtors sold certain equity interests to raise funds. However, the Lender recently informed the Debtors that this would not be permitted and constituted alleged loan

defaults. This left the Debtors without any means to raise funds, and the Lender in the process of exercising its remedies. The Debtors were also forced to factor their receivables, at great expense, thus furthering their liquidity issues. In addition to interest at 15%, the Lender claims a right to be repaid 125% of its interest at the maturity of its debt. For these and other reasons, the Debtors are reviewing potential claims and causes of action they may have against the Lender.

6. The Debtors' customers are drilling again and they have issued extensive purchase orders to the Debtors. However, the Debtors are still left without liquidity and without means to fund their operations which, if operations cease, the Debtors' business is seriously jeopardized. The Debtors therefore filed their Bankruptcy Cases to preserve value, to enable them to raise new capital, and to benefit all of their constituents.

## IV.    DIP FINANCING

7. As noted above, the Debtors continue finalizing the details and documents with the DIP Lender, which the Debtors will file prior to any hearing on this Motion. Substantively, however, the Debtors request authority for the following DIP Financing:

(i)    DIP Lender: Sterling ICF II, LLC;[2]

(ii)   Interim Amount: Up to $1,500,000;

(iii)  Final Amount: $6,000,000;

(iv)   Term: 9 months;

(v)    Interest/default interest: 15%/18%;

(vi)   Points/origination: 5%;

(vii)  Convertible feature to be negotiated as part of final approval;

(viii) Superiority status under section 507(b), subject to Carveout;

---

[2] Principals and/or affiliates of the DIP Lender own 3% of the equity of FCI Sand and hold approximately $2.5 million of debt.

(ix)   First priority, priming security interests and liens on all assets except Lender's current "cash collateral" and Chapter 5 avoidance claims, junior only to taxing authority liens, subject to Carveout;

(x)   customary termination provisions (conversion, trustee appointment, etc.);

(xi)   customary reporting provisions;

(xii)   no rollup, no lockup;

(xiii)   customary lender attorney's fees and expenses provisions; and

(xiv)   Carveout for US Trustee fees and professional fees as per budget.

8.   If approved, the Debtors would be permitted to use the proceeds of the DIP Financing and the DIP Lender's resulting cash collateral as provided for in the Budget attached hereto.

### V.   BASIS FOR RELIEF REQUESTED

9.   Pursuant to section 364(c) of the Bankruptcy Code:

if the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

10.   Pursuant to section 364(d) of the Bankruptcy Code:

The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11. Finally, pursuant to Rule 4001(c)(2), the Court may grant relief on an interim basis "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P. 4001(c)(2)(A).

12. Here, the Debtors are not able to obtain postpetition financing on an unsecured basis. And, without immediate financing on a superpriority and first priority secured basis, the Debtors and their estates will suffer immediate and irreparable injury. Namely, without the immediate use of cash to fund operations, pay employees, and pay utilities, the Debtors' operations will cease. Employees will leave and clients will cancel contracts, going to the Debtors' competitors. Those customers may not return. And, the Debtors will be unable to maintain and service their equipment and plants, to the direct prejudice of the Lender and all creditors.

13. The Debtors must also demonstrate that the Lender will be adequately protected if its interests are primed. As discussed at greater length below, the Lender will be adequately protected for two reasons. First, it is heavily oversecured. The land and improvements at FCI Sand alone are worth approximately $80 million, while the sand that is owned and leased has a value in the hundreds of millions of dollars, at least as-processed. Second, the proceeds of the DIP Financing will be used to continue the Debtors' operations, effectuate repairs and maintenance, dispose of the Lender's inventory and receivables collateral—without the Debtors using the resulting "cash collateral" of the Lender—and otherwise maintain and preserve the value of all of the Lender's collateral.

14. Here, the DIP Financing would be a mix of superpriority administrative claim rights, first priority liens on otherwise unencumbered assets, and priming liens on otherwise encumbered assets.

15. With respect to unencumbered assets, section 552 of the Bankruptcy Code generally cuts off the Lender's prepetition security interests. *See* 11 U.S.C. § 552(a) ("property acquired by the estate or by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case"). This would apply to, for example, postpetition receivables and inventory, as the Debtors do not intend to use the Lender's prepetition "cash collateral" for operations. Likewise, the Debtors do not believe that the Lender has any perfected security interest against FCI South, such that the Debtors' interests in its assets are otherwise unencumbered.

16. Some of FCI Sand's postpetition receivables and inventory may be subject to the Lender's liens against real property, in this case sand. Here, however, it is important to note that that sand has little to no value on its own. The sand has value only because the Debtors, through their employees, their plants, their utilities, and a whole host of other goods and services, process the sand and turn it into a marketable asset. Generally, the Debtors agree that the Lender's prepetition lien extends to postpetition minerals, including sand. *See In re Premier Golf Props., LP*, 564 B.R. 710, 725 (Bankr. S.D. Cal. 2016). However, this does not mean that the proceeds thereof as "cash collateral" and it does not mean that the Court cannot change this due to the facts and equities of the case.

17. As Judge Hale confirmed in the seminal case of *In re Cafeteria Operators, L.P.*, 299 B.R. 400, 405 (Bankr. N. D. Tex. 2003), even if a secured lender has a lien on a good being sold, where that good is made marketable because of the services of the debtor—here, with the addition of the Debtors' resources; *i.e.* employees, heat, trucks, a processing plant, etc.—the resulting receivable is not the "cash collateral" of the lender, at least not in full, if at all. And, this would be the Lender's burden to prove, which would include any allocation of the receivable

between the underlying good and the services' add-on value.

18. Furthermore, under the Bankruptcy Code:

> if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, <u>except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise</u>.

11 U.S.C. § 552(b)(1) (emphasis added).

19. "The equity exception is meant for the case where the trustee or debtor in possession uses other assets of the bankruptcy estate (assets that would otherwise go to the general creditors) to increase the value of the collateral." *J. Catton Farms, Inc. v. First Nat. Bank of Chicago,* 779 F.2d 1242, 1246 (7th Cir. 1985) (referencing *Wolters Vill., Ltd. v. Village Props., Ltd. (In re Village Props., Ltd.)* 723 F.2d 441, 444 (5th Cir. 1984)). In *J. Catton Farms*, the Seventh Circuit provide the following hypothetical:

> Suppose a creditor had a security interest in raw materials worth $1 million, and the debtor invested $100,000 to turn those raw materials into a finished product which he then sold for $1.5 million. The proceeds of this sale (after deducting wages and other administrative expenses) would be added to the secured creditor's collateral unless the court decided that it would be inequitable to do so—as well it might be, since the general creditors were in effect responsible for much or all of the increase in the value of the proceeds over the original collateral.

*J. Catton Farms, Inc.*, 779 F.2d at 1247.

20. "The flexible approach taken by section 552(b) permits the court to preserve valid security interests in proceeds, rents and the like, but at the same time, allows the court to protect the interests of unsecured creditors. If a creditor's collateral is processed and sold or proceeds are otherwise collected, either the creditor or the trustee, debtor, or debtor in possession may request a noticed hearing to have the court determine whether the creditor's interest in proceeds should be

limited based on the equities of the case. Depending on the court's evaluation of these equities, profit or loss may be given to the estate or to the secured party, or apportioned between the estate and the secured party." *Cross Baking Co., Inc.*, 818 F.2d 1027, 1033 (1st Cir. 1987) (citation omitted). In *Cafeteria Operators*, Judge Hale determined that the "pursuant to § 552(b), the equities of the case warrant limiting the Bank Group's interest in Debtors' post-petition cash to the value of the Debtors' inventory subject to Bank Group's lien that is converted to cash upon its sale."

21. Here, the Court should "order otherwise" based on the equities of the case with respect to any prepetition lien of the Lender as against the sand:

(i) the Lender is heavily oversecured, including with millions of tons of valuable sand;

(ii) non-Lender funds, including for employees and utilities, will be used to process that sand, and the Lender should not receive that benefit, especially when it is not needed in light of its other collateral;

(iii) the Debtors' continue operations, dependent on sand mining and processing, will preserve and enhance the value of the Lender's other collateral

22. Regarding adequate protection, the evidence will demonstrate that the Lender is heavily oversecured (to the extent that its debts and liens are otherwise valid, with respect to which the Debtors reserve all of their rights). The Debtors believe that the value of the assets of FCI Sand (real property and improvements) is at least $80 million. Furthermore, the Debtors have a reserve report of their sand that suggests total marketable sand of more than fifty million tons. At sale values of between $25 and $30 per ton (after processing), the value is huge.

23. As such, the DIP Financing is a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is justified under sections 105(a), 363(b), 1107(a), and 1108 of the Bankruptcy Code.

## VI. WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

24. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay period under Bankruptcy Rule 6004(h).

## VII. EMERGENCY CONSIDERATION

25. The Debtors request emergency consideration of this Motion pursuant to Bankruptcy Rule 6003, which empowers the Court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." An immediate and orderly transition into chapter 11 is critical to the viability of the Debtors' operations and any delay in granting the relief requested could hinder their operations and cause irreparable harm. The failure to receive the requested relief during the first 21 days of these chapter 11 cases could severely disrupt the Debtors' operations at this critical juncture and imperil the Debtors' restructuring.

## VIII. RESERVATION OF RIGHTS

26. Nothing contained in this Motion or any order granting the relief requested in this Motion, and no action taken by the Debtors pursuant to the relief requested or granted (including any payment made in accordance with any such order), is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, priority, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' or any other party in interest's rights to dispute any claim on any grounds; (c) a promise or requirement to pay any particular claim; (d) an implication, admission, or finding

that any particular claim is an administrative expense claim, other priority claim, or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (g) a waiver or limitation of any claims, causes of action, or other rights of the Debtors or any other party in interest against any person or entity under the Bankruptcy Code or any other applicable law. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity, priority, or amount of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## IX.  PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request entry of an order, (a) granting the relief requested herein and (b) granting such other relief as the Court deems appropriate under the circumstances.

RESPECTFULLY SUBMITTED this 31st day of July, 2025.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Davor Rukavina*
Davor Rukavina, Esq.
Texas Bar No. 24030781
J. Kyle Jaksa, Esq.
Texas Bar No. 24120923
500 N. Akard St., Ste. 4000
Dallas, TX 75201
Telephone: (214) 855-7500
E-mail: drukavina@munsch.com
E-mail: kjaksa@munsch.com

**PROPOSED COUNSEL TO THE DEBTORS**

## CERTIFICATE OF SERVICE

An omnibus Certificate of Service concerning all "first day" motions shall be separately filed by the Debtor, which shall reflect service of this Motion.

By: */s/ J. Kyle Jaksa*
J. Kyle Jaksa, Esq.