IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS (DALLAS)

|  |  |
|---|---|
| IN RE: | . Case No.: 25-80481-MVL-11 |
|  | . |
|  | . (Joint Administration |
| FCI SAND OPERATIONS, LLC, | .     Requested) |
|  | . |
| Debtor. | . Friday, August 1, 2025 |
| . . . . . . . . . . . . . . . | . 1:31 P.M. |

TRANSCRIPT OF FIRST-DAY HEARINGS RE: MOTION FOR JOINT
ADMINISTRATION OF CASES 25-80481-MVL-11, 25-32838-SWE-11 FILED
BY DEBTOR FCI SAND OPERATIONS, LLC (4); AND NOTICE OF
DESIGNATION AS COMPLEX CHAPTER 11 CASE FILED BY DEBTOR FCI SAND
OPERATIONS, LLC (5); AND EMERGENCY MOTION FOR ENTRY OF INTERIM
AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO PAY CERTAIN
PRE-PETITION CLAIMS OF CRITICAL VENDORS AND (II) GRANTING
RELATED RELIEF FILED BY DEBTOR FCI SAND OPERATIONS, LLC (6);
AND EMERGENCY MOTION FOR AUTHORITY TO PAY PRE-PETITION WAGES
AND RELATED PAYROLL EXPENSES FILED BY DEBTOR FCI SAND
OPERATIONS, LLC (7); AND MOTION FOR DIP FINANCING FILED BY
DEBTOR FCI SAND OPERATIONS, LLC (8); AND MOTION REGARDING PRE
OR POST-PETITION CONTRACTS INSURANCE POLICIES FILED BY DEBTOR
FCI SAND OPERATIONS, LLC (9)
**BEFORE THE HONORABLE MICHELLE V. LARSON**
**UNITED STATES BANKRUPTCY COURT JUDGE**

| | |
|---|---|
| Audio Recorder: | Bryon Robinson |
| | Earle Cabell Federal Building |
| | 1100 Commerce Street, Room 1254 |
| | Dallas, Texas 75242 |
| | |
| Transcription Service: | Liberty Transcripts |
| | 9107 Topridge Drive |
| | Austin, Texas 78750 |
| | (847) 848-4907 |
| | DBPATEL1180@GMAIL.COM |
| | www.libertytranscripts.com |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

APPEARANCES:

For the Debtors:                 Munsch Hardt Kopf & Harr PC
                                 BY: DAVOR RUKAVINA, ESQUIRE
                                 500 North Akard Street, Suite 3800
                                 Dallas, Texas 75201
                                 (214) 855-7587
                                 drukavina@munsch.com

                                 Munsch Hardt Kopf & Harr PC
                                 BY: JAMES KYLE JAKSA, ESQUIRE
                                 500 North Akard Street, Suite 3800
                                 Dallas, Texas 75201
                                 (214) 740-5162
                                 kjaksa@munsch.com

                                 Munsch Hardt Kopf & Harr PC
                                 BY: JONATHAN PETREE, ESQUIRE
                                 500 North Akard Street, Suite 3800
                                 Dallas, Texas 75201
                                 (214) 740-5158
                                 jpetree@munsch.com

For the United States            Office of the United States Trustee
Trustee:                         BY: ELIZABETH ZIEGLER-YOUNG, ESQUIRE
                                 1100 Commerce Street, Room 976
                                 Dallas, Texas 75242
                                 (214) 767-8967
                                 elizabeth.a.young@usdoj.gov

For FCI-SLG, LLC:                Streusand, Landon, Ozburn & Lemmon LP
                                 BY: STEPHEN WAYNE LEMMON, ESQUIRE
                                 1801 South Mopac Expressway, Suite 320
                                 Austin, Texas 78746
                                 (512) 236-9900
                                 lemmon@slollp.com

                                 Streusand, Landon, Ozburn & Lemmon LP
                                 BY: RHONDA BEAR MATES, ESQUIRE
                                 1801 South Mopac Expressway, Suite 320
                                 Austin, Texas 78746
                                 (512) 220-2689
                                 mates@slollp.com

```
APPEARANCES (CONTINUED):

For Momentum Capital        Buchalter, a Professional Corporation
Funding:                    BY: CAROLINE DJANG, ESQUIRE
                            18400 Von Karman Avenue, Suite 800
                            Irvine, California 92612
                            (949) 224-6252
                            cdjang@buchalter.com

                            Buchalter, a Professional Corporation
                            BY: ROBERT ZADEK, ESQUIRE
                            655 West Broadway, Suite 1600
                            San Diego, California 92101
                            (619) 219-5335
                            rzadek@buchalter.com

For SALP Fund VI, LLC       Kane Russell Coleman Logan PC
and Sterling ICF II,        BY: MARK TAYLOR, ESQUIRE
LLC:                        Frost Bank Tower
                            401 Congress Avenue, Suite 2100
                            Austin, Texas 78701
                            (512) 487-6650
                            mtaylor@krcl.com

For GrayStreet Credit       Okin Adams Bartlett Curry LLP
LLC:                        BY: CHRISTOPHER ADAMS, ESQUIRE
                            1113 Vine Street, Suite 240
                            Houston, Texas 77002
                            (713) 228-4102
                            cadams@okinadams.com

                            Okin Adams Bartlett Curry LLP
                            BY: DAVID CURRY, ESQUIRE
                            1113 Vine Street, Suite 240
                            Houston, Texas 77002
                            (713) 255-8880
                            dcurry@okinadams.com
```

```
                              INDEX
```

                                                        Page
MATTERS HEARD

MOTION FOR JOINT ADMINISTRATION OF CASES
25-80481-MVL-11, 25-32838-SWE-11 FILED BY DEBTOR FCI
SAND OPERATIONS, LLC (4)

**Court's Ruling**                                        **30**

NOTICE OF DESIGNATION AS COMPLEX CHAPTER 11 CASE FILED
BY DEBTOR FCI SAND OPERATIONS, LLC (5)

**Court's Ruling**                                       **153**

EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO PAY CERTAIN PRE-PETITION
CLAIMS OF CRITICAL VENDORS AND (II) GRANTING RELATED
RELIEF FILED BY DEBTOR FCI SAND OPERATIONS, LLC (6)

**Court's Ruling**                                       **162**

EMERGENCY MOTION FOR AUTHORITY TO PAY PRE-PETITION WAGES
AND RELATED PAYROLL EXPENSES FILED BY DEBTOR FCI SAND
OPERATIONS, LLC (7)

**Court's Ruling**                                       **162**

MOTION FOR DIP FINANCING FILED BY DEBTOR FCI SAND
OPERATIONS, LLC (8)

**Court's Ruling**                                       **153**

MOTION REGARDING PRE OR POST-PETITION CONTRACTS INSURANCE
POLICIES FILED BY DEBTOR FCI SAND OPERATIONS, LLC (9)

**Court's Ruling**                                       **163**

INDEX

WITNESSES
FOR THE DEBTORS:                                              Page

JOHN NELSON
  Direct Examination by Mr. Rukavina                          31
  Cross-Examination by Ms. Young                              69
  Cross-Examination by Mr. Lemmon                             71
  Examination by the Court                                   100
  Continued Cross-Examination by Mr. Lemmon                  111
  Redirect Examination by Mr. Rukavina                       114
  Recross-Examination by Mr. Taylor                          143
  Recross-Examination by Mr. Lemmon                          145
  Further Redirect Examination by Mr. Rukavina               147

KEVIN COVEY
  Direct Examination by Mr. Rukavina                         124
  Cross-Examination by Ms. Young                             127
  Cross-Examination by Mr. Lemmon                            127
  Cross-Examination by Ms. Djang                             131
  Examination by the Court                                   132
  Redirect Examination by Mr. Rukavina                       134

FOR THE CREDITOR:

(None)


EXHIBITS
                                                          ID    EVD
FOR THE DEBTORS:

3                    Budget                               51     56

5 through 13         Lender Documents                     57     58

14 through 16        Emails                              136    136

17                   Payroll List                         40     55

18                   Email                               119    121

FOR THE CREDITOR:

(None)

1        (Proceedings commenced at 1:31 p.m.)

2             THE COURT:  Please be seated.

3             Good afternoon everyone.  We are here on our 1:30

4   docket.  We have one matter on the docket this afternoon, and

5   that is Case Number 25-80481, FCI Sand Operations, LLC.  I'll

6   take appearances for the record. Now start with those in the

7   courtroom.

8             MR. RUKAVINA:  Your Honor, good afternoon.

9             Davor Rukavina, Munsch Hardt Kopf & Harr, proposed

10  counsel for the Debtors-In-Possession.  With me is Kyle Jaska.

11  I don't know if he's appeared before, Your Honor, before.  I'm

12  proud to announce that he is actually half-Croation.  I'm not

13  --

14      (Laughter)

15            THE COURT:  I was literally waiting with bated breath

16  on what the next statement was.  Okay.

17            MR. RUKAVINA:  And I don't know if you know my other

18  associate, Jonathan Petree.

19            THE COURT:  Yes.

20            MR. RUKAVINA:  Your Honor, with us also is Ms. Eagan

21  Martin Powers.  She is kind of ordinary course outside general

22  counsel.  I don't think she'll be appearing or participating

23  today, but she felt like it was important to be here, as well.

24  We have representatives of the Debtor.  We have our proposed

25  financial advisor here.  And of course, we have a

1    representative of the proposed DIP lender whom I think Your

2    Honor has seen as now someone different.

3              THE COURT:  Okay.  Thank you very much.

4              All right.

5              MS. YOUNG:  Good afternoon, Your Honor.

6              Liz Ziegler-Young for the U.S. Trustee.

7              THE COURT:  Good afternoon.  Anyone else in the

8    courtroom wish to make an appearance?

9         (No audible response)

10             THE COURT:  All right.  I'll now turn to Webex

11   appearances.  I do have a few folks on the electronic roll with

12   Streusand Landon, and the rest is cut off, I think it's Ozburn.

13   I have Mr. Stephen Lemmon and Ms. Rhonda Mates on behalf of

14   FCI-SLG,LLC.  And then with the Buchalter firm on behalf of

15   Momentum Capital Funding, I have Robert Zadek and Caroline

16   Djang.

17             And anyone else who wishes to make an appearance or

18   anyone who have already called who wishes to make their

19   appearance and put a name to the face is fine.  And obviously,

20   correct any of my mispronunciations of your names.

21             MR. LEMMON:  Your Honor, Steve Lemmon and Rhonda

22   Mates on behalf of the senior lender, FCI.  I want to apologize

23   to the Court.  I'm on vacation.  I was able to borrow a tie,

24   but I don't have a jacket.

25             THE COURT:  You're fine.  And obviously, first days

```
 1   are emergency hearings.  I understand things come up. I
 2   appreciate you being here today.  Thank you.
 3           MR. TAYLOR:  Good afternoon, Your Honor.
 4           Mark Taylor with Kane Russell Coleman and Logan in
 5   Austin here on behalf of SALP Fund VI, LLC and Sterling ICF 2,
 6   LLC.
 7           THE COURT:  After the hearing, I'm going to give your
 8   clients some ideas on names that don't have letters all in a
 9   row.  All right.  So let me get that one more time, Mr. Taylor.
10           MR. TAYLOR:  Certainly, Your Honor.  It's SALP Fund
11   VI, LLC.
12           THE COURT:  Okay.
13           MR. TAYLOR:  And Sterling ICF II, LLC.
14           THE COURT:  All right.  Thank you very much,
15   Mr. Taylor.
16           MR. TAYLOR:  Thank you, Your Honor.
17           THE COURT:  Anyone else wish to make an appearance
18   this afternoon?
19           MR. ADAMS: Yes.  Good afternoon, Your Honor.  This is
20   Chris Adams.  Can you hear me?
21           THE COURT:  I can.
22           MR. ADAMS:  Okay, great.  Thank you, Your Honor.
23   I've dialed in on Webex, but I've also called in on the Webex
24   number because my microphone is not so good on the video.  So
25   I'm here representing GrayStreet Credit LLC, the proposed DIP
```

1    lender.

2              THE COURT:  Okay.  I think -- give me one moment. OK,

3    right.  GrayStreet Credit LLC.  Yes, I saw that in the updated

4    form of the DIP order.  Thank you.

5              MR. ADAMS:  Yes, Judge.  Thank you.

6              THE COURT:  You're welcome.  Anyone else wish to make

7    --

8              MR. CURRY:  Your Honor, this is David -- this is

9    David Curry, also from Okin Adams, also on behalf of

10   GrayStreet.

11             THE COURT:  Okay, thank you very much.

12             Anyone else?  If you're on a phone, you can press *6

13   to unmute.

14        (No audible response)

15             THE COURT:  All right.  Well, thank you all very much

16   for being here.  I have had an opportunity, Mr. Rukavina, to

17   review each of the motions that you've set for hearing today.

18   I've also had an opportunity to review the notice of the filing

19   of the amended form, I think, of the DIP order -- maybe it was

20   the original form -- that was filed at about 10:30 or so this

21   morning at Docket 16 in preparation for today.

22             So with that, I am ready when you are.  After we do

23   the greater part of your presentation and we get to the

24   motions, especially joint admin, I'll hear that out.  And

25   assuming you can pass that high hurdle of getting these jointly

1    administered, I'll pause for a minute and I'll enter that order

2    so that the Clerk's Office can do their magic.

3           MR. RUKAVINA:  Your Honor, if I ever lose that

4    motion, please disbar me.

5           THE COURT:  That could come in -- it could be about a

6    joint admin or it could be anything, so.

7        (Laughter)

8           MR. RUKAVINA:  Your Honor, what I'd like to do is as

9    follows.  We are going to have a contested hearing today on the

10   DIP motion.

11          THE COURT:  Sure.

12          MR. RUKAVINA:  I will focus my presentation and the

13   evidence on that.  Unless the pre-petition lender objects, I

14   would ask Mr. Jaksa to handle what I would call the less

15   controversial motions.  Ms. Young would like some evidence, and

16   I think we'll present it by proper.

17          THE COURT:  Of course.

18          MR. RUKAVINA:  So as long as that's acceptable to the

19   Court, then I will focus my presentation on what we're all here

20   on today, which, I'm not hiding the ball, is the priming.  It's

21   364(d).

22          Let me begin my presentation by pointing out that

23   364(d) exists.  It exists.  The Court can, and in the right

24   cases should, prime a pre-existing lender.  Courts sometimes

25   raise a very high burden, very high threshold.  I understand

1   why, because priming a pre-petition lender ain't no small

2   thing.  But again, it exists.  It is not an impossible

3   standard, and it is still the preponderance of the evidence.

4         Now, we're going to make a record today.  It's going

5   to be an interim record.  I agree a hundred million ways

6   possible that it is not going to be binding.  It is not going

7   to be collateral estoppel at any final hearing.  I know that

8   the lender probably doesn't have a lot of evidence available

9   today.  I know that this is an emergency hearing.  Thank you

10  for that.  And it's an emergency hearing for a reason, because

11  we don't have a dollar.  We are not going to use the lender's

12  pre-petition cash collateral, and I don't know that we even

13  have any, because we factored our receivables.

14        We are out of cash.  We are literally out of cash.

15  Payroll is due today.  Propane has to be paid for.  And as Your

16  Honor will hear, if we do not get the interim DIP, then not

17  only are we out of cash, we go dark.  Our customers go

18  elsewhere, and that's it.  Everyone loses.  So I think as far

19  as the immediate irreparable injury standard goes, I think

20  that'll be easily satisfied.

21        And unfortunately, we're going to air some dirty

22  laundry today and, unfortunately, we're going to talk about

23  that because what you're going to see, I think, in this case is

24  that this is a lender trying to become the owner.  And I think

25  that this is a lender wanting to be in possession, and I think

```
 1   we're going to have some pretty serious and heated hearings on

 2   that.  But what I'm going to focus on is the priming thing,

 3   which comes down to adequate protection.  Your Honor will see

 4   that the fair market value of just the physical plant and the

 5   land is about $80 million.

 6          Your Honor will see that we have at least 50 million

 7   tons of usable sand.  That's just the first 50 feet, Your

 8   Honor.  We have sand that goes below 50 feet that the engineers

 9   haven't even looked at yet.  At $24, $25 a ton, which what

10   we're selling for now are $30 a ton, you can do the math, we're

11   talking about hundreds of millions of dollars of proven

12   minerals that we own or that we lease.

13          Your Honor will hear how earlier this year, equity,

14   including Mr. Sterling's -- I'm sorry, Mr. Sterling, including

15   Sterling's principal, were purchasing equity at a $100 million

16   valuation.  So it is my hope that at least today -- we do not

17   have an appraisal.  I don't, to my knowledge, no one has an

18   appraisal.  We are hurriedly trying to retain an appraiser for

19   the final hearing, but I don't think the lender has an

20   appraisal either.

21          I think that -- and I don't think the lender is going

22   to come here and say that they're undersecured.  There are

23   serious consequences if they say that.  I think the lender will

24   have to, in intellectual honesty, admit that they are

25   oversecured.  And the equity cushion isn't just a little bit,
```

1    Your Honor, it's 3, 4, 5, 10X.

2            Now what happened here?  Your Honor will hear how we

3    are an established, successful business.  We've been in

4    business for years.  Our customers are the big ones, the ones

5    that pay, the ones that don't go bankrupt.  And we decided to

6    expand our facility.  We decided to mine a lot more.  So we

7    were building and we built the second plant, plant number two.

8    This is FCI Sand, not FCI South.  In order to finance that,

9    this is where we got the $26 million-and-change change loan.

10           This is a participated loan.  So the lender itself

11   is, I think, a participant.  The lender is a collateral agent,

12   if you will, but it is a participated loan.  And we have

13   friendly lenders in the deck and we have unfriendly lenders in

14   the deck.  But because we were building the second plant, we

15   went dark for a while.  Well, that's not true.  We didn't go

16   dark.  We ramped down operations big time.  So we knew we were

17   going to have a looming liquidity issue because, unfortunately,

18   our clients pay on 60- or 90-day terms.

19           And then, as is, I understand, kind of normal in

20   Texas, fracking and drilling slowed down in the summer.  And

21   what's going on geopolitically?  The good news is that we now

22   have plenty of orders and the budget that we're going to talk

23   about is actual purchase orders in hand, not hypothetical.  So

24   we're back.  We're producing a whole lot of sand.  We're

25   looking great, but we had this ticking time bomb, this

1    liquidity crisis.

2          Our payroll, I think we have 65 employees and these

3    are highly skilled, highly paid, most of them employees.

4    Propane and utilities cost a lot.  Transportation costs a lot.

5    Insurance costs a lot.  So to address the liquidity crisis, we

6    did two things.  One, we started factoring; 18, 20 percent,

7    that's pretty expensive money.  We'd like to get out of that.

8    Maybe we'll have to factor some post-petition, depending on

9    what happens with the DIP loan.  Maybe we can do better terms

10   than 18 or 20 percent.

11         We're generally happy with our factor.  I'm not aware

12   of any litigation or issues there, unlike in other cases where

13   some factors, you know, put their hands in the cookie jar a

14   little too deep.  But we'd like to stop factoring because

15   that's 18, 20 percent.  And then the other thing that we were

16   doing, how we were limping along, and how we were keeping the

17   lender current, was we were selling equity, again, at a $100

18   million valuation.  We were using those proceeds to fund

19   operations and pay the lender.

20         A couple, three weeks ago, the lender said, stop.

21   You're violating our loan documents.  You must not do this.

22   You can't sell equity.  People can't buy equity.  Well, that

23   froze all of our access to any kind of cash.  The lender also

24   got Mr. Milligan involved --

25         THE COURT:  Was it the type of equity?  Or was it --

1          MR. RUKAVINA:  Pardon me, Your Honor?

2          THE COURT:  I said, was it a certain type of equity

3    that was participatory in some way or?

4          MR. RUKAVINA:  I'm not certain of the details, Your

5    Honor.

6          THE COURT:  Okay.

7          MR. RUKAVINA:  What I do know is that the lender has

8    a pledge agreement on the equity.  And in my understanding, and

9    perhaps Counsel will know more, I just got involved recently,

10   as Your Honor can imagine.  My understanding is that the lender

11   took the position that we were selling its collateral and et

12   cetera, et cetera.  In any event, we had no more access to

13   cash.

14         The lender got Mr. Milligan's firm involved.  He's a

15   great guy, known him for years, worked with him and opposite of

16   him.  Well, that's just an invitation to a receivership.  The

17   writing was on the wall.  And the reason why we filed when we

18   filed was not only because we need cash and no one's going to

19   lend to us outside of a 364(d).  That will be another element

20   that will be proven today.  But we happen to have two board

21   members and the lender was certainly going to appoint a third

22   and that would require unanimity for a filing.

23         So everything came together and, hence, the filing.

24   Otherwise, again, because we believe that this is a lender who

25   wants to own for its sole benefit, we felt like we had to come

1   here, had to get cash.  There'll be fights.  There'll be a

2   plan.  We easily anticipate a hundred-some plan.  That'll be

3   down the road.  I understand that today we're talking about

4   preventing immediate irreparable injury.

5           Now, it is relevant to what Your Honor is going to

6   have to decide today to discuss the lender's secured claim just

7   a little bit.  There's no question that the lender filed deeds

8   of trust.  There's no question that the lender has a lien on

9   the minerals.  There's no question that the lender has

10  perfected UCCs on substantially all other assets.  But FCI

11  South, the lender perfected on July the 11th.  We gave them a

12  security interest on July the 11th for something that they

13  funded last December.

14          So it is relevant that that is going to be a lay-down

15  preference.  It might not be a 548 because securitizing

16  unsecured debt may be an exception, but it's a lay-down

17  preference.  There's no possible new value.  There's no

18  possible ordinary course.  That's FCI South, which we own some

19  land and we own a plant where we process sand, but we don't

20  actually mine sand there.  We own that, Your Honor, on a, I

21  call it a loan-to-own.  We're basically carrying the paper.

22          At FCI Sand, the main company --

23          THE COURT:  FCI South is the newly built.

24          MR. RUKAVINA:  No.

25          THE COURT:  No.

```
 1                    MR. RUKAVINA:  So we have three plants.

 2                    THE COURT:  Okay, three plants --

 3                    MR. RUKAVINA:  FCI Sand --

 4                    THE COURT:  -- but in the same company?

 5                    MR. RUKAVINA:  FCI Sand has the old plant.  FCI Sand

 6   has the new plant, the one that we spent all this money doing.

 7                    THE COURT:  Okay.

 8                    MR. RUKAVINA:  And then FCI South is separate.  It's

 9   a wholly-owned subsidiary where we purchased the plant and the

10   land from another party.  I don't know when, but we can talk

11   about that at the evidence.

12                    THE COURT:  Okay, thank you.

13                    MR. RUKAVINA:  So there are three plants.  At the FCI

14   Sand, it's important to look at, again, it's highly relevant,

15   something that I've never seen before.  One, it's 15 percent

16   interest, which okay, that's expensive, but we're going to pay

17   that to the DIP lender.  It's 125 percent bonus at payoff

18   required by contract.

19                    If that ain't usury, then I don't know what is.  And

20   I don't know how the lender's going to, other than by our good

21   graces and cooperating with us, how the lender's going to

22   explain away 125 percent payment on top of the principal

23   payment, on top of 15 percent, probably 18 percent default

24   interest now.  So there's issues.

25                    These issues continue.  Your Honor might ask, why do
```

1     we have a different DIP lender today?  I've never seen

2     something like this in my life.  We have an agreement yesterday

3     morning with the old DIP lender.  I have two emails confirming

4     it.

5                THE COURT:  No, it was the Sterling firm.

6                MR. RUKAVINA:  That was Sterling.

7                THE COURT:  The Sterling company.

8                MR. RUKAVINA:  The Sterling -- the alphabet entity

9     that I --

10                THE COURT:  Yes, but I think it said Sterling in the

11     original motion, maybe.

12                MR. RUKAVINA:  Yes.  And Mr. Jobe and I are

13     negotiating all day.  Ms. Young is not negotiating, Ms. Young

14     is reviewing our orders.  And that's okay.  5:15 comes around,

15     we get an email that Mr. Jobe is not representing Sterling, and

16     that in fact, it's Kane Russell.  That's fine.  They're a

17     business.  They're a business.

18                And then in the evening, past 8:00, I get an email

19     copying the pre-petition lender's counsel, saying there is no

20     deal.  There is no budget.  Pre-petition lender's counsel will

21     get with you.  Well, of course, I can only speculate, and we

22     will take a 2004, and there will be litigation over it.  I can

23     only speculate that it was a bait and switch.  I've never seen

24     something like that in my life, where the post-petition

25     lender's counsel copies pre-petition lender's counsel and says,

```
 1   he will negotiate this with you.  So that's how come we have

 2   Grey, Greystone, Grey Capital?

 3            THE COURT:  GrayStreet.

 4            MR. RUKAVINA:  GrayStreet, I'm sorry.  GrayStreet

 5   Capital here.  So it's the same terms as Sterling is.  And the

 6   benefit is that unlike Sterling, which does own some equity and

 7   does own some debt, GrayStreet owns nothing.  They're a

 8   complete outsider.  No equity, no debt, no management, et

 9   cetera.

10            And then the problem is magnified, Your Honor, by

11   what the lender will tell you today, which is that the lender

12   is offering a DIP on more favorable terms, if we replace

13   current management with three directors of its choosing.  This

14   is the pre-petition lender wanting to put in the Sterling

15   person and two directors of its choosing.  If that ain't

16   loan-to-own, if that ain't lender-in-possession, if that ain't

17   a trick, then I don't know what is.  And that's the unfortunate

18   note that we enter this case on.  Instead of focusing on value,

19   adequate protection, negotiation, we enter with a dirty trick.

20            I will demonstrate to you today, Your Honor, that

21   there is more than adequate protection.  There is more than

22   value.  If the lender is secured and if I don't subordinate

23   them, if I don't defeat them on usury, if all of these things

24   happen, I will demonstrate to you that they are 4, 5X

25   oversecured.  We're not going to use their cash collateral with
```

1    one exception.  We'll be filing a motion next week.  We're

2    getting a $350,000 insurance check that we want to use to fix

3    their collateral, a silo.  So hopefully the lender will --

4    those dollar bills will go directly into fixing the problem.

5    Otherwise, we're not going to use their cash collateral.

6         There's one day's worth of inventory.  We'll be happy

7    to pay them out for one day's worth of inventory.  I'm not

8    aware of any other things --

9         THE COURT:  One day's worth of inventory being

10   extracted sand?

11        MR. RUKAVINA:  Yes, processed sand.

12        THE COURT:  Processed sand, okay.

13        MR. RUKAVINA:  And you'll hear about that.  I think

14   it's 3,000 tons.  So what is that times 25?  It is what it is.

15   And then, so as the evidence will show, I hope, that Your Honor

16   will agree with us -- and I do need to tell the Court, we're

17   not seeking 1.5, we're seeking 1.3.  Ms. Young pointed out to

18   me that, well, Davor, you can't really say that you're not

19   getting a retainer as an immediate and irreparable injury, and

20   she's right.  So we'll take that.

21        I do have a pre-petition retainer. And I can't

22   credibly tell Your Honor now that we have a contested, it's

23   going to be irreparable injury if I don't get another retainer.

24   So it's 1.3 million.  All of that will go to preserving the

25   other collateral.  All of that will be turned into

1  post-petition proceeds and post-petition A/R.  And we'll let

2  552 do what Congress intended it to do.  We will disassociate

3  ourselves and divorce ourselves from this pre-petition lender

4  that seems intent on liquidating us for its sole benefit.

5          The only thing I'm asking under 552 today, Your

6  Honor, and it's not a Cadillac job that was done all night.  I

7  want to thank my team for doing it.  It's the cafeteria

8  operators and 552(b).  The sand is their collateral.  When we

9  sell the sand, it will be cash collateral unless the Court

10  applies the equities-of-the-case exception, which I'm asking

11  you to apply.  Your Honor will hear that that sand has no value

12  unless it's mined, heated, filtered, transported, certified,

13  sold, et cetera, et cetera, et cetera.

14          THE COURT:  Turned into frac sand.

15          MR. RUKAVINA:  Yeah, exactly.  Now, do we have to

16  compensate the lender for that?  Maybe, but just do simple math

17  with me.  If the sand is worth at least -- if there's at least

18  50 million tons, then one ton is 150 million.  That's twice the

19  size of the debt.  That means that it's 50 cents a ton.

20          In other words, if the Court, and maybe not today,

21  but I do understand that the Court might say, well, Debtor, you

22  have a depleting asset and you should pay as adequate

23  protection for depletion of that asset.  Well, that's 50 cents

24  a ton, if we just do the math.

25          But that's maybe not even a today issue.  What I'm

1   telling Your Honor is that under 552(a) and 552(b), a lot of

2   the collateral that we're proposing to pledge is not even going

3   to be subject to the pre-petition lender's lien if that lien is

4   valid.  And then we're asking to prime the land where you're

5   going to hear there's massive equity value.

6          Your Honor, with that --

7          THE COURT:  Wait, let me take a step back then.

8   You're seeking to prime on the real estate?

9          MR. RUKAVINA:  Yes.

10          THE COURT:  Did I misunderstand your proposed form of

11   order or has it changed?

12          MR. RUKAVINA:  I think Your Honor misunderstood it.

13          THE COURT:  Okay, just give me a moment.

14      (Pause)

15          MR. RUKAVINA:  It'll be Paragraph H.

16          THE COURT:  I thought it was before that.  Just give

17   me one moment.

18      (Pause)

19          THE COURT:  All right.  Well, perhaps it was a

20   misconception on my part.  I do see what you're showing me in H

21   as well, but I thought I -- and maybe it was more with respect

22   to lien.  So in any event, we'll let the evidence do its thing.

23          MR. RUKAVINA:  Thank you.  And again, that concludes

24   my opening.

25          THE COURT:  Okay.

```
 1            MR. RUKAVINA:  Once the other parties have spoken, I
 2    would ask Mr. Jaksa with the Court's permission to address the
 3    hopefully non-controversial motions and then I will return with
 4    live testimony on what we're all here for today, the priming.
 5    Thank you.
 6            THE COURT:  All right.  Thank you very much,
 7    Mr. Rukavina.
 8            Is there anyone else who wishes to make an opening
 9    today before we turn to the actual motions?
10            MR. LEMMON:  Your Honor, Steve Lemmon for the lender.
11    I'd like to make an opening.
12            THE COURT:  Please.
13            MR. LEMMON:  Your Honor, this is a very unusual case.
14    I think that you are going to hear that there are problems with
15    the reason that the Debtor filed this bankruptcy.  They're
16    going to tell you that because our clients or actually we hired
17    Harding Partners to come in and do a review to try to figure
18    out what was going on with the operation that they just assumed
19    that we were going to get a receivership.  That's an incorrect
20    assumption, but now they've hauled off and filed bankruptcy.
21            They filed this case and these first-day motions with
22    no declaration.  They only just recently filed the budget.  The
23    testimony, Your Honor, you're going to find that there are
24    giant problems with this budget.  There's no creditors'
25    committee that has been appointed and there are no docs
```

1   proposed in connection with this Debtor-In-Possession loan.

2   They simply want the court order to suffice.

3          There is -- I will tell you, Your Honor, there are

4   other problems with the other motions.  There are problems with

5   critical vendor list.  There are problems with the payroll

6   list.  And I will tell you also, Your Honor, that the existing

7   lender who I represent objects strenuously to being primed in

8   any way and is willing to fund an ordinary DIP loan.  And so

9   there is not going to be any showing that this veteran really

10  went out and shopped this DIP loan.  And I will tell you that

11  my clients would meet the terms they've proposed.  And so this

12  is simply an incorrect procedure at this point.

13         THE COURT:  All right.  Well, thank you very much,

14  Mr. Lemmon.  I appreciate it.

15         Anyone else wish to be heard by way of opening?

16         MR. TAYLOR:  Your Honor, Mark Taylor, if I may?

17         THE COURT:  Mr. Taylor?

18         MR. TAYLOR:  Yes, Your Honor.

19         Mark Taylor.  Can you hear me?

20         THE COURT:  Yes, I can.  Thank you.

21         MR. TAYLOR:  (Indiscernible) comments.  So my

22  clients, one of my clients is an existing lender and equity

23  holder, not lender, part of the lender group.  There is only

24  one lender.  And then he was speaking with the Debtor about

25  also doing a DIP loan.  He talked to me late in the day.  I

1    started looking into it.

2           First thing that Mr. Rukavina failed to tell you is

3    that he failed to disclose to my client and the Debtor failed

4    to disclose to my client that they intend to sue the senior

5    lending group in which he is a participant.  So they wanted him

6    to make a loan and then turn around and sue him.  And given

7    that some of the loan was going to be used to pay appraise

8    fees, at least a retainer, they were going to use his money to

9    use to sue him or to sue the lender group.  But that was

10   unacceptable.   That was not disclosed.  My client only found

11   it out when I started digging into this case.

12          Secondly, Your Honor, although my client is a

13   sophisticated businessman, he's not a sophisticated DIP lender.

14   But again, I started looking at it and realized that what you

15   would expect for a million-five initial DIP plus an additional

16   amount to be funded later was not the place.  There's no DIP

17   credit agreement.  There are no normal controls that you would

18   see in a DIP loan for disbursements and control over

19   disbursements.  There are no milestones set forth that the

20   Debtor has to meet.

21          Essentially, it's a lend me $1.5 million and we'll

22   work out the details later, trust me.  And that is not a proper

23   DIP loan in this type of a proceeding.  I would be shocked if

24   Mr. Rukavina, if he was representing a DIP lender, would let

25   his client enter a DIP loan on those terms.  So, Your Honor, it

1   was really a situation where the Debtor was moving very

2   quickly.  They actually suggested that my client use Mr. Jobe

3   who apparently has some connection with Mr. Rukavina or the

4   Debtor to try to get this deal done quickly.  He was hotboxed

5   and he was not given material facts that would have made a

6   significant difference in his decision-making process about

7   whether to fund the loan.

8          So to the extent Mr. Rukavina or the Debtor want to

9   conduct a Rule 2004 examination, we're happy to do that.  And

10   it's going to show exactly what I said, Your Honor.  Thank you

11   for your time.

12          THE COURT:  All right.  Thank you very much,

13   Mr. Taylor.

14          Is there anyone else who wishes to be heard by way of

15   opening?

16      (No audible response)

17          THE COURT:  All right.  Hearing no further responses.

18   One thing that I'll ask of the Debtor, Mr. Rukavina, unless

19   I've missed them, I didn't see any resolutions attached to the

20   petition, especially if there's any issue with respect to -- I

21   don't know if the ability to bring the case is going to be an

22   issue.  I've heard it's locked.  I know you're going to need to

23   move it up.  I've heard it's locked.  So it would have to be

24   unlocked to move it up.

25          MR. RUKAVINA:  It's okay.

```
 1              THE COURT:  Okay.

 2              MR. RUKAVINA:  Your Honor, we can file those right

 3   after this Court.

 4              THE COURT:  Okay.

 5              MR. RUKAVINA:  I have resolutions from the board.

 6              THE COURT:  Okay.  So let's get those on file.  And

 7   so with that, we'll begin --

 8              MR. RUKAVINA:  Well, it sounds like there's going to

 9   be substantive objections to the motion.  So perhaps I'll just

10   handle it and not Mr. Jaksa, if that's what Mr. Lemmon is

11   telegraphing to the Court.

12              THE COURT:  Well, I mean, however you've prepared.

13   You've appeared before me enough times.  I mean, I'll allow you

14   guys to ham-and-egg it, so to speak.  I mean, to the extent

15   that you believe that by virtue of the contest that you need to

16   assist in the presentation, I'll allow that and allow Mr. Jaksa

17   to do the greater part.  Or if you --

18              MR. RUKAVINA:  No, I'll just --

19              THE COURT:  -- if you wish to do it, that's fine.

20              MR. RUKAVINA:  I'll just do it and I'll call John

21   Nelson --

22              THE COURT:  Okay.

23              MR. RUKAVINA:  -- with Your Honor's permission.

24              THE COURT:  Okay.  Do you want to do -- you call your

25   witness before we do joint admin?
```

```
 1              MR. RUKAVINA:  Oh, I apologize, Your Honor.

 2              THE COURT:  See, Mr. Jaska was going to get that

 3   done.

 4              MR. RUKAVINA:  Go ahead.  Why don't I proffer

 5   Mr. Nelson's testimony?  If I may?

 6              THE COURT:  Okay.

 7              MR. RUKAVINA:  On the joint admin and then we'll go

 8   live on the balance.

 9              THE COURT:  Okay.  Is there anyone who has an

10   objection to the proffer of the witness's testimony for joint

11   administration only?

12              MR. LEMMON:  Your Honor, we have not seen the

13   proffer, but I don't have a problem with testimony being

14   proffered in support of the joint administration.

15              THE COURT:  Okay.  And I recognize that there is no

16   first-day declaration that the -- and I also recognize that we

17   very often see first-day decs in our complex cases these days,

18   but they're certainly not a requirement of the Court.

19              So let's go ahead with the proffer.  If you could

20   give me the spelling and everything of his name, and then we'll

21   do that and then we'll go forward from there.

22              MR. RUKAVINA:  Regular John, J-O-H-N.  Nelson.

23              THE COURT:  All right.

24              MR. RUKAVINA:  N-E-L-S-O-N.

25              Your Honor, if called to testify, Mr. Nelson will
```

1    testify that he is an officer and owner and manager of the

2    Debtor, that being FCI Sand, that FCI Sand wholly owns FCI

3    South, that there is a great commonality of creditors, and that

4    joint administration is in the best interest of the estate

5    because it's going to promote efficiency.  That will end his

6    proffer.

7              THE COURT:  All right.  Thank you very much.

8              Mr. Nelson, if you could raise your right hand for

9    me.

10                 JOHN NELSON, DEBTORS' WITNESS, SWORN

11             THE COURT:  Thank you very much.  Were you able to

12   hear the proffer that your counsel gave?

13             THE WITNESS:  Yes, ma'am.

14             THE COURT:  All right.  Do you agree with everything

15   that he said?

16             THE WITNESS:  Yes, ma'am.

17             THE COURT:  All right.  Do you have anything to

18   change or to amend?

19             THE WITNESS:  No, ma'am.

20             THE COURT:  All right.  Thank you very much.

21             Is there anyone who wishes to cross-examine

22   Mr. Nelson with respect to joint administration only?

23        (No audible response)

24             THE COURT:  All right.  Hearing no takers, is there

25   anyone else who wishes to be heard with respect to joint

1    administration?

2         Ms. Young, did you have an opportunity to review the

3    form of order?

4         Mr. Nelson, she's going to come up behind you.

5         THE WITNESS:  Oh, pardon me.

6         MS. YOUNG:  Thank you, Your Honor.

7         I have reviewed the form of order.  It does appear to

8    be the standard form order.  I don't believe there's any

9    amendments that need to be made to the form of joint

10   administration order.

11        THE COURT:  Okay.  Thank you very much.  So with

12   that, I know that it's been uploaded.  And again, no one else

13   has anything to add with respect to joint admin?

14       (No audible response)

15        THE COURT:  All right.  Hearing no takers, I'm going

16   to go ahead and sign that order.  I think the last case that

17   our Clerk of Court had to jointly administer was like 225

18   Debtors.  I think they'll appreciate the one.  Probably won't

19   require the same size team.  Oh, excuse me.  It was corrected.

20   It was 299 Debtors that were jointly administered.  So I think

21   we've got this one handled.  But I do appreciate you guys

22   allowing me to do that.

23        MR. RUKAVINA:  Remind me to send you that style of a

24   pro se that sued like entities. One of them was coordinates on

25   the map.

1        THE COURT:  Oh, I love that.

2        MR. RUKAVINA:  Your Honor, may I approach with

3  exhibits?

4        THE COURT:  Yes, please.

5        MR. RUKAVINA:  It began with George Bush as a time

6  traveling minister of voodoo, and it ended with he had an

7  ingrown toenail in prison.

8        May I begin, Your Honor?

9        MR. RUKAVINA:  Yes, please.

10                   DIRECT EXAMINATION

11  BY MR. RUKAVINA:

12  Q    What's your name, sir?

13  A    John Rich Nelson.

14  Q    And are you familiar with FCI Sand and FCI South?

15  A    Yes, sir.

16  Q    How so?

17  A    I am one of the founders, one of the principals, and also

18  was the acting plant manager.  And I've been in charge of all

19  the construction and development.

20  Q    Okay.  You're not a professional witness, right?

21  A    No, sir.

22  Q    This is a little new and intimidating to you, isn't it?

23  A    Yes, sir.

24  Q    Okay.  What is the business of the Debtors?

25  A    We mine, process, dry, and produce frac sand for the frac

```
1   sand industry.

2   Q    Do the Debtors own any land?

3   A    Yes, we have 187 acres.

4   Q    That's at FCI Sand?

5   A    Yes, sir.

6   Q    And what about FCI South?

7   A    There's 32 acres at FCI South.

8   Q    Are there, in addition, some mineral leases?

9   A    Yes, there's approximately 2,200 acres, roughly, of

10  royalty leases.

11  Q    And whereabouts are these mines, or whatever they're

12  called?  Are they mines?  Is that what they're called?

13  A    They're just property.  The 1,400 acres is contiguous to

14  the existing plant.  There's another 600, roughly, acres that

15  is down the road.

16  Q    But geographically, in this state, whereabouts are we?

17  A    It is the Eagle Ford, South Texas, Pleasanton area, to be

18  exact.

19  Q    Is that important for customers?

20  A    Yes, it is right in the heart of where the fracking is

21  going on.

22  Q    And that's important because there's less transport costs?

23  A    Yes, we have a logistical advantage over all of the

24  competitors.

25  Q    And I think you answered my question.  The sand is used
```

Nelson - Direct/Rukavina

1   primarily in fracking?

2   A     Yes, sir.

3   Q     Is it quality sand?

4   A     Yes, our sand is the finest in the Eagle Ford.  We're 99

5   percent pure quartz.  We have the lowest turbidity, which is

6   the cleanliness of the sand.  And we have one of the highest

7   crush factors.

8   Q     In addition to the land and mineral leases, do the Debtors

9   own improvements?

10  A     Yes, sir.

11  Q     Can you explain what those are to the Court?

12  A     Yes, our initial plant was that we started three years

13  ago.  We put almost $9 million into building the initial plant.

14  Just recently, we completed doing a three-million-ton-a-year

15  expansion to increase our output.  And then we also acquired

16  the FCI South in December, which has a 400-ton-an-hour dryer

17  and about $19 million worth of improvements.

18  Q     What does the sand sell for?

19  A     That fluctuates in the market.  When we started off, it

20  was 49 to 52.  It usually ranges around mid-thirties.  Right

21  now, with the third quarter being a lull, it's closer to 27,

22  twenty -- we're told by our customers, if we can be in the 25

23  range, then they'll increase --

24  Q     That's dollars per ton?

25  A     Yes, sir.  Sorry.

1   Q     And who are your customers?

2   A     Conoco Phillips.  We were the first -- or first direct

3   supplier to Conoco Phillips in the industry.  We secured that

4   agreement.  We're in a test run, I should say.

5   Q     What other customers?

6   A     We have EOG, Liberty, BPX.

7   Q     Are these large multi-billion-dollar international

8   companies?

9   A     Yes, sir.

10  Q     Are they credit risks?

11  A     No, sir.

12  Q     In order to sell the sand, do the Debtors have to do

13  something to it?

14  A     Yes, sir.  We have to mine it.  We have to wash it.  Let

15  it dry, dry it again, screen it, and then put it in the silos

16  to load the trucks with.

17  Q     Is anyone going to buy the sand just as it is on the

18  ground?

19  A     No, sir.

20  Q     Okay.  This is sand on the ground, right?

21  A     Yes, a lot of it.

22  Q     How much?

23  A     We have at least 50 million tons available to us.

24  Q     And how deep is that?

25  A     We only cored to 50 feet.  That was as deep as it was.  In

1    some areas, it's exceeded that.  There was sand all the way to

2    the bottom.

3    Q    So it's going to be more than 50 million tons?

4    A    Hopefully, yes.

5    Q    And did you have a professional engineer confirm that?

6    A    We confirmed 475 of the 22 -- roughly 475 acres of the

7    2200.  And it had 19 million tons.

8    Q     Nineteen or twenty-four million tons?

9    A    Twenty-four million after sellable product.  After it's

10   washed, it was 19 million.

11   Q    So you take that 400-plus acres and you multiply it across

12   the couple thousand acres.  That's how you get to at least 50

13   million tons?

14   A    Yes, sir.

15           MR. LEMMON:  Excuse me, Your Honor.  Your Honor, may

16   I object?  This testimony is hearsay to the extent that he's

17   relying on estimates that were prepared by other parties.  I'm

18   sorry, I was trying to get in my objection.

19           MR. RUKAVINA:  He's not testifying on hearsay.

20   Hearsay is an out-of-court statement.  He's telling you his

21   understanding, as the owner of the company, how much sand they

22   have.  It's the same as me telling you how many employees I

23   have at my firm.  We are not offering -- we do have a reserve

24   report.  We're not going to offer it today.  He did not tell --

25   he did not say what anyone told him.

 1              MR. LEMMON:  Your Honor, he's repeating the

 2    information in the reserve report, which is one of the

 3    exhibits.  And simply repeating the information in the reserve

 4    report does not mean that he has personal knowledge of what's

 5    in the ground there.  We object to this testimony.

 6              THE COURT:  All right.  I'm going to overrule the

 7    objection.  I have listened closely.  He has not testified as

 8    to something that he's read, he's heard, or otherwise.  Now,

 9    you're well within your rights to cross-examine him as to the

10    extent of his knowledge.  However, I'm going to overrule your

11    objection as to hearsay.

12              Please proceed.

13              MR. LEMMON:  Thank you.

14              THE COURT:  You're welcome.

15    BY MR. RUKAVINA:

16    Q    So we've talked about the sand.  I want to go now to the

17    real estate and the physical plants, the improvements.  What do

18    you understand the fair market value of that to be?

19    A    A fair market value is north of a hundred million.

20    Q    Did the Debtor sell the FCI sand, sell equity earlier this

21    year?

22    A    Yes, sir.

23    Q    Approximately how much equity?

24    A    This year, seven -- around seven million roughly.

25    Q    To how many people?

```
 1   A    About four, four to five people.

 2   Q    To your understanding, are these very sophisticated, very

 3   wealthy people?

 4   A    Yes, sir.

 5   Q    And at what valuation of the Debtor sell equity at?

 6   A    A hundred million.

 7   Q    And that was accepted by the buyers?

 8   A    Yes, sir.

 9   Q    Do you feel that that was a market analysis?

10   A    Yes, sir.

11   Q    No funny business?

12   A    No, sir.

13   Q    No insiders?

14   A    No, sir.

15   Q    These were third parties that purchased debt of their own

16   will at $100 million -- I'm sorry, equity at $100 million

17   valuation just this year?

18   A    Yes, sir.

19   Q    And we're talking about the $26 million debt today, right?

20   It's about 26 million and change?

21   A    Twenty-six and a half, yes, sir.

22   Q    Twenty-six and a half.  Where did that money go?

23   A    That went to capital improvements on the plant.  Adding

24   the second -- whole second facility, the new load outs.

25   Q    Do you feel like that's worth at least the 26 million that
```

```
 1  was spent?

 2  A    It's at least double that.

 3  Q    Give the Judge some understanding of when we're operating

 4  -- in other words, not when we had the lull this summer -- how

 5  much sand on a daily basis or a weekly basis we sell?

 6  A    With the old plant, we had it maxed out at 100 tons an

 7  hour.  We were doing 22 to 24 hundred tons a day when it wasn't

 8  breaking down.  And --

 9  Q    That's about $100,000 a day?

10  A    Yes, sir.

11  Q    Okay.  And do you feel like you're going to be doing that

12  soon?

13  A    Yes, sir.

14  Q    We'll talk about the budget in a little bit.  I think I

15  asked you already that no one's going to buy that sand as it is

16  and just laying on the ground, right?

17  A    No, sir.

18  Q    And you mentioned that the Debtor has to do something to

19  get it in a saleable fashion, right?

20  A    Yes, sir.

21  Q    I think you mentioned, I'm going off memory, but cleaning

22  it, mining it, all that jazz, right?

23  A    Yes, sir.

24  Q    Does the Debtor have employees to do that?

25  A    Yes, sir.
```

Nelson - Direct/Rukavina

1   Q    Does the Debtor depend on those employees?

2   A    Yes, sir.

3   Q    Can a Debtor operate without those employees?

4   A    No, sir.

5   Q    What about utilities?

6   A    Yes, we have to outsource all of our utilities.  There's

7   no line power.  There's no line gas.  We use third party to

8   provide our gas, which they have to be paid on a --

9   Q    And that's a lot for this business, right?

10  A    It's 110,000 every two weeks.

11  Q    What about transportation?

12  A    The mining companies -- or sorry, the customers deal with

13  all the transportation.

14  Q    Insurance?

15  A    The insurance is --

16  Q    Is this a regulated business, by the way, by a federal

17  branch?

18  A    Yes, sir.  It's regulated by MSHA.

19  Q    Say that again.

20  A    MSHA.

21  Q    Enunciate.

22  A    MSHA, Mining Safety and --

23  Q    Okay.  Can you operate without insurance?

24  A    No, sir.

25  Q    Okay.  So if you don't have employees and insurance and

1  utilities, what happens to the business?

2  A    It goes under real quick.

3  Q    Why?

4  A    It's not a business.  It's --

5  Q    Well, will your customers shop somewhere else?

6  A    They will leave.

7  Q    Do you have competition?

8  A    They will leave within minutes.

9  Q    Do you have competition?

10  A    Yes, sir.

11  Q    Has it taken a while for you to get this customer book and

12  this reputation and respect?

13  A    It's been very challenging to earn this customer and our

14  clientele, and we've had to prove ourself with this new plant,

15  with all the previous breakdowns of the existing plant.

16  Q    When is payroll due?

17  A    Every --

18  Q    When?  Just say the day.  Say the day.

19  A    Every Friday.

20  Q    Is that today?

21  A    Yes.

22  Q    Go to Exhibit 17 in your binder, please.  In your binder.

23  A    Oh, sorry.

24  Q    Exhibit 17.

25          THE COURT:  While he's turning to that, Mr. Rukavina,

1    Mr. Jaksa, Mr. Petree, Ms. Harden is going to reach out to you

2    with respect to the form of the order.  There's one little nit

3    that she needs you to correct and re-upload it.

4            MR. RUKAVINA:  Can you do it right now?

5            THE COURT:  Thank you very much.

6            Yeah, I figured one of them could probably get it

7    done.  Thank you.

8    BY MR. RUKAVINA:

9    Q    Did you participate in preparing Exhibit 17?

10   A    Yes, sir.

11   Q    Is this a list of payroll payable today?

12   A    No, sir, we --

13   Q    Well, what is this then?

14   A    Pardon me?

15   Q    What is this?  This is your chart.

16   A    Correct.  This --

17   Q    Has my office changed it?

18   A    This is the payroll from Monday until Thursday, yesterday.

19   Q    That's what I mean.  It's due and payable to the employees

20   today, right?

21           THE COURT:  All right, Mr. Rukavina, since the folks

22   online don't necessarily have the benefit of a paper exhibit,

23   could you give them a docket reference?

24           MR. RUKAVINA:  In my binder, there's no banner on the

25   top of the exhibit.  It's going to be Exhibit 17, Your Honor.

1    Do you have them as filed?

2              THE COURT:  If you just give me a minute.

3              MR. RUKAVINA:  No banner here.  Your Honor, it's

4    Docket 14.

5              THE COURT:  I think it's going to be --

6              UNIDENTIFIED SPEAKER:  It's Docket Number 14.

7              THE COURT:  You can find it at Docket 14.  And I

8    think it's the final exhibit on Docket Number 14.

9              Okay, thank you.

10   BY MR. RUKAVINA:

11   Q    This, just to lead you a little bit, because it's taking

12   more than it should, these are the people that are owed money

13   for pre-petition wages today, right?

14   A    Yes, sir.

15   Q    Okay.  They're all below the priority limit under the

16   Bankruptcy Code of $15,000 and change, right?

17   A    Yes, sir.

18   Q    If these people aren't paid, are you worried that they're

19   going to leave?

20   A    Yes, they will quit.

21   Q    Do you have experience with that?

22   A    Yes.

23   Q    Are any of these insiders?

24   A    No, sir.

25   Q    Okay.  And they've earned this wage?

Nelson - Direct/Rukavina

```
 1  A    Yes, sir.

 2  Q    Now, what about vendors?

 3  A    We -- yes, sir.

 4  Q    Are you familiar with the concept of critical vendors?

 5  A    Yes, sir.

 6  Q    Okay.  And we have a chart of that somewhere, as well.  Or

 7  is that in the motion?

 8       MR. RUKAVINA:  Your Honor, I apologize.  Mr. Jaksa

 9  was going to handle this, so I'm doing it on the fly.

10       THE COURT:  I tried.

11       MR. RUKAVINA:  I know, I know.  But counsel said

12  there's going to be substantive objections, so that's fine.

13       THE COURT:  I understand.  I understand.  I believe

14  if we go to the critical vendors Docket Number 6, there is a

15  chart in there at Page 5.  And then I believe it's also

16  attached to the form of order.  So that's Docket Number 6-1.

17  BY MR. RUKAVINA:

18  Q    Just to clarify, you and Mr. Collier are on Exhibit 17

19  owed pre-petition wages, right?

20  A    Yeah, I believe so.

21  Q    Okay, so you might --

22       MR. RUKAVINA:  They are insiders, Your Honor.  So I

23  just wanted to correct.

24       THE COURT:  Who's that?

25       MR. RUKAVINA:  That Mr. Nelson and Mr. Collier, the
```

 1  │ other director and officer, so they would be insiders.  I

 2  │ believe that they are on Exhibit 17.  So I just wanted to

 3  │ correct the record.

 4  │            THE COURT:  Okay, thank you.

 5  │            THE WITNESS:  Yes, sir.

 6  │            THE COURT:  So Nelson --

 7  │            THE WITNESS:  And Collier.

 8  │            THE COURT:  -- and Collier are each insiders.  But

 9  │ the Court would note that each of the amounts are below the

10  │ $15,000-and-change cap.

11  │ BY MR. RUKAVINA:

12  │ Q    Sir, do you see that chart in front of you?

13  │ A    Yes, sir.

14  │ Q    What is that?

15  │ A    These are the list of critical vendors that we comply --

16  │ comprise.

17  │ Q    And did you go over that with our proposed financial

18  │ advisor, Mr. Michael Roberts?

19  │ A    Yes, sir.

20  │ Q    And what kind of things did you look at?  First of all,

21  │ these are pre-petition amounts owing to these vendors?

22  │ A    A portion of their --

23  │ Q    A portion.

24  │ A    -- pre-petition, yes.

25  │ Q    And do we dispute that that money is owed?

```
1    A     No, sir.

2    Q     They provide a good example of services pre-petition?

3    A     Yes, sir.

4    Q     Okay.  So what kind of methodology did you with

5    Mr. Roberts apply in deciding to put this list together?

6    A     What would keep the plant running to be able to generate

7    revenue?

8    Q     And are these vendors replaceable?

9    A     No, sir.

10   Q     Okay.  And have they, in fact, the propane people, have

11   they already threatened to cut us off if they don't get paid at

12   least some of their pre-petition amounts?

13   A     Yes, they were in the process of cutting us off yesterday.

14   Q     So what does DGTRZ Auto Nations (phonetic), what do they

15   do for us?

16   A     He is the electrician that's finishing up the electrical

17   of the new plant.

18   Q     Why not just get another electrician?

19   A     It would be detrimental for having to figure out the

20   entire electrical to keep it running.

21   Q     It would take a long time?

22   A     Yes, it would be very costly.

23   Q     Would it cost more?

24   A     Very costly, yes.

25   Q     And does that benefit the lender's collateral, getting
```

1   that electricity, wiring done?

2   A      Yes.

3   Q      Okay.  JMN Enterprises, what is that?

4   A      They're in the process of fixing the damaged silo.

5   Q      Okay, tell me about that damage.

6   A      During the rainstorm, I believe it was in end of June,

7   early July, the chute to the silo got clogged up causing the

8   sand overflow to our second silo, causing it to collapse.  So

9   now we are down to one silo.  We're in the process of doing a

10  temporary repair to get that second silo usable.

11         Then the reason that's important is our customers, as you

12  can imagine, don't like to wait.  So with Conoco or EOG,

13  anytime their trucks are sitting at our facility longer than 15

14  minutes, they automatically get rerouted to another supplier.

15  Q      And you lose that --

16  A      And we lose that.  And getting them back is very

17  challenging.

18  Q      Can you just replace JMN Enterprises with someone else?

19  A      It would, again, be very costly and take a lot longer.

20  Q      And would you lose a lot more than $125,000 in revenue?

21  A      Absolutely.

22  Q      Okay.  Rango Inc., what do they do?

23  A      They are our mining contractor.

24  Q      What does that mean?

25  A      They do all of our mining.  They dig up all the sand and

1   bring it up to the wet plant.

2   Q    Can they be replaced?

3   A    Yes, but again, it would be very -- they have millions of

4   equipment that they use on a --

5   Q    Millions of dollars of equipment?

6   A    Millions of dollars of equipment that they use on a daily

7   basis.

8   Q    Is this large equipment?

9   A    This is very large equipment.

10  Q    Does it require time to stage?

11  A    Yes, sir.  Some of the --

12  Q    What about transportation?

13  A    Yes, sir.  Some of the excavators take three days to put

14  together.

15  Q    So if you had to replace Rango, how long would it be

16  before you could get someone else there to mine?

17  A    I would -- best case, weeks.

18  Q    And again, you're talking about several thousand tons,

19  $100,000 a day of lost revenue?

20  A    Yes, sir.

21  Q    Okay.

22  A    Stabilis?

23  Q    Just wait until you have to get reading glasses.  It

24  sucks.  Stabilis, what are they?

25  A    Stabilis is our gas supplier, our liquid propane.

1  Q    Do we owe them a lot more than that amount?

2  A    We do, yes.

3  Q    And have they agreed to take this lower amount in exchange

4  for continuing post-petition delivery of propane?

5  A    Yes, sir.

6  Q    Is that propane critical?

7  A    Absolutely.  We cannot dry sand without it.

8  Q    Can you buy propane from someone else?

9  A    Yes, but they provided the whole propane setup system.  So

10 they would have to rip out their system and bring in -- someone

11 else would have to bring in a new system.

12 Q    The tanks, the piping, the computers, electronics, that's

13 all --

14 A    The vaporizer, yeah, correct.

15 Q    Is that standard?

16 A    Yes, sir.

17 Q    And is that part of how they get you to buy their propane?

18 A    Exactly, yes, sir.

19 Q    And William -- what is it?

20 A    McAda?

21 Q    Macda?

22 A    William McAda.

23 Q    What is that?

24 A    They are our royalty -- they are our land next to us that

25 we are getting the sand off of.  And if we do not pay them, we

1  could lose that royalty and not have sand.

2  Q    So that's a long-term contract that we are going to,

3  that's a long-term lease that we're going to assume?

4  A    We currently are --

5  Q    You're currently mining?

6  A    We're currently mining, yes.  And this is for past revenue

7  for the sand we've already previously mined.

8  Q    Got it.  So it is a pre-petition debt?

9  A    Yes.

10 Q    Now if we talk about insurance, what kind of insurance

11 does the Debtor or do the Debtors have?

12 A    We have a general liability excess --

13 Q    Oh, by the way, on this list of creditors, are any of

14 those insiders?

15           THE COURT:  The critical vendors.

16 BY MR. RUKAVINA:

17 Q    The critical vendors, the one we're just looking at?

18 A    JMN Enterprises is a sister company of mine.

19 Q    Okay.  That's the one that provides the --

20 A    The silo repairs.

21 Q    Okay, yeah.  Other than that, are any of those insiders?

22 A    No, sir.

23 Q    Okay.  You and Mr. Collier don't own interest in any of

24 those?

25 A    No, sir.

1   Q    Okay.  And even though it's a sister company of yours, it

2   is actually effectuating repairs today on that silo?

3   A    Yes, sir.

4   Q    Okay.  And is it earning -- I mean, is there any funny

5   business there?

6   A    No, sir.

7   Q    All above board?

8   A    Absolutely.

9   Q    Market terms?

10  A    Yes, sir.

11  Q    Okay.  Now I'll go to the insurance?  What kind of

12  insurance do the Debtors maintain?

13  A    We maintain general liability, excess workers comp, inland

14  marine, health, life.  I believe I'm covering everything.

15  Q    The liability and property insurance, et cetera, is that

16  premium finance?

17  A    Yes, sir.

18  Q    Okay.  And is that about $12,000 a month?

19  A    Yes, sir.

20  Q    And if we lose insurance, what happens?

21  A    We cannot operate.

22  Q    Okay.  Is that premium finance or an insider?

23  A    No, sir.

24  Q    Is it market terms?

25  A    Yes, sir.

1   Q    Okay.  Now let's talk about the budget, which is in

2   Exhibit 3 in your binder, please.  Well, actually, go ahead and

3   pull up Exhibit 3, and I'm going to ask you to go back to the

4   DIP loan just a little bit here.  I'm sorry, I'm taking you a

5   little bit out of order here.

6        Did we try to get -- so you're familiar with GrayStreet?

7   A    Yes, sir.

8   Q    Is the principal here today?

9   A    Yes, sir.

10  Q    Okay.  Did we try to get a DIP loan from anyone else?

11  A    Yes, sir.

12  Q    How many entities?

13  A    GrayStreet would be number four.

14  Q    Okay.  And did you and I meet with others pre-petition

15  that declined to extend any credit?

16  A    Yes, sir.

17  Q    Even on a priming basis?

18  A    Yes, sir.

19  Q    And then was there another proposed DIP lender yesterday

20  that we thought had agreed to do it?

21  A    Yes, sir.

22  Q    And that would be the Sterling entity?

23  A    Yes, sir.

24  Q    Okay.  So we have tried to shop around for a DIP?

25  A    Yes, sir.

1    Q    And are you familiar that the pre-petition lender offered

2    this morning to be our DIP lender?

3    A    Yes, sir.

4    Q    What conditions did they have?

5    A    That they remove us as operators, kick us out of the

6    business and take over.

7    Q    Appoint three board members?

8    A    Yes, sir.

9    Q    Why wouldn't you agree to that?

10   A    Then that's basically what they're trying to do with

11   forcing us not to -- they're forcing us out of our business.

12   A    Are you concerned that they would not be interested about

13   the employees and unsecured creditors and other creditors?

14   A    No, sir.  They wanted -- or, yes, sir. They wanted to

15   basically furlough some people.  They wanted to chop down some

16   of our vendors and not -- basically, cut down their rates.

17   Q    In any event, it was your business decision that the terms

18   proposed were unacceptable to the estate?

19   A    Yes, sir.

20   Q    And pursuant to your fiduciary duties to the estate?

21   A    Yes, sir.

22   Q    And you understand that those duties compel you to look

23   after the interests of the creditors before you're on?

24   A    Yes, sir.

25   Q    Okay.  Has the Debtor attempted to pre-petition, obtain

1   new credit or post-petition new credit on an unsecured basis?

2   A    Yes, sir.

3   Q    And was that possible?  Did you succeed?

4   A    No, sir.

5   Q    Okay.  Has the Debtor tried pre -- post-petition to obtain

6   credit on what's called a super priority basis only without a

7   lien?

8   A    Can you repeat that?

9   Q    Yeah.  You know, I'm using bankruptcy terminology.  Is the

10  only -- the two lenders that have agreed to lend, right,

11  yesterday and today, did they both require a priming lien?

12  A    As far as I know, yes. Is that the only way on which any

13  of the lenders we spoke to would extend credit?

14  A    Yes, sir.

15  Q    None of them would extend credit based solely on super

16  priority, an unsecured debt in the case?

17  A    No, sir.

18  Q    Okay.  So now this budget, so are you aware that if the

19  Court, if agreeable to the Court, we're going to have a hearing

20  at the end of August, right?

21  A    Yes, sir.

22  Q    So that would be under this budget what we're going to

23  call the interim period, right?  Right?

24  A    Yes, sir.

25  Q    And we're asking for a DIP for the interim period, right?

```
1   A     Yes, sir.

2   Q     And how much would that DIP be?

3   A     1.3, roughly 1.3 million, I believe.

4   Q     If you don't get that today or tomorrow, is the Debtor and

5   the estate going to suffer immediate injury?

6   A     Yes.  It's --

7   Q     Is that injury going to be irreparable?

8   A     Yes, sir.  We're --

9   Q     Explain why the injury and why it would be irreparable.

10  A     I guess number one, the gas provider will cut us off.

11  Q     What happens then?

12  A     Then we cannot produce sand and our customers will leave

13  us.

14  Q     Okay.

15  A     And, again, getting them back will be very challenging.

16  Q     And can that plant just be shut down without a controlled

17  process where the equipment is slowly turned off and lubed up,

18  et cetera, et cetera?

19  A     No, sir.  It'll --

20  Q     It'll damage the equipment?

21  A     Yes.  It would be very challenging to get it back online.

22  Q     And if you can't pay employees?

23  A     They will leave and go somewhere else.

24  Q     Is this in the middle of nowhere, by the way?

25  A     Yes.  It's 45 --
```

1   Q    Is it easy finding employees?

2   A    It's very challenging to get employees and even more

3   challenging to get qualified employees.

4   Q    So if we look at -- now, first of all, did you participate

5   in preparing Exhibit 3?

6   A    Yes, sir.

7          MR. RUKAVINA:  Your Honor, I forgot to move to admit

8   Exhibit 17, please.

9          THE COURT:  All right.

10          MR. RUKAVINA:  I don't know that we need to.  It's a

11   demonstrative, but I would just move to admit Exhibit 17.

12          THE COURT:  All right.  Any objection to the

13   admission of the payroll exhibit, Exhibit 17?

14      (No audible response)

15          THE COURT:  Hearing no objection, 17 is hereby

16   admitted.

17      (Debtors' Exhibit Number 17 admitted into evidence)

18   BY MR. RUKAVINA:

19   Q    Did you participate with the proposed financial advisor,

20   Mr. Roberts, in preparing Exhibit 3?

21   A    Yes, sir.

22   Q    Based on your personal knowledge?

23   A    Yes, sir.

24          MR. RUKAVINA:  Your Honor, I move to admit Exhibit 3,

25   not for the truth of the matter asserted, but just as the

1   budget that we would ask the Court to approve.

2            THE COURT:  Any objection to the admission of the

3   budget, Exhibit 3?  And Exhibit 3, just give me one moment.

4   Just confirming that that's at the same docket reference.

5            Yes, also at Docket 14.  Any objections?

6       (No audible response)

7            THE COURT:  All right.  Hearing none, Exhibit 3 is

8   hereby admitted.

9       (Debtors' Exhibit Number 3 admitted into evidence)

10  BY MR. RUKAVINA:

11  Q    So let's talk about A/R.  Does the Debtor sell the process

12  and on credit, on terms?

13  A    Yes, sir.

14  Q    What are those terms?

15  A    Usually 60, you know, they claim 30 to 45, but it's more

16  like 60 is about an average.

17  Q    So you heard me explain to the judge that we're proposing

18  that we not use any of the pre-petition A/R or its proceeds,

19  but that we start from scratch, right?

20  A    Yes, sir.

21  Q    And so the $1.3 million that's at the beginning of the

22  budget, is that solely from the requested DIP?

23  A    Yes, sir.

24  Q    And then part of it is we need to tie us over until the

25  A/R starts hitting 60 days from now, is that correct?

```
 1   A    Yes, sir.

 2   Q    Now, these expenses under cash disbursements, what are

 3   those for, just generally?  Are these operating expenses

 4   necessary to mine, process, and sell the sand?

 5   A    Yes, sir.

 6   Q    What about general and administrative?

 7   A    Yes, that is our insurance and payroll.

 8   Q    Okay.  If we cannot pay these expenses under cash

 9   disbursements -- so I'm excluding Chapter 11 items, right, I'm

10   looking at cash disbursements and below.  If we cannot pay

11   these expenses during the interim period, the next four weeks,

12   what happens to the business?

13   A    It's detrimental to the business.  It'll shut down.

14   Q    What you talked about earlier about irreparable injury?

15   A    Yes, sir.

16   Q    That's fancy legalese for we're dead?

17   A    Yes, sir.

18   Q    And then what happens to the bankruptcy estate?  Do

19   creditors get paid?

20   A    No, sir.  It's -- I guess, going after the scraps, I

21   guess.

22   Q    So now, let's talk some more about the pre-petition

23   lender.

24        MR. RUKAVINA:  I don't think it's controversial, Your

25   Honor.  4, 5, 6, 7, 8, 9, 10, 11, 12, 13, these are lender
```

1   documents.  I'd move to admit Exhibits 5 through 13.

2           MR. LEMMON:  Your Honor, I haven't had a chance to

3   examine them, but I looked at them briefly, and so I don't

4   object to them being admitted for purposes of today's hearing

5   only.

6           THE COURT:  Okay.  Thank you.

7           MR. RUKAVINA:  So --

8           THE COURT:  Just one moment.

9           MR. RUKAVINA:  I apologize, Your Honor.

10          THE COURT:  Anyone else have any objection to the

11  admission of Exhibits 5 through, was it 13?

12          MR. RUKAVINA:  Yes, Your Honor.

13          THE COURT:  Thank you.

14      (No audible response)

15          THE COURT:  All right.  Hearing no objections, 5

16  through 13 are hereby admitted.

17      (Debtors' Exhibits 5 through 13 admitted into evidence)

18  BY MR. RUKAVINA:

19  Q    So, let's go back to the pre-petition lender, FCI-SLG,

20  right?  You know what I'm talking about when I say pre-petition

21  lender.

22  A    Yes, sir.

23  Q    And I think you mentioned that the 26 million plus was

24  obtained to build out the new plant.

25  A    Yes, sir.

1   Q    Have you been current -- was the Debtor current on this

2   obligation, monetary obligation prior to filing?

3   A    Yes, sir.

4   Q    And I think, well, I don't know if I asked you, did the

5   plant reduce capacity while plant number two was being built?

6   In other words, did the Debtor reduce its capacity?

7   A    Yes, sir.

8   Q    Talk about that.  Explain that to the Judge, please, when

9   it was and why that was and what happened.

10  A    We finalized the majority of the construction in April of

11  this year.  We started commissioning the new plant.

12  Commissioning normally takes three to four weeks. So, during

13  the commissioning portion of the new plant with our providers,

14  part of the contract was them commissioning it.

15       Our first plant, a major component of it broke.  The chain

16  and the drive of the dryer, which is the main item that dries

17  the sand, it broke.  It was going to be a $50,000 to $75,000

18  repair.  We thought that the new plant was going to be

19  commissioned here in the next week or so.  So, we made the

20  decision, us as in me and management, my plant manager, that we

21  would focus on all hands on deck on getting the new plant

22  online.

23  Q    Which was the idea all along anyway?

24  A    Yes.

25  Q    Did that backfire?

1    A    That did backfire.  It ended up taking 10 weeks for Tarmac

2    to commission their plant, which in turn made some of our

3    customers unhappy.  They went and found sand elsewhere.  And

4    then as we fixed all of our kinks and got everything online,

5    the market softened up a little bit.  The well, they were

6    drilling in different areas and it was a little domino effect.

7         And then in addition to that, we had the collapse of the

8    silo, which took us down to one lane, which also deterred some

9    of our customers because it was taking longer.

10   Q    That was because of the rain.  That wasn't anyone's fault.

11   A    It was -- correct.  It was from the rain.

12   Q    And insurance has covered it?

13   A    Yes, sir.

14   Q    And I think I told the Judge $150,000 of insurance money

15   is coming in.  Is that correct?

16   A    Yes, sir.

17   Q    And we're going to hold that and not spend it unless the

18   Court or the lender approved, right?

19   A    Yes, sir.

20   Q    Okay.  So, the things that you've discussed, did that lead

21   to any liquidity issues?

22   A    It turned into major liquidity issues, yes.

23   Q    And what did the Debtor do to try to address those

24   liquidity issues?

25   A    We did exactly what we've done throughout the year.  And

1    we started looking for people to sell shares to, to help carry

2    the cost through the downturn.

3    Q    Is those shares sold at $100 million valuation that you

4    testified about earlier?

5    A    Yes, sir.

6    Q    And what did the Debtor do with those proceeds?

7    A    We invested them right back into the plant.

8    Q    Did they go into your pocket or Mr. Collier's pocket?

9    A    No, sir.  At the beginning, a portion went into -- we were

10   putting half and half.  This was last --

11   Q    Your personal money?

12   A    Yes, sir.

13   Q    Okay.

14   A    And then this year, it's all been going into the company.

15   Q    And keeping the pre-petition under current?

16   A    Yes, sir.  And then in addition to that, we even sold some

17   other equipment that Kevin and I had, some real estate.  And we

18   even put that money into the company to keep it.

19   Q    But that wasn't Debtor -- that wasn't creditor collateral,

20   was it?

21   A    No, sir.

22   Q    That's some other entity or property?

23   A    Yes, sir.

24   Q    And what happened to you continuing to sell equity and

25   fund yourself going forward?

1   A    Yes.   So we were in the process of getting some buyers.

2   We had two different groups that were very interested and were

3   working on the final steps.  And that's when we were informed

4   by the senior loan group that we were not allowed to sell any

5   more shares.

6   Q    Then what happened?

7   A    We met with Mr. Ramming and --

8   Q    Well, first of all, who's Mr. Ramming?

9   A    Mr. Ramming is one of the partners and he's also --

10  Q    Former director, right?

11  A    He was a director.

12  Q    Equity owner, right?

13  A    Yes, sir.

14  Q    And who's he married to?

15  A    Cole Scott.

16        MR. LEMMON:  Your Honor, can I just ask that this

17  examination not be conducted solely by leading questions?

18        MR. RUKAVINA:  Who's Mr. Ramming?

19        THE COURT:  Could you get a little closer to the mic,

20  as well, Mr. Rukavina?

21        MR. RUKAVINA:  Who's Mr. Ramming?  That's not a

22  leading question, but I'll try to be better about it, Your

23  Honor.

24        THE COURT:  You tend to speed up.

25        MR. RUKAVINA:  I do.

1   BY MR. RUKAVINA:

2   Q    Who's Mr. Ramming married to?

3   A    Cole Scott.

4   Q    And who is Cole Scott in this whole matter?

5   A    She is in charge of the senior loan group.

6   Q    So the senior lender's agent is married to a former

7   director and equity owner?

8   A    Yes, sir.

9   Q    Did the lender take any other actions recently that gave

10  you concern?

11  A    Yes, sir.

12  Q    What did they do?

13  A    We met with them to discuss a revision to the payments on

14  the senior loan group.  To help us get through this to stall in

15  payments, which they had the right to call a vote on.  And it

16  would help us -- you know, that $400,000 would allow us to go

17  towards payroll and receivables and not get further in a jam

18  while we were in this slowdown area.

19       Then we met with them after they told us we weren't

20  allowed to sell shares and we had a line of credit lined up to

21  borrow money.  And if we could pledge it as a priming on the

22  lien, we were going to be able to borrow money to get through

23  this if -- since they weren't going to allow us to sell shares,

24  they shot that down.

25  Q    Did you ever factor any receivables?

Nelson - Direct/Rukavina

```
 1    A    Yes, we were factoring receivables.

 2    Q    What was the cost of that?

 3    A    Twenty -- roughly 22 percent.

 4    Q    And so you're still describing the liquidity crisis from

 5    this summer, right?

 6    A    Yes, sir.

 7    Q    What was the husband's name again?  Mr. Ramming?

 8    A    John Ramming, yes.

 9    Q    Does he hold any other debt?  First of all, is he part of

10    the senior secured group?

11    A    He is a Trustee of a trust that is part of it.

12    Q    Okay.  And does he also own some subordinated debt?

13    A    He also has loaned six million and some change to the

14    company.

15    Q    On a subordinated basis?

16    A    Yes, sir.

17    Q    So he's married to the collateral agent and he holds

18    subordinated debt?

19    A    Yes, sir.

20    Q    And senior debt?

21    A    Yes, sir.

22    Q    And equity?

23    A    Yes, sir.

24    Q    Okay.  So why did we file bankruptcy?

25    A    Oh, there was no other option.  We were going to -- number
```

```
 1   one, our gas supplier was going to cut us off as of yesterday.

 2   Our payroll was due yesterday.  That was -- we weren't going to

 3   be able to make that.  And there was just no other option to

 4   save all the jobs and to save the business.  It was our only

 5   resource.

 6   Q    Okay.  Do you believe that these revenue numbers on

 7   Exhibit 3 are reasonably achievable?

 8   A    Yes, sir.

 9   Q    Okay.  Are they based on past performance and anticipated

10   future performance?

11   A    No, sir.  On this budget, I stood solely on POs that we

12   had, written purchase orders that we had.  And I also reduced

13   the price on those purchase orders in case any of the

14   customers, you know, tried to negotiate us down even more.  I

15   wanted to be --

16   Q    When you say purchase orders, these are actual written

17   orders that the Debtors have?

18   A    Yes, sir.

19   Q    Okay.  And provided that we are able to produce that sand,

20   are you comfortable that that revenue will come in?

21   A    Yes, sir.

22   Q    So this is actually bird in hand right now?

23   A    Yes, sir.

24   Q    And if we don't spend these expenditures, what happens to

25   that revenue?
```

Nelson - Direct/Rukavina

```
 1   A     It is gone.

 2   Q     Okay.  Just one moment, Mr. Nelson, please.

 3         Let me make sure that I've covered my exhibits, sir.  Now,

 4   the pre-petition debt, what's the interest rate?

 5   A     The senior loan group?

 6   Q     Yeah.

 7   A     Fifteen percent.

 8   Q     And is there anything unusual about the maturity payment

 9   that has to be made at -- do you know what maturity of a note

10   means?

11   A     No, sir.

12   Q     When it's due.  When you have to pay it back.

13   A     Correct.  Okay.

14   Q     Is there anything unusual about this?

15   A     It is a one-year payback.

16   Q     So one-year amortization?

17   A     Yes, sir.

18   Q     And does anything in addition to the principal have to be

19   repaid at the end?

20   A     We have to -- well, we have to do a minimum of one and a

21   half times payback.  And then in addition, we have to pay

22   another one and a half of free cash flow so they get two and a

23   half times return on their investment.

24   Q     So it's not 26 million, it's north of 52?

25   A     It's closer to mid-60s, yes.
```

1  Q    And Mr. Ramming gets the subordinated note paid?

2  A    Yes, sir.  At a 15 percent.

3  Q    And if the lender gets to put its own directors in, do you

4  think that that's exactly what they're going to do?  They're

5  not going to challenge their own debt, are they?

6  A    No, sir.

7          MR. RUKAVINA:  Thank you.  I'll pass the witness.

8          MR. LEMMON:  Objection.

9          THE COURT:  All right.  Mr. Rukavina, before we pass

10 the witness, because again, this will be a question that the

11 Court will have, and I think it's predicate.  The budget as

12 it's proposed, does it include -- I'd like the witness to tell

13 me if it includes all of the amounts that are requested under

14 the first-day orders, critical vendors, insurance, and payroll.

15         MR. RUKAVINA:  It does.

16 BY MR. RUKAVINA:

17 Q    Will you confirm that?

18 A    Yes, ma'am.

19         THE COURT:  Okay.  Thank you very much.

20         MR. RUKAVINA:  Was that it, Your Honor?

21         THE COURT:  Huh?

22         MR. RUKAVINA:  Was that it?

23         THE COURT:  You know there'll be more, but --

24         MR. RUKAVINA:  Oh, I know.  I know.

25         THE COURT:  There'll be more, but I'm going to let

 1   everyone else ask their questions first.

 2           All right.  So first, I'll ask the parties and the

 3   witnesses, I'm going to put Mr. Nelson up for

 4   cross-examination.  Does anyone need a five-minute break, a

 5   convenience break before we continue?

 6           THE WITNESS:  No, ma'am.

 7           THE COURT:  Because I will keep going, and so anyone

 8   who needs a break is going to have to tell me.

 9           MR. RUKAVINA:  A short one.

10           THE COURT:  -- is going to have to tell me.

11           MR. RUKAVINA:  A short one.

12           THE COURT:  Okay, a short five-minute break.  We'll

13   be in recess.

14           THE CLERK:  All rise.

15       (Recess at 2:42 p.m./Reconvened at 2:49 p.m.)

16           THE CLERK:  All rise.

17           THE COURT:  Please be seated.

18           All right.  We're going to go back on the record in

19   Case Number 25-80481.  I see the witness has returned.  Thank

20   you very much, Mr. Nelson.

21           I'll now put Mr. Nelson up for cross-examination.

22   I'll start with anyone in the courtroom who wishes to

23   cross-examine the witness.

24           Ms. Young?

25           MS. YOUNG:  Thank you, Your Honor.

1                          CROSS-EXAMINATION

2   BY MS. YOUNG:

3   Q    Good afternoon, Mr. Nelson.  I just have one quick

4   question for you and just a clarification.  The motion for

5   employee wages referenced an auto payment or an auto

6   reimbursement.  That is not actually -- you're not actually

7   reimbursing any funds to employees.  Is that correct?

8   A    Our plant manager has a truck allowance.

9   Q    Okay.  And how much is that truck allowance?

10  A    I believe it's $700 a month, but I'm not positive.

11  Q    Okay.  Is that part of the amounts that you're seeking to

12  pay him here today?

13  A    I believe we do break that out weekly.  I'd have to look

14  at -- may I look at it?

15  Q    Okay.  If we go, I believe it's Exhibit Number 17.

16            MR. RUKAVINA:  Your Honor, we'll agree that we're not

17  going to make that payment to the extent it's in there.

18            MS. YOUNG:  As long as it was, I believe, below the

19  cap.

20            THE COURT:  I'm not sure she's objecting,

21  Mr. Rukavina.

22            MS. YOUNG:  No, I just really wanted to just make

23  sure that the motion was accurate since there was --

24  Mr. Rukavina and I had had some back and forth about whether or

25  not this included that auto allowance.  So I --

 1              MR. RUKAVINA:  And I told her that it doesn't, so I

 2  hope I didn't mislead anyone unintentionally.

 3              THE WITNESS:  I don't know if this amount does.  I'd

 4  have to see the breakdown.

 5              MS. YOUNG:  Okay.

 6              THE WITNESS:  But I know he does get a monthly auto

 7  allowance.

 8              MS. YOUNG:  Okay.

 9              THE WITNESS:  But I don't know exactly when that's

10  paid.

11  BY MS. YOUNG:

12  Q    And will that -- if you add that $700 to the amounts

13  you're seeking to pay for his salary here today, will that put

14  him above $15,000 that you were trying to pay him today?

15  A    Oh, no, ma'am.

16  Q    No.

17              MS. YOUNG:  Then with that clarification, the U.S.

18  Trustee does not have any additional questions.

19              THE COURT:  Thank you very much, Ms. Young.  I

20  thought that's where you were going.

21              Anyone else in the courtroom wish to cross-examine

22  Mr. Nelson?

23        (No audible response)

24              THE COURT:  All right.  So with that, with no further

25  folks in the courtroom, I'll now turn to the folks on Webex.

71

1       Mr. Lemmon, do you wish to cross-examine Mr. Nelson?

2             MR. LEMMON:  Yes.  Thank you, Your Honor.

3             THE COURT:  All right.  Please proceed.

4             MR. LEMMON:  May I -- thank you.

5                   CROSS-EXAMINATION

6   BY MR. LEMMON:

7   Q    Mr. Nelson, I want to ask you some questions about your

8   budget, which is Exhibit 3, if you'll put that in front of you,

9   please.  I'm sorry, can you hear me?

10            THE COURT:  Let us know when you're there,

11  Mr. Nelson.

12            THE WITNESS:  Yes, ma'am.  Yes, Your Honor.

13            THE COURT:  We're ready.

14            MR. LEMMON:  Thank you.

15  BY MR. LEMMON:

16  Q    So, Mr. Nelson, you remember your testimony on direct

17  about the critical vendors, yourself included?

18  A    Yes, sir.

19  Q    And do you recall that that list of critical vendor

20  payments that you asked the Court for permission to make was

21  $712,000?

22  A    Repeat that, sir.  I didn't hear you.

23  Q    Do you remember the total that you were asking the Court

24  to give you permission to pay?

25  A    For the critical vendors?  Yes, sir.

1   Q    Yes, sir.  And do you remember that that number is

2   $712,000?

3   A    Yes, sir.

4   Q    Okay.  Now, of that, how much is owed to JMN, your

5   company?

6   A    One hundred twenty-five thousand.

7   Q    And are you saying that your company refuses to do

8   business with the Debtor unless it's paid?

9   A    Yes, sir.  My contractors that work underneath JMN will

10  refuse to do business.

11  Q    Right, but this is not those contractors.  My question is,

12  is JMN refusing to do business with the Debtor unless it's

13  paid?

14  A    No, sir, but JMN pays the contractors.

15  Q    What's JMN doing to try to find other contractors so that

16  it doesn't have to make the Debtor pay $125,000?

17  A    Again, that would be detrimental to try to bring in whole

18  new contractors to get them up to speed when we need to have

19  this fixed by the 10th of August.

20  Q    So, turning back to Exhibit 3, which is in front of you,

21  the budget, and perhaps I just missed this, show us where that

22  $712,000 is shown in the budget.

23       (Pause)

24            THE WITNESS:  I'm not seeing it on this page.  It was

25  at the bottom of the budget.

1   BY MR. LEMMON:

2   Q    Well, I mean, do you have the entire budget in front of

3   you there in Exhibit 3?

4        MR. RUKAVINA:  Your Honor, there's a problem here,

5   which is that I deleted that before I filed it, so Mr. Nelson

6   is going off memory.  So, the correct answer is that,

7   Mr. Nelson, that I did not include that on what I filed with

8   the Court.  That's why you're confused.

9        THE COURT:  Okay.

10       MR. RUKAVINA:  And that's why I guess his prior

11  testimony was incorrect when he said that the pre-petition

12  critical vendors are included in here.  In his mind, it was

13  because it was on the third page but, for whatever reason, I

14  didn't file that report.

15       MR. LEMMON:  (Indiscernible).

16       THE COURT:  Okay, so then let's clarify the record,

17  Mr. Lemmon.  I apologize for interrupting you, Mr. Lemmon.  I

18  see Stabilis on here.  I don't know if that includes the

19  175,000, but are any of the critical vendors included on this

20  budget?

21       THE WITNESS:  No, ma'am.  There was a third page of

22  the budget that had them at the bottom.

23       THE COURT:  Okay.  All right.

24  BY MR. RUKAVINA:

25  Q    So, what I'm getting to is the cash on hand at the end of

Nelson - Cross/Lemmon

1  the week is incorrect, right?

2  A    Appears to be, sir.

3  Q    I'm sorry, I didn't hear you.  You said it appears to be

4  incorrect?

5  A    Yes, sir.

6  Q    Okay.  So, just so I understand what the Debtor is

7  proposing to do here, it wants to borrow 1.5 million.  It wants

8  200,000 of that to be sent to its lawyers for a retainer.  And

9  then the Debtor would start with beginning cash of 1.3 million.

10  And then that 1.3 million, 712,000 of it gets spent immediately

11  for the critical vendors, right?

12  A    Yes, sir.

13  Q    And then the rest of the money gets spent as described in

14  this budget, correct?

15  A    Yes, sir.

16  Q    So, Exhibit 3 is just wrong, right?

17  A    Pardon me?

18  Q    Exhibit 3 is just simply wrong.  It's materially

19  incorrect, right?

20  A    Yes, sir.

21  Q    So, by the way, how much money does the Debtor have in its

22  bank account as we speak?

23  A    I'm not 100 percent sure.

24  Q    Are you 90 percent sure?

25  A    No, sir.  I believe it's very, very low.

```
 1  Q    Well, I mean, define very low for the Court, right?

 2  You've come in and testified about the Debtors' finances.  I'd

 3  like to know how much you think is in the bank account right

 4  now.

 5  A    I think it's under -- under $5,000.

 6  Q    So, how much was in the bank account before the Debtor

 7  paid its retainer?

 8  A    We borrowed money to pay the retainer as far as I'm aware.

 9  Q    Borrowed from who?

10  A    Kevin Collier, my partner, borrowed from a friend of his.

11  Q    Who's the friend?

12  A    John Casey.

13  Q    And what does Mr. Casey have to do with any of this?

14  A    He was just trying to help us out, help Kevin out.

15  Q    Did Kevin give Mr. Casey anything for collateral?

16            MR. RUKAVINA:  Objection, Your Honor.  Foundation.

17            THE COURT:  Before you answer, Mr. Lemmon, were you

18  able to hear the objection?

19            MR. LEMMON:  He said foundation, I believe, Your

20  Honor.  And so the foundation was established by this very

21  witness when I was asking about the Debtors' finances.  And he

22  testified that it was not the Debtor that funded the retainer.

23  It was a friend of Mr. Collier, I guess.  And so that's the

24  foundation itself.

25            I'm trying to find out what the true state of this
```

1   is.  I mean, is this reflected on the Debtors' balance sheet?

2   Did the Debtor consider that the Debtor made the retainer a

3   payment, or was this made by a third party?  I'm just simply

4   trying to find out in connection with this budget.

5           MR. RUKAVINA:  The question was, did Mr. Collier give

6   this other man anything?  That's something that he has no

7   personal knowledge of.  The question was not, did the Debtor

8   give the man anything?

9   BY MR. LEMMON:

10  Q    Did Mr. Collier -- do you know whether Mr. Collier gave

11  this gentleman anything for him to advance his funds for

12  (indiscernible)?

13  A    No, sir, I'm not aware.

14  Q    Have you ever met this gentleman that funded the retainer?

15  A    No, sir.

16  Q    And has Mr. Collier ever explained to you how he knows the

17  gentleman?

18  A    No, sir.

19  Q    How much was the retainer, sir?

20  A    One hundred and fifty thousand and twenty-five thousand.

21  Q    And were those paid at different times?

22  A    Actually, $25,000, one of the retainers was paid out of

23  the bank account, I believe.

24  Q    And you think that was the $25,000, is that wrong?

25  A    Pardon me?

1  Q    That was the $25,000 that got paid out of the Debtors'

2  bank account?

3  A    Yes, sir.

4  Q    And the 150,000 was paid directly from this friend of

5  Mr. Collier's to the law firm, is that correct?

6  A    No, sir, it was paid to, I believe, Collier, and then

7  Collier paid it.  I'm not -- I'm actually not positive.

8  Q    So the money didn't actually travel through the Debtor,

9  you're saying?

10  A    I'm not aware.

11  Q    How often do you look at the Debtors' bank account?

12  A    A couple times a week.

13  Q    Is there a division of responsibility between you and

14  Mr. Collier and Mr. Sheperd as to who manages the Debtors' bank

15  account?

16  Q    Not a direct division.  I'm usually the one that manages

17  it, and Kevin also helps out when I'm not available.

18  Q    By the way, when's the last time Mr. Collier was present

19  at the plant?

20  A    I believe about two weeks ago.

21  Q    Okay.  How often does he show up for work?

22  A    He works from his office in Marble Falls, and I believe

23  it's all the time, every day.

24  Q    By the way, you signed the petition for the Debtor to file

25  this bankruptcy, right?

1    A    Yes, sir.

2    Q    And you attested that the Debtors' location was where, the

3    place of business?

4    A    We have a corporate office in Marble Falls and in Del

5    Valle, and the place of business is in Pleasanton.

6    Q    Okay.  So, back to Exhibit 3, sir.  Will you look at the

7    royalties?

8    A    Yes, sir.

9    Q    And those royalties are found -- let me make sure I'm

10   seeing it.  It's found near the top under royalties accrued,

11   right, and royalties due.  Do you see that?

12   A    Yes, sir.

13   Q    Who owns those royalties?

14   A    Gary Martin, or -- yeah, Gary Martin.

15   Q    Okay.  And how did Gary Martin get those royalties?

16   A    We gifted those to him at the beginning of the plant,

17   because he helped us get loans to do a lot of this stuff.

18   Q    And how much is Mr. Martin's royalty that you propose to

19   pay him under this budget?

20   A    So --

21   Q    How much per ton?  Let's take it back.

22   A    This line, it's $4 a ton for Mr. Martin, which is, I

23   believe, under RJ Machines, and then $1 a ton for the landowner

24   that we mine on.

25   Q    Okay.  Did Mr. Martin's royalties all come at the same

1   time?

2   A     No, sir.

3   Q     Okay.  So, when were the first royalties that went to

4   Mr. Martin?

5   A     At the beginning of this.  I don't really recall exact

6   dates.

7   Q     When's the last time you talked with Mr. Martin?

8   A     Today.

9   Q     Now, you're aware that none of these royalty interests are

10  reported in any accounting records, right?

11          MR. RUKAVINA:  Objection, Your Honor.  Foundation.

12          MR. LEMMON:  Well, I'm just trying to find out if the

13  head of the company understands that these aren't reported.

14          MR. RUKAVINA:  Well, that's the lawyer testifying.

15  The question is then, do you know whether they're recorded or

16  not?

17          THE COURT:  Mr. Lemmon, do you want to restate?

18          MR. LEMMON:  So let's take your word -- sure.

19  BY MR. LEMMON:

20  Q     Do you know whether or not any of these royalties owed to

21  Mr. Martin are recorded?

22  A     I'm not aware.

23  Q     You're not aware of them being reported, correct?

24  A     I'm not aware if they are or not.

25  Q     Okay.  Do you have any understanding, as the

1   representative of the company here, of what the effect is in a

2   bankruptcy if a royalty is not reported?

3   A    No, sir.

4   Q    So, let me then ask you, why are you asking the Court for

5   permission to pay these royalties?

6   A    Because they're ongoing debt.

7   Q    Now, isn't it true that at least part of the royalties

8   owed to Mr. Martin come from Mr. Martin giving the company some

9   aircraft?

10  A    No, sir.

11  Q    Okay, you're denying that.  Does the company or any

12  company subsidiaries, do they own any aircraft?

13  A    Yes, sir.

14  Q    Okay.  Tell the Court about the planes and the

15  helicopters?

16        MR. RUKAVINA:  The question was subsidiaries, I don't

17  know if you heard.

18        THE WITNESS:  No, sir.

19        MR. LEMMON:  Yes, that was the question.

20  BY MR. LEMMON:

21  Q    Oh, I'm sorry.  Did you just change your answer?

22  A    Yes, sir.  No subsidiaries.

23  Q    Okay.  So, who owns the aircraft and the -- including the

24  helicopter?

25  A    FCI Aeronautics.

1    Q    And who owns FCI Aeronautics?

2    A    Field Camp Investments.

3    Q    And who owns Field Camp Investments?

4    A    Kevin Collier and myself.

5    Q    And isn't it true that -- isn't it true, sir, that

6    Mr. Martin extracted an additional royalty in exchange for

7    giving yours and Mr. Collier's company some aircraft?

8    A    No, sir.

9    Q    Okay.  Do you understand that FCI Aeronautics is listed as

10   an affiliate of the Debtor in the loan documents?

11              MR. RUKAVINA:  Your Honor, objection to relevance.  I

12   don't know what FCI Aeronautics has to do with anything.  It's

13   not a Debtor and it's not a Debtor subsidiary.

14              MR. LEMMON:  And, Your Honor, if I may respond.

15              THE COURT:  Please.

16              MR. LEMMON:  The fact of the matter is that this

17   Debtor is paying and proposes to pay an unsecured obligation to

18   Mr. Martin by way of this royalty for some aircraft that the

19   Debtor doesn't even own.  And that significantly increases the

20   Debtors' operating expenses.

21              MR. RUKAVINA:  There is no evidence of that. The

22   witness testified the opposite.  So, if Counsel has any

23   evidence of that, then let him put it in.  Otherwise, it

24   assumes fact is not an evidence and is not relevant.

25              THE COURT:  Do you have anything further or do you

1 want me to rule on the objection?

2 　　　　　MR. LEMMON:  Your Honor, I'm happy for you to rule on

3 the objection.

4 　　　　　THE COURT:  So, if you have further questions to

5 establish what your proposition is, I'll allow it.  But --

6 　　　　　MR. LEMMON:  Thank you, Your Honor.

7 　　　　　THE COURT:  Okay.  Okay.  Please go on.

8 BY MR. LEMMON:

9 Q    So, did Mr. Martin get his royalties, his $4 a ton

10 royalties, did he get those directly from the Debtor or were

11 some of those conveyed to him by somebody else?

12 A    I'm not aware.

13 Q    How much does the Debtor think it costs right now for the

14 Debtor to provide a ton of sand to a customer?

15 A    To produce a ton of sand is roughly 15 to -- well, that

16 number is skewed based on output.  So, the more sand we

17 produce, the cheaper it is, obviously, to produce it.  So, at

18 the current rate of output, we're closer to $16, $17 a ton with

19 the goal to get down to closer to $14 a ton.

20 Q    So, let's assume that you get down to $14 a ton.  Is $4 of

21 that ton a royalty cost?

22 A    Yes, sir.

23 Q    Okay.  Four dollars of that is a royalty cost to

24 Mr. Martin.  There's a dollar also owed to the landowner,

25 right?

1  A    Yes, sir.

2  Q    So, it's $5 a ton are royalty cost out of your total cost.

3  And that's significant.  Let me ask you, sir, when is the last

4  time this company made money?

5             MR. RUKAVINA:  Your Honor, objection.  Vague, make

6  money.

7  BY MR. LEMMON:

8  Q    When is the last time this company turned a profit?

9  A    I'd have to look at our books, but I believe it's been

10  tough to tell, because we've been throwing every penny of

11  additional money into capital expenditures to finish the plant

12  and do all that.  But I would say -- I want to say February of

13  this year it turned a profit, and maybe even March.

14  Q    Do you know how much money the company made in February

15  and March?

16  A    No, sir, not off the top of my head.

17  Q    Can you tell the Court within $100,000 how much money the

18  company made?

19  A    No, sir.

20  Q    Who pays the expenses on maintaining the airplanes and the

21  helicopters?

22             MR. RUKAVINA:  Your Honor, I'll object again.

23  Relevance.  The question should be, does the Debtor pay those

24  expenses.

25             THE COURT:  Mr. Lemmon, any response?

1              MR. LEMMON:  Well, I think that we should know who

2      pays it, because I think that that informs a lot about this

3      Debtor.  So I would stand with my original question.  Who pays

4      the expenses for holding the airplanes and the helicopters?

5              THE COURT:  Okay.  Well, I'm going to try to give a

6      little bit of guardrails on the questions, because some of this

7      is also beyond the scope of what we're here discussing.

8              If you want to ask whether the Debtor pays something,

9      then I think that that is appropriate for questioning.  And if

10     you want to ask if anyone associated with this Debtor, if

11     there's some tangential relationship to the Debtor.  But,

12     again, we've already established that the company is separate,

13     is owned by Mr. Collier and Mr. Nelson.  It is an affiliate of

14     the Debtor, but that that's where the aircraft is.  So let's

15     keep our questioning to how it has adjacency to the Debtor.

16     BY MR. LEMMON:

17     Q    Does the Debtor pay any of the expenses for the aircraft,

18     sir?

19     A    No, sir, not to my knowledge.

20     Q    Has the Debtor ever used any of the aircraft?

21     A    Not to my knowledge.

22     Q    So I take it that you and Mr. Collier have used the

23     aircraft.  You just have never used them for any business

24     having anything to do with the Debtor.  Is that correct?

25     A    Again, I'm not sure.

1    Q    You're not sure if you've used them for any business

2    having anything to do with the Debtor.  Is that correct?

3    (Indiscernible)?

4    A    I mean, I believe John Ramming and Cole have used the

5    aircraft a couple of times and the helicopter.  Myself, I've

6    used the aircraft.  I believe Kevin's used the helicopter.

7    Whether it was used -- I don't believe it was used in FCI

8    capacity is why I'm having a hard time answering that.

9    Q    So back to these royalties due to Mr. Martin, has FCI been

10   paying the royalties on a monthly basis or are there past-due

11   royalties due to Gary Martin?

12   A    There are past-due royalties due.  We have been making

13   small payments when we can to try to knock down our debt.  And

14   then, also, he's been very generous to working with us because

15   he understands getting through these obstacles.

16   Q    Has Mr. Martin loaned you or Mr. Collier any money or

17   anybody else to inject into the company?

18   A    Not to my knowledge.

19   Q    I want to ask you about the factoring.  What percentage of

20   your company's receivables were factored prior to bankruptcy?

21   A    Everything except Halliburton, which I would say is ninety

22   -- it varies depending on when Halliburton's drilling in our

23   area.  But every one of our other customers besides Halliburton

24   is factored.

25   Q    So you've made the decision on behalf of the Debtor to end

1  the factoring relationship, correct?

2  A    Yes, sir.

3  Q    And why did you make that decision?

4  A    It is a very costly expenditure that we were hoping was

5  only going to be a short time.  Twenty-two percent of our

6  revenue average is going to the factoring company.

7  Q    Twenty-two percent going forward or twenty-two percent

8  backwards?

9  A    Backwards.

10 Q    Okay.  I'm sorry.  I misunderstood.  I thought you said

11 that about 20 percent of your invoices were factored.  Did I

12 miss something there?

13 A    Can you repeat the question?

14 Q    What percentage of your invoices were factored prior to

15 bankruptcy?

16 A    I'm not sure I'm following the question.

17 Q    Okay. So prior to bankruptcy, you've been factoring your

18 invoices, right?

19 A    We've been factoring all of our invoices except for

20 Halliburton, yes, sir, for I believe the last five or so -- or

21 a while now.

22 Q    Okay.  How about EOG?  Is it factored?

23 A    EOG is factored, yes.

24 Q    Okay.  So what percentage, can you tell the Court what

25 percentage of your invoices you've been factoring historically?

Nelson - Cross/Lemmon

```
 1   A    I wouldn't have that figure on how much of year-to-date
 2   has been Halliburton and how much has not been.
 3   Q    So I want to ask this question about Field Camp.  So when
 4   we see Field Camp as somebody, tell the bar -- I'm sorry, tell
 5   the Court what Field Camp is, please.
 6   A    Field Camp is mine and Kevin's entity that owns our
 7   shares.
 8   Q    Okay.  So you see under cash disbursements on Exhibit 3.
 9   A    Yes.
10   Q    So right under JMN Enterprises and the payment to it for
11   the four Ford trucks, there's also four line items -- one, two,
12   three, four line items for payments to Field Camp, correct?
13   A    Yes and no.  Those are equipment that is in Field Camp's
14   name that is used in FCI's operations in everyday operations,
15   because when FCI started out, it didn't have established credit
16   to be able to purchase these equipment.  So FCI -- or sorry,
17   Field Camp purchased these in behalf and is leasing to FCI for
18   this everyday operations.
19   Q    So that's an insider that is leasing to the Debtor, right?
20   A    Yes, but that equipment is also pledged as collateral.
21   Q    To my client, right?
22   A    Yes, sir.
23   Q    Okay.  So tell the Court what A&R Demolition is.
24   A    A&R Demolition is my demolition company.
25   Q    Okay, I'm sorry, I misunderstood on the direct testimony.
```

Nelson - Cross/Lemmon

1    I thought you said that the only insider on this list was JMN,

2    but now we've heard about A&R and Field Camp, right?

3            MR. RUKAVINA:   That was the critical vendor list,

4    Your Honor.  I'll object.

5    BY MR. LEMMON:

6    Q    Has Field Camp been paid currently?

7    A    No, sir.  These payments go directly to the finance

8    companies on behalf of the Field Camp and the A&R.

9    Q     Are there any other insiders on this list for cash

10   disbursements?

11   A    The process engineer, he is our wet plant process

12   engineer.  He is here on a work visa from Ireland through

13   Collier Materials.  So we pay his salary to Collier Materials

14   and Collier Materials pays him.

15   Q    And Collier Materials, is Kevin Collier your other owner

16   on this?

17   A    Yes, sir.

18   Q    Any other insiders?

19   A    No, sir.

20   Q    Now, I want to ask about the proposed DIP lender that

21   would prime my client under your proposal, right?  When did you

22   first talk to them?

23   A    I believe it was the day before yesterday.

24   Q    And how did you find them?

25   A    I knew of the principals.  I had met them previously and

1    it was a last-ditch effort after the previous two people had

2    turned down the financing.

3    Q    So, I'm going to ask this question of you, sir.  And that

4    is, to your knowledge, do you, does Gary Martin or does Kevin

5    Collier have any interest in funds that have been advanced to

6    this lender for the purpose of making this loan?

7    A    No, sir.  Not to my knowledge.

8    Q    Who handled the negotiations directly with GrayStreet, I

9    think, with the proposed lender?

10   A    My counsel.  Our counsel.

11   Q    By the way, when did the company retain bankruptcy

12   counsel?

13   A    Wednesday.

14   Q    Okay.  Day before yesterday?

15   A    Yes, sir.

16   Q    Is that when you first met with bankruptcy counsel?

17   A    No, sir.

18   Q    When did you first meet with anyone from Munsch Hardt?

19   A    I don't recall the exact date, but a very short time ago.

20   Q    When you say a very short time ago, do you mean days ago,

21   weeks ago, months ago?

22        MR. RUKAVINA:  Your Honor, this is turning into a

23   deposition.  I object on relevance.  This has nothing to do

24   with DIP financing.  I've already said that we're not seeking

25   to get any of this interim DIP as a retainer.

```
 1                THE COURT:  Mr. Lemmon?

 2                MR. LEMMON:  Well, Your Honor, I'm sorry, but that's

 3   just not what the budget says, right?   And, I mean, the budget

 4   shows $1.5 million being advanced by the lender.

 5                THE COURT:  Please proceed, Mr. Lemmon.

 6                MR. LEMMON:  Yes, ma'am.  So --

 7                THE COURT:  No, no, no.  Please proceed with your

 8   response to his objection.

 9                MR. LEMMON:  Oh, sorry.  Your Honor, the response to

10   the objection is that these are questions about the budget, and

11   I think that we're entitled to know -- it's not a hard

12   question.   I can move along -- when they first consulted

13   bankruptcy counsel.

14                THE COURT:  And so my question, and I've cautioned

15   Mr. Rukavina to let me do this because I'd like to make sure

16   that we have time to get to these witnesses today.  Did you

17   hear at the opening of the hearing when they said that the DIP

18   would be 1.3 instead of 1.5, and it wouldn't include the

19   $200,000 retainer?

20                MR. LEMMON:  Your Honor, I heard the discussion.

21   Frankly, what I thought he said was that it was 1.5, but the

22   200 was going to go someplace else.  If I misunderstood, I

23   apologize.  And so if the proposed interim DIP is only 1.3, I

24   stand corrected.

25                THE COURT:  Okay.  Mr. Rukavina, can you confirm the
```

 1    Court's understanding, or Mr. Lemmon's?

 2              MR. RUKAVINA:  I would like to -- first of all, I can

 3    confirm absolutely that none of the interim DIP, whether it's

 4    1.3 or 1.5, will go to the line items for retainers for

 5    Mr. Roberts or myself.

 6              What I'd like to do during the break, because

 7    Mr. Lemmon has pointed out that there's an inconsistency in the

 8    cash position, so I need to talk to the financial advisor

 9    whether it still needs to be 1.5 in light of the critical

10    vendor.  So I don't necessarily -- I went into the hearing

11    thinking it was 1.3, but Mr. Lemmon's actually right. There

12    seems to be a discrepancy because I changed that exhibit.

13              So during the break, I'll talk to Mr. Roberts, and

14    then I can confirm whether it's 1.3 or 1.5.  But none of that

15    will be going towards my fees or Mr. Roberts' fees.

16              THE COURT:  Okay.  Thank you.

17              All right.  So please proceed, Mr. --

18              MR. LEMMON:  And, Your Honor, I'll (indiscernible).

19    BY MR. LEMMON:

20    Q    So, Mr. Nelson, you and Mr. Collier have both pledged your

21    equity interest to the company -- I'm sorry, to the senior

22    lender.  Is that correct?

23    A    I believe so, yes.

24    Q    And that is why you had to get permission to sell your

25    equity interest to third parties, right?

1   A    Yes, sir.

2   Q    Now, I want to make sure I understand your testimony to

3   the Court.  While you don't have an appraisal, you say that the

4   187 acres you have in South Texas is worth more than 100

5   million?

6   A    The land and improvements, yes, sir.

7   Q    How much of that is land and how much is improvements?

8   A    I'm not an appraiser, but I would say the improvements

9   alone are worth 80 million-plus, and then the land and the sand

10  is worth far more than 20 million.

11  Q    Now, you remember on direct testimony, you were asked

12  about the amount of sand in the ground in that 187 acres,

13  right?

14  A    Yes, sir.

15  Q    And where did you get that information from?

16  A    We have drilled test holes.  We --

17  Q    When you say we, do you mean you personally?  Who drilled

18  them?

19  A    Well, my mine guys, we bought an auger and drilled down.

20  Well, number one, we're mining right now, and some areas we're

21  down to 47 feet and still chasing sand.  And in addition to

22  that, we've drilled holes and checked sand to shore up the

23  reserve report to make sure that we follow the right path and

24  we're getting the most bang for our buck where we're mining.

25       And then in the additional land that we acquired, we

1  drilled test holes and chased the sand as well to confirm it's

2  there before we shored up the lease agreements.

3  Q    Now, my client has offered to make the identical $1.3

4  million loan, or 1.5 if that's what it takes, to avoid being

5  fined.  Why are you rejecting it?

6           MR. RUKAVINA:  Your Honor, that assumes facts, not

7  evidence.  In fact, I believe I heard Counsel during opening

8  state that there would be all kinds of conditions, milestones,

9  et cetera, et cetera.  So let's get the record straight.  Is

10  the prior pre-petition lender offering a DIP on identical terms

11  or not?

12           MR. LEMMON:  I believe he's mistaking me for

13  Mr. Taylor, who was speaking to the issues involved in the

14  negotiations with the Sterling Group.  I have not said that to

15  this Court.

16           MR. RUKAVINA:  And that may be true.

17           MR. LEMMON:  What I'm saying is --

18           MR. RUKAVINA:  And I do apologize to you, Mr. Lemmon,

19  that may be true.

20           THE COURT:  And that is accurate.

21           So, Mr. Lemmon, I'm going to, again, require a little

22  bit of clarity here.  I'll let you question the witness about

23  if he's had negotiations with the pre-petition lender and if

24  there's something there.  But I don't think from the Court's

25  perspective there's anything in the record about what the

Nelson - Cross/Lemmon

 1   pre-petition lender is or is not willing to do in terms of a

 2   DIP loan or anything else.  But I'll let you make that record

 3   now.

 4            MR. LEMMON:  So, if my client offers to make the

 5   interim loans on the same terms with normal DIP protections

 6   that we see in this Court every day, will your client accept

 7   that?

 8            MR. RUKAVINA:  Your Honor?

 9            MR. LEMMON:  Not your -- will you accept it?  I'm

10   sorry.

11            MR. RUKAVINA:  The witness --

12            MR. LEMMON:  Will you accept it?

13            MR. RUKAVINA:  The witness can't possibly answer that

14   question because what are normal DIP terms?  He's not an

15   expert.  This is his first bankruptcy.  So, I'm sure they will

16   include, for example, a release of the lender.  I'm sure they

17   will include, for example, a ratification of all pre-petition

18   liens.  So, again, let's get the cards on the table.  If we're

19   talking apples to apples or we're talking apples to tricks.

20            MR. LEMMON:  Well, Your Honor, I mean, that's the

21   subject of discussion, and we're happy to have that discussion.

22   My client objects to --

23            THE COURT:  And I guess that's my question,

24   Mr. Lemmon.  Are you trying to have a discussion in the middle

25   of cross-examination, or are you saying that there has been a

```
1    discussion and that your client's offer has been declined?

2    That's kind of where I'm trying to get at.  Are we taking

3    evidence now, or are we having a negotiation with the Court

4    present?

5              MR. LEMMON:  That's an excellent point, Your Honor,

6    and I'll just say that my suggestion to the Court would be that

7    since we have to take a break for them to look at their budget,

8    that that might be an appropriate time to have a discussion.  I

9    would suggest that when we take that break, we have that

10   discussion.

11             MR. RUKAVINA:  Your Honor, I'm happy to talk.  We

12   spoke right before the hearing, but we need to get some

13   resolution, some answer from you.  Thumbs up and thumbs down

14   today.  It is a Friday, and certainly I have Mr. Lemmon's

15   email.  I'm going to offer it to the witness on redirect, and,

16   Your Honor, we'll see exactly what the offer is.  It's, you

17   guys have to be fired, three new board members, and usual and

18   customary DIP terms, which we all know includes releases.

19             MR. LEMMON:  Your Honor, now who's testifying?  I

20   object.

21             THE COURT:  If there's anything that I'm going to ask

22   you to take a leap of faith on, Mr. Lemmon, you haven't

23   appeared in my Court, but I do know the difference between

24   argument and evidence.  So we are on the same page there.

25             So let's do this.  Let's proceed, again, on the terms
```

1    that we've just discussed.  If you have questions for the

2    witness that's based upon any negotiations that have taken

3    place heretofore that you'd like to question him on, let's do

4    that.  If not, let's move to a point to where if we do break

5    and we shore up the budgetary questions, and then we can

6    address any counteroffer that the pre-petition lender is

7    willing to make, we'll do that on a recess, okay?

8           MR. LEMMON:  Thank you, Your Honor.  And I'll just

9    have a couple more questions.

10          THE COURT:  All right.

11   BY MR. LEMMON:

12   Q    So you prepared your budget with the assistance of a

13   professional, right?

14   A    Yes, sir.

15   Q    And who was that?  Mr. Roberts?

16   A    Yes, sir.

17   Q    Has the Debtor retained Mr. Roberts?

18   A    Yes, sir.

19   Q    And we see in the 20th of May that the Debtor proposes to

20   pay Mr. Roberts $25,000 plus another $15,000 in about nine

21   weeks.  Is that right?

22          MR. RUKAVINA:  Again, Your Honor, that's gone.

23          THE COURT:  That's not a part of the budget for

24   interim?

25          MR. RUKAVINA:  Correct.

 1                    MR. LEMMON:  Okay, I'm sorry.  I misunderstood.

 2                    THE COURT:  That's okay.

 3  BY MR. LEMMON:

 4  Q    Then let me just ask you, was there any kind of internal

 5  testing that occurred that you and Mr. Roberts did in order to

 6  determine whether or not you were getting this direct from the

 7  budget?

 8                    MR. RUKAVINA:  I didn't understand the last couple of

 9  words, Your Honor.  Any direct testing?

10                    THE COURT:  Any internal testing to determine whether

11  or not the numbers in the budget are correct?

12                    MR. RUKAVINA:  Thank you.  I apologize.

13                    THE COURT:  Is that a fair restatement of your

14  question, Mr. Lemmon?

15                    MR. LEMMON:  Yes, Your Honor.

16                    THE WITNESS:  And, Your Honor, I'm not following the

17  question.

18                    THE COURT:  He doesn't follow internal testing.

19  BY MR. LEMMON:

20  Q    What did you do to double check to make sure that your

21  budget was correct that you were presenting it for?

22  A    Historical cost of equipment, payroll, gas based on ton

23  volume, our cost of insurance, our cost of -- average cost of

24  diesel, our actual cost of utilities, internet, Starlink, our

25  actual cost of -- or our average cost of repairs and

1   maintenance, and average cost of safety supplies for our

2   employees and for our operations.  Yes.

3   Q    So, one last question, I believe, right now, and that is,

4   you testified that on the payroll that there were only two

5   insiders, yourself and Mr. Collier.  Do you recall that?

6   A    Yes, sir.  And I --

7   Q    Do you recall saying -- okay, in fact, Mr. Sheperd is also

8   included, right?

9   A    He is -- I think his family is -- actually, I'm not sure

10  if he's part of the group that is the very last investor.  I

11  think it's his family member, but he may be part of that group,

12  now that you mention it.

13  Q    Mr. Sheperd or his family are investors in the company,

14  right?

15  A    Yes, sir.

16  Q    Can you tell the Court who Mr. Sheperd is?

17  A    He is the new acting president of the company.

18  Q    And does he have responsibility for sales?

19  A    He is direct oversight of our sales guys.

20  Q    Have you seen Mr. Sheperd's projections for the near and

21  intermediate term on how many tons of sand he thinks the

22  company can sell to different well sites?

23  A    Yes, sir.

24  Q    And do you agree entirely with those projections?

25  A    I'd have to see them in front of me.

1   Q    And what did you do to incorporate those projections into

2   this budget?  I had him send me the actual POs that we have

3   written from our customers, because I didn't want to speculate

4   on potentials or, you know, our customers telling us it was

5   coming.  I wanted to solely base my budget on actual written

6   purchase orders.

7   Q    Do you know a man by the name of Reed Seaton?

8   A    Yes, sir.

9   Q    Do you trust Reed Seaton?

10  A    I do not know him that well. I've met him once.

11  Q    Did you ask Reed Seaton to lend you money?

12  A    We approached him to be the DIP lender.  And last night at

13  8:45, he rescinded his offer.

14  Q    Did you talk directly with Mr. Seaton about the DIP loan?

15  A    Yes, sir.  He called yesterday.  We talked about the DIP

16  loan and him wanting to include additional silos and the

17  additional cost into the -- to move the dryer to the new plant.

18  The additional cost of putting up two other silos, adding that

19  all into the DIP loan to get us to a position to where the

20  company is marketable.

21  Q    Did you offer to let Mr. Seaton have a management role in

22  the company if he made the DIP loan?

23  A    I did not.

24  Q    Okay.  Have you told Mr. Seaton, or have you told anybody,

25  that you and Mr. Collier are planning on leaving the company?

1   A     No, sir.

2   Q     You deny that?

3   A     Yes, sir.

4         MR. LEMMON:  Thank you, Your Honor.  I pass the

5   witness.

6         THE COURT:  All right.  Thank you very much.

7         MR. RUKAVINA:  Redirect Your Honor before or after

8   Your Honor's questions?

9         THE COURT:  I'll allow you to redirect after.

10        Is there anyone else who wishes to cross-examine

11  Mr. Nelson?  Again, if you've made an appearance and you're on

12  the phone, you can press *6 to unmute.

13      (No audible response)

14        THE COURT:  All right.  Hearing no takers.  So the

15  Court's got some questions for you, Mr. Nelson.

16                            EXAMINATION

17  BY THE COURT:

18  Q     And I recognize that the budget is going to be reviewed on

19  recess.  And I also recognize this was probably put together in

20  the last number of days, and so the Court has some

21  understanding as to why there might be some misses.

22      Let's talk about the various companies that you and

23  Mr. Collier have an interest in that would receive payments

24  post-petition.  I recognize that there are ongoing operations.

25      So with respect to JMN Enterprises where it says the four

Nelson - Examination/Court

```
 1   Ford trucks, is there any markup between JMN Enterprises and

 2   the price it pays for the Ford trucks and the cost that is

 3   passed on to the Debtor?

 4   A    No, Your Honor.  They pay directly to the financing

 5   company on behalf.

 6   Q    So each of those Ford trucks is financed?

 7   A    Yes, ma'am.

 8   Q    Okay.  So let's just say that a hypothetical truck is

 9   financed at $500 a month.  JMN pays the finance company $500 a

10   month.  Do you pass that cost on to the Debtor at 500 or at

11   something greater than 500?

12   A    No, Your Honor.  FCI pays directly to Ford Motor Credit,

13   so there's no passthrough or no markup or no --

14   Q    Okay.  All right.

15   A    -- additional --

16   Q    So there's no VIG between JMN and the Debtor for those

17   trucks?

18   A    No, Your Honor.

19   Q    Okay.

20   A    It's a direct payment.

21   Q    Same question with respect to the various equipment that

22   Field Camp owns.  Is all of that financed?

23   A    Yes, Your Honor.

24   Q    Okay.  And does the Debtor pay those finance charges

25   directly?
```

1   A    Yes, Your Honor.

2   Q    Is there any markup between Field Camp and the Debtor for

3   that equipment?

4   A    No, Your Honor.

5   Q    Okay.  Let's talk about the process engineer and Collier

6   Materials.  So I understand that Collier Materials has assisted

7   with the visa for the process engineer?

8   A    Yes, Your Honor.

9   Q    Okay.  And does the Debtor pay that engineer's salary

10  essentially?

11  A    Yes, Your Honor, and expenses.

12  Q    Okay.  And does the Debtor pay the engineer directly or

13  through Collier?

14  A    Your Honor, according to the visa, it had to be paid

15  through Collier.  So it's exact, no markup.

16  Q    Okay.

17  A    Exact amount paid.  Whatever his check is, it's just

18  deducted that amount.

19  Q    Okay, fair enough.  With respect to A&R Demolition, it

20  looks like A&R Demolition, that's a company that you or

21  Mr. Collier own a piece of, as well?

22  A    Just myself, Your Honor.

23  Q    Okay, that you do.  Okay.  And it says a skid steer, a

24  telehandler, and a mini excavator, which I have trouble

25  pronouncing because I have a lisp.  But are those pieces of

103

Nelson - Examination/Court

```
 1  equipment financed as well?

 2  A    Yes, Your Honor.

 3  Q    All right.  And same question, does the Debtor pay those

 4  finance charges directly?

 5  A    Yes, ma'am, direct.

 6  Q    Is there any markup on the equipment finance charges?

 7  A    No, Your Honor.

 8  Q    Okay.  So it's an apples-to-apples payment between the

 9  finance charge and the Debtor.

10  A    Yes, Your Honor.

11  Q    All right.  So let's talk a little bit about the attempts

12  to raise equity pre-petition.  When the equity was being

13  raised, was it new equity in the company, or were you or

14  Mr. Collier selling your shares?

15  A    Your Honor, Kevin and myself or Field Camp, our entity,

16  was selling directly its shares to not have to dilute any of

17  the other shareholders, and we were using that capital to fund

18  the business.

19  Q    Okay.  And has Field Camp pledged its shares to the

20  lender?

21  A    A portion of its shares.  Yes, Your Honor.  There was a

22  threshold of -- that we were not allowed to go under.  The

23  Debtor -- sorry, the lender, the lender has verbally allowed us

24  to sell other shares and allowed us to invest that money into

25  the company, subordinated verbally.  It was never done in
```

1    writing.

2         And then this last time, a week ago -- a week ago from

3    Monday when we went to them to propose the same scenario to

4    sell more shares and subordinate it, at that point is when they

5    told us we weren't allowed -- we weren't allowed to pledge our

6    shares, we weren't allowed to sell any more shares, we weren't

7    allowed to loan the company any more money.  We basically had

8    no options to fund the company through this downturn -- down

9    times.

10   Q    Thank you.  With respect to the post-petition A/R, so in

11   other words, these are the accounts receivable that you intend

12   to both generate and collect money on in post-petition.  Is

13   that correct?

14   A    Pose -- sorry.

15   Q    So if you look at the budget when we're talking about cash

16   coming in, it says post-petition A/R which I assume is going to

17   mean post-petition accounts receivable?

18   A    Yes, Your Honor.

19   Q    Okay.  Is that money that you intend to collect from

20   customers, generate and collect from customers post-petition?

21   A    Yes, Your Honor.

22   Q    Is any of this accounts receivable pre-petition accounts

23   receivable?

24   A    No, Your Honor.

25   Q    Okay.  Now, under cash receipts, it says royalties

1  accrued.  Is that royalty money that's supposed to come in, or

2  money that would be paid out in some way?

3  A    Yes, Your Honor.  Money that would be paid out.  And it is

4  due the 15th of the following month after it has accumulated.

5  Q    Okay.  And can you show me on the budget where that money

6  comes out?

7  A    On line number -- well I don't have a line.  But on number

8  seven, on week number seven, it shows the total of the accrued

9  money.  And if you look at the revenue generated, I guess on

10  the fourth line down, and then it's less that number on the 7th

11  line, if I'm counting that correctly.  And then on the ninth

12  line is the actual generated revenue.

13         MR. RUKAVINA:  Your Honor, I think the witness is

14  saying that we're not supposed to pay that during the interim

15  period.  I'm not sure.  But --

16         THE WITNESS:  Yeah.  I don't --

17         MR. RUKAVINA:  -- if that's the case, then we can

18  remove that, make it crystal clear.

19         THE WITNESS:  It would be week seven before it's due.

20  BY THE COURT:

21  Q    So none of the royalties would be paid until week seven?

22  A    Yes, Your Honor.

23  Q    Okay.  So it's outside the interim.  Okay.  And Mr. Lemmon

24  asked you a question with respect to the company's historical

25  profitability.  And I think I understood you to say that the

106
Nelson - Examination/Court

1    last time that -- that most of the money that was generated

2    from the company was being put into the building and

3    commissioning it to come on of the new plan.  Is that correct?

4    A    Yes, Your Honor.

5    Q    But you testified that you thought that the last time that

6    the company was probably profitable was in the February/March

7    time frame?

8    A    Yes, Your Honor.  And I may have -- what I meant by that

9    is the capital -- that didn't go to capital contributions that

10   the company actually covered its debt and its obligations,

11   excluding the stuff that went back into capital contributions

12   on the P&L sheet.  It showed profitable.

13   Q    Okay.  Are there any other operating expenses, so if you

14   look for me on the budget it says cash disbursements.  And then

15   critical vendors and operating expenses.  I mean, we've already

16   established that the critical vendor numbers may not be in

17   here.

18        So JMN Enterprises, I'm going to back on you for a moment.

19   I apologize.  JMN Enterprises critical vendor, the Debtors

20   propose to pay them $125,000.  And I assume you are the JMN of

21   JMN Enterprises.  You said that you had contractors that worked

22   under you.  So tell me a little bit about that.

23   A    Yes, Your Honor.  So we have erectors, crane operators,

24   welders, fabricators.

25   Q    It's like you've described my whole family.  Keep going.

1  A    And the -- basically, as critical for the silo repair, we

2  are building temporary structures to support a bridge.  And you

3  can tell me to shut up if I'm talking too much.

4  Q    No.

5  A    We're supporting the bridge because the top eight rings of

6  the silo have collapsed.  We are fabricating a temporary roof

7  so that we can use that second silo because it's underneath the

8  silo is how we load the trucks.

9  Q    Sure.

10 A    So it will allow us to be able to load more trucks.  And

11 in our industry, trucks like to show up ten at a time.  And if

12 we can't load them fast enough, then it's detrimental.  it will

13 automatic -- with Conoco, it automatically reroutes them to

14 another supplier.

15      And as we get to week -- roughly week - really week three

16 and week four when we're doing the 700,000 ton range, that's

17 100,000 tons a day.  Sorry, that's $700,000.  It's basically

18 3,500 tons a day that we have to sell, which would be very

19 tough with one silo.  It's about a six-minute loadout time.

20 And having a timeline without upsetting a truck driver would

21 probably be very tough.

22 Q    With respect to -- so it is JMN Enterprises that you're

23 telling me is paying certain of these contractors that is

24 repairing this silo?

25 A    Yes, Your Honor.

Nelson - Examination/Court

```
 1   Q    Okay.  And does JMN Enterprises have any employees of it

 2   own that are managing or supervising these contractors?

 3   A    Yes, Your Honor.

 4   Q    Okay.  And so the 125 is -- that you propose to pay, it's

 5   a little bit different than the money that's going to Field

 6   Camp and to A&R Demolition?

 7   A    Yes, Your Honor.

 8   Q    Correct?  So explain to me, I want to understand how

 9   market, essentially the relationship is between JMN Enterprises

10   and the Debtor.  So explain to me how the two work together?

11   A    Yes, Your Honor.  SO JMN has been the, I would call it the

12   general contractor for the entire build from start to finish.

13   Q    Of the new plant?

14   A    Both plants.

15   Q    Okay.

16   A    The plant and the new plant, the repairs to the south

17   plant to bring it online.  It's orchestrated, the trucking, the

18   electricians, the concretes, the -- sorry, concrete contractors

19   that the concrete suppliers, the materials and just worked as a

20   liaison to get this expansion we did if we had gone out to a

21   company other than myself and JMN would be about a 50 or $60

22   million capital, or improvement.

23        So by doing it in-house with, you know, my supervisors and

24   subcontractors, we were able to drastically --

25   Q    What's your DC percentage?
```

Nelson - Examination/Court

1   A     JMN, other than the labor makes the -- than the labor

2   rate, we make no markup.  There's no percentage.

3   Q     There's no ten and ten or anything like that?

4   A     No.  No, ma'am.

5   Q     No?  Okay.  Not telling you how to do your business.

6   A     It would be nice.  There is not.

7   Q     So essentially, and again, I need you to correct me if I'm

8   mistaken.  Any monies paid for trucking for electricians, for

9   concrete suppliers, is there any markup on the amount paid by

10  JMN compared to the amount paid by the Debtor to pay for those

11  things?

12  A     No, Your Honor.  Other than my crane operators that I bill

13  at a fair market rate --

14  Q     Right.

15  A     -- or my supervisors, my truck drivers, and crane

16  operators that I bill at the standard rate, JMN makes

17  absolutely no markup.

18  Q     Okay.  And so if JMN pays a crane operator $35 an hour,

19  that that $35 an hour is passed directly to the Debtors.

20  A     If we pay a subcontractor, that's directly.  I bill my

21  standard employees at the standard rate.

22  Q     Okay.

23  A     So I bill them at what a normal contractor would charge

24  us.

25  Q     Okay.  And does JMN Enterprises do work for anyone other

1    than the Debtor?

2    A    Yes, Your Honor.

3    Q    Okay.  And do you charge the Debtor the same rates that

4    you charge to other third parties?

5    A    I charge them -- others more.  And I have a markup, a 20

6    percent markup.

7         THE COURT:  Okay.  Thank you.  You probably didn't

8    know this was coming.  Mr. Rukavina did.  I'm infamous for

9    asking questions.

10        MR. RUKAVINA:  I like the surprise.

11   BY THE COURT:

12   Q    And so back to the question I began to ask but I stopped

13   myself.  So back on your budget where it says critical vendors

14   and operating expenses, any other affiliates, any other -- I

15   mean, I think you've picked up on our term insiders in

16   bankruptcy court.  Any of these other companies or these

17   expenses would be going to pay folks that otherwise have an

18   ownership in the business?

19   A    No, Your Honor.

20        THE COURT:  Okay.  Thank you very much.  So with

21   that, Mr. Lemmon, if you have any further cross-examination of

22   the witness based solely upon the questions I asked, I'll let

23   you ask them now.

24        MR. LEMMON:  Thank you, Your Honor.  I do have one

25   small area.

...

1          THE COURT:  Excellent.

2                    CONTINUED CROSS-EXAMINATION

3   BY MR. LEMMON:

4   Q    Back to the issue that you chatted with the Court about on

5   the sales of the equity of you and Mr. Pawsey and the

6   discussions with the lender, is it correct to say that the

7   lender asked you for more information about what was going on

8   with the Debtor financially before they made the approval?

9   A    No, Your Honor.  That they wanted more information -- they

10  couldn't make a decision on extending the terms of the senior

11  loan group as far as to my understanding.

12  Q    Isn't it true that the Debtor told you that they wanted to

13  look at the finances of the Debtor to make sure that the money

14  that you and Mr. Collier were getting from selling your equity

15  was in fact going into the Debtors' operations.  Isn't that

16  true?

17          THE COURT:  I'm going to ask you to restate the

18  question, Mr. Lemmon, because you said did the Debtor tell you.

19  And I'm confused about your question.

20          MR. LEMMON:  I'm sorry.

21          THE COURT:  And I think you accidentally misspoke.

22          MR. LEMMON:  Thank you, Your Honor.  Yeah.

23  BY MR. LEMMON:

24  Q    Isn't it true, Mr. Nelson, that the lender told you that

25  they wanted to look at the finances of the Debtor in order to

 1   make sure that the money that you and Mr. Collier had been

 2   receiving from the sale of your equity was actually finding its

 3   way into -- directly into the Debtor?

 4   A    No, sir.  Not to my knowledge.

 5   Q    Isn't it true that you reflected this as a loan on the

 6   balance sheet, that in other words, when you and Mr. Collier

 7   sold equity to third parties, that then you reflected a loan

 8   that you made in that amount to the Debtor on the balance

 9   sheet?

10   A    Yes, sir.  That's true.

11   Q    Okay.  So explain to the Court why that's a loan instead

12   of what you were just saying which was selling equity?

13              MR. RUKAVINA:  Your Honor, objection.  Relevance.

14   We're not here on a 510(c) or a recharacterization.

15              THE COURT:  Mr. Lemmon?

16              MR. LEMMON:  We're here on the -- Your Honor, I

17   suggest that this goes to the issue at heart, and this was

18   raised in the original direct examination which is why did this

19   evil lender not let you sell any more of your equity?

20              THE COURT:  I'm going to allow questioning on this

21   line.  Mr. Nelson?

22              THE WITNESS:  Sorry, can you repeat that one more

23   time, please?

24   BY MR. LEMMON:

25   Q    Isn't it true that you reflected on the balance sheet that

Nelson - Continued Cross/Lemmon

1  the company owed you money for the sales of stock that you then

2  made, you and Mr. Collier?

3  A    Sir, we sold personal shares that we held personally, not

4  company stock.  We didn't dilute any of our shareholders.  We

5  sold personal shares and then -- which we will be taxed on, and

6  loaned that company -- loaned the money to the company

7  subordinate, if I'm saying that right, subordinate to the

8  senior loan group at our own, you know, basically just because

9  we didn't want to subordinate any of the -- we didn't want to

10  dilute any of the shareholders.

11  Q    So when you gave the money to the company, you're saying,

12  how was that documented?

13  A    Documented as a loan.

14  Q    And were there -- was there a -- were there loan papers

15  drawn up, you know, that says FCI --

16       MR. RUKAVINA:  I apologize, Your Honor.  Again, it's

17  four o'clock.  This is well outside the course of Her Honor's

18  examination, and I object on relevance.

19       MR. LEMMON:  Your Honor, what it's relevant to is the

20  lender's request that it be given information about this before

21  it made any further waivers of regarding its collateral being

22  sold.  And this was raised by the Debtors' Counsel in the

23  direct examination.  And I want to just make sure that the

24  Court understands what really happened.

25       MR. RUKAVINA:  The problem with that is that it

Nelson - Redirect / Rukavina

 1   assumes facts not in evidence.  The witness said no, that the

 2   lender did not say that.

 3           THE COURT:  Look, I have no doubt that this issue is

 4   going to come up again over the course of this case.  I think

 5   for purposes of in interim DIP, I better understood basically

 6   just upon the pledge of why there was a dispute.  I was curious

 7   about the pre-petition dispute.  I don't think we have to get

 8   down to the nitty-gritty on every reason that it was stopped,

 9   that we are -- we're here where we are at present.  We're in

10   bankruptcy.  And so no one's selling equity now.

11           So do you have any other questions, Mr. Lemmon?

12           MR. LEMMON:  No, Your Honor.  Thank you.

13           THE COURT:  Okay.  Thank you.  Mr. Rukavina, any

14   redirect?

15           MR. RUKAVINA:  I do.  I'm going to try to go quickly,

16   okay?  So if I talk too fast, tell me to slow down.

17           THE COURT:  He will talk too fast.

18           MR. RUKAVINA:  I will.  I will.  In a few hours and a

19   few beers, I might slow down a little bit.

20                        REDIRECT EXAMINATION

21   BY MR. RUKAVINA:

22   Q    On your operational margin, Mr. Lemmon took you through

23   the costs and the royalties.  Do I understand that even on top

24   of those royalties, there's about a 5 or a $6 a ton operational

25   profit?

1   A    Yes, sir, Your Honor, even at 20 --

2   Q    I'm not -- I'm not the Judge.

3   A    Oh, sorry.

4   Q    Even I'm not going to cross that line.  The answer is yes?

5          THE COURT:  The FBI background check would be

6   entertaining, though.

7   BY MR. RUKAVINA:

8   Q    SO let me just, so let me understand.  So you've said that

9   when the plant is functioning, you're going to be selling 3,500

10  tons a day?

11  A    Yes, sir.

12  Q    Thirty-five hundred times six.  That's about $20,000 of

13  profit a day?

14  A    Yes, sir.

15  Q    And is that worth the 15 percent, $1.5 million DIP to

16  preserve that for the benefit of the estate?

17  A    Yes, sir.

18  Q    Okay.

19  A    And the employees.

20  Q    Mr. Martin (phonetic), did the entity purchase three

21  aircraft for Mr. Martin in exchange for part of the royalties?

22  A    Pardon me?

23  Q    Did the entity that we talked about earlier purchase there

24  aircraft from Mr. Martin in exchange for some of the royalties?

25  A    No, Your Honor.  No, sir.

Nelson - Redirect/Rukavina

1   Q    Did the company originally grant one of those dollars of

2   royalties to a gentleman named Tommy Kratic (phonetic) who

3   then, to your knowledge, or sold that to Mr. Martin?

4   A    Yes, sir.

5   Q    Did Mr. Martin provide lending initially to the Debtor to

6   get started?

7   A    Yes, sir.

8   Q    Did he charge interest or did he charge a royalty?

9   A    (No audible response)

10  Q    Was the royalty partial consideration for the loans to

11  Mr. Martin granted early on?

12          MR. LEMMON:  Objection.  Leading.

13          THE WITNESS:  No, sir.  They were -- they were a

14  gift.

15          MR. RUKAVINA:  Hold on.  There was an objection.

16          THE COURT:  Restate.

17  BY MR. RUKAVINA:

18  Q    You used the word -- what I'm struggling with, sir, is

19  that you used the word that the Debtor gifted the royalties to

20  Mr. Martin.  So was it a gift, or did Mr. Martin do something

21  to earn the royalties?

22  A    Well, Mr. Martin gave us several loans throughout -- he

23  gave us the loan for us to --

24  Q    And were the royalties linked to those loans?

25  A    I'm not understanding it then.

Nelson - Redirect/Rukavina

```
 1              MR. RUKAVINA:  Okay.  You know what?  I don't think
 2    it's that important today.  We're not here today to ratify Mr.
 3    Martin's contracts or not.
 4              THE COURT:  And as I understand it, the royalties are
 5    not being paid on the interim.
 6              MR. RUKAVINA:  During the interim period, that's
 7    correct, Your Honor.  That's why I think I can move on.
 8              THE COURT:  Okay.
 9    BY MR. RUKAVINA:
10    Q    But prior to this loan, did the Debtor disclose the
11    royalties to the pre-petition lender?
12    A    Yes, sir.
13    Q    And did you discuss that with Mr. Ramming?
14    A    Yes, sir.
15    Q    Was he mad about that?
16    A    Yes, sir.
17    Q    Did he demand something in return?
18    A    He demanded additional ownership --
19    Q    How much?
20    A    Of five --
21              MR. LEMMING:  Your Honor, I object.  This is beyond
22    the scope.
23              MR. RUKAVINA:  It's not beyond the scope.  He went
24    all into these royalties, so let's talk about them as though
25    the pre-petition lender didn't know and approve of them and
```

118

Nelson - Redirect/Rukavina

```
 1   actually profit on them to the tune of five percent equity.

 2            THE COURT:  Anything further, Mr. Lemmon?

 3            MR. LEMMON:  Your Honor, this is beyond the scope.

 4   He asked about the royalties in the budget that were being paid

 5   to Mr. Martin.  We -- he's now asking about negotiations that

 6   took place, you know, in connection with the pre-petition loan.

 7   I'm sorry, the senior loan.

 8            THE COURT:  Mr. Rukavina?

 9            MR. RUKAVINA:  I'll withdraw the question.

10            THE COURT:  Okay.

11   BY MR. RUKAVINA:

12   Q    Inventory, how much -- do you know what inventory means?

13   It's process sand.  How much is there at any given time?

14   A    In the --

15   Q    Let me ask you this.  How much was there yesterday right

16   before we filed?

17            MR. RUKAVINA:  I'm sorry, did we file yesterday?  How

18   much was there -- did we file on Wednesday?  These days blur.

19   How much inventory was there --

20            THE COURT:  30th.

21   BY MR. RUKAVINA:

22   Q    -- when we filed Wednesday?

23   A    Finished product, there was 1,988 tons.

24   Q    And everything after that would be post-petition mined?

25   A    Yes, sir.
```

Nelson - Redirect/Rukavina

```
 1   Q    Nineteen hundred tons?  Okay.  If you go back to that

 2   budget -- you don't have to pull it out necessarily.  But if

 3   you recall, is the only thing that was wrong on that budget the

 4   cash on hand at the end because it failed to take into account

 5   critical vendors?

 6   A    Yes, sir.

 7   Q    Okay.  The actual -- were there any mistakes on actual

 8   vendors to be paid and amounts to be paid?

 9   A    No, sir.  The operating is still the same.

10   Q    Now, even if -- so let's -- one more -- maybe some

11   bankruptcy terminology.  If we were going to use just the pre-

12   petition lender's cash collateral, so A/R and cash coming in,

13   would that be enough to operate?

14   A    Repeat that.

15   Q    Do we need the DIP even if we were allowed to use pre-

16   petition lender's cash collateral?  Do you understand the

17   question?

18   A    Yes, sir.  We would --

19   Q    So the pre-petition cash collateral would not be enough?

20   A    No, sir.

21         MR. RUKAVINA:  May I approach, Your Honor?  Mr.

22   Lemmon, I'm going to now offer Exhibit 18 which is the email

23   from you to me of 7:34 a.m.  May I approach, Your Honor?

24         THE COURT:  Yes, you may.

25         MR. LEMMON:  Your Honor, I object.  This was done in
```

Nelson - Redirect/Rukavina

1  the name of compromise, and there's -- it's inappropriate for

2  him to go into this right now.

3          MR. RUKAVINA:  This isn't a compromise, it's an offer

4  to extend credit.

5          MR. LEMMON:  This is a proposal made in order to

6  avoid this conflict that brings us here today.  And this is,

7  you know, I think inappropriate.  It's settlement negotiations.

8          MR. RUKAVINA:  I don't see Rule 408, I don't see a

9  settlement negotiation.  I see many other people copied here

10 that have nothing to do with me, and I see what the DIP lender

11 is doing is making an offer to extend the loan.  Now that's not

12 a negotiation.  It's an offer to extend the loan.

13         THE COURT:  I'm going to --

14         MR. LEMMON:  Your Honor, let me make clear, that's

15 not my current -- that's not my client's current proposal.

16         THE COURT:  And I do understand that, Mr. Lemmon.

17 And that is why I've already agreed to allow you guys to speak

18 on a recess.  I am going to overrule the objection,

19 specifically as it goes to the Debtors' efforts to market a DIP

20 because obviously, there has been a lot of testimony and

21 consternation over what was done by the Debtor to get a DIP on

22 better terms.  So I'm going to allow it for that purpose.

23         MR. RUKAVINA:  Your Honor, I would move to admit

24 Exhibit 18.  I will authenticate it as a true and correct copy

25 of a document received by me this morning.

 1            THE COURT:  Any objection to -- any further objection

 2   to the admission?

 3            MR. LEMMON:  No, Your Honor.  Just our initial

 4   objection.  We don't object to the authenticity.  But it was

 5   received before this morning.  Well, I guess it was received

 6   this morning.  Never mind.

 7            MR. RUKAVINA:  You might be on vacation somewhere

 8   else, but I received it at 7:34 this morning.

 9            THE COURT:  I'm going to admit Exhibit 18.

10        (Debtors' Exhibit Number 18 admitted into evidence)

11            THE COURT:  And I'm going to ask that you upload that

12   after the hearing.

13   BY MR. RUKAVINA:

14   Q    So we discussed earlier that the DIP lender had made a

15   proposal, right?  I'm sorry, that the pre-petition lender had

16   made a proposal to become the post-petition lender, right?

17   A    Yes, sir.

18   Q    Is this the offer that you were referring to then?

19   A    Yes, sir.

20   Q    And is this the only offer that you've ever heard or

21   received from the pre-petition lender?

22   A    Yes, sir.

23   Q    Did the pre-petition lender ever explain to you what

24   normal DIP controls are?

25   A    No, sir.

1    Q    Okay.  One more question.  Does the DIP lender, to your --

2    strike that.  Does the pre-petition lender, to your

3    understanding, have $1.5 million?

4              MR. LEMMON:  Objection, Your Honor.  Assumes -- let's

5    put it this way, lack of foundation.

6              MR. RUKAVINA:  I'll rephrase.

7    BY MR. RUKAVINA:

8    Q    Did the actual lending entity, what is it called, FCI-SLG,

9    did they actually extend any credit to the Debtor, or was it

10   the underlying loan participants that extended credit?

11   A    The loan participants.

12   Q    To your understanding, does FCI, the pre-petition lender,

13   do anything other than administer this loan?

14   A    No, sir.

15             MR. RUKAVINA:  Okay.  I'll pass the witness, Your

16   Honor.  Thank you.

17             THE COURT:  Thank you.  Mr. Nelson, any further --

18   Mr. Lemmon, I apologize, any further recross, sir?

19             MR. LEMMON:  No thank you, Your Honor.

20             THE COURT:  Okay.  Thank you very much for your

21   testimony, Mr. Nelson.  You may step down.

22             THE WITNESS:  Thank you, Your Honor.

23        (Witness excused)

24             THE COURT:  Is it a good time for --

25             MR. RUKAVINA:  I'd like to call, if possible --

```
 1                    THE COURT:  -- a break?

 2                    MR. RUKAVINA:  -- Mr. Covey, and then that would

 3   complete my evidence.

 4                    THE COURT:  Okay.

 5                    MR. RUKAVINA:  He'll be short.

 6                    THE COURT:  Okay.  Excellent.  Let's do that.

 7                    MR. RUKAVINA:  Your Honor, I'll call Kevin Covey,

 8   C-O-V-E-Y.

 9                    THE COURT:  So spelled like Coovey?

10                    MR. RUKAVINA:  C-O-V-E-Y.

11                    THE COURT:  Okay.

12                    MR. RUKAVINA:  I can't pronounce it another way.

13                    THE COURT:  This is true.  This is true.  If you'll

14   take the witness stand, I'll go ahead and swear you in.

15                    MR. LEMMON:  And, Your Honor, may I take about a

16   five-minute break at 5:20, 5:30 on the dot?  I have something

17   I've got to do --

18                    THE COURT:  So what time is it for you right now?

19                    MR. LEMMON:  Oh, I'm sorry.  It is -- at 4:30 Texas

20   time, may I take a five-minute break?

21                    MR. RUKAVINA:  I'll be done well before then.

22                    THE COURT:  Yes.  He says it will be a quick witness.

23   So -- and I'm sorry, sir.  I was busy teasing Mr. Rukavina

24   about his accent.  And you said it was Kevin Covey?

25                    MR. COVEY:  Kevin Covey, C-O-V-E-Y.
```

Covey - Direct/Rukavina

```
 1              THE COURT:  Thank you very much.  If you could raise

 2   your right hand.

 3                KEVIN COVEY, DEBTORS' WITNESS, SWORN

 4              THE COURT:  Thank you very much.  Please proceed.

 5                          DIRECT EXAMINATION

 6   BY MR. RUKAVINA:

 7   Q    Kevin Covey, right?

 8   A    That's correct.

 9   Q    And are you related to the proposed pre-petition --

10   proposed post-petition DIP lender?

11   A    Yes.  I'm the managing partner of GrayStreet Credit, LLC.

12   Q    What is Gray Stone Credit [sic]?

13   A    GrayStreet Credit --

14   Q    GrayStreet Credit.  I apologize.  Sounds like everyone's

15   mumbling.

16   A    It is one -- it is one of our funds that is dedicated

17   solely for the purpose of providing debtor-in-possession

18   financing in the bankruptcy to Debtors' post -- you know, post-

19   petition lending.

20   Q    So what do you do?  What's your line of work, you

21   personally?

22   A    I do many things.  I manage the firm.  But one of the

23   things that I do personally is manage all our debtor-in-

24   possession financings on our bankruptcy investing in general.

25   We work with debtors who file.  In many cases, we are
```

Covey - Direct/Rukavina

1  disinterested in the cases prior and do not have pre-petition

2  debt or acquire it.  Sometimes we do.  In this case, we have

3  nothing to do with any of the pre-petition lenders or the

4  Debtor.

5  Q    So that's very important.  Neither you nor any of your

6  entities that you manage hold any pre-petition debt?

7  A    We do not.

8  Q    Or equity?

9  A    We do not.

10  Q    About how many assets -- what's the total volume or value

11  of assets that are under management by you?

12  A    We manage 1.3 billion in assets.  We have been investing

13  in bankruptcies and distressed credit for -- since 2008.  I

14  personally have been involved in 30 bankruptcies or more, and

15  at least half of them as debtor-in-possession financing

16  providers.

17  Q    And really quickly, just to establish the bona fides with

18  the Judge, what's your basic educational background and kind of

19  history?  I mean, you're a fund manager, so we could probably

20  guess, but.

21  A    Yeah.  I'll start with college.  I went to the University

22  of Chicago.  I have a degree in economics and math.  I went to

23  work for Credit Suisse.  After that is in a role as a general

24  M&A analyst.  I then went to work for Hudson Advisors, the

25  sponsor of Loan Star Funds, which is Dallas-based here.  And I

Covey - Direct/Rukavina

```
 1   cut my tooth on bankruptcy and distressed investing under one

 2   of the fund managers there.  And I left to start my own firm in

 3   2010, raised money from friends and family, and it's been a fun

 4   ride ever since.

 5   Q    Congratulations.  Does the proposed lender have $1.5

 6   million cash right now?

 7   A    We do.

 8   Q    Is the proposed DIP lender willing to advance any post-

 9   petition funds without a priming lien?

10   A    No.

11   Q    Why is that?

12   A    This fund is solely dedicated for this purpose.  The

13   investors were promised investments, made representations to

14   that.  I have a fiduciary duty to them.  We cannot make a DIP

15   loan without a priming lien.

16   Q    And to lead you a little bit, here it's 15 percent

17   interest.  It's a nine-month term.  Default interest of three

18   percent.  We have to pay your attorney's fees, reasonable

19   attorney's fees.  Bu the Judge gets to decide if there's a

20   problem with that.  And we're discussing a potential

21   conversion, but we haven't agreed on that.  Is that generally

22   the terms?

23   A    That is correct.

24   Q    Are those market terms?

25   A    Yes.  That's in line with what we've done in the last half
```

1   dozen here.

2   Q    Has the Debtor or anyone on behalf of the Debtor made you

3   any promises other than or in excess to the terms that I just

4   summarized and you just confirmed?

5   A    No.

6   Q    Did you negotiate this in good faith?

7   A    I did.

8        MR. RUKAVINA:  Thank you, thank you.  I'll pass the

9   witness.

10       THE COURT:  Thank you, Mr. Rukavina.

11       I'll start with Ms. Young, any questions for the

12  witness?

13                      CROSS-EXAMINATION

14  BY MS. YOUNG:

15  Q    Good afternoon.  Just one question for you, Mr. Covey.

16  The loan that you are proposing as a priming DIP on an interim

17  basis does not extend liens to Chapter V causes of action.  Is

18  that accurate?

19  A    That is accurate.

20       MS. YOUNG:  No further questions, Your Honor.

21       THE COURT:  Thank you very much, Ms. Young.

22       Mr. Lemmon, questions for Mr. Covey?

23       MR. LEMMON:  Thank you, Your Honor.

24                      CROSS-EXAMINATION

25  BY MR. LEMMON:

1   Q    Mr. Covey, is it your practice to make debtor-in-

2   possession loans without a loan agreement?

3   A    It is not out of our practice.  We have done this before,

4   and we currently have one on the books in the Southern District

5   in Judge Lopez's court that was done without, and a credit

6   agreement on an interim basis.  And we negotiated a credit

7   agreement prior to the final order.

8   Q    Okay.  And so is it -- have you ever made a DIP loan

9   before without a promissory note?

10  A    Yes.

11  Q    Okay.  Now, is it -- do I understand you to say that prior

12  to the final DIP, that you anticipate that you may enter into a

13  loan agreement?

14  A    Into a credit agreement.  We would anticipate that prior

15  to or in conjunction with the final DIP order, we execute a

16  credit agreement with the Debtor.  But we are comfortable with

17  the protections afforded by the interim order as entered by the

18  Court.

19  Q    You believe that -- do you anticipate that that credit

20  agreement will have any other protections built in like

21  milestones or financial -- Debtor financial reporting than what

22  is reflected in the document in front of the Court?

23  A    We do, sir.  It's our expectation that we will work in

24  good faith to negotiate those between now and the final order.

25  But in many cases, and freefall cases, we find that there is

Covey - Cross/Lemmon

1    little time to stabilize the business for the protection of all

2    stakeholders.  So we have to act quickly.

3    Q    Yes.  Thank you.  What kind of financial information were

4    you provided before you agreed to make the loan?

5    A    The Debtor sent me an initial budget.  We reviewed that.

6    The Debtor additionally made representations to myself on the

7    phone about the value of the assets which have been affirmed by

8    his testimony today.  And that is all the information that I

9    have had thus far.

10   Q    When you say the Debtor, you mean Mr. Nelson, right?

11   A    Mr. Nelson.

12   Q    And did you negotiate with anyone else at the Debtor

13   besides Mr. Nelson?

14   A    Yes.  Mr. -- his Counsel, Davor, and I'll butcher your

15   name, I apologize.  I can't even get it off my tongue.

16   Q    Got it.  But that's it, right?

17   A    That's it.

18   Q    Okay.  If we say -- is it fair to say that you anticipate

19   that the final document that you would enter into before the

20   final DIP would have ordinary debtor-in-possession lender

21   protections?

22   A    Debtor-in-possession protections, yes.

23   Q    And what do you -- can you just tell the Court what those

24   would be?

25   A    The only -- the real litmus test, the real reason that we

130

Covey - Cross/Lemmon

```
 1   would enter into this, and the only absolute expectation we

 2   have, because every DIP loan in every case is different, is

 3   that we have a priming lien affirmed by the Court on an interim

 4   basis.  And then on a final -- on a -- in the final order, as

 5   well, we would obviously need that.  That is our principal

 6   tenant of our investment.

 7   Q    Were you provided any financial information in writing

 8   other than the budget?

 9   A    I was not.

10   Q    Do you have any historical information about the cost of

11   operations for this Debtor?

12   A    I do not.

13         MR. LEMMON:  Thank you, Your Honor.  That's all I

14   have (indiscernible).

15         THE COURT:  All right.  Thank you, Mr. Lemmon.  Just

16   a few questions -- well, let me see if there's anyone else who

17   wishes to cross-examine Mr. Covey.

18       (No audible response)

19         THE COURT:  Just a couple of questions.  And I'm

20   looking at the form of order that was uploaded this morning

21   around about 10:25.  And it's the first time that I saw the

22   name of your entity as the proposed post-petition lender.  It

23   says in -- oh, wait.

24         I understand that Mr. Djang has her hand raised?

25         Ms. Djang, do you wish to cross-examine Mr. Covey?
```

1          MS. DJANG:  I do, Your Honor.  I just have a couple

2    brief questions.  I apologize if the hand raise wasn't the

3    proper way to get Your Honor's --

4          THE COURT:  No.

5          MS. DJANG:  -- attention.

6          THE COURT:  You're perfectly fine.  Please proceed.

7          MR. RUKAVINA:  Your Honor, might I just inquire, I

8    missed it, maybe who this -- who Ms. Djang represents?

9          THE COURT:  She --

10          MS. DJANG:  Your Honor, I represent Momentum Capital

11    Funding, LLC.

12          MR. RUKAVINA:  That's fine.

13          THE COURT:  Yes.

14          MR. RUKAVINA:  Thank you.

15          MS. DJANG:  Which is the factoring company.

16          THE COURT:  Exactly.  Please proceed.

17                         CROSS-EXAMINATION

18    BY MS. DJANG:

19    Q    So I'll be very brief, Mr. Covey.  Good afternoon.  Thank

20    you for being here today.  I represent Momentum Capital Funding

21    which is the factoring company that has a pre-petition backing

22    agreement with the Debtor.  Were you aware of this factoring

23    arrangement?

24    A    I became aware of it during testimony today.

25    Q    Okay.  And you testified multiple times that your

Covey - Cross/Djang

```
 1  investors were promised priming liens.  Is it your

 2  understanding that your investors would also expect priming

 3  liens on any accounts receivable?

 4  A     No.

 5        MS. DJANG:  Okay.  That was my only question.  Thank

 6  you, Your Honor.

 7        THE COURT:  Thank you very much, Ms. Djang.  Is there

 8  anyone else?  And thank you, Mr. Calkins, for alerting me as to

 9  her hand being raised.  I don't pay as good of attention.  I'm

10  used to being interrupted.  I don't pay as good of attention to

11  the hand raises as I should.

12                           EXAMINATION

13  BY THE COURT:

14  Q     So just a couple questions, again going back to the form

15  of the order.  And it states in the order that any funds

16  borrowed pursuant to the order would bear a simple interest at

17  15 percent until paid in full absent a default.  Is that

18  correct?

19  A     That's correct.

20  Q     And upon any default, that the sums would bear simple

21  interest at 18 percent?

22  A     That is correct.

23  Q     Okay.  The next part is something that I had a question

24  about.  It says, "The Debtor shall pay the post-petition lender

25  an origination fee in points of five percent of the interim DIP
```

1    actually funded, which funds may be set off by the post-

2    petition lender from any such funds."

3         So what is -- exactly.  Your confusion is mine.  And I

4    thought I spoke DIP.  But, so what is your understanding of the

5    origination in the points on the loan?

6    A    It's a five-point origination fee.

7    Q    Okay.

8    A    These are -- we play in a very small to middle market

9    space where it's -- these are -- you know, participating in

10   these bankruptcies, as much as I love it, is time consuming.

11   And so we saw for the cost of deploying the resources in our

12   company to these small loans.

13   Q    All right.  And is it the lender's intention that the five

14   points would come out of the interim?  So essentially if you --

15   A    I understand the question, ma'am.

16   Q    Okay.

17   A    No.  That's not our intention, Your Honor.

18   Q    Okay.

19   A    The intention is that that would be accrued, all of our

20   return on this would be accrued until the point where the

21   company is confirmed or has cash sufficient to cover.

22   Q    Okay.  Essentially paid it when the DIP was otherwise

23   terminated or upon exit?

24   A    Correct.

25   Q    The only other question that I have, in Paragraph 17, it

1  says that the interim DIP shall be terminated, and it's got

2  various terminations which the Court is familiar with,

3  conversion, dismissal, appointment of a trustee and the like.

4      One of the provisions is that upon a default, that the

5  post-petition lender would provide notice of the same to the

6  debtors, and on the docket of the case.  I typically require

7  either five-day or three business days opportunity to cure.

8  Would your --

9  A    We are happy to accommodate, Your Honor.

10         THE COURT:  Okay.  Thank you.

11     (Background discussion from unmuted Webex participant

12  unrelated to hearing, not transcribed)

13         THE COURT:  I think someone's accidentally not on

14  mute.  I am not going into the city tomorrow.  So if you could

15  mute your line for me, thank you.  I don't leave the 'burbs on

16  the weekends.

17         I think that that's all the questions that I have.

18  So, Mr. Lemmon, I know you got four minutes.  Do you have any

19  other questions of the witness based on the Court's questions?

20         MR. LEMMON:  No thank you, Your Honor.

21         THE COURT:  Thank you, Mr. Lemmon.

22         Mr. Rukavina, any redirect?

23         MR. RUKAVINA:  I'll be very quick.

24                    REDIRECT EXAMINATION

25  BY MR. RUKAVINA:

```
 1  Q    Your colleague, Mr. Black, is in the courtroom, right?

 2  A    Yes.

 3  Q    So might he have gotten some financials from Ms. Martin or

 4  the company?

 5  A    I believe he did.  And I have consulted with him on this

 6  in the last day.

 7  Q    And see -- so you obviously, you're in the DIP market in

 8  the State of Texas?

 9  A    Correct.

10  Q    See if -- I'm not going to lead you, but see if you agree

11  with my experience.  But just getting a large tip, $100

12  million, is super easy.  But finding a DIP in the low to mid

13  seven figures is much harder.  Is that generally correct?

14  A    That's been the business plan of this -- of this fund for

15  us.  We have sought out a market that is very hard to fund for

16  a lot of debtors because there's a tendency for -- really it's

17  a joke in my industry.  But some debtors are too broke to go

18  bankrupt.  And you have to have a sufficient asset base to

19  cover the admin costs.  And so there tends to be very little

20  room for -- there seems to be very little -- very few lenders

21  that will support a bankruptcy that's less than $100 million

22  estate.

23  Q    Thank you.

24  A    And that's where we find our business.

25            MR. RUKAVINA:  Thank you.  That's been my experience,
```

1   as well.  Thank you, Your Honor.  I'll pass the witness.

2          THE COURT:  Thank you.  Mr. Lemmon, any recross?

3      (No audible response)

4          THE COURT:  Thank you very much for your testimony,

5   Mr. Covey.

6          THE WITNESS:  Pleasure to be here, Your Honor.

7          THE COURT:  Thank you.

8      (Witness excused)

9          MR. RUKAVINA:  Your Honor, before the break, the only

10   last item of business before I close is I will authenticate as

11   true and correct copies of the originals Exhibits 14, 15, and

12   16.  And I will ask that they be admitted.

13          THE COURT:  I know Mr. Lemmon needs the break in a

14   couple minutes.  Any objection to 14, 15, and 16, which are the

15   three emails?

16          MR. LEMMON:  No, Your Honor.

17          THE COURT:  All right.  14, 15 --

18          MR. LEMMON:  Not from me.  I don't know if anybody

19   has an objection.

20          THE COURT:  Okay.  Anyone else wish to be heard with

21   respect to the admission of those emails?

22      (No audible response)

23          THE COURT:  Hearing no further responses, 14, 15, and

24   16 are hereby admitted.

25      (Debtors' Exhibit Numbers 14, 15, and 16 admitted into

1    evidence)

2              MR. RUKAVINA:  Your Honor, the Debtor will rest.

3              THE COURT:  Okay.  We are going to take a recess.

4    How long for recess do you need, Mr. Lemmon?

5              MR. LEMMON:  Your Honor, I would ask for 20 minutes.

6              THE COURT:  Twenty minutes?

7              MR. RUKAVINA:  Your Honor, may I ask for planning

8    purposes, because I have to get my car, whether Mr. Lemmon or

9    anyone else will have any of their own evidence?

10             MR. LEMMON:  I can't say right now, and I apologize.

11             THE COURT:  Okay.

12             MR. RUKAVINA:  Thank you.

13             THE COURT:  So is 20 minutes sufficient for you to do

14   whatever you need to do, Mr. Rukavina?

15             MR. RUKAVINA:  No, it's not.  But I'll take care of

16   it one way or the other.  Don't worry about it.

17             THE COURT:  Okay.

18             MR. LEMMON:  We can go longer.  That doesn't bother

19   me.

20             THE COURT:  The Court needs to know, as well, because

21   that will push us to 5:00 and I'll need to establish some time

22   with the marshals and my staff.

23             MR. LEMMON:  Your Honor, I only need 20 minutes.

24             THE COURT:  Okay.  So let's return at 4:50.

25             MR. LEMMON:  Thank you.

138

```
 1            THE CLERK:  All rise.

 2        (Recess at 4:29 p.m./Reconvened at 4:52 p.m.)

 3            THE COURT:  Please be seated.  We're going to go back

 4    on the record in Case Number 25-80401.  When we last broke, Mr.

 5    Rukavina, I think you were prepared to complete the Debtors'

 6    evidence?

 7            MR. RUKAVINA:  Yes.  The evidence has closed.  I just

 8    wanted to inform the Court and all parties that the Debtor does

 9    request the 1.5 million.  None of that would be Mr. Roberts or

10    my appraisal -- retainers or monies.

11            THE COURT:  Okay.

12            MR. RUKAVINA:  None of that would go, again, to

13    confirm on the royalties during the interim period.

14            THE COURT:  Okay.  So --

15            MR. RUKAVINA:  And there was no proposal made during

16    the break.  But that's okay.

17            THE COURT:  Okay.  So $1.5 million, and so I'm going

18    to want some clarity with respect to the budget.  Okay.  I

19    understand you said that there would be no royalties paid

20    during the interim.  And so let me check.  By rough math, the

21    interim will go through week four, correct?

22            MR. RUKAVINA:  Correct.

23            THE COURT:  All right.  So I'm trying to look at --

24            MR. RUKAVINA:  Can I give you an answer to a question

25    that you haven't asked?  Two hundred and fifty thousand of this
```

1   will come from the insurance proceeds.

2           THE COURT:  Okay.

3           MR. RUKAVINA:  So that's why the math doesn't

4   necessarily work out.

5           THE COURT:  Okay.

6           MR. RUKAVINA:  And again, we are not going to use

7   those -- we haven't gotten them yet.  The check's in the mail.

8   We will not use them.  We will not spend them without other

9   approval from Mr. Lemmon or come into court and getting

10  approval over their objection.

11          MR. LEMMON:  Your Honor?

12          THE COURT:  Yes, Mr. Lemmon?

13          MR. LEMMON:  We used the time over the break to

14  confer with my client.  My client is willing to do the 1.5

15  million on the same terms as are in the order on an interim

16  basis.  My client objects to being fined in any way, and I

17  would point out that the evidence that was submitted would not

18  support the DIP.  But my client will agree to do the DIP on the

19  same terms as are being proposed in the order.  The 1.5

20  interim.

21          THE COURT:  Mr. Rukavina?

22          MR. RUKAVINA:  Your Honor, we do not agree.  There's

23  no talk about a final DIP.  Mr. Covey was here.  And we have

24  our -- we have the ring on the proposed DIP lender's finger,

25  subject of course to Your Honor's ruling.

```
 1              MR. LEMMON:  And, Your Honor, if I may respond?  Mr.

 2    Covey very clearly said that they were going to have to

 3    negotiate further on documentation for the final.  And so what

 4    we're offering to do is precisely what the Debtor is asking you

 5    to do right now.  And my client objects to being fined.  We

 6    think that it's improper to fine us legally and factually in

 7    this case.

 8              But we are willing to do the identical deal that the

 9    Debtor is proposing to you in this order.

10        (Pause)

11              THE COURT:  Anything further, Mr. Rukavina?

12              MR. RUKAVINA:  Your Honor, unless there's any

13    evidence, I've prepared for a very brief closing.

14              THE COURT:  Okay.  Mr. Lemmon, when can your client

15    fund?

16              MR. LEMMON:  I understand that my client can fund

17    tomorrow.  Actually, I need to -- we just had that

18    conversation.  I'm told that my client can fund almost

19    immediately.

20              THE COURT:  Well, why don't you put your witness on?

21              MR. LEMMON:  Okay.  We can -- I've just got the

22    email.  My client can fund Monday.  Okay.  Well, why don't you

23    put your client on?

24              MR. LEMMON:  Okay.  Your Honor, I don't have a

25    witness right now to put on.  So you know, I would have to go
```

1    have additional time to line up a witness to put them on to

2    testify that they'll fund.  But I'm telling the Court they will

3    fund.  And then if we want to have argument, I'll point out the

4    ways in which the evidence in front of the Court is sufficient

5    to support the proposal made by the Debtor.

6          But my client is offering to give the Debtor

7    everything that they want and that they're asking the Court to

8    grant.  And we object to being fined.

9          MR. RUKAVINA:  Your Honor just has to ask her

10   colleague, Judge Morris, about the Tuesday Morning case where

11   an esteemed, respected lawyer said the very same thing, and

12   everyone relied on it.  And the client didn't fund.  And that

13   was a multi-hundred million dollar lawsuit.

14         THE COURT:  So is there anyone else who wishes to put

15   on evidence?

16      (No audible response)

17         THE COURT:  So evidence is closed.

18         MR. LEMMON:  Mr. Taylor is waiving his arms, Your

19   Honor.

20         THE COURT:  I can't -- Mr. Taylor, if you're talking

21   to the Court, I can't hear you.

22         MR. TAYLOR:  Can you hear me now?

23         THE COURT:  I can.  Thank you.

24         MR. TAYLOR:  Thank you.  It's my technology issues.

25   Your Honor, Mr. Rukavina put on the emails back and forth

1    between the Debtor and my client.  And because he did that, I'm

2    going to have to put Mr. Nelson back on the stand for a few

3    questions.

4            THE COURT:  Put who back on the stand?

5            MR. TAYLOR:  Mr. Nelson.

6            THE COURT:  Mr. Nelson?  You're recalling Mr. Nelson?

7            MR. TAYLOR:  Yes.  Just --

8            MR. RUKAVINA:  Your Honor --

9            MR. TAYLOR:  Just with respect to the emails Mr.

10   Rukavina put in the record, and himself authenticated.  If Mr.

11   Rukavina would prefer, I could question him.  But I thought

12   he'd rather me question his client.

13           MR. RUKAVINA:  I'm happy to be questioned.  I'm

14   assuming that it's brief.  But Mr. Nelson could certainly sit

15   down again.

16           MR. TAYLOR:  Yes, please.

17           MR. RUKAVINA:  The most interest that I have is

18   getting a ruling today.  So if it would help, I can withdraw

19   those three emails.

20           MR. TAYLOR:  If that's the case, then I won't need to

21   question his witness today, Your Honor.

22           MR. RUKAVINA:  If Your Honor is agreeable to

23   withdrawing those three emails, I'm not sure that they're

24   really relevant today anyway, then we can cut that off.

25           THE COURT:  The Court will note for the record --

 1                    MR. RUKAVINA:  Actually, Your Honor, I stand

 2     corrected, please.  I apologize.  I'd like to withdraw my

 3     request to withdraw.  Now that we have an alleged competing

 4     DIP, so let's have Mr. Nelson testify, please.  I apologize for

 5     the confusion.

 6                    THE COURT:  Mr. Nelson, I think you've been recalled

 7     back to the stand.  So if you could take the stand again, I'll

 8     remind you, sir, that you're under oath that you were sworn in

 9     earlier.  Mr. Taylor?

10                    MR. TAYLOR:  Thank you, Your Honor.

11                    THE COURT:  You're welcome.

12               JOHN NELSON, DEBTORS' WITNESS, PREVIOUSLY SWORN

13                          RECROSS-EXAMINATION

14     BY MR. TAYLOR:

15     Q    Mr. Nelson, we haven't met before.  But I represent Reed

16     Seaton and his entities.  You know Mr. Seaton, don't you?

17     A    Yes, sir.

18     Q    And I think you testified that you spoke with him maybe

19     even yesterday about having one of his entities provide a DIP

20     loan.  Is that right?

21     A    Yes, sir.

22     Q    During the conversations you had with Mr. Seaton, you did

23     not tell him, did you, that the Debtor was considering suing

24     the senior lender over tis liens and debt.  You didn't tell him

25     that, did you?

1    A    Repeat that?

2    Q    During your conversations with Mr. Seaton, you did not

3    tell him that the Debtor was considering suing the senior

4    lender and challenging its liens and debt.  You didn't tell him

5    that, did you?

6    A    I don't know if I've had that conversation.

7    Q    You don't recall having that conversation with Mr. Seaton,

8    do you?

9    A    No.  Or with my counsel, no.

10    Q    Have you ever lent money to somebody for the purpose of

11    them suing you?

12            MR. RUKAVINA:  Your Honor, again, we're assuming

13    facts not in evidence that there was ever --

14            MR. TAYLOR:  I'm asking -- I'm asking him a question.

15    I'm not assuming any facts.  I've asked if he's ever done that.

16            THE COURT:  I'm going to allow the question.

17            THE WITNESS:  Sorry.  I don't think that FCI has said

18    we're going to sue the lender.

19    BY MR. TAYLOR:

20    Q    That wasn't my question.  My question, sir, was have you

21    ever lent money to a person for the purpose of having them sue

22    you?

23    A    No, sir.

24            MR. TAYLOR:  Thank you.  Pass the witness, Your

25    Honor.

 1              THE COURT:  Any cross-examination?  Or wherever we

 2   are, recross, redirect.

 3              MR. RUKAVINA:  None, Your Honor.  Thank you.

 4              THE COURT:  Thank you.  Anyone else --

 5              MR. LEMMON:  May I --

 6              THE COURT:  Oh, Mr. Lemmon.

 7              MR. LEMMON:  I'm sorry.  Yes.

 8                       RECROSS-EXAMINATION

 9   BY MR. LEMMON:

10   Q    Mr. Nelson, you were negotiating with Mr. Seaton about Mr.

11   Seaton providing this DIP that we're here about today, right?

12   A    No, sir.  I mean, well, I talked to him briefly yesterday.

13   Q    Okay.  But you were -- you made a -- you and Mr. Seaton

14   had talked about Mr. Seaton making the DIP loan.  Is that

15   correct?

16   A    Yes, sir.  But no negotiating.

17   Q    Okay.  Were there terms that were agreed between the

18   Debtor and Mr. Seaton, general terms?

19   A    I was not part of the negotiations.

20   Q    When you were having the discussions with Mr. Seaton, did

21   you ever doubt whatsoever that he had the ability to fund the

22   DIP?

23   A    Not to my knowledge, no.

24   Q    Okay.  You know Mr. Seaton to be a man who has resources

25   who can fund the DIP, right?

Nelson - Recross/Lemmon

```
 1                    MR. RUKAVINA:  Objection, Your Honor.  That's just
 2   lack of foundation, speculation.  If Mr. Seaton wants to come
 3   testify, he can.
 4                    MR. LEMMON:  He was -- this Debtor was proposing a
 5   deal with Mr. Seaton.  that's why they put forward these
 6   emails.  I want to ask whether the Debtor had confidence that
 7   Mr. Seaton could fund the DIP.
 8                    THE WITNESS:  I'm not --
 9                    THE COURT:  The DIP that Mr. Seaton declined to fund?
10                    MR. LEMMON:  The DIP that Mr. Seaton -- that they
11   couldn't reach terms on, Your Honor.
12                    THE COURT:  I'm going to give you a very --
13                    MR. LEMMON:  At the time --
14                    THE COURT:  -- brief leeway.  I'm not sure, I mean
15                    MR. LEMMON:  Sure.
16                    THE COURT:  I'm not sure the purpose of this whole
17   line at this point.  I understand why Mr. Taylor may want to --
18                    MR. LEMMON:  Sure.
19                    THE COURT:  -- further cross-examine Mr. Nelson on
20   this point.  But I'm just not sure how we're pushing the ball
21   forward.
22                    MR. LEMMON:  Very brief, Your Honor.
23   BY MR. LEMMON:
24   Q    Did you have any doubt that Mr. Seaton could fund the DIP
25   when you were having the discussions?
```

```
 1   A     Not to my knowledge, no.

 2            MR. LEMMON:  Thank you, Your Honor.  That's all I

 3   have.

 4            MR. RUKAVINA:  Briefly, Your Honor?

 5            THE COURT:  Very briefly.

 6            MR. RUKAVINA:  I apologize if I'm trying the Court's

 7   patience.

 8                    FURTHER REDIRECT EXAMINATION

 9   BY MR. RUKAVINA:

10   Q     Exhibit 14.  Go to the second page, please.  Do you see

11   the CFO is emailing to Hudson Jobe, and then they're forwarding

12   me that email.  Do you see that?

13   A     This Page 2?

14   Q     Yeah.  Do you see that?

15   A     Yes, sir.

16   Q     Hudson, Davor, sent.  Do you see that?  Initial terms are

17   five percent origination, fifteen percent interest, nine month

18   term on six million financed, et cetera, et cetera.  And then

19   you see that Mr. Seaton later on wrote yes?  The first page.

20   A     Yes, sir.

21   Q     So there were terms agreed with Mr. Seaton, weren't they?

22            MR. TAYLOR:  Objection.  Leading.

23            MR. RUKAVINA:  I'll pass the witness.  I'm sorry.

24   I'll withdraw the question.

25            THE COURT:  Withdraw the question.
```

```
 1              Mr. Taylor, anything further for Mr. Nelson?

 2              MR. TAYLOR:  No, Your Honor.  Thank you.

 3              THE COURT:  Okay.  Thank you, Mr. Nelson.  You may

 4  step down.

 5         (Witness excused)

 6              THE COURT:  Anyone else have any evidence to present?

 7         (No audible response)

 8              THE COURT:  I'll now hear closing arguments.  Mr.

 9  Rukavina, I assume you want to go last?

10              MR. RUKAVINA:  I'll go first.

11              THE COURT:  Okay.

12              MR. RUKAVINA:  Your Honor, I ask you to think about

13  two things.  I'm asking questions, I guess, which is not smart

14  during closing.  The first question is have you heard anyone

15  say that the lender is under secured?  No.  And the second

16  question is, is Mr. Nelson credible?  Yes.

17              If he is credible, which he is, and I hope that the

18  Court finds it so, then also credible is his testimony that

19  there are hundreds of millions of dollars of collateral value

20  here.  And if that testimony is credible, then the elements of

21  364(d) are satisfied on their face.

22              And because that code provision exists, rare as it

23  might be, and closely scrutinized by judges like you, it

24  exists.  The evidence is here.  You've heard that this Debtor

25  is going to make a lot of profit to pay everyone.  That's why
```

1    there's a play for the assets.  That's why they want a DIP.

2          And we need this interim DIP to get there.  Without

3    this, our doors are closed.  If, you know, if the lender really

4    wanted to be serious, then they would have some evidence.  I'm

5    telling you that this is a passthrough entity.  This is the

6    collateral agent.  They're getting their money from somewhere,

7    probably Mr. Seaton.  Certainly no other participants to my

8    knowledge have been asked.  The lender would make better terms.

9          And at the final, I guarantee you that they would

10   want a release.  We're not prepared to do that.  So I'm sorry

11   to be disrespectful.  It's a little too little and it's a

12   little too late from an entity that already did a switcharoo

13   yesterday.  Thank you, Your Honor.

14         THE COURT:  Thank you, Mr. Rukavina.

15         Mr. Lemmon, do you wish to be heard in closing?

16         MR. LEMMON:  Yes.  Thank you, Your Honor.  The

17   Debtors' evidence is wholly deficient.  They brought forth a

18   budget which was proven to be not just inaccurate, but

19   inaccurate of a magnitude that is stunning.  Nevertheless, they

20   asked the Court to rely upon what they admit is entirely wrong

21   in making decisions to go forward.

22         Mr. Nelson may or may not be credible.  But I would

23   point out to the Court that Mr. Nelson testified about the fact

24   that there weren't payments to insiders that were taking place.

25   And then when it was pointed out to him, he'd say oh yes, those

1    are insiders on the critical vendor list.  And then he would

2    say but, you know, they're really not making money.  But those

3    are entities that he and Mr. -- I'm sorry, his partner Kevin.

4    I forgot --

5             THE COURT:  Collier.

6             MR. LEMMON:  -- his last name.  I apologize.  Yes,

7    Mr. Collier set up to do business with the Debtor purposely.

8    And now they're saying that those entities won't take the

9    credit risk that they took prior to bankruptcy, and that those

10   entities demand to be paid ahead of everybody else.

11            There are a number of serious questions that need to

12   be explored in this bankruptcy.  And the evidence is just not

13   there to support priming my client's lien.  And I will point

14   out that my client is prepared to meet the precise terms that

15   are proposed on this interim.  Your Honor, it would be improper

16   and wrong to fine the existing lender on the basis of this

17   evidence, especially when the client and the senior lender is

18   saying that they will advance the funds.

19            You know, they told you that the reason that they had

20   to file was that they weren't able to circumvent the terms of

21   the loan agreements and achieve additional sales.  They

22   testified a couple of different ways.  I'm sorry.  Mr. Nelson

23   testified a couple of different ways about what waws going on

24   with the cash infusions into the company.  And then, you know,

25   he finally admitted that he recorded them as debt on the

1  company's books.

2          We weren't able to find out what the documentation

3  was for those advances to the company.  My client just has some

4  questions that it wants to go into, but we don't want to be

5  fined in the interim.  And we suggest that the evidence that

6  was brought forward regarding valuation is -- lacks foundation

7  and is deficient.

8          Now sure, he can say, well, we dig up a lot of sand

9  out there so we think it's worth a lot of money.  But he can't

10  at all assure the Court that my client's interests are

11  adequately protected, especially when they can't even put

12  together a competent budget (indiscernible).  And so we object.

13  We want to make the same loan.  We don't want to see this

14  debtor die.  This is all false history as put forth by the

15  Debtor, I would suggest.

16          And we want to get this done.  And so you know, I

17  don't have a witness to put on the stand about a deal that we

18  agreed to 20 minutes ago.  But we are -- my client is willing

19  to go forward.

20          THE COURT:  Thank you, Mr. Lemmon.  Anyone else wish

21  to be heard by way of closing?

22          MR. ADAMS:  Your Honor --

23          MR. TAYLOR:  Not from me, Your Honor.

24          MR. ADAMS:  -- Chris Adams on behalf of the --

25          THE COURT:  I'll start with Mr. Adams.  And then I'll

1   go to you next, Mr. Taylor.

2           MR. TAYLOR:  Oh, no.  I was saying I didn't have any

3   closing, Your Honor.

4           THE COURT:  Okay.  I appreciate that.  Thank you very

5   much.  Mr. Adams, any closing?

6           MR. ADAMS:  Yes, Your Honor.  Briefly.  Thank you.

7           Chris Adams on behalf of GrayStreet Credit.

8           Your Honor, quite frankly, even if Mr. Lemmon had

9   evidence to support that his client was willing to do a DIP

10  loan on the same terms, I think that fundamentally, that is

11  actually never going to be capable of being the same deal that

12  GrayStreet's willing to and capable of doing, Your Honor.

13          GrayStreet comes to this brand new.  This is what

14  they do.  They're, you know, purely interested in making, you

15  know, a commercial loan.  They don't have any ties to the

16  Debtor like Mr. Lemmon's client.  And no other motives at all.

17  It's just quite simply not the same proposition at all.

18          And, Your Honor, you know, quite frankly, the, you

19  know, the DIP loan that we're talking about today is an interim

20  DIP of 1.5.  I don't think anybody disputes that that money is

21  absolutely necessary to keep the Debtor going.  So you know,

22  Mr. Covey has the money.  He can inject the money quickly.

23  That's -- there's no, you know, issues with that.  We know that

24  that will happen.

25          And if Mr. Lemmon has arguments about further priming

1   on the, you know, the final, which I'm confident he will, and

2   I'm confident he'll be bringing forward, you know, testimony

3   and other evidence.  You know, the Court can take that up then.

4   But I think it's very rare to see this happen on an interim

5   basis.

6            But if there's a case where this should be done,

7   where the evidence supports it, Your Honor, I believe this is

8   it.  Thank you, Your Honor.

9            THE COURT:  Thank you, Mr. Adams.  Anyone else wish

10  to be heard?

11       (No audible response)

12           THE COURT:  The Court's going to take a recess, and

13  I'll return with my ruling.

14           THE CLERK:  All rise.

15       (Recess at 5:13 p.m./Reconvened at 5:32 p.m.)

16           THE CLERK:  All rise.

17           THE COURT:  Please be seated.

18           All right.  We're going to go back on the record in

19  Case Number 25-80481.  The Court has a number of motions before

20  it, all first-days.  And I will start with the simplest of

21  them, which we really didn't touch on, the notice of

22  designation as a complex case.  I will grant that motion.  I do

23  need to take a look at the form of order on that before it's

24  uploaded, but I am going to grant designation as a complex

25  case.  I believe that it fulfills the requirements of a complex

1  case under the Court's procedures.

2          With respect to the remaining motions, given that

3  wages, critical vendors, and insurance all rely upon the

4  existence of a DIP, I will start with that.  The Court will

5  start with essentially the language of the Code.  364(d)

6  provides that if the Trustee or Debtor-in-possession is unable

7  to obtain credit or financing on any other basis, such as that

8  provided in Section 364(c), that credit may be secured by a

9  lien on property that has is senior to or equal to an existing

10  lien on the property provided that the existing lienholder is

11  adequately protected.

12          Under this provision, the Trustee or the

13  Debtor-in-possession may prime an existing lien,

14  notwithstanding covenants in the existing loan agreement or

15  provisions of non-bankruptcy law that would protect the

16  position of the existing lender.

17          The Code further goes on to state that the Trustee or

18  the Debtor-in-possession in this case would have the burden of

19  proving that the existing lender is adequately protected.  In

20  this particular instance, I would grant the pre-petition lender

21  that the valuation evidence, given that it was primarily the

22  lay testimony of the Debtors' principal, was light -- let's

23  just say that -- in terms of proving adequate protection.  But

24  likewise, I don't think that there was a considerable contest

25  to whether the lender was adequately protected.

1          Likewise, Section 361 of the Code does give the Court

2    a bag of tricks in terms of how to protect a pre-petition

3    lender.  And in this instance, the Court would, as part of any

4    DIP, provide the pre-petition lender with replacement liens to

5    the extent of any diminution in cash collateral.  Now, the

6    Debtor has stated time and time again that it is not intending

7    to use the cash collateral of the lender.  To the extent it

8    does and to the extent that there is a decrease in the value of

9    the pre-petition lender's interest in the property, the Court's

10   going to grant replacement liens to the pre-petition lender.

11          Likewise, obviously, a very important prong of the

12   statute and that which I think we delved into a greater extent

13   is whether the Debtor is unable to obtain credit otherwise.

14   And that essentially goes to whether or not the Debtor has made

15   sufficient pre-petition efforts to get DIP financing or to

16   procure DIP financing on terms other than that of priming the

17   DIP lender.

18          Again, the pre-petition dispute that is going to pour

19   into the bankruptcy between the existing pre-petition lender,

20   which has got a certain number of insiders there, and the

21   Debtor and its management is palatable.  I recognize that there

22   is a history and a story there that the Court has yet to hear

23   because I think that we heard only snippets today.  We have not

24   heard from near enough of the players, I am sure, to be able to

25   get a clear picture of what's happening.  But what I do have a

1    very clear picture of is that if a DIP is not extended today,

2    if payroll is not made today, and if folks like gas suppliers

3    and things of that nature are not paid today, that irreparable

4    harm will befall this company.

5         I don't pretend to be a frac sand expert, but I do

6    know enough to know that if you shut your doors, the customers

7    go elsewhere.  And I do know enough that if you shut your doors

8    and you shut your plant down, then it takes considerable effort

9    and expense to come back up and uncontroverted evidence

10   reflected the same.  And so, for that reason,  I believe that

11   the irreparable harm element is one of the biggest things for

12   the Court to consider today.  So I'll circle back now to

13   whether the Debtor is unable to obtain credit otherwise.

14        I appreciate Mr. Lemmon's proposition that he has a

15   client that is ready, willing, and able to extend on the same

16   terms of that of GrayStreet.  But frankly, all I have is a

17   statement of counsel.  And as Mr. Lemmon is an officer of the

18   Court, I have no reason to believe that he isn't sincere in his

19   words.  However, at the end of the day, I have no evidence.  It

20   is not difficult to get a witness here before the Court that

21   will just say plainly, I represent the pre-petition lender, we

22   are ready, willing, and able to fund and we will fund on these

23   terms.  This was the time to do it.

24        It's a first-day hearing.  These come on shortened

25   notice, but this issue has been out there since June 30th, and

1   we are where we are.  So I don't have any contrary evidence to

2   the fact that the Debtor was unable to obtain credit otherwise.

3   Although I will recognize that there was obviously considerable

4   back-and-forth and there's probably a history of why the Debtor

5   may not want to take further funding on a post-petition basis

6   from the pre-petition lender, but, again, there was no evidence

7   that would undermine the Debtors' business judgment on this

8   point.

9        There's obviously evidence of multiple attempts at

10  obtaining financing.  All that I have in the record is that

11  some member of the pre-petition credit group offered and then

12  withdrew his offer of providing a DIP otherwise.  And so what I

13  have in terms of evidence is that there is one game going and

14  that is the GrayStreet Credit lender, again, whose principal

15  has testified that his entity is ready, willing, and able to

16  fund.

17       So for those reasons, I am going to grant what I know

18  to be an extraordinary remedy, but I'm going to do it on an

19  interim basis pursuant to Section 364(d)(1) of the Bankruptcy

20  Code and allow the Debtors to prime the existing lender for

21  $1.5 million of interim credit.  I'm going to look at the

22  budget closely when it comes back to me.

23       Mr. Rukavina, I'll grant you this is what we'd have

24  called in the olden days a freefall.  I mean, obviously, this

25  is a very, very quick filing.  But it was very palatable to the

158

1    Court that everybody was kind of coming up to speed during the

2    context of the hearing.  So when we have a second-day hearing,

3    I'm going to expect the I's to be dotted and the T's to be

4    crossed.  We got there in terms of the various creditors, the

5    various post-petition funding that will be made, but I don't

6    really like to watch the sausage get made.  I don't like to

7    learn who the insiders are during the course of a hearing.

8           Again, I appreciate Mr. Nelson's testimony.  I found

9    him to be credible, but hear me, there are a lot of insider and

10   affiliated companies that are doing business with one another.

11   The Court expects those to be on either net-zero terms while I

12   am priming another lender or if it is a situation such as that

13   of JMN, I believe it was, as a critical vendor, that they're on

14   market terms that which he is providing to other third parties

15   or better for the Debtors.  And I think the testimony bore that

16   out today.

17          Again, for the $1.5 million, I expect that part of my

18   approval of the other orders, which I'll go into, is going to

19   be on the basis that they are provided for in the budget.  As

20   I've put my eyes on the budget, I don't see the critical

21   vendors all in there.  There's a potential for Stabilis to be

22   in there.  I don't see Mr. McAda and things of that nature, if

23   these folks are going to get paid in the first four weeks of

24   the case, we need to provide for that and we need to see where

25   that $1.5 million is going.  And, again, like you said, there

1   may be another inflow of $250,000 that we don't see here.  So

2   I'd like to see a better budget attached to the form of the DIP

3   order.

4           MR. RUKAVINA:  Your Honor, just for the first interim

5   period, or the whole period?

6           THE COURT:  Oh, no, no, no.  I only need a budget

7   that goes through the interim period for the interim DIP order.

8           With respect to the form of order that was uploaded

9   at 16-1, in Paragraph 3, I think there's just a little nit.  It

10  says they've got a property and plant in Live Oak County at

11  which it says "hit processes."  I think that's "it."  And

12  Paragraph 6, the last line says, "To the extent of any

13  pre-petition cash collateral, the Debtor shall otherwise

14  account for the same subject to their right to use any of the

15  same by separate motion of order."  I think that should say,

16  "To the extent of the use of any pre-petition cash collateral,

17  the Debtor shall otherwise account for the diminution of the

18  same."  And, again, in here, I am going to require the Debtor

19  to give replacement liens to the extent of any diminution, of

20  course, we would address that further at final, as well.

21          With --

22          MR. RUKAVINA:  For clarity, Your Honor, the

23  replacement liens will still be against all like collateral?

24          THE COURT:  Yes.

25          MR. RUKAVINA:  Thank you.

```
 1              THE COURT:  Yes.  I'm trying to look at your
 2   Paragraph 7.  It reads very much like a paragraph from a motion
 3   rather than an order.  I think what you're getting at there is
 4   that the property that is acquired by the estate after the
 5   petition date shall not be subject to the liens of the
 6   pre-petition lender except as otherwise provided by Section 552
 7   of the Bankruptcy Code.  I think that that's unquestionable.
 8              And to the extent that the post-petition assets are
 9   available, then, yes, I will give the DIP lender a first
10   priority lien on those without the necessity of priming the
11   pre-petition lender there.
12              I think that I'd like you to give me a little clarity
13   in Section 14.  Again, it said, "The Debtor shall pay the
14   post-petition lender an origination fee and points of five
15   percent of the interim DIP actually funded, which funds may be
16   set off by the post-petition lender from any such funds."  I
17   think it was Mr. Covey's testimony that that will not happen in
18   the interim.
19              Section 17 (iv) says 48 hours opportunity to cure.
20   I'd like five calendar days or three business days, whatever
21   you want to work in there.
22              Paragraph 24 says that the Debtors have sought
23   post-petition financing from other non-insiders.  I think the
24   evidence showed that they've sought post-petition financing
25   from insiders and non-insiders.
```

1          Section B, once we get to the ordered paragraphs, I

2     think you've been given a date by Ms. Harden, is that correct,

3     August 29th?

4          MR. RUKAVINA:  Yes, Your Honor.   August 29th, I

5     forget what time but we'll input that from Ms. Harden.

6          THE COURT:  Okay.  And then either here or in your

7     notice of hearing, I'd like you to establish an objection

8     deadline.  Why don't you establish that, let's see, as the

9     22nd.

10          Take a look at Section I now that there's not going

11     to be -- I mean, the carveout may still be there, but take a

12     look as to whether or not this language needs to be amended

13     since you're not taking anything out of the interim portion.

14     Also, even to the extent that any of this language stays, it

15     says, "For avoidance of doubt, only the United States Trustee

16     and the professionals will have any rights to the carveout

17     funds."  I understand what you're saying there, but I'm not

18     sure you're granting an actual right to the United States

19     Trustee.  So just take a look at that language, and I'm sure

20     Ms. Young can give you some language there.

21          With those comments, again, on an interim basis

22     subject to a budget which is going to provide for everything

23     that will go out in the interim on wages, critical vendors, and

24     insurance, the Court will approve the DIP loan pursuant to

25     Section 364(d)(1).

1              The Court will note as I go through the remainder of

2    the motions, I'll start with joint admin's already been

3    granted.  I did have an opportunity to review the complex

4    designation order while I was talking.  And it mirrors that

5    which I have approved in Zips and other cases and so I will

6    sign that.  That is a good form of order.

7              With respect to, let's start with wages.  Again, I

8    appreciated the testimony today that there are at least a

9    couple, two or three insiders that are on the wages list.  Each

10   of those folks as well under, in terms of the money that would

11   be going out as part of this order as well under the priority

12   cap, and so the Court will grant the pre-petition wages and

13   payroll motion.  I don't have any comments to the order itself.

14   It seems to be in good shape.  The only thing that I would ask

15   is, again, that it be provided for in the DIP.

16             The next one is with respect to critical vendors.

17   Again, the Court is going, subject to the amounts being put

18   together in a budget, I'm going to note for the sake of the

19   order as it pertains to critical vendor payments, I'm

20   authorizing the Debtors to use their discretion as to whether

21   or not to make these payments.  It does not by any means

22   require the Debtor to make every single one of these payments.

23   It doesn't require that the Debtor make every single one of

24   these payments in the first four weeks of the case on an

25   interim.  Obviously, making all of these payments would eat up

1    about half of what the DIP would otherwise be.

2            And so, I'm just making that point because I think

3    that there was a lot of issues with the budget not having these

4    critical vendor payments in them.  But, again, that's subject

5    to the further agreement of these critical vendors to continue

6    to do business with the Debtor.  And it's also subject to the

7    Debtors' discretion as to if and when to pay these.  So I'm

8    going to approve this order.  I'm going to approve it on an

9    interim basis.

10           And I recognize that sometimes the cat's out of the

11   bag, but I do like to pass my critical vendor motions and my

12   orders to final such that, number one, we'd have a committee on

13   board by the time we would get to a final order, most likely.

14   And then in addition to that, because we have at least one

15   insider that is on the schedule and because it is -- like I

16   said, it's a decent percentage of the interim DIP, I'm going to

17   give this interim approval.  And we'll just put it on the same

18   date, the 29th, that we were going to schedule the final DIP

19   and we'll establish a similar objection period.

20           MR. RUKAVINA:  Put that in the order, Your Honor?

21           THE COURT:  You can either do it in the notice of

22   hearing, but the order needs to say it's interim, obviously.

23           MR. RUKAVINA:  Yep.

24           THE COURT:  And then finally, with respect to

25   insurance, I don't think that there was really any objection as

1    to insurance.  Any amounts that are approved pursuant to the

2    insurance order need to be in the form of budget.  Let me look

3    at the order.  I'm going to do this one on interim, and this is

4    not because I have a question of whether or not insurance

5    should be paid.  It's just recognizing the speed with which

6    this case had to be paid.

7            Inner Larson guy tells me you probably have another

8    insurance policy that you might not have listed on Exhibit A,

9    but you're going to want to pay so that if I give you the

10   ability to go to final on a second day, you're going to find

11   the insurance policy and then you're going to ask me to pay it.

12   And the United States Trustee does love it some insurance, and

13   so do I.  So I'm going to give interim approval there, same

14   rules apply.  We will set that on the 29th with the others.

15   Let's see.  Other than that, I didn't have any comments to the

16   form of order itself.

17           Is there any motion that I have missed?

18           MR. LEMMON:  Your Honor, I have one question.  Will

19   the parties have the opportunity to see the corrected budget

20   before the order is signed?

21           MR. RUKAVINA:  Your Honor, I'm sorry, I cannot --

22           THE COURT:  He asked for the pre-petition lender to

23   be able to see the order and the budget before it's uploaded.

24           MR. RUKAVINA:  Absolutely.  Yeah, absolutely.  And

25   I'll have that, sir, to you I'm hoping tomorrow evening.  And

1   the order's not going to uploaded until Monday anyway, so I

2   would just ask that any comments come back to me before Monday

3   at noon because we've got to get employees paid.

4           THE COURT:  Okay.

5           MR. RUKAVINA:  There's no way we're going to upload

6   it tonight even if Your Honor would be willing to enter it

7   because we have to -- it's just not going to happen tonight.

8           THE COURT:  Okay.  Well --

9           MR. RUKAVINA:  The employees have been told that

10  they're going to be paid on Monday,  So --

11          THE COURT:  Okay.  Well, the --

12          MR. RUKAVINA:  -- when Your Honor said today in her

13  ruling, I took it to mean figuratively today.  They've been

14  told they're going to be paid on Monday.

15          THE COURT:  Okay.  Well, I'll let my staff know.  We

16  understand.  I mean, if you can give it to us tonight, we'll

17  sign it tonight.

18          MR. RUKAVINA:  No, because I'm going to go into that

19  budget myself and --

20          THE COURT:  Okay.

21          MR. RUKAVINA:  -- when I follow up with you, I'm

22  going to -- it will be --

23          THE COURT:  Understood.

24          MR. RUKAVINA:  -- it will be cleaned up.  But I don't

25  want to do it in a rush.

1    THE COURT:  Okay.  Understood.  Well, if the

2  employees are prepared that they'll get paid on Monday, then

3  let me look at my calendar just to give everyone a heads up of

4  what we've got going on Monday.  It will be a good time for me

5  to find out myself.  Let's see.

6    (Pause)

7    MR. RUKAVINA:  If I might, Your Honor, interrupt?

8    THE COURT:  Yes.

9    MR. RUKAVINA:  Would it be possible to upload the

10  order and if Mr. Lemmon can accommodate me over the weekend?

11  I'm not asking anyone to work on the weekend, but I just don't

12  know how -- back when I was a law clerk, we didn't have ECF

13  order processing, so I don't know how it works.

14    THE COURT:  Right.  I'm not sure that I have access

15  to someone who -- I can sign, but that doesn't mean that it can

16  --

17    MR. RUKAVINA:  That doesn't make it entered, yeah.

18    THE COURT:  -- be uploaded.

19    MR. RUKAVINA:  Let's target Monday morning, then.

20    THE COURT:  Yeah.

21    MR. RUKAVINA:  Again, if Mr. Lemmon will just -- and

22  his client (indiscernible) the comments quickly.

23    THE COURT:  Certainly.  And I'm wide open on Monday.

24  My docket was rescheduled.

25    MR. RUKAVINA:  Thank you, Your Honor.  And if I might

1    inform Ms. Harden as soon as it's entered.

2              THE COURT:  Yes.

3              MR. RUKAVINA:  As soon as it's uploaded.

4              THE COURT:  Absolutely.  If you'll email Ms. Harden

5    on Monday, she will be here before all of us, I can guarantee

6    you that.  Definitely before me.

7              MS. DJANG:  Your Honor, can I just make one comment?

8    I apologize.

9              THE COURT:  Please.

10             MS. DJANG:  Again, Caroline Djang of Buchalter,

11   appearing on behalf of Momentum.

12             We heard testimony earlier from the DIP lender's

13   counsel that -- or the DIP lender's representative that their

14   priming lien is not intended to prime any of the liens on the

15   receivables that are owned by Momentum.  Would it be possible

16   to add some language to Paragraph H specifying that?  That's

17   for Debtors' Counsel.

18             MR. RUKAVINA:  I have no problem clarifying that.

19             MS. DJANG:  Sure.

20             MR. RUKAVINA:  It's at Paragraph I.  No, I have it

21   somewhere.  Yeah, I have it on Paragraph H that there is no

22   lien on anything that would be the cash collateral or the pre-

23   petition lender.  I'm happy to add, if you'll email me the

24   formal name of your --

25             MS. DJANG:  Yes.

1           MR. RUKAVINA:  Yeah, and I'll put the cash

2   collateral, the pre-petition lender and/or Momentum, if that's

3   okay with Your Honor.

4           THE COURT:  That's fine.

5           MS. DJANG:  That would be perfect.  Thank you so

6   much.

7           THE COURT:  Of course.  All right.  Anything else,

8   ladies and gentlemen?

9           MR. RUKAVINA:  One moment.

10      (Pause)

11          MR. RUKAVINA:  No, Your Honor.  Thank you very much.

12          THE COURT:  All right.  Did I cover all your motions?

13          MR. RUKAVINA:  Thank you for your time and I

14  apologize it was all afternoon.  I might be confusing two

15  cases, but I do envision filing a motion -- well, first of all,

16  Mr. Lemmon and I, we'll see if we can't get an agreement to use

17  that insurance check.  If not, then that's the only urgent

18  thing that I can remember right now.  But typically, when I

19  forget something --

20          THE COURT:  All right.  Well, obviously, at this

21  point, reach out to Ms. Harden if you need any dates in the

22  interim between now and the 29th.  She is superwoman.  She

23  stands ready.  I think you do -- I know you've been in touch

24  with her as you were requesting your omnibus dates.  Do be

25  aware that there won't be any hearing availability the 25th

```
 1    through the 27th.  I'm out of town.  I'm speaking at a

 2    conference.

 3             MR. RUKAVINA:  I believe we've secured September 30th

 4    and October 30th in the afternoon.

 5             THE COURT:  Yes, okay.  Excellent.  All right.  Well

 6    with that, I'm going to be in the bench a few minutes cleaning

 7    up but, otherwise, the Court will stand adjourned for the day.

 8    You guys have a great day.

 9             MR. RUKAVINA:  Again, thank you for staying late and

10    thank you for your time and your staff.

11             THE COURT:  You're very welcome.

12             Mr. Lemmon, get back to your vacation.  So sorry.

13             MR. LEMMON:  Thank you, Your Honor.

14             THE COURT:  Thank you.

15             THE CLERK:  All rise.

16        (Proceedings were adjourned at 6:00 p.m.)

17                           *  *  *  *  *

18

19

20

21

22

23

24

25
```

```
 1              C E R T I F I C A T I O N

 2        I, DIPTI PATEL, court-approved transcriber, certify that

 3   the foregoing is a correct transcript from the official

 4   electronic sound recording of the proceedings in the above-

 5   entitled matter, and to the best of my ability.

 6

 7

 8   _____

 9   DIPTI PATEL, AAERT CET-997

10   Expires: December 6, 2026

11   Liberty Transcripts                Date:  August 4, 2025

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```