Davor Rukavina, Esq.
Texas Bar No. 24030781
J. Kyle Jaksa, Esq.
Texas Bar No. 24120923
**MUNSCH HARDT KOPF & HARR, P.C.**
500 N. Akard St., Ste. 4000
Dallas, TX 75201
Telephone:   (214) 855-7500
E-mail:        drukavina@munsch.com
                  kjaksa@munsch.com

*Counsel to the Debtors*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| FCI SAND OPERATIONS, LLC, *et al.*, | § | Case No. 25-80481-mvl-11 |
| | § | |
| Debtors.[1] | § | Jointly Administered |

**DEBTORS' EMERGENCY APPLICATION TO EMPLOY
PIPER SANDLER & CO. AS INVESTMENT BANKER**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 4:00 P.M. (CT) ON NOVEMBER 14, 2025.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**

TO THE HONORABLE MICHELLE V. LARSON, U.S. BANKRUPTCY JUDGE:

COME NOW FCI Sand Operations, LLC ("FCI Sand") and FCI South, LLC ("FCI South,"

and together, the "Debtors"), the debtors-in-possession in the above styled and numbered

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: FCI Sand Operations, LLC (2539) and FCI South, LLC (4193) (the "Debtors"). The location of the Debtors' service address is 606 County Rd. 121, Marble Falls, TX 78654.

DEBTORS' EMERGENCY APPLICATION TO EMPLOY PIPER SANDLER & CO.                     PAGE 1
AS INVESTMENT BANKER

bankruptcy cases (the "Bankruptcy Cases"), and file this their *Debtors' Emergency Application to Employ Piper Sandler & Co. as Investment Banker* ("Application"), respectfully stating as follows:

## I. RELIEF REQUESTED

1. By this Application, the Debtors request entry of an order substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"), (i) authorizing the retention and employment of Piper Sandler & Co. ("Piper Sandler") as their investment banker in accordance with the terms and conditions set forth in that certain engagement agreement, dated as of November 4, 2025, a copy of which is attached as **Exhibit 1** to the Proposed Order (the "Engagement Agreement"), pursuant to section 327(a) of the Bankruptcy Code, Bankruptcy Rule 2014(a), and Local Rule 2014-1, effective as of November 4, 2025, and (ii) granting related relief. In support of the Application, the Debtors rely on the *Declaration of Joseph Denham* (the "Declaration"), attached as **Exhibit B** and incorporated by reference as if fully set forth herein.

## II. JURISDICTION AND VENUE

2. The United States Bankruptcy Court for the Northern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This Application constitutes a core proceeding under 28 U.S.C. § 157(b)(2), a matter that arises exclusively under the provisions of the United States Code, Title 11 §§ 101 *et seq.* (as amended, the "Bankruptcy Code"), and as to which the Court accordingly has the power consistent with the United States Constitution to enter a final order. The Debtors expressly consent to such a final disposition by this Court. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

3. The statutory basis for the relief requested herein are sections 327(a) and 330 of the Bankruptcy Code, rules 2014(a) and 2016 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules"), rules 2014-1 and 2016-1 of the Local Court Rules of the United States

Bankruptcy Court for the Northern District of Texas ("Local Rules"), and the Procedures for Complex Cases in the Northern District of Texas (the "Complex Procedures").

### III.     BACKGROUND

4.    On July 30, 2025 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division to be jointly administered. The Bankruptcy Cases are procedurally being jointly administered. The Debtors continue to operate their business and to manage their estates as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On August 21, 2025, the United States Trustee appointed a statutory committee of unsecured creditors in these Bankruptcy Cases (the "Committee"). No trustee or examiner has been appointed.

### IV.     BASIS FOR RELIEF REQUESTED

5.    The Debtors, "with the court's approval, may employ one or more attorneys, accountants, … or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons..." 11 U.S.C. § 327(a). An application for retention shall include:

> specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

FED. R. BANKR. P. 2014.

6.    The Debtors request authority to retain Piper Sandler to assist with the formulation, analysis and implementation of various options for a restructuring, reorganization or other strategic alternatives. As required, this Application and the exhibits attached hereto set forth specific facts

showing the need for the employment, the reasons for selecting Piper Sandler, the professional services to be rendered, the proposed arrangements for compensation, and any Piper Sandler connection to parties-in-interest. Further, as stated in the Declaration, Piper Sandler does not represent or hold any interest adverse to the Estates with respect to the matters for which retention is sought. Piper Sandler is qualified to provide professional services to the Debtors and retention is in the best interests of the Estates, their creditors, and all other parties-in-interest.

A.  **Basis for Selection of Piper Sandler**

7. The Debtors have selected Piper Sandler because of Piper Sandler's reputation and extensive experience and knowledge in providing investment banking services. Piper Sandler's professionals each bring a rich and varied experience to the table and therefore offer valuable perspective. Piper Sandler's professionals also have extensive experience with financially troubled companies in complex financial restructuring including chapter 11 cases. In addition, Piper Sandler has extensive experience with the most likely buyers and sources for funding: middle-market, consumer-focused investors. The individual who will be primarily responsible for supervising Piper Sandler's services in the Bankruptcy Cases is Mr. Joseph Denham.

8. Piper Sandler maintains an office at 800 Nicollet Mall, Suite 900, Minneapolis, MN 55402; Telephone: (212) 284-9300.

B.  **Services to be Rendered**

9. The Debtors seek to employ and retain Piper Sandler to provide services to assist the Debtors in their formulation and implementation of various restructuring options, including but not limited to, the following:

   a. review and analyze the Debtors' assets and liabilities and the operating and financial strategies of the Debtors;

b. review and analyze the business plans and financial projections prepared by the Debtors;

c. evaluate the Debtors' debt capacity in light of its projected cash flows and assist in the determination of an appropriate capital structure for the Debtors;

d. evaluate the Debtors' liquidity, including financing alternatives;

e. assist the Debtors in raising debt or equity financing, including developing marketing materials, creating and maintaining a data room and contact log, initiating contact with potential capital providers and running the process for a New Capital Raise (as defined below);

f. assist the Debtors in M&A Transaction[2] related activities, including developing marketing materials, creating and maintaining a data room and contact log and initiating and managing contact with interested buyers throughout the process;

g. assist the Debtors and its other professionals in reviewing the terms of any proposed M&A Transaction and/or New Capital Raise (whether proposed by the Debtors or by a third party), in responding thereto and, if directed, in evaluating alternative proposals for a M&A Transaction and/or New Capital Raise, as applicable;

h. advise the Debtors with respect to, and attend, meetings of the Debtors' board of directors, creditor groups and other interested parties, as reasonably requested; and

i. render such other financial advisory and investment banking services as may be agreed upon by Piper Sandler and the Debtors.

---

[2] As used herein, the term "M&A Transaction" shall mean (a) any merger, consolidation, reorganization, recapitalization, financing, refinancing, business combination or other transaction pursuant to which the Debtors (or control thereof) is acquired by, or combined with, any person, group of persons, partnership, corporation or other entity (an "Acquirer"), (b) any acquisition, directly or indirectly, by one or more Acquirers (or by one or more persons acting together with an Acquirer pursuant to a written agreement or otherwise), through a credit bid or otherwise, whether in a single transaction, multiple transactions or a series of transactions of (x) a material portion of the assets or operations of the Debtors or (y) any outstanding or newly-issued shares of the Debtors' capital stock or any securities convertible into, or options, warrants or other rights to acquire, such capital stock or other equity securities of the Debtors for the purpose of effecting a recapitalization or change of control of the Debtors; (c) any acquisition, directly or indirectly, by the Debtors, whether in a single transaction, multiple transactions or a series of transactions, of any outstanding or newly-issued shares of another person's capital stock or any securities convertible into, or options, warrants or other rights to acquire, such capital stock or other equity securities of another person, for the purpose of effecting a recapitalization or change of control of the other person; or (d) any transaction similar to any of the foregoing, including, without limitation, any sale transaction under sections 363, 1129 or any other provision of the Bankruptcy Code. As used herein, the term "Applicable Statute" shall mean (i) the Bankruptcy Code or (ii) the bankruptcy, insolvency or similar law of any other jurisdiction (each, an "Other Bankruptcy Law", and any proceeding under the Bankruptcy Code or Other Bankruptcy Law, a "Bankruptcy Proceeding").

10. Subject to this Court's approval of the Application, Piper Sandler is willing to serve as the Debtors' investment banker in the Bankruptcy Cases and to perform the services described above.

## C. Compensation and Reimbursement

11. As set forth more fully in the Engagement Agreement, Piper Sandler and the Debtors have agreed on the following terms of compensation and expense reimbursement (the "Fee and Expense Structure"):

   a. Monthly Fee. Commencing as of the date hereof, whether or not a transaction is proposed or consummated, an advisory fee (a "Monthly Fee") of $150,000 per month. The initial Monthly Fee shall be pro-rated based on the commencement of services as of the date hereof through to the end of the calendar month. One third (1/3) of each Monthly Fee shall be payable in cash and the remaining two thirds (2/3) of each Monthly Fee shall be payable in cash upon the earlier of (i) consummation of any M&A Transaction or New Capital Raise and (ii) the Debtors' emergency from the Bankruptcy Cases. The cash portion of the first full two Monthly Fees shall be payable by the Debtors upon the execution of this Agreement by the Debtors, and thereafter the cash portion of the Monthly Fee shall be payable by the Debtors in advance on the first day of each month.

   b. A fee (an "M&A Fee") of $2,500,000, plus an additional 2.5% applicable to values of Aggregate Consideration (as defined below) above $90,000,000, payable upon the closing of each M&A Transaction. The term "Aggregate Consideration" shall mean the total amount of all cash plus the total value (as determined pursuant hereto) of all securities, contractual arrangements (including, without limitation, any lease arrangements or put or call agreements) and other consideration, including, without limitation, any contingent, escrowed or earned consideration, paid or payable, directly or indirectly, in connection with an M&A Transaction (including, without limitation, amounts paid (i) pursuant to covenants not to compete, employment contracts, employee benefit plans, management fees or other similar arrangements, and (ii) to holders of any warrants, stock purchase rights or convertible securities of the Debtors and to holders of any options or stock appreciation rights issued by the Debtors, whether or not vested). Aggregate Consideration shall also include the amount of any short-term liabilities and any long-term liabilities of the Debtors (including, without limitation, the principal amount of any indebtedness for borrowed money, capitalized leases and the full amount of any off-balance sheet financings) (x) assumed, repaid, defeased or retired, directly or indirectly, in connection

    with or in anticipation of an M&A Transaction or (y) existing on the Debtors' balance sheet at the time of an M&A Transaction (if such M&A Transaction takes the form of a merger, consolidation or a sale of stock or partnership interests).  For purposes of calculating the amount of revolving credit debt in the preceding sentence, the arithmetic mean of the amount of revolving credit debt outstanding on the last day of each month during the 12 months preceding the closing of the M&A Transaction will be used.  In the event such M&A Transaction takes the form of a sale of assets, Aggregate Consideration shall include (i) the value of any current assets not purchased, minus (ii) the value of any current liabilities not assumed.  In the event such M&A Transaction takes any other form, Aggregate Consideration shall include the fair market value of (i) the equity securities of the Debtors retained by the Debtors' security holders following such M&A Transaction and (ii) any securities received by the Debtors' security holders in exchange for or in respect of securities of the Debtors following such M&A Transaction (all securities received by such security holders being deemed to have been paid to such security holders in such M&A Transaction).  The value of securities that are freely tradable in an established public market will be determined on the basis of the last market closing price prior to the consummation of an M&A Transaction.  The value of securities that are not freely tradable or have no established public market, or if the consideration consists of property other than securities, the value of such property shall be the fair market value thereof as mutually determined in good faith by Piper Sandler and the Debtors; _provided_, _however_, that all debt securities shall be valued at their stated principal amount without applying a discount thereto.  If the consideration to be paid is computed in any foreign currency, the value of such foreign currency shall, for purposes hereof, be converted into U.S. dollars at the prevailing exchange rate on the date or dates on which such consideration is payable.

  c.    A new capital fee (each, a "New Capital Fee") equal to (i) 2.0% of the face amount of any senior secured Financing raised, including, without limitation, any senior secured debtor-in-possession financing raised; (ii) 3.0% of the face amount of any junior secured or senior or subordinated unsecured Financing raised and (iii) 5.0% in the case of any other Financing, including, without limitation, equity or equity-linked Financing, capital convertible into equity or hybrid capital raised, including, without limitation, equity underlying any warrants, purchase rights or similar contingent equity securities (each, a "New Capital Raise").  The New Capital Fee shall be earned and payable upon the earlier of execution of a commitment letter or execution of a definitive agreement with respect to such Financing.  For the avoidance of doubt, (x) there may be multiple New Capital Fees if there are multiple transactions by which the new capital is committed, (y) the term "raised" shall include the amount committed or otherwise made available to the Debtors whether or not such amount (or any portion thereof) is drawn down at closing or is ever drawn down and

whether or not such amount (or any portion thereof) is used to refinance existing obligations of the Debtors and (z), the New Capital Fee relating to any warrants, purchase rights or similar contingent equity securities shall be due and payable upon the closing of the transaction by which such instruments are issued and shall be calculated as if all such instruments are exercised in full (and the full exercise price is paid in cash) on the date of such closing, whether or not all or any portion of such instruments are vested and whether or not such instruments are actually so exercised. In addition, any Financing exclusively funded by Graystreet Credit, LLC shall not trigger a New Capital Fee.

d.  A milestone fee (each, a "Milestone Fee") payable subject to the following milestones:

   i.   $500,000 payable upon commencement of a sale and/or new capital raise process following Piper Sandler receiving a written instruction by the Debtors;

   ii.  $500,000 payable upon receipt of one or more bona fide written offer(s) or term sheet(s) from prospective buyers and/or financing parties in connection with an M&A Transaction and/or New Capital Raise; and

   iii. $500,000 payable upon receipt of binding commitment letter to pursue an M&A Transaction and/or New Capital Raise.

   The Milestone Fee(s) earned by and paid to Piper Sandler shall be fully (*i.e.*, 100%) credited (without duplication) against any M&A Fee or New Capital Fee (the "Milestone Fee Credit"), provided that the Milestone Fee Credit shall not exceed the M&A Fee or New Capital Fee.

e.  A fee (each, a "Testimony Fee") of $1,000,000 for Piper Sandler preparing to testify at deposition or trial or testifying at deposition or trial or, if necessary, preparing any report in connection therewith (the "Expert Report"), of which 50% shall be payable upon delivery of a written request by the Debtors to Piper Sandler that Piper Sandler begin preparation to testify (including through deposition or live testimony (whether in person or via telephonic or other remote appearance)) or that Piper Sandler begin preparation of the Expert Report, and the remaining 50% shall be payable upon the earlier of (i) the delivery of the Expert Report by Piper Sandler to the Debtors and (ii) such testimony being given (including through deposition or live testimony (whether in person or via telephonic or other remote appearance)). The Testimony Fee(s) earned by and paid to Piper Sandler shall be fully (*i.e.*, 100%) credited (without duplication) against any M&A Fee or New Capital Fee (the "Testimony Fee Credit"), provided that

the Testimony Fee Credit shall not exceed the M&A Fee or New Capital Fee.

The Debtors and Piper Sandler acknowledge and agree that (x) the hours worked, (y) the results achieved and (z) the ultimate benefit to the Debtors of the work performed, in each case, in connection with this engagement, may be variable, and that the Debtors and Piper Sandler have taken such factors into account in setting the fees hereunder.

12. Subject to this Court's approval, the Debtors have also agreed to the reimbursement of Piper Sandler for all out-of-pocket expenses incurred in connection with Piper Sandler's investment banking services provided to the Debtors, including but not limited to travel and lodging, research, data processing and communication charges, and regulatory and courier services and fees.

13. The Fee and Expense Structure set forth in the Engagement Agreement is reasonable. The Fee and Expense Structure appropriately reflects both the nature of the services to be provided by Piper Sandler and the fee structures typically utilized by leading investment banking firms of similar stature to Piper Sandler for comparable engagements, both in and out of court. The Fee and Expense Structure is consistent with Piper Sandler's normal and customary billing practices for cases of this size and complexity that require the level of scope and services outlined herein. Moreover, the Fee and Expense Structure is reasonable in light of: (a) industry practice; (b) market rates charged for comparable services both in and out of the chapter 11 context; (c) Piper Sandler's professionals' substantial experience with respect to investment banking services; and (d) the nature and scope of work to be performed by Piper Sandler in these Bankruptcy Cases. The Fee and Expense Structure creates a proper balance between fixed monthly fees and contingency fees.

14. The Debtors and Piper Sandler negotiated the Fee and Expense Structure to function as an interrelated, integrated unit corresponding to Piper Sandler's overall services. It would be contrary to the intention of Piper Sandler and the Debtors for any isolated component of the Fee and Expense Structure to be treated as sufficient consideration for any isolated portion of Piper Sandler's services. Instead, the Debtors and Piper Sandler intend that Piper Sandler's services be considered as a whole for which Piper Sandler is to be compensated by the Fee and Expense Structure in its entirety.

15. In light of the foregoing and given the numerous issues that Piper Sandler may be required to address in the performance of its services pursuant to the Engagement Agreement, Piper Sandler's commitment to the variable level of time and effort necessary to address all such issues as they arise, and the market prices for Piper Sandler's services for both in court and out of court engagements of this nature, the Debtors believe that the Fee and Expense Structure is fair and reasonable and market-based under the standards set forth in section 328(a) of the Bankruptcy Code.

16. As set forth above, Piper Sandler is not charging for its services on an hourly basis. It is not the general practice of financial advisory and investment banking firms, including Piper Sandler, to keep detailed time records similar to those customarily kept by attorneys and required by the Complex Procedures. Because Piper Sandler does not ordinarily maintain contemporaneous time records in one-tenth hour (0.10) increments or provide or conform to a schedule of hourly rates for professional services, the Debtors request that Piper Sandler be excused from compliance with such requirements and instead should only be required to maintain time records in half-hour (0.50) increments setting forth, in a summary format, a reasonably detailed description of the

services rendered by each professional and the amount of time spent on each date by each such individual in rendering services on behalf of the Debtors.

17. Piper Sandler will also maintain reasonably detailed records of any actual and necessary costs and expenses incurred in connection with the aforementioned services.

18. Piper Sandler's applications for compensation and expense reimbursement will be paid by the Debtors pursuant to the terms of the Engagement Agreement and the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Complex Procedures, the *Order Granting Motion to Establish Procedures for Interim Compensation and Reimbursement of Expenses* [Dkt. No. 141], and any other applicable procedures established by the Court.

D. **Disinterestedness of Piper Sandler**

19. To the best of the Debtors' knowledge, other than as set out in the Declaration attached hereto as Exhibit B and incorporated herein by reference for all purposes, the members of Piper Sandler (i) do not have any connection with the Debtors, their creditors, or any other party-in-interest or its respective attorneys and accountants, (ii) do not have any connection with the United States Trustee or any person employed in the Office of the United States Trustee; (iii) are "disinterested persons" as that term is defined in § 101(14) of the Bankruptcy Code, and (iv) do not hold or represent any interest adverse to the Debtors' Estates.

E. **Indemnification Provisions**

20. The Engagement Agreement provides that the Debtors shall indemnify Piper Sandler and the other Indemnified Persons (as defined under the Engagement Agreement) against any and all losses, claims, damages, or liabilities to which the Indemnified Persons may become subject in connection with the Engagement Agreement, except to the extent such losses are finally

judicially determined to have resulted primarily from such Indemnified Person's gross negligence, willful misconduct or bad faith.

21.  The Debtors and Piper Sandler believe that the indemnification, contribution, reimbursement, and other related provisions contained in the Engagement Agreement are customary and reasonable for financial advisory and investment banking engagements, both in and out of court, and, as modified by the Proposed Order, reflect the qualifications and limitations on indemnification provisions that are customary in this district and other jurisdictions.

22.  The terms and conditions of the Engagement Agreement, including these provisions, were negotiated by the Debtors and Piper Sandler at arm's length and in good faith. The Debtors respectfully submit that such provisions, viewed in conjunction with the other terms of Piper Sandler's proposed retention, are reasonable and in the best interests of the Debtors, their estates and creditors in light of the fact that the Debtors require Piper Sandler's services in these Bankruptcy Cases.

### F. Approval of Employment

23.  This Application is filed within 30 days of the commencement of professional services and, accordingly, is deemed to be made contemporaneous with such commencement of services pursuant to Local Rule 2014-1(b)(1).

### V. CONCLUSION

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court enter the Proposed Order: (i) approving the Application; (ii) authorizing the Debtors' employment of Piper Sandler as investment banker pursuant to 11 U.S.C. § 327(a) effective as of November 4, 2025; and (iii) granting all other and further relief, at law or in equity, to which the Debtors may be entitled.

Dated: November 11, 2025

Respectfully submitted,

**MUNSCH HARDT KOPF & HARR, P.C.**

By: */s/ Kyle Jaksa*
Davor Rukavina, Esq.
Texas Bar No. 24030781
J. Kyle Jaksa, Esq.
Texas Bar No. 24120923
500 N. Akard St., Ste. 4000
Dallas, TX 75201
Telephone: (214) 855-7500
E-mail: drukavina@munsch.com
E-mail: kjaksa@munsch.com

**COUNSEL TO THE DEBTORS**

**CERTIFICATE OF SERVICE**

I hereby certify that, on November 11, 2025, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Northern District of Texas on the parties registered or otherwise entitled to notice in this proceeding pursuant to the Electronic Filing Procedures in this District.

*/s/ Kyle Jaksa*
J. Kyle Jaksa, Esq.

**CERTIFICATE OF CONFERENCE**

The undersigned hereby certifies that, on November 11, 2025, he reached out to counsel for the United States Trustee, counsel for the Official Unsecured Creditor Committee (the "Committee"), counsel for FCI-SLG, LLC, GrayStreet Credit, LLC, and counsel for Ramming Materials, LLC via email regarding the relief requested in this application, but has not yet confirmed such parties are not opposed to such relief. Given the shortened notice being requested, it is necessary to file this application without allowing additional time to confer.

By: */s/ Kyle Jaksa*
J. Kyle Jaksa, Esq