IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>FCI SAND OPERATIONS, LLC,<br><br>Debtor. | **Case No. 25-80481-mvl-11**<br><br>Dallas, Texas<br>April 14, 2026<br>1:30 p.m. Docket<br><br>DEBTORS' EXPEDITED MOTION TO APPROVE BID PROCEDURES [377] |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

COURTROOM APPEARANCES:

| | |
|---|---|
| For the Debtor: | Davor Rukavina<br>James Kyle Jaksa<br>MUNSCH HARDT KOPF & HARR, P.C.<br>500 N. Akard Street, Suite 4000<br>Dallas, TX 75201<br>(214) 855-7587 |
| For RJ Machine Company, Inc. | Jason S. Brookner<br>GRAY REED & MCGRAW, LLP<br>1601 Main Street, Suite 4600<br>Dallas, TX 75201<br>(469) 320-6132 |
| For the Official Committee of Unsecured Creditors: | Eric M. English<br>PORTER HEDGES, LLP<br>1000 Main Street, 36th Floor<br>Houston, TX 77002<br>(713) 226-6612 |
| For the United States Trustee: | Meredyth Kippes<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |

WEBEX APPEARANCES:

| | |
|---|---|
| For Cuatro Paisanas Ranch, Inc.: | Michael G. Colvard<br>MARTIN & DROUGHT, P.C.<br>300 Convent, 25th Floor<br>San Antonio, TX 78205<br>(210) 227-7591 |
| For FCI-SLG, LLC, et al.: | Stephen W. Lemmon<br>Rhonda Bear Mates<br>STREUSAND, LANDON, OZBURN & LEMMON, LLP<br>1801 S. Mopac Expressway, Suite 320<br>Austin, TX 78746<br>(512) 2360-9900 |
| For FCI-SLG, LLC, et al.: | Mark C. Taylor<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>401 Congress Avenue, Suite 2100<br>Austin, TX 78701<br>(512) 487-6560 |
| For Ramming Materials, LLC: | Gregory Getty Hesse<br>HUNTON ANDREWS KURTH, LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, TX 75202-2799<br>(214) 468-3300 |
| For Three Rivers Sand, LLC: | J. Robert Arnett, II<br>CARTER ARNETT, PLLC<br>8150 N. Central Expressway, Suite 500<br>Dallas, TX 75206<br>(214) 550-8209 |
| For Tex-Con Oil Co.: | Alejandra Garcia Castro<br>HUSCH BLACKWELL, LLP<br>1900 N. Pearl Street, Suite 1800<br>Dallas, TX 75201<br>(214) 981-7053 |
| For Deere Credit, Inc.: | Jody Dewayne Jenkins<br>JENKINS & YOUNG, P.C.<br>P.O. Box 420<br>Lubbock, TX 79408<br>(806) 796-7351 |

WEBEX APPEARANCES, cont'd.:

| | |
|---|---|
| For GreyStreet Credit, LLC: | Edward A. Clarkson, III<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| Also in Attendance, Interested Party: | Mark Johnston |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - APRIL 14, 2026 - 3:02 P.M.

THE COURT: Let me go ahead and call Case No. 25-80481, FCI Sand Operations, LLC. I'll take appearances for the record, and I'll start with those folks in the courtroom. Mr. Rukavina?

MR. RUKAVINA: Your Honor, good afternoon. Thank you for having us on this expedited hearing today. Davor Rukavina and Kyle Jaksa for the Debtors-in-Possession.

THE COURT: All right. Thank you.

Mr. Brookner, would you like to make an appearance?

MR. BROOKNER: Yes, I was waiting.

THE COURT: And I'm going to say Jaksa today.

(Laughter.)

THE COURT: And I'll let that awkward conversation take place while you're making your appearance.

MR. BROOKNER: May I?

THE COURT: Yes, please.

MR. BROOKNER: Good afternoon, Your Honor. Jason Brookner from Gray Reed on behalf of RJ Machine.

THE COURT: Thank you very much.

Mr. English?

MR. ENGLISH: Good afternoon, Your Honor. Eric English from Porter Hedges on behalf of the Committee.

THE COURT: Thank you very much.

All right. I'll now take appearances on WebEx. I'll

start with those folks that I can see. Mr. Colvard?

MR. COLVARD: Good afternoon, Your Honor. Michael Colvard for Cuatro Paisanas Ranch, Inc.

THE COURT: Thank you.

All right. Mr. Lemmon, would you like to make an appearance?

MR. LEMMON: Yes, Your Honor. Steve Lemmon with Rhonda Mates and Mark Taylor on behalf of FCI-SLG.

THE COURT: All right. Thank you very much.

All right. Mr. Hesse, would you like to make an appearance?

MR. HESSE: Yes, Your Honor. Greg Hesse on behalf of Ramming Materials.

THE COURT: All right. Thank you.

Mr. Arnett, would you like to make an appearance?

MR. ARNETT: Yes. Good afternoon, Your Honor. Bob Arnett appearing for Three Rivers Sand, LLC.

THE COURT: All right. Thank you.

I think that's probably as many -- Ms. Garcia Castro, would you like to make an appearance, ma'am?

MS. GARCIA CASTRO: Yes, Your Honor. Alejandra Garcia Castro on behalf of Tex-Con Oil Co.

THE COURT: All right. Thank you.

And I think that's as many as I can see. Is there anyone else who would like to make an appearance? Is Ms. Kippes on?

MR. JENKINS: Good afternoon, Judge. Jody Jenkins on behalf of the John Deere Credit entity.

THE COURT: All right. Thank you, Mr. Jenkins.

MR. CLARKSON: Your Honor, this is Edward Clarkson on behalf of GreyStreet Credit, LLC. I apologize if I missed the roll earlier.

THE COURT: Thank you. No, you did not. You're fine. Thank you.

All right. And I know that Ms. Kippes was here. I'll go ahead and --

MR. BROOKNER: I just texted her, Your Honor.

THE COURT: Yes. And I'll just, I'll get her name down. She was patient in the courtroom.

All right. Anyone else wish to make an appearance?

(No response.)

THE COURT: Okay. So we have two matters on for today. I think one, if I'm not mistaken, Mr. Jaksa, was subject to an agreed form of order, so why don't we go ahead and take that one up first. We'll take up the preliminary hearing on the motion for relief from stay filed at 364. Whenever you're ready, sir.

MR. JAKSA: Thank you, Your Honor. Kyle Jaksa for the Debtors.

Yes, the Debtors have reached an agreement with Tex-Con, and they have uploaded the agreed order, and we believe that

the parties are now fully settled on that matter and are ready for the preliminary hearing to not need to go forward.

THE COURT: All right. Thank you very much.

Ms. Garcia Castro, anything to add today, ma'am?

MS. GARCIA CASTRO: No, Your Honor, unless you have any questions.

THE COURT: Okay. I do not. And I didn't use the announcement procedure because we only usually use that on preliminary hearing dockets. But I appreciate you staying on with us.

I did have an opportunity to review the agreed form of order that was entered into between the Debtors and Tex-Con prior to the hearing. The Court has no comments on it. And given that there was a motion to lift stay, I think the only issue that I had is if a notice of the lifting of the automatic stay were to be filed. But I think at this point, given there was a motion to lift stay that was already filed, and this is the conditions to that agreement, that I'm okay with it as filed. Okay?

MR. JAKSA: Thank you, Your Honor.

THE COURT: All right. Because I assume that if it's filed, the Debtors and the UCC would notice it, as well as the Secured Lender. So thank you very much, Mr. Jaksa. And I'll enter that. You can upload it. I think it's already uploaded, but I haven't had an opportunity to enter

it yet. Thank you.

MR. JAKSA: Understood. Thank you, Your Honor.

THE COURT: Appreciate it. All right.

MS. GARCIA CASTRO: Thank you.

THE COURT: Thank you, Ms. Garcia Castro. Nice to see you.

All right. Mr. Rukavina, what I assume to be the main show?

OPENING STATEMENT ON BEHALF OF THE DEBTOR

MR. RUKAVINA: Yes, Your Honor. The bid procedures. So I think, briefly, because I know that the Court has a packed afternoon, --

THE COURT: It's pretty so.

MR. RUKAVINA: -- this case has been quiet for some time. It was pretty active early on, and I think you're going to see it be very active in the next four or six weeks. There's been a bunch of disputes that have been kind of simmering. We're going to hopefully keep them simmering or resolving, but ultimately it's time for this case to conclude. And it will conclude either through a plan of reorganization or a sale.

The Debtor cannot fund right now a plan of reorganization. We just simply cannot pay off the DIP Lender. Which leaves the Debtor in the position of seeking a sale for going concern value, for fair market value, through

an organized process.

Your Honor has heard repeatedly throughout that we've been having liquidity issues. And yes, we have. And it seems like we've never just -- we've just never had enough money. The parts that were supposed to come in in late December from Ireland came in four weeks later. Well, in the meantime, we weren't selling sand. Another conveyor broke. Your Honor has heard it repeatedly.

So, unfortunately, that's been the boogeyman in this case, which is that we've always been racing against liquidity, racing against operational profitability.

The weird thing is that we're doing just fine right now. We're selling good amounts of sand. Still not where we want to be, but more than enough to cover our nut. But we still have this bubble now, this continuing liquidity issue that now compels a sale. We can't, we can't keep going like this anymore, and I think that the creditors have waited too long.

So the Debtor did not seek to extend exclusivity. And I want to make it clear for all the parties on the WebEx and in court that Mr. Shapiro, although we're going to proceed with a going concern sale, Mr. Shapiro will have a fiduciary out, as, of course, the Court will ultimately make the decision. So that we are going to start hopefully today a sale process that will bring finality to the case, but nothing should preclude interested parties from working with the Debtor or

with other parties to try to propose a plan that might be more in the interests of the creditors.

With that, Your Honor, it is time to discuss this motion. Earlier today, we did file the actual sale motion. So let me be clear, because I don't know that we need a long evidentiary hearing today. Let me be clear if I haven't been already, especially with respect to Cuatro Paisanas and Three Rivers. We are not proposing today to prejudice any issue related to -- whether it's a lease, whether it's a real property transfer, related to administrative claims, related to whether we can sell property. None of that. So to be crystal clear, I don't what there is to try on that today. I don't think that any of the procedures themselves have been objected to by those parties. We're not seeking to prejudice anything like that.

At the end of the day, with Three Rivers, maybe it's a lease, maybe it's not, but the Debtor has an interest that is marketable and that is salable. And hopefully, hopefully the process will work out such that maybe someone comes in here with enough money to make all these problems go away and maybe we don't have to try that issue.

So with respect to my colleagues representing those creditors, I don't know what there is today that they need to hear other than that this is completely without prejudice to all of their rights and remedies.

We have the Senior Lender's objection. The Senior Lender raises a couple issues, again, that I think are more sale motion. I'm going to address them. And then the Senior Lender also wants to preserve its credit bid rights.

We agree that the Senior Lender has credit bid rights of about $32 million. It's whatever their prepetition claim is. That amount might grow under 506(b) if the sale process is really fulsome and if it turns out that, after the DIP Lender is paid off in full, that they're oversecured. We don't know that yet. So we don't -- so we're prepared today to agree to a let's call it $32 million credit bid, and then the parties reserve their rights on whether that number should be higher.

We're not prepared today to agree that it's going to be an automatically qualifying bid or that it's going to be the highest and best bid, just that they have a credit bid right. And that's all that 363(k) says. It doesn't mean that they get to advance ahead of everyone else and not have to do all of the other stuff that everyone else does.

So I don't know if that's going to take care of their objection or not.

Now to give the Court an update on where we are today, which is going to change some of the relief we're asking for. Just today, just this morning, we have agreed with our DIP Lender on a combined third tranche DIP and a stalking horse bid. We're not here today to get that approved. What I

intend to do --

THE COURT: That's good news.

MR. RUKAVINA: Yeah. I think Your Honor would --

THE COURT: Let's level-set expectations.

MR. RUKAVINA: I think Your Honor would question my sanity more so than usual if -- yeah. Your Honor, all a motion to prime the Lender.

No, Your Honor. But that's why I say you're going to see a flurry of activity in the next six weeks. That was my polite way of saying please give us expedited hearings. We do expect to file the motion today, and we're going to seek a hearing next week.

Again, we're not here today to try those issues, but it is going to affect the timeline and the relief requested. So that -- you're going to see what that is going to be. It's going to be $2.5 million of additional DIP funds on the same terms as before, meaning priming. And you're going to hear, if that's relevant today, that the alternative is that the plant goes dark. That's what Piper, that's what Mr. Shapiro, that's what the Committee, and that's what we think most of the creditors are trying to avoid.

But, in exchange, in addition to the economic terms, the DIP Lender wants to be a stalking horse. Which, coincidentally, Piper and Mr. Shapiro think is excellent, because one of the problems that the Senior Lender has with

this motion is that there is no stalking horse. That is a legitimate concern. It's not really an objection; it's a concern. But the DIP Lender will be a stalking horse at $21 million. The DIP Lender will agree to pick up up to $2.5 million of unpaid admin claims. And the DIP Lender will leave accounts receivable in the estate.

Again, we're not here to try that today. I just wanted to inform the Court and all parties that Mr. Shapiro, in consultation with Piper, will file a motion to approve that DIP and to approve the stalking horse bid.

And the reason why that stalking horse bid, even though it's a credit bid, is very much in the interests of the estate is because it's going to force everyone else to get real. We have been confused by the lack of a real stalking horse offer to date, and we don't quite know what's going on. We suspect that people are waiting, thinking that we're going to tank and then pick up the pieces for pennies, you know, in some kind of fractured liquidation, which is what we're trying to avoid.

But with this now, two of the --

THE COURT: Maybe hence the 12 dial-ins.

MR. RUKAVINA: Pardon me, Your Honor?

THE COURT: Maybe hence the 12 dial-in parties.

MR. RUKAVINA: Maybe. Maybe. But Your Honor, this will hopefully give -- and I don't know if the Senior Lender

is going to object to the DIP. Certainly, they've said before in open court that they would.

THE COURT: Sure.

MR. RUKAVINA: There will be a little bit of time to discuss that. Hopefully, we'll be able to demonstrate to them that actually it's a net benefit for them because the stalking horse is going to leave the A/R and pick up $2.5 million, et cetera, et cetera.

But, again, I'm sure that the DIP Lender does not want to own this business. I don't know why they would. Everyone is trying to really find a solution here to bring some of these people that are out there, that we think that are out there, that are strategic buyers, bring them to the table and say, okay, enough is enough. The judge is going to put -- well, Mr. Shapiro is going to put the gavel down, the judge will put her bench down or hammer or whatever it's called now -- gavel, I believe -- and on *x* date that's it. So, you know, do what you've got to do.

So, with that introduction, again, we're not here today to try the sale motion. We're not here today to try the DIP stalking horse motion that I will file. People will have a right to object to it. I would ask for an expedited hearing on that next week. And then, with -- because, otherwise, again, we're going to be going dark.

And then, with that, we can talk about the rest of the

timeline. Mr. Shapiro is prepared to testify. But I don't, I just don't know that there's a lot of need for evidence here because I think most of the facts are self-evident. And, again, we're not trying to prejudice anyone's substantive rights today.

THE COURT: All right. And to the extent that the -- and I recognize there's a couple issues to come. But if the DIP would seek to be the stalking horse, your intent was that essentially they would enter into negotiations with Mr. Shapiro, and that and any other takers that would come along, that decision would be made by the May 1st that you've proposed in your papers?

MR. RUKAVINA: No, Your Honor.

THE COURT: No? Okay.

MR. RUKAVINA: It would completely -- it would completely change that. We would have -- let's assume that the Court gives us a hearing next week, which I know the Court hasn't done yet. Then --

THE COURT: No. No, she has not.

MR. RUKAVINA: Then next week that issue will be decided and who the stalking horse, it's done.

THE COURT: Oh, okay.

MR. RUKAVINA: Now, should someone come in, you know, tomorrow and say, here's $200 trillion, well, obviously, we're going to switch horses, but that's not going

to happen.

THE COURT: Yes. Okay.

MR. RUKAVINA: Not at $200 trillion. Maybe at $200 million, but that's not going to happen either. The point being that that's the only relief today that I'm suggesting that we modify, because I think it's actually better.

THE COURT: Okay.

MR. RUKAVINA: And Mr. Shapiro is prepared to testify that it is better.

So all the dates would stay the same, Your Honor, but the identity -- the stalking horse bid, subject to all objections thereto, would be heard sometime when it's convenient for the Court. We will again ask for next week, because it's combined with the DIP motion.

THE COURT: So that I understand, you want to push up your timeline?

MR. RUKAVINA: Only, Your Honor, on the identification of the stalking horse bid.

THE COURT: Okay. So everything that you have between May 1st and May 8th in your motion, you now want to have next week?

MR. RUKAVINA: Yes, Your Honor. So let's say that I filed a motion today, and then we have a week for people to object, --

THE COURT: Uh-huh.

MR. RUKAVINA: -- that's not dissimilar from what we've requested before.

THE COURT: All right. Well, and I'll hear from obviously the Secured Lender and the UCC on that, and anyone else that wants to be heard.

MR. RUKAVINA: Thank you, Your Honor.

THE COURT: So I'll hear anyone else by way of opening.

Thank you, Mr. Rukavina.

MR. RUKAVINA: Thank you.

THE COURT: Mr. English?

OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

MR. ENGLISH: Thank you, Your Honor. The Committee supports the bid procedures. It's something we've been asking for for a while. We appreciate that the Debtors have addressed the funding and liquidity concerns that are related to that, because that is, frankly, a legitimate concern.

THE COURT: Sure.

MR. ENGLISH: But with the filing, the imminent filing of a DIP motion, we think that that -- that that satisfies us that approving the bid procedures is the right path forward.

With respect to the Secured Lender's credit bidding rights, the Committee is not prepared today to stipulate to

anyone's right to credit bid. Of course, the Court has the ability to prohibit credit bidding for cause. No one has sought to do that yet, and I'm not sure that we would. But that issue is something that we need to reserve the right to take up if it comes.

THE COURT: Tell me, Mr. English, did the Committee challenge the liens of FCI-SLG in any way?

MR. ENGLISH: They haven't yet.

THE COURT: Okay.

MR. ENGLISH: There hasn't -- there was not a challenge --

THE COURT: And the challenge deadline is still --

MR. ENGLISH: Yes. There wasn't a sort of traditional challenge --

THE COURT: Okay.

MR. ENGLISH: -- deadline.

THE COURT: Okay.

MR. ENGLISH: So it's something we've been looking at. And frankly, you know, there are some potential issues there. It hasn't -- it's not something that has come to the forefront yet, and it may never. But to waive the right to do that today is something that I'm not able to do.

THE COURT: Fair enough.

MR. ENGLISH: Other than that, Your Honor, we support what the Debtor is doing here and we appreciate the

progress.

THE COURT: Okay. Thank you very much, Mr. English.

Anyone else in the courtroom wish to be heard?

All right. Hearing no other takers, Mr. Lemmon, I'll start with you, sir.

MR. LEMMON: Thank you, Your Honor.

THE COURT: Thank you.

OPENING STATEMENT ON BEHALF OF THE FCI-SLG, LLC ENTITIES

MR. LEMMON: The Court will recall that at the status conference the Court -- we've talked about the liquidity problems that the Debtor had, the poor performance that the Debtor has, and that the Debtor has not once made money in any reporting period. And they continue to lose money.

Now, the Debtor, at the initial hearings in this case, promised the Court that the assets were worth some $300 million and that it was appropriate to prime my client. Now they've lost money every single reporting period. They destroyed equipment every single month. And now they propose to borrow more money, principally to pay professionals, so that they can get through a sale process. We find that to be unacceptable, Your Honor.

And we do oppose any further DIP. They want to prime my client to the tune of another $2-1/2 million to pay themselves in the case, just to try to live through a sale

process while they continue to lose money. The assets are worth whatever they're worth, Your Honor, but losing money every month, every week and every month, means that they simply -- every month they dig themselves deeper in the hole.

Now, Your Honor, my client wants the right to credit bid. This right to credit bid is afforded in these bid rights to the -- or, I'm sorry, in these bid procedures, to the DIP Lender in Paragraph 11 on Page 11 of the procedures, and we want the same rights if this process is to go forward. Otherwise, all this is is another way to spend money, prime my client further, and then object to our ability to bid. That's an unfair process, and we object to this unfair process.

This Debtor does not have the money to make it through the bid process, Your Honor. And so all we're doing is setting ourselves up for continued failure of this entity.

Finally, Your Honor, you know, we hear that Mr. Shapiro is sort of -- you know, well, what -- Mr. McManigle was originally called the sale czar, right, in this case. And apparently he is that, but with even fewer defined powers in this case. And we -- you know, what this document does is it gives Mr. Shapiro the right to make all decisions at all times, now in consultation with us, but we've had really very little of that consultation.

I will point out that another problem is this Debtor

can't even really say what they're selling. Some of this equipment is leased. Some of it is borrowed. Some of it belongs to the insiders. The Debtor has broken some of its own equipment. It has spent money fixing the insiders' equipment. And so really all that's happened is we've improved the lot of the insiders, who continue to get paid throughout this process.

And so, yes, we object to these bid procedures as they're currently written, and we don't think that it's a fair process. We don't think that it is beneficial to the estate at all.

THE COURT: All right. Thank you, Mr. Lemmon. And I'm not being flip here. What I'm going to want to understand from the Secured Lender is, if not a sale process, then what are you proposing?

MR. LEMMON: We propose they go dark, because they lose money every single week, and we think that this thing sells -- we think it sells for more money if it's not being continued to be harmed by the people that are running it.

THE COURT: Okay. So you're prepared to put on evidence that a boarded-up plant, and I'm using that obviously figuratively, and a dark plant is more valuable than an operating business?

MR. LEMMON: Your Honor, I understand that those of us in this profession traditionally believe that something

that's operating tends to sell for more than something that's not operating. However, I've never seen something that loses money that's an operation, I mean, that's not a trading operation, that is a physical operation, that's a plant, that continues to lose money every single week that it's run.

This Debtor needs to find out a different -- either a different way to run the thing or they need to go dark. Otherwise, we're just going to lose another $2-1/2 to $5 million, and my client is going to get primed for more of that. And we're not even going to get our credit bidding rights. That's just not a fair process, Your Honor.

THE COURT: All right. Well, and again, we'll certainly address your 363(k) rights during the process. But I did want to better understand, because I don't think that I really gathered from the motion, and maybe that was my mistake, what your alternative proposal was. I don't know if it was Chapter 7, if it was dismissal, or if it was, as you've articulated now, that it essentially goes dark. Okay. Thank you.

All right. I'll now hear -- Mr. Arnett, I'll start with you. Do you wish to be heard by way of opening, sir?

OPENING STATEMENT ON BEHALF OF THREE RIVERS SAND, LLC

MR. ARNETT: Yes, Your Honor. So, we have -- we filed a limited reflection to the motion to approve bid procedures because, as we read it, the Debtor was seeking bid

procedures that would encompass selling what Three Rivers maintains is its property. You know, the South Lease, the 30-plus-acre piece of property, is subject to a lease agreement. There's, you know, Three Rivers is the owner of that property. The Debtor, well, one of the Debtors, FCI South, is the tenant under that property. The property is subject to a deed of trust that existed on the property several years before the lease agreement was entered into. There is, you know, no provision for how they intend to satisfy that debt. That's a deed of trust held by Sabine State Bank & Trust Company, whom they have not identified as a creditor, that's not, you know, a plaintiff in this case.

So we just, we object to any effort to predetermine or prejudice the issues between Three Rivers and the Debtors, which are now teed up for -- in front of a hearing on our motion for relief from the stay on May 29th.

So that was the basis of our objection, Your Honor.

THE COURT: All right. Thank you very much, Mr. Arnett.

And obviously I'll hear from Mr. Colvard as well, who has similar but not exactly the same positions.

As I mentioned at that initial hearing, I think that there are certainly things that can be done by way of order that kind of puts a pin in everyone's rights and makes sure that they are reserved.

At the end of the day, the Debtor sells what it owns, and if it owns a tenancy, then all it could do was essentially sell and -- or, in that case, assume and assign the tenancy, to the extent that it could be cured, and whatever rights are thereunder.

So I think that we could probably figure out some reservation language. But I completely agree with you. We're not going to determine, especially since there is an active dispute and future hearings on a lift stay and things of that nature, we're not going to determine those things today, because, again, I think that this might be one of those things where time could be our friend, those could be worked out, to the extent that there are any interested buyers. We'll see.

And one of the other things that I noticed in the Debtor's proposed sale and bid procedures, I do believe we need to set a deadline by which cure notices will be filed. You set an objection for cure objections, but I think we probably need to establish a deadline to file those cure notices, especially given some of the issues that you've got going.

So I'll go to Mr. Colvard next. Thank you, Mr. Arnett.

OPENING STATEMENT ON BEHALF OF CUATRO PAISANAS RANCH, INC.

MR. COLVARD: Thank you, Your Honor. As the Court knows, I'm representing Cuatro Paisanas. They're the

predecessor in title to Three Rivers and the Sabine. Their concerns primarily are the reservations, restrictions, and covenants that are built within the special warranty deed that we contend that any party in interest takes subject to.

With the Court's announcement about putting a pin in these matters, and with Mr. Rukavina's, as I understand it, concession that none of those rights are going to be prejudiced, I think that primarily takes care of my concerns, which are essentially that the rights that we are asserting pursuant to the deed of trust, excuse me, special warranty deed and the underlying purchase and sale agreement, those rights are reserved, they're not being disposed of by the approval or disapproval of any sale process at this time, and will be reserved for a later time, subject to a final determination by the Court. And I'm happy with that understanding, Your Honor.

THE COURT: Excellent, Mr. Colvard. And, again, both with respect to Three Rivers, Cuatro Paisanas, and to the extent that Deere Credit has anything similar, I think that essentially we can have the reservation of those particular rights in the bid procedures.

To the extent that there is a data room that's established, it should probably include or have reference to the disputes with Three Rivers and the disputes with Cuatro Paisanas. Obviously, we didn't conclude the hearing relative

to Cuatro Paisanas and the extent to which those sand covenants run with the land. So I think that, again, for now, however they're sold, they're subject to the Court's determination or any other agreement with respect to the rights of those parties.

So thank you, Mr. Colvard.

MR. COLVARD: Yes, Your Honor.

THE COURT: I think we can certainly work that out.

All right. Anyone else wish to be heard by way of opening?

All right. Hearing no takers, Mr. Rukavina, do you want to call your first witness, or do you want to address evidentiary matters?

MR. RUKAVINA: I would call Mr. Shapiro, Your Honor.

THE COURT: Excellent. Mr. Shapiro, if you could approach the witness, I'll go ahead and swear you in, sir. Thank you.

MARK SHAPIRO, DEBTOR'S WITNESS, SWORN

THE COURT: Thank you very much. Please be seated.

DIRECT EXAMINATION

BY MR. RUKAVINA:

Q You're Mark Shapiro, the CRO, right?

A Yes.

Q And who do you work for, or what company are you affiliated with?

A GlassRatner Advisory & Capital Group, LLC.
Q And what is some of your experience in restructuring and sales processes under 363 of the Bankruptcy Code?
A I've been doing this restructuring for probably close to 20 years. Most cases involved in the sale process, either officially running the process as a CRO, managing the process, or as a Committee advisor, monitoring the process as well.
Q Okay. And what is your understanding as to the scope or extent of your role as CRO with respect to sales in this bankruptcy case?
A Ultimately, I am running the sale process, using Piper to -- well, I should say I'm managing the sale process, with Piper Sandler running the sale process for --
Q Well, let me specify. You're in sole and complete charge on behalf of the Debtors of the sale; is that correct?
A Yes, I am.
Q And current management can't tell you what to do or fire you?
A They cannot.
Q Okay. And have you exercised your independent judgment as the CRO that we just mentioned in --
A Yes, I am.
Q -- proposing these bid procedures? You mentioned Piper. Who are they?

A Piper Sandler is the investment banker in these cases.

Q Okay. And have you been in consultation with them regarding the potential sale of these assets?

A Yes, we have.

Q And have they been actively, to your understanding, pursuing a sale?

A Yes.

Q Do you know how many parties they have reached out to?

A They reached out to 105 parties, and we have, I think, 26 executed NDAs.

Q Nondisclosure agreements?

A Correct.

Q Is there a data room?

A Yes, there is.

Q Has that been set up by Piper?

A Yes.

Q Are --

THE COURT: Did you say 20 NDAs, Mr. --

THE WITNESS: Twenty-six.

THE COURT: Twenty-six NDAs? Thank you. And a data room. I apologize for the interruption.

THE WITNESS: It's either 24 or 26. I may be off.

MR. RUKAVINA: Okay.

THE COURT: Okay. Thank you.

BY MR. RUKAVINA:

Q Have you been satisfied that, as the investment banker, Piper has been doing its job?
A I am, yes.
Q Okay. Now, we're probably not going to use names because this is going to be a competitive bid process, but are you familiar with some of those entities that have signed NDAs?
A I am.
Q And are these legitimate, large companies in this marketplace?
A They're all over the board. There's large operators and small operators. There's liquidators. There's financial firms who just have an interest in distressed investing. All the above.
Q Okay. I take it, then, that -- well, we filed a motion to sell this morning, right, so you have determined that it is in the estate's best interest to sell substantially all business assets, correct?
A Correct.
Q Why have you made that determination?
A Ultimately, we have to move this to conclusion. I personally was hired five months after this case was filed, really due to the inertia in the case. I think we got off to a slow start. But ultimately, we don't have the liquidity to keep managing the cases and it has to come to a conclusion, either through a sale or a plan.

Q Okay.

MR. RUKAVINA: May I approach, Your Honor?

THE COURT: Yes, you may. Thank you, sir.

MR. RUKAVINA: That's just a pleading binder, and Exhibit 1 are the bid procedures. This is as it's been filed with the Court, Your Honor. I'm sorry. Exhibit 1 has the bid procedures attached as Exhibit A.

THE COURT: Okay.

BY MR. RUKAVINA:

Q I just have that so that you can look at it if you need to.

A Okay.

Q You're familiar with the bid procedures that we're seeking approval of today; is that correct?

A I am.

Q Did you help prepare these bid procedures?

A I did.

Q Did you have the input of Piper Sandler in preparing these bid procedures?

A We did.

Q Did you have the input of other professionals in preparing these procedures?

A Yes.

Q Did you have the input of the Debtor's other managers in preparing these bid procedures?

A Yes.
Q Okay. What are these bid procedures designed to do, in your words?
A Ultimately, it's designed to start a process to let people know that these assets really are for sale, that we have a specific time frame of closure. We've had a number of discussions with Piper that part of the issue in these cases is the fact that we did not have bid procedures. I know the Committee has been pushing these for quite some time. But ultimately it gives a set, firm process to manage a sale process and conclude the cases.
Q Is it your understanding that one of the reasons why we don't have a stalking horse bid is because we don't have bid procedures?
A That's my understanding, yes.
Q Okay. And is it your hope and/or expectation that with a structure, a formal structure approved by the Court that will guide procedures for bidding and an auction, that we will secure stalking horse offers?
A Not necessarily a stalking horse, but other bidders to the process.
Q Right. Understood. Understood. Have you designed or structured these bid procedures with Piper Sandler to maximize consideration to the estate?
A Yes.

Q Have you taken into account transparency and fair bidding processes?
A Absolutely.
Q Are you trying to avoid any kind of non-arm's-length or non-transparent negotiations and sales?
A Yes.
Q Okay. Based on your experience, are these fairly standard bid procedures, as modified for the facts of this case?
A They are. Very standard.
Q Okay. And you propose an auction at the end of May, with a sale hearing in early June; is that correct?
A May 27th is the auction, I believe, and the sale hearing on or around June 1st.
Q Okay. Why those dates?
A We're trying to manage enough time so that we can touch and provide adequate due diligence to interested parties, but also understanding that it takes money to run these cases and we're trying to manage liquidity against adequate time.
Q Okay. You heard Mr. Lemmon reference that the Senior Lender might prefer that the plant goes dark, correct?
A I heard that, yes.
Q Do you share that view?
A I do not.
Q Okay. Why not?

A It's counterintuitive to think that, number one, a going concern is going to drive less value than a shuttered plant. Again, this is not a shuttered manufacturing plant. This is sand. You can't -- you can't just go dark. We've actually gone through what we would have to do. You have to essentially idle it, keep it warm, keep security. So it's not as if it's $2-1/2 million or zero. We put together some budgets, and even to try and come up with a scenario that would manage -- to manage through that process, it's probably a million, a million and a half to do that. But ultimately we'd be in breach of the DIP Lender and it'd push it to a 7. So it's not even a Chapter 11 shutdown versus a Chapter 11 sale in my mind. It's a Chapter 11 sale or a Chapter 7 conversion.

Q Okay. Now, let's say that the facts develop such that you have to shut down the plant. Would that necessarily affect the bid procedures that you're seeking approval of?

A No.

Q So, and we don't have to make that decision today, do we?

A Correct.

Q Okay. One of the objections that the Senior Lender had is this liquidity issue, that we don't have the liquidity to get to the sale. Has the DIP Lender agreed to advance a third tranche of DIP funding?

A Yes, they have.

Q And in what amount?
A Two and a half million.
Q And have the terms been agreed to today, so we'll file the motion and the agreed order today?
A I believe the last turn I saw before this hearing are the final ones, yes.
Q Okay. Approximately how many tons of sand a day are we selling at the North Plant now?
A Three thousand. High twos to the low threes.
Q And is that about operational breakeven before we take into account professional fees?
A Approximately, yes.
Q Okay. So I know we're not here today to approve this DIP, but are you confident that, in exchange for the $2.5 million, that at least that much value will be preserved or created?
A That's my belief, yes.
Q Okay. That DIP, the third tranche, is that also linked to a stalking horse offer?
A Yes.
Q Okay. Tell the judge about what that stalking horse offer is.
A So, the stalking -- the credit -- the DIP Lender, one of the preconditions of them advancing more money under the DIP was they wanted to make sure that, if they indeed were going

to be the owner, that it was an operating concern and a going concern. So the deal that we'll announce is they will credit bid their DIP loan right now. So, with the new money, that should be somewhere around $15 million.

THE COURT: Fifteen?

THE WITNESS: One-five.

THE COURT: Okay.

THE WITNESS: That's with the new money.

They agreed to assume up to $2-1/2 million of admin liabilities -- payroll, trade payables. And our projections at the end of the case, it would exceed $2-1/2 million. So that's real value. And also they would agree to leave behind the accounts receivable, also to provide liquidity to the estate, which we believe will be at least $3-1/2 million. So 15 plus 3-1/2 plus 2-1/2 is where Mr. Rukavina got his $21 million from.

BY MR. RUKAVINA:

Q So between the $2-1/2 million assumption of administrative liabilities, and leaving maybe $3-1/2 million of accounts receivable, should that be enough to satisfy unfunded and unpaid admin claims? For example, if it's a lease to Three Rivers, the monthly nut postpetition that we haven't paid?

A Close. Might not be in full, but again, we're hopefully getting other bidders, but we assume it will be close.

Q Is this the only stalking horse offer you have received?
A Yes.
Q And have you conferred with Piper?
A Yes.
Q And what is their decision as to whether to accept the stalking horse offer?
A They are in favor of accepting this offer.
Q And are you in favor of accepting this offer?
A Yes, I am.
Q And why so? Not just for the things you mentioned, but are there additional reasons?
A I'm not a big fan of naked auctions that starts at a dollar versus $21 million. It also shows the outside world that there is interest here. They understand that's a low bid and that's a credit bid from a DIP Lender. But it, again, starts the process and shows people that there is real interest here, that it will be a going concern one way or the other, and we believe that it would enhance value.
Q Originally, we asked that there be a deadline of May 1 to designate a stalking horse. Are you now asking that that in fact be changed and we go to a stalking horse hearing as soon as the Court will let us, maybe next week?
A Yes, because the DIP Lender --
Q And let me ask you. Let me ask you: Why are you in favor of that route as opposed to waiting to May 1?

A Because the DIP Lender has conditioned their additional DIP money on them being a stalking horse bidder. We don't have any other alternatives. We don't have any other alternative -- alternate DIP Lenders. And I think it's important for keeping the case advancing to accept this as a stalking horse bid. And also I've reviewed it with Piper to make sure that they were comfortable, which they were.
Q If we don't get additional DIP funds very soon, will vendors cut us off?
A Yes.
Q Are some of them listening today because we've assured them that we were going to announce today we have a third tranche DIP?
A Yes. Definitely.
Q And if they cut us off, do we go dark?
A Especially fuel vendors, yes.
Q Okay. And then the whole rest of what you've discussed about a going concern value and a stalking horse offer becomes moot and we go to Mr. Lemmon's sale as a dark plant, correct?
A Correct. Or Mr. 7's sale as a dark plant.
MR. RUKAVINA: Your Honor, I don't really know that any -- I'm done with Mr. Shapiro for now.
I don't really know that any of the procedures themselves have been questioned as far as their reasonableness, so I

don't know what more to ask Mr. Shapiro. I'll therefore reserve questions until Mr. Lemmon or anyone else has cross-examined him.

THE COURT: All right.

MR. RUKAVINA: Thank you.

THE COURT: Thank you.

All right. So I'll start with those folks in the courtroom. Mr. English, any cross-examination for Mr. Shapiro?

MR. ENGLISH: Not right now, Your Honor.

THE COURT: All right. Thank you.

Anyone else in the courtroom, including you, Ms. Kippes? I put you down for an appearance.

MS. KIPPES: (faint laughter)

THE COURT: All right. So now I'll go to those folks on WebEx. Mr. Lemmon, would you like to cross-examine Mr. Shapiro?

MR. LEMMON: Yes, thank you, Your Honor.

THE COURT: Okay.

CROSS-EXAMINATION

BY MR. LEMMON:

Q Mr. Shapiro, we heard about your duties as CRO. Are you also in charge of plant operations?

A Ultimately, yes.

Q Okay. And so since you've been on the job, has the

Debtor made or lost money?

MR. RUKAVINA: Your Honor, I'm going to object to that as vague. But I think Counsel can specify. Because we know that we've had millions of dollars of capital improvements as opposed to operational losses. So I think Counsel should specify what he's talking about, has the Debtor lost money? That's a vague question.

THE COURT: Mr. Lemmon?

MR. LEMMON: Sure.

THE COURT: If you could restate.

BY MR. LEMMON:

Q Has the Debtor made or lost -- has the Debtor made or lost money on an operational basis?

A Cash-wise, or net income?

Q Let's go cash-wise.

A No. It's been negative.

Q Okay. How negative? How much have you lost since the time you've been on the job?

A Since I've been on the job? The last --

Q Yes.

A The last -- we have used approximately whatever the DIP -- last DIP draw was. Was that $3 million?

Q Are you aware that the Debtor originally testified that it would have no trouble paying back the DIP when the DIP was due?

A I was not aware. I wasn't here at the time.
Q So you're not aware? You don't know that?
A Correct.
Q Okay. How much money does the Debtor have in the bank now?
A Last check was between five hundred thousand and a million dollars.
Q How much is the Debtor's cash spend a week?
THE COURT: And please, be specific --
THE WITNESS: I don't -- I don't have --
THE COURT: -- if it's operationally or if it's --
THE WITNESS: Yeah.
THE COURT: Okay.
THE WITNESS: I don't -- I don't have the numbers in front of me.
THE COURT: Okay.
BY MR. LEMMON:
Q So, typically, how much money on a cash basis does this Debtor lose per month?
A Again, I don't have the numbers in front of me. We have variance reports. If I was reading them, I could tell you.
Q Isn't it true that the Debtor is already in breach of the DIP, on the DIP lending facility?
A I am not aware.
Q Have you reviewed the DIP lending facility paperwork?

A Not in detail recently.
Q Okay. Did you review the bid procedures with the DIP Lender before they were filed?
A Before they were filed?
Q Yes. You remember the testimony that you had about how you reviewed the DIP procedures. I'm sorry. The DIP -- how you reviewed the bid procedures. Did you review the bid procedures with the DIP Lender before the bid procedures were filed?
A It would have been done through attorney. I did not personally do it.
Q Okay. How much have insiders been paid since the time that you were retained?
A Yeah. I don't have those numbers in front of me.
Q Is it more than a million dollars?
A I don't have the numbers in front of me.
Q How much have you spent on capital -- on CAPEX since you were retained?
A I don't have the numbers in front of me.
Q Isn't it true, well, didn't we just hear that you spent several million on CAPEX?
A No.
Q Okay. Is it true that you've spent several million on CAPEX since the time that you were retained?
A Several million on CAPEX since I've been retained? No, I

don't believe so.
Q Okay. Do you have a ballpark estimate you can give the Court for how much has been spent on your watch?
A No.
Q Okay. Isn't it true that, of the CAPEX, though, almost all of it was spent with an insider?
A If you're referring to the fact that some of the equipment is owned by insiders and one of the managers of the plant is in charge of improvements and maintenance, yes.
Q Are -- is both the North Plant -- are both the North Plant and the South Plant running today?
A Today, the North Plant is running. The South Plant --
Q And --
A -- is not today.
Q I'm sorry. I didn't mean to interrupt. Okay.
A And --
Q And how long has it been the case that the South Plant was not -- has not been running?
A It's not that the South Plant is not operational. The South Plant, you have to -- it's whether the determination is whether shipping the sand down to the South Plant is worth shipping down there to sell it out of there.
Q Because the Debtor takes sand from the North Plant, ships it to the South Plant, and sells it from the South Plant sometimes. Is that correct?

A Sometimes, yes.

Q Okay. Is it your testimony to the Court that not running the South Plant weekly hurts the sale value of the South Plant?

A Not necessarily.

Q Now, you've spoken to potential strategic buyers, right?

A Yes.

Q And just so we're all clear, without naming them, can you tell the Court what a strategic buyer is?

A Someone who's in the business already.

Q And so isn't it true, though, that a strategic buyer of these assets doesn't care about the operation, doesn't care about the management, they're simply looking at the assets, because they're already in the business and they're deciding whether or not those assets help their business? Is that correct?

A No. That's your opinion.

Q What's your opinion? You're the czar.

A I think different companies have different interests. I've run many a sale process. Some strategics have an interest in the going company, some interests have no interest in the going company, and some interests want to buy a company and put it out of business so they can keep the business in their other plants. I think it's all the above.

Q Are you currently -- are you current with your

postpetition payables?
A We are not current with our postpetition payables.
Q Why not?
A We've been managing through a liquidity crisis. Not -- I don't want to say crisis. We've been managing through liquidity issues. And this has been going on long before I got there. I don't think we're in much worse shape than when I first got retained, but we're trying to manage through the payables as the collections come in.
Q But you haven't been able to catch up?
A Correct.
Q Now, you talked about how this thing you think is worth more as a going concern. Do you recall that?
A Yes.
Q Are you an accountant?
A Yes.
Q Would you give this a -- would you consider this a going concern on an accounting basis, sir?
A What do you mean?
Q Would you, if you were -- if you were the accountant for this entity and you were issuing a report, isn't it true that you would have to give it a going concern -- you would have to give it a going concern warning, you know, or a condition, right?
A A qualified opinion? Yes.

Q A qualified opinion. Sorry. I'm inarticulate.
A Okay.
Q Is that correct?
A Yes.
Q Okay. Now, I want to make sure I understood your testimony correct, correctly. Right now, the Debtor has borrowed how much from the DIP Lender?
A Eleven principal. We got a payoff statement from them. My understanding, with accrued fees and interest, it's 12 -- their buyout, payoff today would be approximately $12.4 million.
Q Okay. So right now, my client's been primed to the tune of $12.4 million. Is it your testimony that my client has been adequately protected through that process?

MR. RUKAVINA: Your Honor, I'm going to object now based on relevance. What Mr. Lemmon is doing is clearly trying to set up a 507(b) claim. We're not here on a motion to convert. We're not here on a motion to dismiss. We're here on bid procedures that he has not identified any objection to. So this is not relevant.

MR. LEMMON: We have identified the objection that this is not a going concern and that giving them another 60 days and -- and I'm just simply going into what he went into on direct, Your Honor. I want to ask him about the calculation that he did of what the DIP Lender is going to do

as part of this process to further prime my client.

MR. RUKAVINA: Your Honor, we're not asking for another 60-day lifeline. We're asking for bid procedures that will apply if we survive 60 days. Mr. Lemmon can file a motion to convert tomorrow. We'll even agree to an expedited hearing. This is outside the course --

MR. LEMMON: Your Honor, I --

MR. RUKAVINA: This is outside the course of direct, and it's not relevant. And frankly, what he's doing is driving away buyers.

THE COURT: Mr. Rukavina, --

MR. LEMMON: Your Honor, I want to -- I'm sorry.

THE COURT: -- take it down.

MR. RUKAVINA: Thank you, Your Honor.

THE COURT: Thank you.

Mr. Lemmon?

MR. LEMMON: Your Honor, I simply want to cross-examine based on what the direct testimony was. And there was testimony about what the components of the deal with the DIP Lender are. And I'm -- I just want to go into it that way.

THE COURT: Okay. And I'm going to sustain the objection in part. When it comes to things like adequate protection, I think that's kind of beyond the scope of direct, probably beyond the necessity of covering those

issues for this hearing. But if you want to address, like you said, going dark versus keeping it operational, if you want to address other fees that could be considered, I'll certainly allow that for purposes of cross.

MR. LEMMON: Thank you, Your Honor.

THE COURT: You're welcome.

BY MR. LEMMON:

Q So do you recall your testimony on direct regarding the components of what your deal with the DIP Lender is and what the DIP Lender's claim will end up being?

A Yes.

Q Okay. I want to go through that to make sure that I understand it. Right now, they're owed $12.4 million, and you propose to borrow an additional $2-1/2 million in cash, right?

A Yes.

Q And where will that $2-1/2 million go?

A In round numbers, about a million dollars is going to go to CAPEX to fix the issues at the plant that have not been fixed to date. We're actually planning on moving to the South Plant for a number of weeks to finally fix some of the issues at the North Plant to make sure that we don't have these issues in the future.

Operationally, we're forecasted to be about neutral. At these levels, we should be about neutral operationally.

And professional fees will be about a million and a half.

That's for the 13 weeks. So, the $2-1/2 million in general is neutral on operations, a million dollars of CAPEX, a million and a half for professional fees.

Q Now, I want to just -- I want to go into one thing that you just said, and that is you plan on moving operations to the South Plant. Is that correct?

A Yes.

Q And that's why you spent another million dollars at the North Plant. Is that correct?

A Partly, yes.

Q And during that period of time, the Debtor's sales will all occur out of the South Plant and not out of the North Plant, right?

A For that short period of time, yes.

Q And you said a short period of time. How long do you anticipate that those repairs will take?

A Somewhere around three weeks.

Q Okay. So, for three weeks of the sales process, the North Plant won't even be running. Is that correct?

A No. I mean, again, we're not shutting it down. We're doing things, but we're actually making the repairs to try -- we have to fix belts, we have to do things, but I don't believe we're planning on being idle for three weeks.

Q So how long will you be idle?

A I'm not in charge of the plan of how exactly it's going to be working and what's going to be fixed and how it's going to be fixed. But they've told me two to three weeks is -- is how long the repairs will take.
Q Who's in charge of that?
A The managers at the company. There's a --
Q And who specifically is in charge of the repairs? Is that Mr. Nelson?
A It's Mr. Nelson, it's Paul Sheperd, it's Kevin Collier. It's the managers of the company.
Q So the same people who have been working on it before and haven't been able to fix it are the ones who you think are going to fix it in three weeks; is that correct?
A I don't want to get into your opinions of how they're operating the plant, but those three people are going to be the ones who are in charge.
Q Okay. Now, you said something about the DIP Lender also assuming $2-1/2 million of payables. Is that correct?
A Correct.
Q Now, will that increase the DIP Lender's claim that they'll be allowed to credit bid?
A It does not increase their claim, but it increases the value of their bid.
Q So it increases the amount of their debt and therefore the value of their bid?

A Yes.
Q Okay. So --
A In a traditional sale process, you have cash and you have some liabilities. Some of the two.
Q Oh, okay. I just want to make sure I understand this correctly. So, for the purpose of their bid, they agreed to bid in their 15 or so that they're owed, right, 12.4 plus 2-1/2?
A Right.
Q And assuming that you're able to -- for to prime us. Right? And so their credit bid is 15, but also as part of their bid they're going to assume $2-1/2 million of payables, right?
A Correct.
Q Okay. Anything else that will increase the value of their bid?
A Yes. They are not purchasing the accounts receivable. Or any cash in the business.
Q And so the accounts receivable and the cash in the business is another three?
A Three and a half.
Q Okay. And so to outbid the DIP Lender, someone has to bid how much?
A $21 million, plus amount of an overbid, plus a three percent breakup fee.

Q So you've agreed to a breakup fee with the DIP Lender?
A There will be a three percent breakup fee of their bid price.
Q Why won't the Debtor agree to let my client credit bid?
MR. RUKAVINA: Your Honor, I'll object. I very clearly said at the opening that we agree to a credit bid of $32 million.
THE COURT: Mr. Lemmon, did you hear the response to your --
MR. LEMMON: Yeah.
THE COURT: Okay.
MR. LEMMON: Well, let me express it, then, this way.
BY MR. LEMMON:
Q Why won't the Debtor agree that my client is a qualified bidder when it agrees that the DIP Lender is a qualified bidder?
MR. RUKAVINA: Your Honor, may I take the client on *voir dire* briefly?
THE COURT: Regarding--?
MR. RUKAVINA: This question. This -- well, because this question comes out of nowhere. Mr. Shapiro just learned about this from me an hour ago. I think I can help the Court guide the direction so that he can actually give you an answer.

THE COURT: Briefly.

VOIR DIRE EXAMINATION

BY MR. RUKAVINA:

Q In order to be a qualified -- qualifying bid, bidder, as you proposed, what does a bidder have to do?

A They have to show financial wherewithal --

Q In that case, and here, would that include taking out the DIP Lender?

A Yes.

Q Okay. What else do they have to do?

A Prove that there's no collusion, insiders, name who's a party to their --

Q Are we -- is it possible that Mr. Sheperd is one of those that will be working with them?

A Yes.

Q Okay. So have we said that they can credit bid but they can't be a qualifying bidder today?

A Just they can't be a qualified bidder today. That's all we've said.

Q Because you want things like proof of ability to close and who is behind them?

A We want transparency.

MR. RUKAVINA: Thank you, Your Honor. Thank you for that *voir dire*.

THE COURT: Mr. Lemmon, I'll allow you to ask your

question.

CROSS-EXAMINATION, RESUMED

BY MR. LEMMON:

Q So what I'm interested in is what is the basis for your not agreeing that my client can be a qualified bidder? I heard the dialogue between you and the company's counsel, and I want to make sure that I understand what you're saying with these bid procedures that you're asking be approved. Are you saying that my client has to show that they can come up with $21 million plus three percent before they can be a qualified bidder?

A All I'm saying is whatever the rules are for everybody else is the same for your client.

Q Why did you agree to a breakup fee?

A I thought it was important to have a stalking horse bidder. It's a -- if they are not -- if nobody else comes to the table, then there is no breakup fee. And if anybody else comes to the table, they have to overbid. So essentially it's self-funding. I don't think there's any damage to providing them those protections to have them serve as a stalking horse.

Q What is the Debtor's projection, your projection on behalf of the Debtor, for how much the Debtor is going to have to spend in cash to get through the sale process?

A $2-1/2 million.

Q So you believe that $2-1/2 million covers everything, that you won't further increase your payables and that you will -- you'll only lose another $2-1/2 million through the process?

A I don't want to say we -- you asked me how much cash we're going to be using, and my understanding or our forecast is that it would take $2-1/2 to get through the process.

Q And so the Debtor does not project that it will be operationally breakeven during the sale process?

A We're using $2-1/2 million. We are building accounts receivable to offset that. But, overall, no, we would not be operationally neutral or working capital neutral through this period.

Q Is the Debtor having difficulty collecting cash from any of its parties that owe it money?

A A few. But they've been traditional problems. But for the most part, our customers are paying.

Q Isn't it true that some of those customers comprise over 25 percent of your sales, some of the problem customers?

A It might be an overstatement, but we've been trying to collect, and they've paid, but they're -- they're aged. There are some slower payers.

MR. LEMMON: Thank you, Your Honor. I pass the witness.

THE COURT: All right. Let me take just a moment.

Mr. Sherman, can you approach?

(Off the record bench discussion.)

THE COURT: All right, ladies and gentlemen. I just had a sidebar with the case that we broke from, just to see if they want to wait around after. I apologize for the disruption.

All right. Thank you for your questioning, Mr. Lemmon.

Is there anyone else on WebEx who wishes to cross-examine the Debtor?

MR. ARNETT: Your Honor, this is Bob Arnett. I have a few questions for Mr. Shapiro.

THE COURT: Please proceed.

MR. ARNETT: Thank you.

CROSS-EXAMINATION

BY MR. ARNETT:

Q So Mr. Shapiro, am I understanding correctly that the stalking horse bid does not involve any new money?

A Correct.

Q Does the stalking horse bid contemplate that the buyer would buy the South Plant, the land, and all of the equipment and assets and improvements associated with it?

A We haven't finalized the APA for the stalking horse, but my understanding is, at this point, yes, they intend to bid on the South Plant as well.

Q And so if the stalking horse bid winds up being the

prevailing bid, where is the money going to come from to pay Three Rivers Sand?

A From the -- from the two other places that we were talking about, the remaining accounts receivable that they're leaving behind, the cash -- while they're not putting in any new money, they are not purchasing certain assets. They're not buying the A/R or -- they're not buying the A/R. They're not buying the cash. And they're also agreeing to assume certain administrative claims that would help deal with some of the issues that Mr. Lemmon was talking about on some of the aged payables, which would generate cash to be able to pay your claim.

Q You said earlier that the stalking horse is assuming, I guess round numbers, $2.5 million in payables.

A Yes.

Q Is that correct?

A Correct.

Q Are any of those payables payables to Three Rivers Sand?

A We haven't identified specific payables related to that $2-1/2 million.

Q In terms of the data room that's been set up, does the data room include material relevant to the dispute between Three Rivers Sand and the Debtors regarding whether the lease agreement is a lease or something else and whether the option that is contained within the lease agreement has become

unenforceable?

THE COURT: Mr. Arnett, I don't mean to cut you off, but it will. In case I was unclear earlier, I'm going to require that anything relative to the Cuatro Paisanas dispute, anything relative to the Three Rivers dispute, be included in the data room, or that there be some notification directing folks to the docket so that they could familiarize themselves with it.

But feel free to explore further, but I just wanted to let you know that, if it exists there now, it will.

MR. ARNETT: Thank you, Your Honor.

BY MR. ARNETT:

Q Mr. Shapiro, is --

THE COURT: And it will also be in the bid procedures order, for your reservation, so I think that parties would be on notice that way. But please continue. I apologize for the interruption.

MR. ARNETT: Thank you, Your Honor.

BY MR. ARNETT:

Q Mr. Shapiro, in terms of negotiating the stalking horse bid, was the stalking horse or the DIP Lender informed of the dispute between Three Rivers Sand and the Debtors regarding the legal effect of the lease agreement?

A I can't say for certain, but the DIP Lender is very aware of the docket and is well aware of the hearings and some of

the issues in the case. In fact, I believe their attorney is on the phone right now, so -- Mr. Clarkson.

Q In terms of the $21 million stalking horse bid, how much of that is allocated to the South Plant versus the North Plant?

A We don't have an allocation.

MR. ARNETT: I'll pass the witness, Your Honor.

THE COURT: Thank you, Mr. Arnett.

Mr. Colvard, do you wish to cross-examine Mr. Shapiro?

MR. COLVARD: Not at this time, Your Honor. Thank you.

THE COURT: Okay. Thank you.

Anyone else wish to cross-examine Mr. Shapiro?

MR. LEMMON: Your Honor, I have one follow-up question at the appropriate time.

THE COURT: All right. Well, I'm going to have some questions, and then I'll reopen it, and then I'm going to give Mr. Rukavina the last word in terms of redirect.

EXAMINATION BY THE COURT

THE COURT: All right. And so I'll try not to retread any ground, Mr. Shapiro. And I recognize obviously the Court has not approved the new DIP. The Court hasn't approved the stalking horse agreement. But the current intention would be to have a hearing -- I know Mr. Rukavina said next-week-ish -- to approve a stalking horse agreement.

Is it your intention to entertain stalking horse bidders between now and then, or did I hear your testimony correctly that it is a condition of the DIP that they be the stalking horse?

THE WITNESS: It's a condition of the DIP.

THE COURT: Okay.

THE WITNESS: However, if a stalking horse comes and wants to be a replacement DIP Lender or provide that same liquidity, we would entertain that.

THE COURT: Okay. And two, you said with respect to the $2-1/2 million of admin claims, and I know you've testified that that's essentially real debt, that the admins actually are in excess of the $2-1/2 million, is that relative to cure obligations or is that separate?

THE WITNESS: Separate.

THE COURT: Separate? Okay. And so obviously to the extent that the DIP Lender intends to assume and assign, or excuse me, that the Debtor would assume and assign to the DIP Lender as part of any stalking horse arrangement, the bid would be specific as to those cure claims?

THE WITNESS: Correct.

THE COURT: Okay. Do you have an estimate of how much A/R you would generate during the sale process?

THE WITNESS: Approximately a million and a -- a million to a million and a half of A/R.

THE COURT: Okay.

THE WITNESS: And that's over the 13 weeks.

THE COURT: Yes. And so right now it's my understanding that the South Plant is primarily let's just say sales operational sand. That frac sand is brought from somewhere else and sold out of that facility. Why is that? Is that for the benefit of customers who are more local to the South Plant?

THE WITNESS: Correct.

THE COURT: Okay. And you testified that it would take, I think, one to one and a half million dollars to shutter the plants, to actually go dark, so to speak. But you don't think that that same amount of money would have to be spent if the North Plant were to -- during the time where the North Plant is being repaired?

THE WITNESS: That's already in our numbers.

THE COURT: Okay. All right. And what are the nature of the repairs? Is it a conveyer belt issue?

THE WITNESS: Belts, motors, equipment.

THE COURT: Okay.

THE WITNESS: There's been a lot of things that have broken down.

THE COURT: All right. And one of the questions --

THE WITNESS: Generators.

THE COURT: Generators? Taking a look, and I know

this is a little bit off topic to direct, but you'll bear with me: Looking at the Consultation Parties in the bid procedures, it looks like the Consultation Parties are the Prepetition Lender, Mr. Lemmon's client; counsel to the Official Committee of Creditors; and obviously yourself and Piper would be involved, as well as the Debtors. And so in this instance the proposition would be the DIP Lender would not necessarily be a Consultation Party if they were a stalking horse, correct?

THE WITNESS: I don't believe so.

THE COURT: Okay. All right. I think those are my questions.

So, Mr. Lemmon, I'm going to let you ask your questions now, and it can be based upon the questions asked by Mr. Arnett and myself. And then I'll turn him over to Mr. Rukavina for redirect.

MR. LEMMON: Thank you, Your Honor.

THE COURT: You're welcome.

MR. LEMMON: My one question has turned to two, though, Your Honor. So let me start with this, and that is --

THE COURT: I don't charge you by the question. You're okay.

MR. LEMMON: All right.

CROSS-EXAMINATION, RESUMED

BY MR. LEMMON:

Q The first is my original question, and that is: What mechanism have you built into the bid procedures to protect the respective estates? In other words, to make sure that the proper amount is being paid for the assets of South versus North?

A We don't have anything in the bid procedures right now about allocation of assets.

Q So the answer is nothing is built into the bid procedures to protect the respective estates' constituents?

A Not at this point.

Q Okay. Second, do I understand from the answers that you gave the Court that you think that you'll generate one to one and a half million dollars of A/R during the sale process, but that it will cost you two and a half million to generate one to one and a half?

A The $2-1/2 million is -- so, from an operations standpoint, it's operationally neutral, and we're generating a million to a million and a half of A/R. We have a million dollars of CAPEX that we're putting that we're putting into the plant. We have a million and a half to professional fees.

Q Okay. And how much does it cost you operationally to run the plant, the respective plants, during that sale period, sale process period?

A It should be -- it should be operationally neutral.
Q In other words, you think that you should be breakeven?
A Yes.
Q And that'll be for the first time in your tenure there that you would be breakeven, right?
A It's also the first time that we've been selling 3,000 tons a day since I've been here. When I first got in, we were selling 200, 300.
Q Have you reviewed the testimony from the earlier hearing that breakeven was 3,800 tons a day?
A No, but we also will be operating out of the South Plant, which is why we want to work out of both plants, to sell 4,000. And also the 3,800 breakeven had to do with fuel costs that, based on what we're doing today, should be lower. Also, the trucking costs between North and South. So we've made some operational improvements that hopefully would reduce the breakeven from the 3,800 that we talked about earlier.

MR. LEMMON: No further questions right now, Your Honor.

THE COURT: Thank you, Mr. Lemmon.

MR. LEMMON: Thank you.

THE COURT: Mr. Rukavina, redirect?

REDIRECT EXAMINATION

BY MR. RUKAVINA:

Q Mr. Shapiro, the 3,800, did that include professionals?
A I don't believe so.
Q Okay. And, again, on the A/R that Mr. Lemmon was asking you about, do I understand that it won't be that one or 1.5 million will be generated, but an additional one or 1.5 over what's there today will be generated during the sales process?
A Correct.
Q Okay. I want the judge to understand more the interplay between the North and South Plant. So, at the North Plant, we take raw sand. Correct?
A Correct.
Q And then what's the first thing that happens to it?
A It gets washed.
Q Okay. So there's a wash -- what is it called, a wash facility, wash plant?
A It's a wash plant.
Q Wash -- a washing machine? A gigantic washing machine? Once it's washed, what happens to it?
A It's dried.
Q Okay. And then once it's dried, what happens to it?
A It gets picked up and shipped.
Q Well, first, on very long conveyor belts that have a bunch of ball bearings and things that have fallen apart and need to be replaced, right?

A Correct.
Q Okay. Is there a washing plant, whatever it's called, at the South Plant?
A No.
Q Okay. So the interplay between the North and South Plant is that the North Plant can wash -- I'm sorry. Is there --
A We mine and we wash at the North Plant.
Q Okay. Does the South Plant have a dryer?
A Yes.
Q Okay. So we can take wet sand from the North Plant that's been washed up there and then dry it at the South Plant. Is that correct?
A Correct.
Q Okay. You mentioned that the last tranche of DIP funds was $3 million, correct?
A I believe so.
Q And how much did you mention is in A/R today?
A Two and a half.
Q Okay. All collectable?
A Yeah.
Q And how much did you mention is in cash today?
A Between five hundred and a million dollars.
Q Okay. So around $3 million there?
A Correct.
Q So has it cost anything for the -- has the Senior Lender

to your knowledge paid anything to have the plant operational the last few months?
A Well, I'm not sure what the A/R was when we started.
Q Okay. Fair enough. But isn't it also true that the losses that Mr. Lemmon was asking about, a lot of them are not operational losses, they are funds -- and I don't know the accounting term -- there's cash that we had that we had to use for improvements and capital expenditures. Is that correct?
A Correct.
Q And is it anticipated that those expenditures have preserved or increased by maybe a dollar-for-dollar the value of that plant?
A It's a belief.
Q Okay. And as far as operational losses, were most of them occasioned by the plant being down in order to effectuate repairs so we weren't able to sell sand?
A Correct.
Q Okay. And how long now have we been selling roughly 3,000 tons a day?
A It's been about three weeks now.
Q Okay. And does that give you some comfort that maybe it is the first time in this case that we're actually doing what we said we would?
A In a long -- first time in a long time.

Q Is now the time to pull the plug and make it go dark?
A I don't believe so.
Q Okay. Three Rivers. So there is a potential, is there not, that the judge will find that that's a lease and that therefore for us to assume it we're going to have to pay them a large cure claim?
A I know there's a dispute going on.
Q Okay. And that cure claim might be, let's say, a million dollars, right?
A Correct.
Q Okay. And if we don't pay them that million dollars, will we be able to assume that lease? If it's a lease?
A No.
Q Okay. Is anything that we're doing today trying to prejudice or decide those issues?
A No.
Q Okay. I want to focus on the million and a half that you discussed in the budget that would go to professionals. Would that include previously unfunded carve-outs?
A Yes.
Q Okay. Now, this is important, I think. So, right now, there is a large number of professional carve-outs that has not been funded. Correct?
A Correct.
Q And as a result of that, would the professionals get, up

to the amounts of the unfunded carve-outs, the first dollars that come in?
A Yes.
Q Okay. So right now, let's just call that *x*. Right? So right now, that *x* comes on top of everyone. Is that accurate?
A Correct.
Q Okay. And if we use new DIP money to pay that off, then that *x* goes away. Right?
A That's correct.
Q But now there's the new DIP money *y*, right?
A That's correct.
Q Are those numbers pretty much the same?
A Yeah.
Q Are the professionals going to keep working for free?
A I will, but nobody else will.
Q Is Piper going to work for free?
A No.
Q Okay. The point is, is there -- is there any net prejudicial effect on the Senior Secured Prepetition Lender as a result of the professionals being paid their previously-unfunded carve-outs?
A I don't believe so.
Q Okay. How much is Tex-Con owed, approximately?
A Oh. Three hundred. Four fifty. I don't know which

month it is right now. Four fifty, I think.
Q And if -- and have we told them that we're going to pay them once we get the DIP?
A Yes.
Q And what have they told us is going to happen if we don't do that?
A They will not ship us.
Q And what happens to the plant?
A It goes dark.
Q Okay. And Mr. Lemmon asked about insiders, which he does quite a bit. These insiders would include Mr. Sheperd, Mr. Collier, and Mr. Nelson, I take it?
A That is. Yes.
Q And are they there managing the plant?
A They are running the plant.
Q Okay. And Mr. Nelson has some kind of construction company, right?
A Yes, he does.
Q Okay. And does he provide construction services, for example, for some of these repairs and maintenance and improvements?
A Correct.
Q And to your understanding, does he make a profit on those?
A My understanding is it's not the profit he could make to

other people.
Q Okay. Are you aware that he's testified before under oath in this Court that he either -- that he -- I forget if it was that he doesn't make a profit or that he does it at below-market rates for the Debtor.
A I've heard it's either cost or below-market.
Q Okay. And are you satisfied that that's true?
A Yes.
Q Is there anyone else that would provide these services to you?
A On a sporadic basis, but no one's -- no one's rushing to provide services.
Q Okay. Has he been paid current postpetition?
A He is still owed money.
Q Okay. And past that, are you familiar with an entity called Field Camp?
A Yes.
Q And that's another -- that's another John Nelson entity?
A Yes.
Q And do they provide leased equipment -- trucks, tractors, what we call yellow steel -- to us?
A Yes.
Q Okay. And do we get value for that?
A Yes.
Q Okay. And are you aware that they then just take those

same payments and pay -- make the same payments to their senior secured lender on that equipment?

A That's my understanding.

Q Do you know whether they make a profit on that?

A I don't believe they make a profit.

Q All right. Other than basically a sale, a liquidation value, is there any alternative to bid procedures and an auction in this case?

A At this point, no.

Q Okay. There are some people that might be ready to perhaps propose a plan? Are you aware of that?

A We've spoken to some folks who have some interest.

Q Okay. That hasn't happened yet, has it?

A No.

Q Okay. Are we trying to preclude people from proposing a plan with these bid procedures?

A No.

Q Will you always employ your fiduciary duty on behalf of the Debtors to decide what is in the better interest of the estate?

A Yes.

MR. RUKAVINA: Thank you, Your Honor. I'll pass the witness.

THE COURT: Thank you very much, Mr. Rukavina.

Just one moment.

(Pause.)

THE COURT: I don't think that I have any further questions with respect to Mr. Rukavina's redirect. Thank you very much for your testimony, Mr. Shapiro.

(The witness is excused.)

MR. RUKAVINA: Your Honor, the Debtors have no further evidence. I don't know that we need the bid procedures in evidence. They're attached to the motion.

THE COURT: Okay. Thank you very much.

All right. Anyone else wish to call their own witness?

(No response.)

THE COURT: Okay. Any other evidence that any of the Objectors or any of the other Joiners wish to put on?

(No response.)

THE COURT: Okay. With that, I'll hear closing. Mr. Rukavina, would you just like to have the first word and the last word, or just the last word?

MR. RUKAVINA: Your Honor, I'm not going to repeat myself.

THE COURT: Okay.

MR. RUKAVINA: I'll stand by my opening remarks and the evidence.

THE COURT: All right. Thank you, sir.

All right. Mr. Lemmon?

CLOSING ARGUMENT ON BEHALF OF THE FCI-SLG, LLC ENTITIES

MR. LEMMON: Your Honor, I won't repeat myself, but Mr. Arnett's question raises really the key problem, or a key problem with this, in addition to the things that we said before. And that is there's no segregation or allocation in the sale process. They propose to mash the operations -- that's an accounting term -- of the North Plant into the South Plant during the sale process and -- in order to try to keep going, right? And first of all, they don't have a problem with essentially going dark at the North Plant during that period of time in the sale. And right now the South Plant is dark. So this issue --

THE COURT: Well, Mr. Lemmon, I'm going to take a little bit of umbrage with you, because I heard testimony just within a week. What you're calling dark means they're not washing and drying sand. They're doing something at the South Plant. They're loading up trucks. I heard a lot of testimony about trucks --

MR. LEMMON: Well, --

THE COURT: -- and rolling on the roads. So they're doing something. And I think that ties with Mr. Shapiro's testimony.

MR. LEMMON: We can discuss this more at another time, Your Honor, because the evidence is closed. But I believe that they are not operating at the South Plant right now and that they intend to shift operations there. I don't

think they're even loading trucks at this moment because the machinery that was there to load the trucks broke. Their front-end loader broke. And so -- but again, that's not in the evidence for today.

THE COURT: Okay.

MR. LEMMON: And we can figure that out.

My problem that I'm having that I'm trying to point out to the Court is what this is in this sale is a *sub rosa* plan. And worse than that, Your Honor, this sale proposal, these bid procedures, are a *sub rosa* plan with a de facto substantive consolidation. And there is zero showing that we should have a substantive consolidation. And we would object to that because there's a different creditor set in each of the two plants.

Now, just because they're sloppy businessmen and just because they're inept and the machinery keeps breaking at one place or another is not an excuse to substantively consolidate these. There are no protections built into these bid procedures. And so we're setting up a process that is going to be costly and is doomed to fail.

THE COURT: So is that a bid procedures issue or a sale issue?

MR. LEMMON: I believe that the bid procedures should protect the respective constituencies and should call for the bids to be received separately for the assets of each

of the two Debtors.

THE COURT: Tell me, Mr. Lemmon, remind me: Does your client only have a lien on one of the two plants and assets?

MR. LEMMON: Well, that's an interesting point, Your Honor. My client has a lien on one of the two plants, unquestionably. We have a lien on some parts of the second plant. You may or may not recall that at the August 1st hearing Mr. Rukavina started by challenging our lien on the South Plant.

THE COURT: Okay. All right.

MR. LEMMON: So I would say that it's not a settled point.

THE COURT: All right. Thank you. Anything else, Mr. Lemmon? I didn't mean to cut you off.

MR. LEMMON: No. Thank you, Your Honor.

THE COURT: All right. Thank you.

Mr. Arnett, do you wish to be heard in closing?

MR. ARNETT: Just very briefly, Your Honor.

CLOSING ARGUMENT ON BEHALF OF THREE RIVERS SAND, LLC

MR. ARNETT: I won't repeat my concerns about predetermining the disputes between Three Rivers Sand and the Debtors. I think that the Debtors have --

(WebEx interruption.)

MR. ARNETT: -- that there will be --

THE COURT: Could you delete that phone number?

MR. ARNETT: -- language in the order that protects that.

I do have a concern about whether --

THE COURT: Sorry about that, Mr. Arnett.

MR. ARNETT: I do have a concern about whether this is viable, but I think that that is probably more appropriate to address when we take up the hearing on the stalking horse bid.

THE COURT: All right. Thank you very much.

MR. ARNETT: So I'll leave it at that, Your Honor.

THE COURT: Okay. Thank you.

All right. Mr. Colvard, do you wish to be heard by way of closing?

MR. COLVARD: Your Honor, Michael Colvard. Just with the reservation of rights, Your Honor, I don't have any further comments.

THE COURT: Thank you.

All right. Anyone else?

(No response.)

THE COURT: All right. Well, obviously, a great deal has changed in terms of where we were the day this was filed on March 30th and what the Debtors are seeking today.

The Court shares Mr. Shapiro and the Debtor's concerns with respect to a naked auction. I certainly believe that

traditional thinking is that going in with a stalking horse bidder, number one, drives bids, and number two, brings some sort of structure to the bidding.

Now, it could very well be that the bid that's been at least laid out as a proposed stalking horse bid of the DIP Lender is not the same way that a strategic buyer might bid. And so I think that whatever the Debtor, in consultation with the parties, the Consultation Parties, determine [Court edit] the way that bids are reviewed, I think that they should maintain maximum optionality on how the bids have to take place. Because as Mr. Rukavina aptly noted, the DIP Lender isn't in the business of running sand plants, and that wouldn't be the basis for its purchase. Rather, again, not predetermining a DIP, not predetermining a stalking horse, it would be a way to kind of get this process going.

Mr. Lemmon on behalf of the Secured Lender raises very important, very serious concerns. These are concerns that have been at the forefront of this case for at least a couple months, I would say. But what I think the Secured Lender doesn't bring to me is my other option. We're all big boys and big girls. I know what the other options are, right? There's Chapter 7. I don't have a motion to convert in front of me. There is a dismissal. I don't have a motion to dismiss in front of me. And there's a plan process. And I don't have one of those, either.

So I guess in some ways it's like do I approve bid procedures or do I *sua sponte* convert. Well, I'm not going to do that. I think that would be highly inappropriate. Again, I think that where we're headed now is entering into bid procedures. We can discuss when the hearing on the approval of the stalking horse bid should be and when I would expect to see papers on that, more importantly, because expedited hearings are great for everyone who just shows up and argues [Court edit], but the Court does like to prepare. Crazy me. So that's one thing.

With respect to Mr. Lemmon's more substantive objections along the way, the Secured Lender has 363(k) rights until they don't. And I am going to wholly discourage gamesmanship in this instance. I don't want to be approaching a sale and then all of a sudden someone is disputing their [Court edit] lien just so that they can't bid. If there is a reason to dispute their lien, then let's bring it. Things aren't changing. If they don't have good liens, we should know that sooner rather than later, or at least the assertion, of course, of disputable liens. So they'll have their 363(k) rights.

I will only approve -- and this is, again, a motion for another day -- but I'm only going to approve a stalking horse bid with a fiduciary out. I think, again, on the whole, if there is a DIP Lender that (a) wants to fund this process

with a budget and that (b) wants to be the stalking horse bidder, well, you're going to do that if that's the best bid going. If I have somebody -- we've done the math a few times. I'm embarrassed that I don't remember it. I think it was in the nature of like $21 million. But if there's somebody that wants to bid $30 million, well, then that's going to be the stalking horse. I don't want to crush anybody's hopes and dreams. Because I think at the end of the day what we need to do with the layers of debt that we have in this case with the DIP, with the Secured Lender, and with the other issues relative to unpaid admin creditors, we have to maximize value. We have to recognize that that's where all of this Court's decisions are going to go, is how do we maximize value, how do we have a sales process that will do so.

And obviously, recognizing that the Debtor is not blowing itself out of the water, clearly, because it's in the middle of a desert, but in terms of operations, we need to make sure that we kind of keep the reins on expenses.

So when it comes to a qualified bidder, again, if there is no objection to the Secured Lender's liens, then 363(k) says that they're able to credit bid. I don't know why they would need to otherwise qualify if that's all they're going to do.

Now, let's just say for sake of numbers that they're owed

$30 million. If you want to credit bid $30 million but your whole bid is $32 million, then you have to qualify and you have to do whatever is necessary to give assurances of the overbid portion of your credit bid [Court edit]. I think that that's fair.

So that will be part of my ruling, that the Secured Lender only needs to qualify, so to speak, for any amount over what it intends to credit bid. And I think that that should be a known commodity, that we should set out what the credit bid is. If there is an objection to any portion of it, then set that out so that we know what that overage is.

With respect to Three Rivers, with respect to Cuatro Paisanas, I think I've made myself clear. I think that that information should be in the data room. You can establish the reservations in the order [Court edit]. I am not, by virtue of approving bid procedures today, deciding those issues in any way, shape, or form.

And I think that was most of the issues. So the only other issue that I see is with respect to the bid procedures, I'm going to determine any [Court edit] breakup fee to a stalking horse agreement, I'm going to determine that under a separate order. In terms of hearings, I can tell you what I have. Ms. Harden told me that -- let me get back up -- that we have the afternoon of April 22nd at 1:30.

MR. RUKAVINA: Your Honor, that'll work for the

Debtor.

THE COURT: Okay.

MR. RUKAVINA: And I believe it'll work for the Committee.

MR. ENGLISH: It will.

THE COURT: All right. So if you want a hearing -- when are you going to get your papers filed, Mr. Rukavina?

MR. RUKAVINA: Your Honor, I'll commit to doing it by tomorrow, by -- definitely by tomorrow, served by tomorrow. And then --

THE COURT: Okay. All right.

MR. RUKAVINA: Yeah. And again, it'll be a combined DIP/stalking horse motion.

THE COURT: Okay. Was somebody seeking to be heard?

MR. LEMMON: And Your Honor?

THE COURT: Mr. Lemmon?

MR. LEMMON: Yeah. Your Honor, Steve Lemmon. I think Mr. Taylor is on the line. I don't know his schedule. That works for me. We will need to take a couple of depositions, but we can probably take those, you know, over Zoom. So, --

THE COURT: Okay. Relative to a stalking horse or a DIP motion?

MR. LEMMON: Correct, Your Honor.

THE COURT: All right. Well, expedition is what it

is. Expedited discovery. Fair enough.

And to be certain, I just, I don't see a lot of other avenues of opportunity in terms of a nice chunk of time. Next week, actually -- no. No, not really, because the only other day is Monday, which is way too soon. So let's do the necessary to meet that deadline.

Other than that, when you upload the form of order and bid procedures, Mr. Rukavina, if you could set a deadline by which you will provide cure notices. I think that's going to be important in this case.

I will approve a 14-day turnaround. I think that is market at this juncture.

And I don't have an issue with your auction dates and your notice of successful bidder deadline.

Let me tell you what we have in June. Yes, it looks like we have some time on June 3rd in the morning.

MR. RUKAVINA: I can't do that day, Your Honor.

THE COURT: Okay.

MR. RUKAVINA: New Orleans on the *WPI* case.

THE COURT: Oh, okay. Well, assuming you're fighting for me, then I guess I'm going to have to give you that day off.

The only things that I have that I see big chunks -- and again, you can go through these with Ms. Harden as well -- is I've got some time on the 2nd, I think, in the morning.

That's typically a self-calendar docket, so you'll have to talk about that with Ms. Harden.

MR. RUKAVINA: Well, and Your Honor, I think I have the afternoon in the Federal adversary.

THE COURT: Yes, you do.

MR. RUKAVINA: So I think there's going to be some time in the afternoon as well on the 2nd.

THE COURT: Okay.

MR. RUKAVINA: But the 2nd morning -- I would suggest, respectfully, that we do set a date now so that all parties have that. And unless Mr. Taylor or Mr. Lemmon are not available -- of course, someone can move to continue, if need be -- but I would request a setting on the 2nd, if possible.

THE COURT: Well, Ms. Harden leaves at 4:30 and she's the person who gives us that.

MR. RUKAVINA: Oh. I'll get with her tomorrow morning.

THE COURT: Yes, exactly. Get with her tomorrow morning. What I'm telling you is I see the 2nd available in the morning, but that's a self-calendar docket, so it could very well be that she has some super-secret spy hearings in there that I'm just not seeing. And so I want to make sure that you get that from her.

MR. RUKAVINA: Yes, Your Honor.

THE COURT: And she's here at like 7:00 a.m., so I do let her leave from time to time.

MR. RUKAVINA: I've gotten emails from her on the weekend.

THE COURT: Yes, you do.

MR. RUKAVINA: She's a workaholic.

THE COURT: No, she's amazing. She is amazing.

The only other thing I can see, and this is something that literally Ms. Harden might want to speak to Ms. Kippes about, actually, is we have some things going Thursday morning. I don't know if those are going to be needed. And now we do have time on Friday.

MS. KIPPES: Your Honor?

MR. RUKAVINA: The 5th does not work for me, Your Honor.

THE COURT: Okay.

MS. KIPPES: Your Honor, right now we do not have any agreements on the matter that is set on the Court, but I live in hope.

THE COURT: Yes, exactly. Hope springs eternal. I love that.

So it does look like the 2nd will probably have to be kind of where we go with this. And so, with that, you just reach out to Ms. Harden.

MR. RUKAVINA: While we're here, I just want to ask

for one point of clarification.

THE COURT: Yes.

MR. RUKAVINA: This is on the Senior Lender's credit bid right.

THE COURT: Yes.

MR. RUKAVINA: The concern by Mr. Shapiro and myself is not that they're going to offer cash in excess of their maximum credit bid right.

THE COURT: Sure.

MR. RUKAVINA: This is an unusual case because they have to come in and take out the DIP Lender.

THE COURT: Yes.

MR. RUKAVINA: So that's what I was referring to and what Mr. Shapiro were referring to, that I just want to make sure that I understand the Court. What I understood the Court to mean is if they're coming in with money, then they have to, like other bidders, demonstrate that they have the wherewithal, demonstrate where the money is come from, et cetera. Am I understanding that correctly?

THE COURT: Yes.

MR. RUKAVINA: Okay.

THE COURT: You are understanding it correctly. So, again, if they are credit bidding, if you're going to credit bid junior debt, well, that's a determination issue with respect to what bid is, is it higher and better? Because

you're bidding in junior debt if they've been primed. Right?

MR. RUKAVINA: Yeah.

THE COURT: So, --

MR. JOHNSTON: When you finish, ma'am, my name is Mark Johnston. I'm a party in interest. I have a question I'd like to ask you when you get done, a clarification question.

THE COURT: Perhaps. So that's not a qualification bid. That is an apples-to-apples bid. Can you bid in junior debt and have that bid essentially better the DIP? Because if it doesn't take out the DIP, then that -- okay? Does that --

MR. RUKAVINA: And I think the Court understands. Because, yeah, we -- again, the Debtor, not the Committee -- the Debtor acknowledges that they have at least a $32 million credit bid right.

THE COURT: Sure.

MR. RUKAVINA: But that doesn't satisfy the unpaid admins and the DIP Lender.

THE COURT: Right. And the other issue that I want to speak to -- and I'll hear you out, Mr. Lemmon -- is I did not address Mr. Lemmon's argument with respect to segregation of the bids.

I am not going to require two separate bids per Debtor with respect to assets, but just recognize that at the time

of a sale hearing, if these parties are for any reason proportioning their bid on anything less than the whole, then we should be able to know that at a sale hearing. These things usually happen organically in the context of an auction: I want to bid on just these widgets and not those. But if anyone is bidding on anything other than the whole, then they should be prepared to allocate.

MR. RUKAVINA: One more thing that we forgot to discuss.

THE COURT: Uh-huh.

MR. RUKAVINA: The Committee requested, I think justifiably, that there be a deadline for the credit bid to be made. Mr. Lemmon requested 48 hours before the auction. I think we're agreeable to that.

So as long as we're still all fine with that, what I would propose is to upload an order that will -- so, in other words, so that the senior Lender gets to see what the other bids are, but then 48 hours prior to the auction that's their deadline to credit bid.

MR. ENGLISH: Okay. We don't have any objection to that, Your Honor. I mean, if we're going to pursue a challenge to their right to credit bid, we'll do it before that time.

THE COURT: Right. Thank you. No, and I think that makes sense, because the qualified bid deadline, at least as

it's been laid out, is the 22nd. And so I think it certainly makes sense is, number one, any challenge to their liens needs to come before the bid deadline, and then number two, with respect to the Secured Lender, it looks like --

MR. RUKAVINA: That'll be Monday --

THE COURT: Yes, it's the 25th.

MR. RUKAVINA: Which is Monday, Memorial Day.

THE COURT: Memorial Day.

MR. RUKAVINA: I just want to make sure that we're going to --

THE COURT: Yes.

MR. RUKAVINA: That Mr. Lemmon is not going to say, well, it's pushed, so --

THE COURT: Well, yes. That's why I love the specificity of actual days instead of 48 hours.

MR. RUKAVINA: Yeah.

THE COURT: Because I don't want a situation in which the 25th becomes the 26th --

MR. RUKAVINA: Yeah.

THE COURT: -- and then I have an emergency motion, so that I can try to get into y'all heads.

MR. LEMMON: Well, Your --

MR. RUKAVINA: I warned Your Honor we're going to have a flurry of motion practice as the case ends.

THE COURT: Well, you know what, --

MR. RUKAVINA: But Mr. Lemmon, are you okay with it being Memorial Day?

MR. LEMMON: We are okay with it being Memorial Day. What we're not okay with, though, is a last-minute objection. And so we believe that the objection needs to be filed in time for the Court to consider the objection prior to the bid.

MR. RUKAVINA: Well, you're not going to have one from me. So that's, Your Honor, between the Committee and Mr. Lemmon.

THE COURT: Mr. English, what are you thinking about in terms of timing?

MR. ENGLISH: I think I heard you say that an objection would have to be lodged by the bid deadline --

THE COURT: Before.

MR. ENGLISH: -- of May 22nd or before that.

THE COURT: Okay.

MR. ENGLISH: I think that probably is fine.

THE COURT: Okay. Mr. Lemmon?

MR. LEMMON: Well, but what we don't want is for there to be an objection, us not able to bid, and then we win the objection. Right? We want the objection to be heard prior to the bid deadline.

(Pause.)

THE COURT: Can you object or bring whatever your

dispute is by the 15th, Mr. English?

MR. ENGLISH: I think that works for us, Your Honor.

THE COURT: All right. And Mr. Lemmon, with that, why don't you contact Ms. Harden in the morning, and maybe copy Mr. English and his team, and you guys can see what we can do the week of the 18th.

MR. LEMMON: Thank you, Your Honor.

THE COURT: Not the 18th. Just so you know.

MR. LEMMON: Right.

THE COURT: All right.

MR. LEMMON: The week of the 18th, yes.

THE COURT: Exactly. If it's the 18th, I'll probably be getting a divorce, and nobody wants to talk to me the day after that.

All right. So, with that, Mr. Johnston, do you want to approach the podium and identify -- pardon?

MR. JOHNSTON: If you can hear me, I don't need a mic.

THE COURT: No, you need a mic for the record. If you can state your name for the record for me.

MR. JOHNSTON: Yes, ma'am. My name is Mark Johnston.

THE COURT: Uh-huh.

MR. JOHNSTON: And I had a clarification about the concern that Mr. Lemmon brought with the 363(k) --

THE COURT: Uh-huh.

MR. JOHNSTON: -- and the DIP lender. So if they were going to credit bid --

THE COURT: And I'm sorry, who are you again, sir?

MR. JOHNSTON: I'm just an interested party at this moment.

THE COURT: Okay. Interested like as an interested buyer? Interested how?

MR. JOHNSTON: Yes, ma'am.

THE COURT: Interested buyer?

MR. JOHNSTON: Yes, ma'am.

THE COURT: Okay.

MR. JOHNSTON: Yes, ma'am.

THE COURT: All right.

MR. JOHNSTON: And so I've been in dialogue with the Secured Lender, and I wanted a clarification. If they have, just say for round numbers, a $30 million 363(k) ability to use in a credit bid, if there is a $12 million, for round numbers, DIP or $15 million DIP at that point, they would have to actually qualify; they could not credit bid with their secured dollar amount towards that bid. That was the clarification I was looking for.

So like you had gave an example a moment ago of $30 million, and if the bid was $32 million, they would have to qualify just like everybody else.

THE COURT: Right.

MR. JOHNSTON: Raise real money, $2 million. Prove to Mark Shapiro that they could pay that. And that's what would qualify their bid at $32 million.

So if they are going to tender a bid, if the Secured Lender is going to tender a bid at all, they would have to prove financial capability to supersede the DIP purchase with real funds. Is that correct?

THE COURT: That is correct.

MR. JOHNSTON: That was my question.

THE COURT: Mr. Lemmon, do you believe anything different?

MR. LEMMON: Your Honor, the way I'd put it is we understand that we have to take out the DIP.

THE COURT: Okay. Thank you.

MR. JOHNSTON: That's all I wanted to put on the record. Thank you, ma'am.

THE COURT: Thank you very much, Mr. Johnston.

All right. Anyone else? Anything that I have left unclear?

MR. BROOKNER: Your Honor, Jason Brookner. That Monday in question, I may have missed it: Did you tell Mr. Rukavina to talk to Ms. Harden on the time for April 22nd or did you give a time for April 22nd?

THE COURT: Oh, no, he needs to confirm that with

Ms. Harden.

MR. BROOKNER: Okay. So it's 1:30, maybe, and --

THE COURT: What I'm telling you is April 22nd. No, wait. Did I say April 22nd?

MR. RUKAVINA: Yes, Your Honor. You said April 22nd at 1:30.

THE COURT: Mr. Robinson, am I crazy?

(Court confers with Clerk.)

THE COURT: Oh, okay, so you think that that -- okay. Yes. You'll need to confirm with Ms. Harden.

MR. RUKAVINA: I will do so, Your Honor.

THE COURT: Yes. I think we have the afternoon, but to be honest, I've got colors of the rainbow over here that mean things.

(Discussion.)

THE COURT: Excellent. Yes. Thank you. All right. I am not allowed to use the calendar, ladies and gentlemen. I have so many powers; that's not one of them. That's not in my 105 powers, either.

All right. Anything else, ladies and gentlemen?

(No response.)

THE COURT: All right. Well, thank you all for being here.

Obviously, I think that this is certainly a situation where, Mr. Rukavina, I'll ask that you confer with the

parties, with the Objecting Parties and the other Consultation Parties, with preparation of the order that you upload. And if there are any disputes, if, heaven forbid, you have to upload redlines of competing forms of order and I make the call, then just let me know what the bid and ask is and I'll get that done.

And just one moment.

(Pause.)

THE COURT: Ms. Harden from her vehicle has confirmed, because she just knows these things, that April 22nd is available at 1:30. So, again, if you get your stuff on file tomorrow, you can upload your notice of hearing, but do confirm with her via email so that she's not required to, while she's driving, set these things in stone, okay?

(Conclusion of proceedings at 4:57 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **04/16/2026**

______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX

PROCEEDINGS 4

OPENING STATEMENTS

Mr. Rukavina 8
Mr. English 17
Mr. Lemmon 19
Mr. Arnett 22
Mr. Colvard 24

WITNESSES

Debtor's Witnesses

Mark Shapiro
- Direct Examination by Mr. Rukavina 26
- Cross-Examination by Mr. Lemmon 38
*Voir Dire* Examination by Mr. Rukavina 52
- Cross-Examination by Mr. Arnett 55
- Examination by the Court 58
- Cross-Examination by Mr. Lemmon 62
- Redirect Examination by Mr. Rukavina 63

EXHIBITS

-none-

CLOSING ARGUMENTS

Mr. Lemmon 72
Mr. Arnett 75

RULINGS

Motion for Relief from Stay [364] - Agreed Form of Order 7

Debtors' Expedited Motion to Approve Bid Procedures for Sale of Substantially All Assets [377] 76

END OF PROCEEDINGS 94

INDEX 95