J. Robert Arnett II
Texas State Bar No. 01332900
CARTER ARNETT STAHL & CHO PLLC
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
barnett@carterarnett.com
Telephone: (214) 550-8188
Facsimile: (214) 550-8185


Counsel for Three Rivers Sand, LLC

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Case No. 25-80481-MVL** |
| **FCI SAND OPERATIONS, LLC, et al.[1]** | § | **Chapter 11** |
| | § | |
| **Debtors.** | § | **(Jointly Administered)** |
| | § | |

**THREE RIVERS SAND, LLC'S OBJECTION TO DEBTORS' EMERGENCY
MOTION (I) APPROVING ADDITIONAL POSTPETITION FINANCING ON FIRST
PRIORITY, PRIMING BASIS, (II) APPROVING THE DEBTORS' SELECTION
OF A STALKING HORSE BIDDER, (III) APPROVING BID PROTECTIONS IN
<u>CONNECTION THEREWITH, AND (IV) GRANTING RELATED RELIEF</u>**

TO THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE:

Creditor Three Rivers Sand, LLC ("Three Rivers" or "Landlord") files its Objection to

the Debtors' Emergency Motion (I) Approving Additional Postpetition Financing on First

Priority, Priming Basis, (II) Approving the Debtors' Selection of a Stalking Horse Bidder, (III)

Approving Bid Protections in Connection therewith, and (IV) Granting Related Relief [Doc. No.

407] (the "Motion") as it relates to the Lease Agreement entered into as of January 23, 2025,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number are: FCI Sand Operations, LLC (2539) and FCI South, LLC (4193). The location of the Debtors' service
address is 606 County Road 121, Marble Falls, Texas 78654.

between Three Rivers and Debtor FCI South, LLC ("FCI South" or "Tenant"), or the assets that are the Premises under the Lease, and respectfully shows the Court as follows:

## **FACTUAL AND PROCEDURAL BACKGROUND[2]**

1.      Three Rivers, as Landlord, and FCI South, as Tenant, entered into a Lease Agreement dated as of January 23, 2025 (the "Lease"), for 30.034 acres of land, plus two road easements, in the City of Three Rivers, Live Oak County, Texas (the "Land"), and all plant, equipment, machinery, materials, and parts located on the Land and used in the operation of a sand plant (together with the Land, the "Premises").

2.      Three Rivers had obtained title to the Premises by a Substitute Trustee's Deed with Bill of Sale executed on December 7, 2021, and recorded in the real property records of Live Oak County, Texas on December 12, 2021.

3.      The Premises are subject to a Deed of Trust by Three Rivers as grantor in favor of Sabine State Bank & Trust Company ("Sabine Bank") recorded in the real property records of Live Oak County, Texas,  to secure payment of a Line of Credit Promissory Note made by Three Rivers and payable to Sabine Bank in the original principal amount of $12,955,945.64.

4.      The Lease is for a term of five years and requires payments of Base Rent of $116,028.82 per month.  The Base Rent was expressly intended to cover Three Rivers' debt service on its indebtedness to its lender, Sabine Bank.

5.      The Lease is an absolute net lease, requiring the Tenant to pay as Additional Rent all expenses of every kind and nature relating to or arising from the Premises, specifically including property taxes of every kind and nature.

---

[2] Capitalized terms as used herein have same meanings as defined in the Lease.

6.      The Lease includes a Purchase Right Option to Tenant exercisable during the Lease Term for a fixed Purchase Price of $6,000,000.  If Tenant exercises the Purchase Right Option, a portion of the previously paid Base Rent will be credited against the Purchase Price. Tenant is not obligated to exercise the Purchase Right Option or to purchase the Premises.

7.      Tenant has rights to terminate the Lease if Tenant determines in "its sole and absolute discretion" during its Due Diligence Period that it does not want to proceed with exercising the Purchase Right Option or on the occurrence of a Landlord Event of Default.  The termination becomes effective 30-days after Tenant provides written notice to Landlord that it does not wish to proceed with the Purchase Right Option and terminates Tenant' obligation to pay Rent. If Tenant terminates the Lease, there is no obligation for Landlord to refund any portion of previously paid Base Rent or Additional Rent.

8.      Landlord has rights to terminate the Lease upon the occurrence of a Tenant Event of Default, which includes failure to pay Base Rent or Additional Rent when due and failure to observe or perform any other term, condition, covenant, or agreement in the Lease and fails to cure such default within 30 days after Landlord provides written notice thereof.  If Landlord terminates the Lease, there is no obligation for Landlord to refund any portion of previously paid Base Rent or Additional Rent.

9.      To preserve its Purchase Right Option under the Lease, within 20-days after the Effective Date (January 23, 2025), FCI South was required to deliver a copy of the Lease to the title company selected by FCI South together with $1,000, $500 of which was to be remitted to Three Rivers by the Title Company.  FCI South failed to comply with this requirement.

10.      FCI South was required to deliver written objections to matters affecting title to the Premises to Three Rivers, along with the Title Commitment, the Survey, and all instruments

identified therein within 20-days after receipt of the Title Commitment and Survey. FCI South failed to comply with this requirement.

11. The Lease contains a provision in Section 15.08 that "All time limits stated in this Lease are of the essence of this Lease."

12. FCI South filed its voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code on July 30, 2025.

13. At the time it filed its bankruptcy petition, FCI South was delinquent in paying one month's Base Rent for July 2025.

14. After filing the bankruptcy petition, FCI South failed to pay Base Rent in August 2025.

15. The approved budget attached to the Final Order Granting Debtors' Motion for Interim and Final Approval of Superpriority and First Priority Secured Postpetition Financing provided for payment of Base Rent under the Lease in the months of September, October, November, and December of 2025, and January, February, March, and April of 2026.

16. FCI South paid Base Rent in September and October 2025, but failed to pay Base Rent in November and December 2025 and January, February, March, and April 2026. Three Rivers has been forced to pay its debt service on the Premises from other sources.

17. FCI South also failed to pay the real property taxes when due to Live Oak County, and Three Rivers was required to pay such taxes in the amount of $80,805.91, to avoid the real property taxes becoming delinquent and a default under Three Rivers' deed of trust on the Premises securing Three Rivers' note to Sabine Bank.

18. On February 24, 2026, the Debtors filed a motion to assume executory contracts and unexpired leases, including the Lease. Three Rivers filed an objection to this motion.

19. On March 17, 2026, Three Rivers filed a motion for relief from the automatic stay to permit it to terminate the Lease, retake possession of the Premises, and recover the equipment FCI South had removed from the Premises.

20. On March 24, 2026, the Debtors filed Debtors' Original Complaint against Three Rivers and Bazil Moore, asserting a claim for declaratory relief claiming that the Lease is a financing agreement and that the Debtors own the assets that constitute the Premises under the Lease, a claim for alleged stay violations, a claim for conversion, and a claim under the Texas Theft Liability Act.

21. At the preliminary hearing on Three Rivers' motion for relief from the automatic stay on April 7, 2026, the Court set the final hearing on Three Rivers' motion, together with the Debtors' declaratory relief claim, for May 29, 2026 at 9:30 a.m.

22. On April 15, 2026, the Debtors filed the Motion, seeking approval to borrow an additional $2.5 million in DIP funding and to approve the DIP Lender as a stalking horse bidder.

## ARGUMENTS AND AUTHORITIES

23. Three Rivers objects to the Motion because it constitutes a scheme to deliver Debtors' assets to the DIP Lender in derogation of the rights of the Debtors' secured creditors, and because it demonstrates that the Debtors cannot establish the conditions for selling property free and clear of liens, claims, encumbrances, and interests under 11 U.S.C. § 363(f). Specifically, the Debtors cannot establish that the price at which the assets are to be sold is greater than the aggregate value of all liens on such property under Section 363(f)(3). Nor can the Debtors provide adequate protection of the interests of secured creditors under Section 363(e).

24.     The Motion to approve the DIP Lender as a stalking horse bidder for all the Debtors' assets for $21 million puts the lie to the Debtors' repeated assertions that the rights of their senior secured lender, FCI-SLG, LLC, are being adequately protected.  The Debtors have conceded that FCI-SLG's secured debt exceeds $32 million yet seek approval of a stalking horse bid that is $11 million short of that number, which is the best they have obtained after months of pursuing a sale.

25.     Moreover, the Motion makes virtually no mention of Three Rivers and makes no claims regarding adequate protection of its interests.  The Motion does not explain whether the stalking horse bid includes acquisition of the fee interest in the Premises free and clear of liens and encumbrances or acquisition of the leasehold estate including whatever rights FCI South may have under the Purchase Right Option.  The Debtors have taken the inconsistent positions that (1) the Lease is actually a financing arrangement and that FCI South owns the Premises and (2) the Lease is a lease and FCI South should be permitted to assume it.

26.     The Debtors' position that FCI South owns the Premises is wrong as a matter of Texas real property law.  The Lease does not contain operative words or words of grant showing an intention to convey to FCI South a real property interest, therefore, the Lease is not effective to convey title to FCI South.  *See Sanderson v. Sanderson*, 109 S.W.2d 744, 747 (Tex. Com. App. 1937); *Gordon v. West Houston Trees, Ltd.*, 352 S.W.3d 32, (Tex. App.–Houston [1st Dist.] 2011, no pet.).

27.     The Debtors' position that FCI South owns the Premises is based on their contention that the Lease is not a "true" or "bona fide" lease but instead is a financing arrangement intended as security, but that position is legally incorrect.

28.     The burden of proof lies with the party challenging the bona fides of a lease. *In re LATAM Airlines Group S.A.*, No. 20-11254 (JLG), 2022 WL 272167 at *23 (Bankr. S.D. N.Y. Jan. 28, 2022); *In re Anchorage Sportsplex, Inc.*, 462 B.R. 722, 730 (Bankr. D. Alaska 2010); *In re Integrated Health Services, Inc.*, 260 B.R. 71, 75 (Bankr. D. Del. 2001); *In re Barney's, Inc.*, 206 B.R. 328, 332 (Bankr. S.D. N.Y. 1997).   The quantum of evidence necessary to satisfy that burden is "substantial."   *LATAM Airlines Group*, 2022 WL 272167 at *23; *Anchorage Sportsplex*, 462 B.R. at 720; *Barney's*, 206 B.R. at 332.

29.     The fact that a lease is a typical triple net lease, in which the tenant is responsible for paying taxes, operating expenses, and the like, does not indicate the absence of a true lease. *Int'l Trade Admin. v. Rensselaer Polytechnic Institute*, 936 F.2d 744, 751 (2nd Cir. 1991); *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 863 (M.D. Fla. 2000).

30.     In order to find that a lease is intended as security, it is necessary to find an obligation on the part of the tenant that is to be secured. *In re Armstrong*, 84 B.R. 94, 95 (Bankr. W.D. Tex. 1988); *In re Peacock*, 6 B.R. 922, 924 (Bankr. N.D. Tex. 1980).   A definite obligation to pay rent during the lease term totaling an amount substantially equivalent to the fair market value of the leased property plus a financing factor is a precondition to finding that the lease is intended as security. *Armstrong*, 84 B.R. at 95; *Peacock*, 6 B.R. at 924.

31.     Conversely, an agreement that gives the lessee the right to terminate the lease at any time during the lease term, without any obligation for rents accruing during the remainder of the lease term should undoubtedly be viewed as a true lease. *Sunset Enterprises, Inc. v. B&B Coal Co., Inc.*, 38 B.R. 712, 717 (W.D. Va. 1984); *Armstrong*, 84 B.R. at 95-96; *Peacock*, 6 B.R. at 924.

32.     The final step in the analysis is whether the lessor has effectively bargained away the absolute right to retake control and use of the leased property, which is a significant characteristic of a true lease. *In re Int'l Plastics, Inc.*, 18 B.R. 583, 587 (Bankr. D. Kan. 1982); *Peacock*, 6 B.R. at 925.  Where a lease gives the landlord the typical landlord rights and remedies, including the right to remove an unsuccessful tenant and relet the premises to another company capable of performing the tenant's obligations, the lease is a true or bona fide lease. *In re Martin Bros. Toolmakers, Inc.*, 796 F.2d 1435, 1441 (11th Cir. 1986).

33.     Here, the Lease is a true or bona fide lease because there is no tenant obligation to be secured.  FCI South is not obligated to exercise the Purchase Right Option and has the right to terminate the Lease if it determines that it does not wish to proceed with the Purchase Right Option and that would terminate FCI South's obligation to pay Rent for the remainder of the Lease term.  If either FCI South or Three Rivers terminates the Lease, FCI South has no right to recover any portion of the previously paid Rent.

34.     Additionally, Three Rivers did not effectively bargain away the absolute right to retake control and use the Premises but has the typical landlord rights and remedies, including the right to remove an unsuccessful tenant and relet the premises to another company.  Under these circumstances, the Lease is a true or bona fide lease.

35.     If the contemplated sale is proceeding under the theory that FCI South owns the Premises and the stalking horse bid includes acquisition of the fee interest of the Premises, the stalking horse bid is woefully inadequate.  Under that theory, Three Rivers would be a secured creditor to the extent of the Purchase Price, which would be approximately $5.4 million.  The Debtors do not contend that Three Rivers would be under-secured and FCI South has valued the

Premises at $6,050,000.00 in its schedules.  The Motion has no explanation of how the $5.4 million would be paid from the stalking horse bid, which is a non-cash offer.

36.    The stalking horse bid consists of $12.4 million in previous DIP funding, $2.5 million in new DIP funding, assuming $2.5 million in payables, and leaving the Debtors cash and accounts receivable of $3.5 million.  There is no money available to pay Three Rivers.

37.    Further, the Motion does not take the Sabine Bank deed of trust into account.  The Debtors have not identified Sabine Bank as a secured creditor, even though Sabine Bank's deed of trust predates the Lease by several years.  Sabine Bank is not a party in interest to these bankruptcy proceedings, has not been given notice of these bankruptcy proceedings, and has not been given an opportunity to be heard.  Attempting to sell the Premises free and clear of Sabine Bank's deed of trust would be a violation of constitutional due process.

38.    In the alternative, if the stalking horse bid is based on the theory that the Lease is a lease and FCI South is able to assume and assign it, the bid remains inadequate.  The cure payment necessary to assume the Lease by the time a sale would close will be at least $1,241,094.11.  There is no cash in the stalking horse bid to pay that amount.

39.    If the stalking horse bid is predicated on being able to exercise the Purchase Right Option then it is illusory.  An option is not a contract to purchase real property unless and until it is exercised in strict compliance with the requirements of the agreement that created the option. *Galactic Power LLC v. Pickens Resource Corp.*, No. 4:23-CV-00405, 2024 WL 4101939 at *6 (E.D. Tex. July 2, 2024), rep. & recom. adopted, 2024 WL 4198188 (E.D. Tex. Sept. 13, 2024); *City of Brownsville v. Golden Spread Elec. Coop., Inc.*, 192 S.W.3d 876, 880 (Tex. App.–Dallas 2006, pet. denied); *Comeaux v. Suderman*, 93 S.W.3d 215, 219-20 (Tex. App.–Houston [14th Dist.] 2002, no pet.).  Accordingly, the holder of an option does not have an ownership interest in

the property that is the subject of the option. *Stanford v. Evans*, No. 14-08-00776-CV, 2010 WL 2517675 at \*4-\*5 (Tex. App.–Houston [14th Dist.] June 24, 2010, no pet.).

40.     Moreover, both the option and the underlying contract must be supported by consideration. *Galactic Power*, 2024 WL 4101939 at \*7; *Lopez v. Sanchez*, No. 05-14-01108-CV, 2015 WL 7717218 at \*3 (Tex. App.–Dallas Nov. 30, 2015, no pet.); *Hott v. Pearcy/Christon, Inc.*, 663 S.W.2d 851, 854 (Tex. App.–Dallas 1983, writ ref'd n.r.e.). If no consideration is given the option never becomes a binding contract and is unenforceable. *Via v. Blanchard*, No. 5:20-CV-170, 2021 WL 4902391 at \*8-\*9 (N.D. Tex. July 30, 2021); *Lopez*, 2015 WL 7717218 at \*3; *Hott*, 663 S.W.2d at 854.

41.     Here, the Purchase Right Option was not supported by consideration. The Lease provided for consideration to be given by requiring FCI South to deposit $1,000 with the Title Company, $500 of which was to be remitted to Three Rivers, however, FCI South failed to comply with that requirement and therefore the Purchase Right Option never became a binding contract and is unenforceable.

42.     Additionally, it is well-settled Texas law that strict compliance with the provisions of an option contract is required. *Healy Law Offices, P.C. v. Troutmen*, No. 12-24-00350-CV, 2025 WL 3724365at \*5   (Tex. App.–Tyler Dec. 23, 2025, no pet.); *Besteman v. Pitcock*, 273 S.W.3d 777, 784 (Tex. App.–Texarkana 2008, no pet.); *Crown Constr. Co., Inc. v. Huddleston*, 961 S.W.2d 552, 558 (Tex. App.–San Antonio 1997, no pet.). Any failure to exercise an option according to its terms, including an untimely or defective acceptance, is simply ineffective, and legally amounts to nothing more than a rejection. *Besteman*, 273 S.W.3d at 784; *Crown Constr.*, 961 S.W.2d at 558; *Atterbury v. Brison*, 871 S.W.2d 824, 829 (Tex. App.–Texarkana 1994, writ denied) (Cornelius, C.J., concurring).

43. FCI South failed to exercise the option in strict compliance with the requirements to do so. It failed to make the $1,000 deposit, $500 of which was to be remitted to Three Rivers, which it was required to do within 20-days of the Effective Date in order to preserve the Purchase Right Option. It failed to provide Three Rivers with its objections to the Title Commitment and Survey within the time required by the Lease. FCI South's failure to strictly comply with the requirements for preserving and exercising the Purchase Right Option amounts to a rejection of the option and precludes it from attempting to exercise the option. Put simply, the Purchase Right Option became void and unenforceable months before the Debtors filed their bankruptcy petitions.

44. It is also well settled that the bankruptcy court does not have the authority to resurrect a purchase option that terminated prior to the filing of bankruptcy. *See In re P & J Marketing, Inc.*, 142 B.R. 608, 610 (D. R.I. 1992); *see also In re 1075 S Yukon, LLC*, 590 B.R. 527, 536-37 (Bankr. D. Colo. 2018); *In re Premier Automotive Services, Inc.*, Adv. No. 05-1378-JS, 2006 WL 4711334 at *5 (Bankr. D. Md. June 14, 2006), *aff'd*, 2006 WL 8456776 (D. Md. Oct. 31, 2006), *aff'd*, 492 F.3d 274 (4th Cir. 2007).

45. The inadequacy of the stalking horse bid is exacerbated by the fact that Motion does not allocate the consideration of the stalking horse bid between the Lease and/or the Premises and the Debtors' remaining assets. Without such an allocation and a valuation of the remaining assets, the Debtors cannot show that the rights of FCI-SLG or of Three Rivers are being adequately protected.

46. The Debtors' request for an additional $2.5 million in DIP funding should be denied because it will only benefit estate professionals and the DIP Lender while further

subordinating the rights of creditors.    The Debtors plan to use $1.5 million to pay estate professionals and $1 million for repairs and improvements at the North Plant.

47.    The game plan is clear at this point—set up the DIP Lender's stalking horse bid to be the prevailing bid, declare that proves the fair market value of the Debtors' assets is $21 million, wipe out the secured creditors' liens, and pay the creditors nothing.    Instead of continuing this case in chapter 11, the case should be converted to a case under chapter 7 or should be dismissed.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Three Rivers respectfully requests that this Honorable Court deny the Debtors' motion for additional DIP financing and to approve the stalking horse bid, and grant Three Rivers such other relief as the Court finds just and equitable.

Respectfully submitted, this 21st day of April 2026.

*/s/ J. Robert Arnett II*
J. Robert Arnett II
Texas State Bar No. 01332900
Email:  barnett@carterarnett.com
**CARTER ARNETT STAHL & CHO PLLC**
8150 N. Central Expressway, Suite 500
Dallas, Texas 75206
Tel.: 214-550-8188 | Fax: 214-550-8185

**Counsel for Three Rivers Sand, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that on April 21, 2026, the foregoing document was electronically filed with the Clerk of Court via ECF and served upon all those who receive electronic notification.

*/s/ J. Robert Arnett II*
J. Robert Arnett II