Stephen W. Lemmon
Texas Bar No. 12194500
Streusand, Landon, Ozburn & Lemmon, LLP
1801 N. Mopac Expwy, Suite 320
Austin, Texas 78746
Telephone: (512) 236-9900
Email: lemmon@slollp.com

Mark C. Taylor
Texas Bar No. 19713225
Kane Russell Coleman Logan PC
401 Congress Avenue, Suite 2100
Austin, Texas 78701
Telephone: (512) 487-6560
Email:  mtaylor@krcl.com

*Attorneys for FCI-SLG, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| IN RE: | § | Chapter 11 |
| | § | |
| FCI SAND OPERATIONS, LLC, et al.,[1] | § | Case No. 25-80481-MVL11 |
| | § | |
| Debtors. | § | Jointly Administered |

**OBJECTION TO DEBTORS' EXPEDITED MOTION FOR APPROVAL OF
ADDITIONAL POSTPETITION FINANCING [ECF 407]**

FCI-SLG, LLC ("Secured Lender"), the primary secured creditor of FCI Sand

Operations, LLC and FCI South LLC ("Debtors"), hereby files this Objection (the

"Objection") to *Emergency Motion (i) Approving Additional Postpetition Financing on*

*First Priority, Priming Basis, (ii) Approving the Debtors' Selection of a Stalking Horse*

*Bidder, (iii) Approving Bid Protections in Connection Therewith, and (iv) Granting*

*Related Relief (the "Motion"* [ECF 407], and respectfully states as follows:

## I.    INTRODUCTION

1.    Debtors' Motion seeks additional funds to further continue to operate the

estates at a loss.   The Debtors have failed in every promise to the Court and constituents

regarding performance of the operation and have failed to implement promised reforms.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, if any, are: FCI Sand Operations, LLC (2539) and FCI South, LLC (4193) (the "Debtors"). The location of the Debtors' service address is 606 County Rd. 121, Marble Falls, TX 78654.

This is a rare circumstance where the equipment is worth more now than it will be if the Debtors continue to operate.

## II.   BACKGROUND

2.      Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on July 30, 2025 (the "Petition Date"), commencing these jointly administered cases before this Court.

3.      Debtors own and operate two frac-sand mines and processing plants in the Eagle Ford Shale region of Texas. Their assets include real property, mineral leases, processing equipment, and an operating business with existing customer orders. The Secured Lender has a secured claim of more than $32 million secured by liens on nearly all the Debtors' property.

4.      On April 15, 2026, Debtors filed the Motion seeking authority, on an expedited basis, to increase the *Senior Secured, Superpriority Debtor-In-Possession Master Credit Agreement* dated as of September 10, 2025 (the "DIP Loan") between GrayStreet Credit, LLC (the "DIP Lender"), and the Debtors, as amended by the *First Amendment to Senior Secured, Superpriority Debtor-in-Possession Master Credit Agreement* dated as of December 12, 2025, by $2.5 million (the "Additional DIP Financing"), bringing the total principal amount to $13.5 million (the "DIP Financing") and approving the DIP Lender as the Stalking Horse Bidder pursuant to the bidding procedures (the "Bidding Procedures").

## III.   ARGUMENT

**A.   The Debtors Have Failed at Every Turn**

5.      Since the inception of this case, the Debtors have made a series of promises.  Not one of those promises has been met.  The Debtors have failed to meet a

single goal.  In spite of, and precisely because of this history of failure, the Debtors now want to borrow more money and to prime the Senior Lender even further.

**B.     The Debtors Cannot Adequately Protect the Senior Lender or the Other Constiutuents**

6.      The Debtors cannot prove adequate protection of the Senior Lender.  The Debtors admit that the value of the assets have diminished, rather than increased during the case.

**C.     The "Controls" Have Not Been Implemented**

7.      Throughout this case, the Debtors have assured the Court and parties-in-interest, including the Secured Lender, that they would implement controls to protect the interests of estate constituents. Despite such assurances, some of which were incorporated into orders of this Court, Debtors ignored any controls it supposedly put in place.

8.      For example, the *Order Authorizing the Debtors' Emergency Application for Authorization to (I) Amend GlassRatner Advisory  Capital Group LLC's Retention to Include Providing the Debtors a Chief Restructuring Officer, and (II) Designate Mark Shapiro as the Debtors' Chief Restructuring Officer* [ECF 312] (the "Shapiro Order") grants Mark Shapiro, as CRO, the sole authority with respect to the following:

> a.      The sale of substantially all of the Debtors' assets, including sole authority to approve any sale and to determine whether to accept any bid on the Debtors' assets.
>
> b.      "The negotiation and terms of any postpetition financing, including the sole authority to approve any budget associated with any financing."
>
> c.      "The Debtors' finances and accounts."
>
> d.      "The financial and organizational stabilization required to implement the sale strategy."

3

e.  "Implementing cash management controls."

f.  "Retaining a third-party operations consultant to assist with manufacturing and performance."

g.  "Approval of all capital expenditures, repairs and maintenance."

9.  The Shapiro Order also provides: "All capital expenditures shall be subject to the applicable DIP budget approved by Mr. Shapiro."

10.  Despite these Court-ordered "controls," Mr. Shapiro testified in his April 20, 2026, deposition that he:

- sees his "primary role and the reason why I was retained was to manage a sale process and to oversee the Debtors during the sale process" (Shapiro Dep. at 8);

- does not know if Debtors keep separate books (Id. at 6);

- has never asked to see the Debtors' books (Id.);

- does not know who is in charge of accounting (Id. at 7;)

- has not talked with anyone at the Debtor about accounting questions (Id.);

- "view[s] the role of a CRO to be familiar with the financials, not necessarily getting involved in debits and credits" (Id. at 8.);

- believes his role is not to tell the managers how to minimize expenses, but to oversee the managers and Jason Rae, who tracks the expenditures (Id. at 10-11);

- approves the budget, but not every check that goes out – "I'm not the one who is saying… 'Repair this truck today." (Id. at 10-11);

> Q.  Are you the one who's saying, "Bring me the CapEx budget so I can manage it?"
>
> A.  No.

- has not "visited the company that frequently" and has made only one trip to the plants (Id. at 10-11);

- does not know how much Kevin Collier makes or specifically what he does on a day-to-day basis (Id. at 11);[2]

---

[2] Based on information and belief, Mr. Collier is a manager who makes more than $240,000 per year.

4

- does not know how many employees the Debtors have—he can't say if it is more or less than one hundred (Id. at 12);

- has done nothing specifically to reduce headcount (Id. at 12);

- cannot say how many tons of sand the Debtors have to sell to break even (Id. at 12-13);

- does not know the average sales per day since he was appointed (Id. at 13);

- does not know the exact amount of receivables collected last week (Id. at 15);

- has been "more focused on managing cash as opposed to managing profitability (Id.);

> Q.   And what have you done to manage the cash?
>
> A.   We're managing the cash we have available.
>
> Q.   What does that mean?
>
> A.   Just what I said, we're managing to the cash we have available.

- cannot provide details as to how the funds budgeted for CapEx and maintenance and repairs were used (Id. at 28-31);

11.     Regrettably, this has resulted in waste of the previously-advanced DIP funds.  The Debtors want to borrow more money to do the work that they previously borrowed funds to accomplish.  The Debtors say they accept the blame and the responsibility for their failures. But they do not understand the causes of them.  And Debtors' motion seeks merely to shift the burden of their failures to the Senior Lender. Their only thought is to borrow even more money to fund shortfalls and for that money to be borrowed at Senior Lender's expense.

**D.     The Estate is Better Off Selling the Assets in Mothballed Condition**

12.     While conventional wisdom might hold that operational entities sell for more than mothballed entities, that does not appear to be the case here.  Since the inception of the first DIP loan, Debtors have operated at a deficit.  That deficit is

5

exacerbated by poor management – the plant does not seem to have ever run a week without a serious break down. Management is literally hurting the value of the collateral by operating it.  And the management controls have not solved the problems.

**E.      Approval of DIP Lender as Stalking Horse Bidder Is Not in Accordance with the Bid Procedures**

13.      Per the bid procedures, the stalking horse deadline is May 2. The Motion effectively moots the Bid Procedures and gives no other party the opportunity to be stalking horse. While the order appointing Mr. Shapiro as CRO makes him in charge of the sales process, he seems to have delegated such process to others.  He has not met with prospective bidders.  The stalking horse process has not been competitive

**F.      The Debtors Are Administratively Insolvent and Further DIP Will Not Solve the Problem**

14.      The fact is, Debtors have been administratively insolvent for some time. They have blown through massive amounts of money and all the estate has to show for it is broken equipment.  The new proposed DIP will largely be used to pay professionals.

**IV.      RESERVATION OF RIGHTS**

15.      The Senior Lender respectfully objects to the extension of further DIP to the Debtors and reserves all rights.

Dated: April 21, 2026                                          Respectfully submitted,

                                                              **STREUSAND, LANDON, OZBURN & LEMMON, LLP**

                                                              By: */s/ Stephen W. Lemmon*
                                                              Stephen W. Lemmon
                                                              State Bar No. 12194500
                                                              Rhonda Mates
                                                              State Bar No. 24040491
                                                              1801 S. MoPac Expressway, Suite 320
                                                              Austin, Texas 78746
                                                              (512) 236-9900 (Telephone)

6

(512) 236-9904 (Facsimile)
lemmon@slollp.com
mates@slollp.com

-and-

**KANE RUSSELL COLEMAN LOGAN P.C.**

Mark C. Taylor
State Bar No. 19713225
401 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 487-6560
mtaylor@krcl.com

**ATTORNEYS FOR FCI-SLG, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served electronically upon those parties receiving the Court's ECF e-mail on April 21, 2026.

/s/ Stephen W. Lemmon
Stephen W. Lemmon