Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1E0088E8900A

**Lease Agreement**

between

**Three Rivers Sand, LLC, Landlord**

and

**FCI South, LLC, Tenant**

dated as of

January 23, 2025



EXHIBIT

TRS-3

Docusign Envelope ID: 1E4191BD-B56C-42E4-8F27-1FD688F2890B

# Lease Agreement

This LEASE AGREEMENT (the "**Lease**") is made and entered into as of the 23rd day of January 2025 (the "**Effective Date**"), by and between Three Rivers Sand, LLC, a Texas limited liability company ("**Landlord**") and FCI South, LLC, a Texas limited liability company ("**Tenant**") (Landlord and Tenant are herein each a "**Party**" and are collectively referred to as the "**Parties**").

## ARTICLE I
## DEFINITIONS

**Section 1.01   Definitions.** The following terms, as used in this Lease, shall have the meanings set forth below:

"**Additional Rent**" shall mean all amounts payable by Tenant under this Lease, other than Base Rent, and whether or not expressly designated as Additional Rent in this Lease.

"**Affiliate**" shall mean a Person which shall Control, be under the Control of, or be under common Control with the Person in question.

"**Assets**" shall mean all permits, plant, equipment, machinery, on-hand materials and parts presently located at the Land used for the operation of a sand plant, any Improvements thereon and all permits, authorizations, rights, privileges, easements, and appurtenances to the Land and the Improvements, collectively.  The Assets subject to this Lease are set forth on Exhibit B.

"**Assignment**" shall mean the sale, exchange, assignment, or other disposition of all Tenant's interest in this Lease and the leasehold estate created thereby, whether by operation of Law or otherwise.

"**Base Rent**" shall have the meaning set forth in Section 3.01 hereof.

"**Business Day**" shall mean any day that is not a Saturday, Sunday, or a day observed as a holiday by either the State of Texas or the federal government.

"**Commencement Date**" shall have the meaning set forth in Section 2.01 hereof.

"**Control**" shall mean the ownership of more than fifty percent (50%) of the outstanding voting ownership interests of the Person in question or the power to direct the management of the Person in question.

"**CP Ranch Deed Restriction Violations**" shall mean and refer to any condition on the Premises that is contrary to or a violation of the restrictions set forth in the certain Special Warranty Deed from Cuatro Paisanas Ranch, Inc., as Grantor, to Atlas Mining, LLC, as Grantee, dated as of August 10, 2018 and filed in the real property records of Live Oak County, Texas, as Document Number 1790450

"**CP Ranch Royalty**" shall have the meaning set forth in Section 3.02 hereof.

"**Control**" shall mean the ownership of more than fifty percent (50%) of the outstanding voting ownership interests of the Person in question or the power to direct the management of the Person in question.

Docusign Envelope ID: 1E4191BD-B56C-42E4-85D7-1FD088E28900

"**Due Diligence Period**" shall have the meaning set forth in Section 5.02(a) hereof.

"**Environmental Laws**" shall mean all Laws: (a) relating to the environment, human health, or natural resources; (b) regulating, controlling, or imposing liability or standards of conduct concerning any Hazardous Materials; (c) relating to Remedial Action; and (d) requiring notification or disclosure of releases of Hazardous Materials or of the existence of any environmental conditions on or at the Premises, as any of the foregoing may be amended, supplemented, or supplanted from time to time.

"**Environmental Liabilities**" shall mean any loss, cost, expense, claim, demand, liability, obligation, action, or other responsibility of whatever kind, based upon or required under Environmental Laws or otherwise relating to: (a) any environmental, health, or safety matter or condition (including, but not limited to, on-site or off-site pollution or contamination, the welfare, safety, and health of people at the Premises or elsewhere, and the regulation of chemical substances or products); (b) fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands, responses, and remedial, investigative, or inspection costs and expenses arising under or caused by application of Environmental Laws (including, but not limited to, fees for attorneys, engineers, and other professionals); (c) financial responsibility under Environmental Laws for Remedial Action or for any damages to natural resources; or (d) any other Remedial Actions required under Environmental Laws.

"**Expiration Date**" shall mean the earlier of (i) the last day of the month in which occurs the fifth (5th) anniversary of the Commencement Date, (ii) the date upon which Tenant closes on a transaction purchasing the Premises from Landlord, or (iii) **Error! Bookmark not defined.**the date on which the Term shall sooner end pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law.

"**Force Majeure Event**" means any of the following events: (a) acts of God; (b) floods, fires, earthquakes, hurricanes, tornadoes, explosions, or other natural disasters; (c) war, invasions, hostilities (whether war is declared or not), terrorist threats or acts, riots or other civil unrest; (d) governmental authority, proclamations, orders, laws, actions, or requests; (e) embargoes or blockades in effect on or after the date of this Agreement; (f) epidemics, pandemics, or other national or regional public health emergencies; (g) strikes, labor stoppages or slowdowns, or other industrial disturbances; and (h) shortages of supplies, adequate power, or transportation facilities; and (i) other similar events beyond the reasonable control of the parties.

"**Governmental Authority or Governmental Authorities**" shall mean the United States of America, the State of Texas, the County of Live Oak, the City of Three Rivers, any political subdivision of any of the foregoing, and any other governmental or regulatory authority, agency, board, department, or any other public or quasi-public authority, having jurisdiction over the Premises or the matter at issue.

"**Hazardous Materials**" shall mean any and all substances, materials, chemicals, or wastes that now or hereafter are classified or considered to be hazardous or toxic under any Environmental Law, or that are or become regulated by any Governmental Authority because of toxicity, infectiousness, radioactivity, explosiveness, ignitability, corrosiveness, or reactivity under any Environmental Law applicable to the Premises, and shall also include: (a) gasoline, diesel fuel, and any other petroleum hydrocarbons; (b) asbestos and asbestos containing materials, in any form, whether friable or non-friable; (c) polychlorinated biphenyls; (d) radon gas; and (e) flammable liquids and explosives.

Docusign Envelope ID: 1E4191BD-B56C-42E4-BF27-1BDD93E289ue

**"Impositions"** shall mean any and all: (a) property taxes of every kind and nature; (b) property assessments (whether general, special, business improvement district, or otherwise); (c) personal property taxes; (d) occupancy and rent taxes; (e) water, water meter, sewer rents, rates, and charges; and (f) any and all other governmental levies, fees, rents, assessments, or taxes and charges, general and special, ordinary and extraordinary, foreseen and unforeseen, of any kind and nature whatsoever, and any interest or costs with respect thereto, which at any time during the Term are, or, if the Premises or any part thereof or the owner thereof were not exempt therefrom, would have been assessed, levied, confirmed, imposed upon, or would have become due and payable out of or in respect of, or would have been charged with respect to, the Premises (excluding any capital gains taxes imposed in connection with the execution of this Lease).

**"Improvements"** shall mean all plants and other improvements now located, or hereafter erected, on the Land, together with all fixtures now or in the future installed or erected in or upon the Land or such improvements owned or leased by Landlord or Tenant.

**"Land"** shall mean all that certain plot, piece, real estate, or parcel of land with a street address of 254 Eagle Ford Way, located in the City of Three Rivers, County of Live Oak, State of Texas and which land is legally described in Exhibit A attached hereto and incorporated herein.

**"Landlord Event of Default"** shall have the meaning set forth in Section 10.02 hereof.

**"Landlord's Note"** shall mean and refer to the note executed by Landlord on the December 7, 2021, for the benefit of Sabine State Bank & Trust Company.

**"Landlord's Note Rate"** shall have the meaning same as in Landlord's Note.

**"Law"** or **"Laws"** shall mean any present or future applicable law, statute, ordinance, regulation (including zoning regulations), code, building code, judgment, injunction, arbitration award, order, rule, directive, common law, codes and ordinances of any Governmental Authorities, easement, covenant, restriction, or other agreement of record affecting the Premises as of the date of this Lease or subsequent thereto.

**"Liabilities"** shall mean all losses, claims, suits, demands, costs, liabilities, and expenses, including reasonable attorneys' fees, penalties, interest, fines, judgment amounts, fees, and damages, of whatever kind or nature.

**"Option Fee"** shall have the meaning set forth in Section 5.02(b) hereof.

**"Party"** or **"Parties"** shall have the meaning set forth in the Preamble.

**"Person"** shall mean any individual, corporation, partnership, firm, or other legal entity.

**"Premises"** shall mean (i) the Land and (ii) all plant, equipment, machinery, on-hand materials and parts presently located at the Land used for the operation of a sand plant, any Improvements thereon and all permits, authorizations, rights, privileges, easements, and appurtenances to the Land and the Improvements (collectively, the "Assets") (all as set forth on the "**Asset Schedule**" at Exhibit B).

**"Purchase Price"** shall have the meaning set forth in Section 5.01 hereof.

Docusign Envelope ID: 1E4191BD-B56C-42E4-8F27-1FD688F28900

"**Purchase Right Option**" shall have the meaning set forth in Section 5.01 hereof.

"**Release**" shall mean the release or threatened release of any Hazardous Materials into, upon, under, or above any land, water, or air, or otherwise into the environment, including by means of burial, disposal, discharge, emission, spillage, leakage, seepage, leaching, or dumping.

"**Remedial Action**" shall mean the investigation, response, clean up, remediation, prevention, mitigation, or removal of any Hazardous Materials necessary to comply with any Environmental Laws.

"**Rent**" shall mean Base Rent and Additional Rent.

"**Sabine Bank Deed of Trust**" shall have the meaning set forth in Section 3.02 hereof.

"**Survey**" shall have the meaning set forth in Section 5.02(c) hereof.

"**Tenant Event of Default**" shall have the meaning set forth in Section 10.01 hereof.

"**Term**" shall mean the term of this Lease commencing on the Commencement Date and ending on the Expiration Date.

"**Title Company**" shall mean and refer to the title company selected by Tenant to issue the Title Commitment.  Tenant shall select and give notice of the Title Company within twenty (20) days of the Effective Date of this Lease.

"**Transfer**" shall mean any transaction or series of transactions (including any assignment, transfer, issuance, or redemption of any ownership interest, or any merger, consolidation, or dissolution) that results in a change of Control of Tenant or any Person or entity which directly or indirectly Controls Tenant. Notwithstanding the foregoing, a Transfer shall not be deemed to include an issuance or a transfer of stock through the "over the counter" market or through any recognized national stock exchange.

## ARTICLE II
## LEASE OF PREMISES; CONDITION OF PREMISES

**Section 2.01  Lease of Premises.** Subject to the terms and conditions of this Lease, Landlord leases to Tenant, and Tenant leases from Landlord, the Premises for a Term that shall commence on January 23, 2025 (the "**Commencement Date**") and end on the Expiration Date subject to earlier termination pursuant to any of the terms, covenants, or conditions of this Lease or pursuant to Law.

**Section 2.02  Condition of Premises.** Tenant has inspected the Premises and accepts possession of the Premises in its "AS IS" condition on the Commencement Date. Except as otherwise expressly provided in this Lease, Tenant has full responsibility for the repair, alteration, maintenance, and replacement of the Premises. Tenant expressly acknowledges and agrees that Landlord has not made and is not making, and Tenant is not relying upon, any warranties or representations regarding the Premises, except to the extent same are expressly set forth in the Lease.

5

## ARTICLE III
## RENT; RENT PAYABLE TO LANDLORD; NET LEASE

**Section 3.01    Rent.**   Tenant covenants and agrees to pay monthly rent in the amount of $116,028.82 (the "Base Rent").  Base Rent shall be due and payable for each calendar month on or before the tenth day of that month commencing the month of March 2025 without notice or demand.  For the avoidance of doubt, no Base Rent will be due for the period covering the Commencement Date through February 28, 2025.  As set forth in Article V, in the event Tenant exercises its Purchase Right Option, a portion of Base Rent shall be applied as a credit towards payment of the Purchase Price.  Exhibit C sets forth a schedule of Base Rent and the portion of which shall be applied to the Premises Purchase Price.

**Section 3.02    Base Rent Increase.** Parties agree and acknowledge that the Base Rent is determined based on the Purchase Price, amortized over a period of 5 years at an interest rate of 6%, in accordance with Exhibit C, with the understanding that the interest rate portion of the payment is not credited toward the Purchase Price itself. In the event that the Landlord's Note Rate exceeds 6%, the Base Rent shall increase to correspond with the increase in the interest rate, and the Parties shall revise Exhibit C accordingly.

**Section 3.03    CP Ranch Royalty.**   Tenant acknowledges that the certain Purchase and Sale Agreement by and between Cuatro Paisanas Ranch, Inc. ("CP Ranch") and Atlas Mining, LLC ("Atlas") provides that Atlas (and its successors or assigns) is obligated to pay a fee of twenty-five cents ($0.25) for each ton of sand processed at the Premises for a period of ten years commencing from the termination of the certain "Sand Lease" between CP Ranch and Atlas (the "CP Ranch Royalty").  Per said Sand Lease, the CP Ranch Royalty extends to Atlas's "heirs, successors and assigns" and purports to "run with the" Premises.  However, the deed conveying the Premises from CP Ranch to Atlas contains no such fee provision and the Premises was subsequently sold via foreclosure by and through the certain Substitute Trustee's Deed with Bill of Sale dated December 7, 2021, for the benefit of Sabine State Bank & Trust Company (the "Sabine Bank Deed of Trust").  During the Due Diligence Period (defined herein), Tenant shall further review the purported CP Ranch Royalty and to the extent it remains a due and payable obligation encumbering the Premises, Tenant acknowledges and agrees that it will timely pay the CP Ranch Royalty for the period covering the Commencement Date through February 28, 2025.

**Section 3.04    Net Lease.** This Lease is an absolute net lease. Tenant shall pay as Additional Rent all expenses of every kind and nature whatsoever relating to or arising from the Premises, including Impositions, and all expenses arising from the leasing, operation, management, construction, maintenance, repair, use, and occupancy of the Premises, except as otherwise expressly provided in this Lease. Notwithstanding the foregoing, Landlord agrees to pay the following expenses: (a) any expenses expressly agreed to be paid by Landlord in this Lease; (b) debt service and other payments with respect to the Sabine Bank Deed of Trust and any indebtedness secured by the same; (c) expenses incurred by Landlord prior to the Commencement Date; and (d) expenses that are personal to Landlord.

## ARTICLE IV
## PAYMENT OF IMPOSITIONS; UTILITIES

**Section 4.01    Payment of Impositions.**

(a)    During the Term of this Lease, Tenant shall timely pay or shall cause to be paid all Impositions directly to the Governmental Authority charged with the collection thereof. If by law, any Imposition may at the option of the taxpayer be paid in installments (whether or not interest shall accrue on the unpaid balance of such Imposition), Tenant may exercise the option to pay the same in such installments and shall be responsible for the payment of such installments only, together with applicable interest, if any; provided that all such installment payments together with applicable interest, if any, relating to periods prior to the Expiration Date shall be made prior to the Expiration Date. Tenant shall promptly notify Landlord if Tenant shall have elected to pay any such Imposition in installments. Tenant shall furnish to Landlord official receipts of the appropriate Governmental Authority, or other evidence reasonably satisfactory to Landlord, evidencing the payment of such Impositions.

(b)    Any Imposition relating to a period, a part of which is included within the Term and a part of which is included in a period of time before the Commencement Date or after the Expiration Date shall be apportioned between Landlord and Tenant as of the Commencement Date or Expiration Date, as the case may be, so that Tenant shall pay only that portion of such Imposition which that part of such fiscal period included in the period of time after the Commencement Date or before the Expiration Date bears to such fiscal period, and Landlord shall pay the remainder thereof.

(c)    Tenant shall have the right to contest the amount or validity, in whole or in part, of any Imposition by appropriate proceedings diligently conducted in good faith. Upon the termination of such proceedings, it shall be the obligation of Tenant to pay the amount of such Imposition or part thereof as finally determined in such proceedings, the payment of which may have been deferred during the prosecution of such proceedings, together with any costs, fees (including reasonable attorneys' fees and disbursements), interest, penalties, or other liabilities in connection therewith. Landlord shall not be required to join in any proceedings referred to in this Article IV unless the provisions of any Law at the time in effect shall require that such proceedings be brought by or in the name of Landlord, in which event, Landlord shall join and reasonably cooperate in such proceedings or permit the same to be brought in its name but shall not be liable for the payment of any costs or expenses in connection with any such proceedings and Tenant shall reimburse Landlord for any and all costs or expenses which Landlord may reasonably sustain or incur in connection with any such proceedings.

(d)    If there shall be any refunds or rebates on account of any Impositions paid by Landlord or Tenant, such refund or rebate shall belong to the party that paid the Imposition.

**Section 4.02    Utilities.** Tenant shall obtain and pay for all utilities directly from and to the utilities and vendors serving the Premises, including fuel, gas, electric, water and sewer service, trash collection, telephone, and internet service.

Docusign Envelope ID: 1E4191BD-B56C-42E4-BE71-8D988E28900

## ARTICLE V
## PURCHASE OPTION; DUE DILIGENCE

**Section 5.01    Sole and Exclusive Option to Purchase.** Tenant shall have the sole and exclusive option to purchase the Premises, including all of the Assets (the "**Purchase Right Option**") at any time during the Lease Term for a total purchase price of $6,000,000 (the "**Purchase Price**").

**Section 5.02    Due Diligence; Tenant's Early Termination Right; Landlord's Cooperation.**

(a)    Upon the execution of this Lease, Tenant shall commence its due diligence process to consider whether it shall move forward with potentially exercising the Purchase Right Option. Tenant expects that its due diligence process shall take no longer than four (4) months, except that such period may be extended by Tenant in writing where Tenant is waiting on consents from third-parties or otherwise still working in good faith to resolve encumbrances or objections with respect to the issuance of the Title Commitment on the Land (the "**Due Diligence Period**").

(b)    To preserve its Purchase Right Option, within twenty (20) days after the Effective Date, Tenant shall deliver to Title Company a copy of this Lease Agreement and $1,000.00 of which $500 (the "**Option Fee**") shall be remitted by the Title Company to Landlord as independent consideration for the Purchase Right Option granted in this Lease Agreement. The remainder of the payment shall be considered "earnest money" towards any subsequent exercise of the Purchase Right Option and is otherwise fully refundable to Tenant. Tenant shall—at that time—request that the Title Company prepare and issue a "**Title Commitment.**"

(c)    Within twenty (20) days after the Effective Date, Tenant shall order a survey (the "**Survey**") of the Premises, which shall be done for the benefit of Tenant and at Tenant's sole cost and expense.

(d)    Upon receipt of the Title Commitment and Survey, Tenant shall have twenty (20) days to deliver objections to matters effecting title in writing to Landlord along with a copy of the Title Commitment, the Survey and all instruments identified therein.

(e)    Landlord covenants and agrees that it will cooperate with Tenant's reasonable requests for information and assistance in conducting due diligence and resolving objections to the Title Commitment and Survey. Landlord shall have twenty (20) days after receipt of Tenant's written objections to resolve the objections or otherwise provide a written response regarding the resolution of such objections.

(f)    If during its Due Diligence Period, Tenant in its sole and absolute discretion determines that it does not want to proceed with exercising the Purchase Right Option, Tenant may terminate this Lease by giving notice of the same to Landlord and such termination will become effective thirty (30) days thereafter.

(g)    The foregoing (b)-(e) notwithstanding, the Title Company shall update the Title Commitment at least ten (10) days prior to Closing and Tenant shall have the right to object to any new encumbrances or exceptions set forth therein which must be resolved to Tenant's satisfaction or Tenant shall have the right to rescind its election to exercise the Purchase Right Option.

**Section 5.03   Notice of Intent to Purchase.** Tenant must notify Landlord of its intent to exercise the Purchase Right Option at least one month prior to the desired closing date and then state in writing the date upon which it will close (herein, the **"Closing Date"** with **"Closing"** referring to the execution of such documents and instruments to effect the sale of the Premises and Assets by Landlord to Tenant). Tenant must close by that deadline unless such deadline is extended in writing by Landlord.

**Section 5.04   Lease Payments Applied to Purchase Price.** In the event that Tenant exercises the Purchase Right Option, as detailed in Exhibit C, a portion of the Base Rent shall be applied towards the Purchase Price to be paid by Tenant. Any amounts not credited toward the purchase price will remain as lease payments and will not be applied to the final purchase price, except as otherwise specified in Exhibit C.

**Section 5.05   Closing.** At Closing, Landlord shall deliver and convey to Tenant good and indefeasible fee simple title in and to the Land and the Assets by special warranty deed (as to real property) free and clear of all liens, encumbrances, conditions, easements, assessments, restrictions and other conditions, except for Permitted Exceptions, and by bill of sale as to all other Assets and execute such other customary documents to transfer title to the Premises to Tenant.  The Permitted Exceptions shall be (i) general real estate taxes for the year of closing and otherwise not yet due and payable; (ii) easements, restrictions and other encumbrances approved by Tenant in writing; and (iii) matters of record disclosed in the Title Commitment or matters affecting title shown on the Survey to which Tenant does not object during the Due Diligence Period (or thereafter if such issue does not appear until after the conclusion of the Due Diligence Period).

**Section 5.06   Closing Costs.** If Tenant exercises the Purchase Right Option, the parties will proceed with a standard real estate closing process, with Tenant responsible for any closing costs, including title transfer and associated fees.

# ARTICLE VI
## MAINTENANCE, REPAIRS, ALTERATIONS, AND NO EQUIPMENT REMOVAL

**Section 6.01   Maintenance and Repair of the Premises.** Tenant shall, at all times during the Term of this Lease, at Tenant's sole cost and expense, keep and maintain the Premises as it existed as of the Commencement Date in good order and condition, ordinary wear and tear excepted, and make all necessary repairs thereto, interior and exterior, structural and nonstructural, ordinary and extraordinary, and foreseen and unforeseen. Unless otherwise expressly provided in this Lease, Landlord is not required to maintain, repair, clean, alter, or improve the Premises, or to provide any services to the Premises.

**Section 6.02   Alterations.** Tenant may, at its sole cost and expense, alter, replace, or remodel any Improvements upon the Premises (**"Alterations"**), provided that: (a) the Alterations are made in compliance with all Laws; (b) the Alterations are completed in accordance with general accepted construction standards; (c) any remodeling shall not materially diminish the value of Improvements or the Premises; and (d) Tenant shall not allow mechanic's or materialmen's liens to affix to the Premises because of the Alterations.

**Section 6.03   Permits.** Landlord and Tenant will cooperate with each other in good faith to transfer Landlord's permits (listed on Exhibit B) to Tenant.

Docusign Envelope ID: 1E4191BD-B56C-4E54-9B27-1FD668F38900

**Section 6.04    No Equipment Removal.** Tenant agrees that no equipment, machinery, or personal property included under the Lease shall be removed from the Premises without the prior written consent of the Landlord.

## ARTICLE VII
## INSURANCE

**Section 7.01    Insurance.** It is the intent of the parties that all risk of loss for the Premises be shifted to insurance to the maximum extent practicable. Accordingly, unless Landlord otherwise agrees in its sole discretion, Tenant shall maintain, or cause to be maintained, insurance covering the risks enumerated below. The premiums for such insurance shall be paid by Tenant. Such insurance shall be written on an occurrence basis unless Landlord otherwise consents in writing, but for errors and omissions insurance issued on a claims-made basis. The policy shall provide that: (a) such insurance shall be primary coverage without reduction or right of offset or contribution on account of any insurance provided by Landlord to itself or its officers, officials, or employees; (b) such insurance shall not be altered or cancelled without sixty (60) days' written notice to Landlord; and (c) such insurance shall name Landlord and its lender as additional insureds. The insurance policies purchased by Tenant must be issued by a company authorized to conduct business in the State or by a company acceptable to Landlord.

**Section 7.02    Property Insurance.** Tenant shall, at its sole cost and expense, maintain insurance covering the full replacement cost of the Premises, including the building structure, any improvements, fixtures, and personal property. Such insurance shall be in an amount sufficient to cover the full replacement value of the Premises, including any Tenant improvements or alterations.

**Section 7.03    Workers' Compensation and Employer's Liability.** At all times prior to the expiration or earlier termination of this Lease during any construction conducted by or on behalf of Tenant in or on the Premises, Tenant shall maintain, and cause its contractors to maintain, Workers' Compensation Insurance as required by the Laws of the State. Tenant shall require all subcontractors performing work under this Lease to obtain an insurance certificate showing proof of Workers' Compensation and Employer's Liability Insurance.

**Section 7.04    Public Liability.** At all times during the Term of this Lease, Tenant shall maintain a primary commercial general liability insurance ("CGL") policy covering all claims for bodily injury (including death) and property damage, including loss of use thereof, in an amount not less than ONE MILLION DOLLARS ($1,000,000.00) per occurrence and TWO MILLION DOLLARS ($2,000,000.00) in the aggregate. The policy or policies must be on an "occurrence" basis unless waived by Landlord. The CGL policy shall include contractual liability coverage, which shall be endorsed to state that indemnity obligations specified in this Lease are insured by the carrier.

**Section 7.05    Payments for Tenant by Landlord.** If Tenant fails to procure the insurance required to be procured by Tenant under this Lease, or fails to pay any premium of insurance, Impositions, or any other sum in this Lease required to be paid by Tenant (other than Rent), Landlord may, after expiration of the applicable cure period, at Landlord's option, procure on behalf of Tenant any such insurance, and pay on behalf of Tenant any such payment or payments as may be necessary. Any sums so paid or expended by Landlord on behalf of Tenant shall immediately be reimbursed and paid by Tenant to Landlord, as Additional Rent.

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-1ED888F28980

# ARTICLE VIII
# ASSIGNMENT

**Section 8.01   Assignment.** Tenant shall have the right to enter into an Assignment or Transfer with a Person (hereinafter called the **"Transferee"**) provided that: (a) the Transferee is Tenant's Affiliate; and (b) with respect to an Assignment or a Transfer, the Transferee assumes all Tenant's obligations under this Lease thereafter arising and Landlord is provided with a fully-executed copy of the assignment and assumption agreement. If Tenant's interest in this Lease is assigned in violation of the provisions of this Article VIII, such Assignment shall be void and of no force and effect against Landlord. Neither any Assignment, Transfer, nor any subleasing, occupancy, or use of the Premises or any part thereof by any Person, nor any collection of Rent by Landlord from any Person other than Tenant, nor any application of any such Rent shall, in any circumstances, relieve Tenant of its obligations under this Lease on Tenant's part to be observed and performed.

# ARTICLE IX
# INDEMNIFICATION

**Section 9.01   Tenant Indemnification.** Tenant hereby releases and agrees to indemnify and hold harmless Landlord and all its trustees, officers, employees, directors, agents, and consultants (hereinafter collectively referred to as the **"Landlord Indemnitees"**) of and from any and all claims, demands, liabilities, losses, costs, or expenses for any loss including but not limited to bodily injury (including death), personal injury, property damage, expenses, and attorneys' fees, caused by, growing out of, or otherwise occurring in connection with this Lease, due to any negligent or intentional act or omission on the part of Tenant, its agents, employees, or others working at the direction of Tenant, on its behalf, or due to the application or violation of any pertinent federal, State, or local Law except for the gross negligence or intentional misconduct of the Landlord Indemnitees. In case any action or proceeding is brought against Landlord by reason of any claim mentioned in this Article IX, Tenant, upon notice from Landlord, shall, at Tenant's expense, resist or defend such action or proceeding in Landlord's name, if necessary, by counsel for the insurance company, if such claim is covered by insurance, or otherwise by counsel approved by Landlord. Landlord agrees to give Tenant prompt notice of any such claim or proceeding. This indemnification is binding on the successors and assigns of Tenant, and this indemnification survives the expiration or earlier termination of this Lease, or the dissolution or, to the extent allowed by Law, the bankruptcy of Tenant. This indemnification does not extend beyond the scope of this Lease and does not extend to claims exclusively between the undersigned parties arising from the terms, or regarding the interpretation of this Lease.

**Section 9.02   Landlord Indemnification.** Landlord hereby releases and agrees to indemnify and hold harmless Tenant and all its trustees, officers, employees, directors, agents, and consultants (hereinafter collectively referred to as the **"Tenant Indemnitees"**) of and from any and all claims, demands, liabilities, losses, costs, or expenses for any loss including but not limited to bodily injury (including death), personal injury, property damage, expenses, and attorneys' fees, caused by, growing out of, or otherwise occurring in connection with this Lease, due to any negligent or intentional act or omission on the part of Landlord, its agents, employees, or others working at the direction of Landlord, on its behalf, or due to the application or violation of any pertinent federal, State, or local Law except for the gross negligence or intentional misconduct of the Tenant Indemnitees. In case any action or proceeding is brought against Tenant by reason of any claim mentioned in this Article IX, Landlord, upon notice from Tenant, shall, at Landlord's expense, resist or defend such action or proceeding in Tenant's name, if

11

Docusign Envelope ID: 1E4191BD-B56C-4254-8527-1FB688B2E900

necessary, by counsel for the insurance company, if such claim is covered by insurance, or otherwise by counsel approved by Tenant. Tenant agrees to give Landlord prompt notice of any such claim or proceeding. This indemnification is binding on the successors and assigns of Landlord, and this indemnification survives the expiration or earlier termination of this Lease, or the dissolution or, to the extent allowed by Law, the bankruptcy of Landlord. This indemnification does not extend beyond the scope of this Lease and does not extend to claims exclusively between the undersigned parties arising from the terms, or regarding the interpretation of this Lease.

## ARTICLE X
## DEFAULT; REMEDIES

**Section 10.01 Tenant Events of Default.** Each of the following events shall be an event of default by the Tenant ("**Tenant Event of Default**"):

(a)     If Tenant shall fail to pay any item of Rent, or any part thereof, when the same shall become due and payable and such failure shall continue for ten (10) days after Tenant receives written notice of the default from Landlord.

(b)     If Tenant shall fail to observe or perform one or more of the other terms, conditions, covenants, or agreements contained in this Lease, and such failure shall continue for a period of thirty (30) days after notice thereof by Landlord to Tenant specifying such failure unless such failure requires work to be performed, acts to be done, or conditions to be removed which cannot by their nature or because of Force Majeure Events reasonably be performed, done, or removed, as the case may be, within such thirty (30)-day period, in which case no Tenant Event of Default shall be deemed to exist as long as Tenant shall have commenced curing the same within such thirty (30)-day period and shall diligently, continuously, and in good faith prosecute the same to completion.

(c)     If Tenant shall make an assignment for the benefit of creditors, file a voluntary petition in bankruptcy by Tenant, or the filing of any involuntary petition by Tenant's creditors, which involuntary petition remains undischarged for a period of ninety (90) days.

(d)     If a levy under execution or attachment shall be made against the Premises and such execution or attachment shall not be vacated or removed by court order, bonding, or otherwise within a period of sixty (60) days.

Upon the occurrence of a Tenant Event of Default, Landlord may, at its option, give notice to Tenant of the termination of this Lease and, upon ten (10) days after service of such notice, this Lease, the Term shall terminate and shall end with the same force and effect as if that day were the day fixed for the expiration of this Lease.

**Section 10.02 Remedies for Tenant Event of Default.** If this Lease is terminated pursuant to Section 10.01, or if Landlord re-enters or obtains possession of the Premises by summary proceedings or any other legal action or proceeding or by any other legal act (without liability or obligation to Tenant or any other occupant of the Premises), all the following provisions shall apply:

Docusign Envelope ID: 1E4191BD-B56C-4254-8E07-EB588824900

(a)   Tenant shall immediately vacate and surrender the Premises to Landlord in good order, condition, and repair, reasonable wear and tear and damage that Tenant is not obligated under the terms of this Lease to repair excepted.

(b)   Tenant shall promptly pay to Landlord all Rent payable to the date on which this Lease is terminated or the date on which Landlord re-enters or obtains possession of the Premises.

**Section 10.03 Landlord Events of Default.**  Each of the following shall be an event of default by the Landlord ("**Landlord Event of Default**"):

(a)   If Landlord shall fail to pay over the entire amount of Base Rent paid by Tenant to Landlord to Sabine Bank within three (3) business days of Landlord's receipt of the Base Rent from Tenant.

(b)   If Landlord fails to timely pay all Landlord indebtedness secured by the certain Sabine Bank Deed of Trust when due to Sabine Bank.

(c)   If the Landlord breaches its obligations under the Sabine Bank Deed of Trust or any documents evidencing indebtedness or covenants between the Landlord and Sabine Bank that are secured by the Sabine Bank Deed of Trust or Sabine Bank otherwise gives notice to Landlord of an "Event of Default" under the Sabine Bank Deed of Trust that Landlord fails to cure within the time period set forth in the Sabine Bank Deed of Trust.

(d)   Sabine Bank posts a notice of foreclosure with respect to the Land or Premises and such notice is not withdrawn within ten (10) days.

(e)   Landlord fails to pay all real and personal property taxes due and owing the for the 2023 and 2024 tax years by January 31, 2025.

(f)   Landlord fails to comply with Tenant's reasonable due diligence requests to allow Tenant to evaluate whether to exercise its Purchase Right Option and such failure shall continue for ten (10) days after Landlord receives written notice of the default from Tenant.

(g)   Landlord shall make an assignment for the benefit of creditors, file a voluntary petition in bankruptcy, or the filing of any involuntary petition by Landlord's creditors, which involuntary petition remains undischarged for a period of ninety (90) days.

(h)   If a levy under execution or attachment shall be made against the Premises on account of a debt owed by Landlord (or its Affiliates) and such execution or attachment shall not be vacated or removed by court order, bonding, or otherwise within a period of sixty (60) days.

(i)   Landlord enters into any contract or agreement to convey all or part of the Land or Premises to any third-party other than Tenant while Tenant's Purchase Right Option is in force.

(j)   Landlord (or Tenant in furtherance of potentially exercising its Purchase Right Option) is unable or unwilling to resolve the alleged CP Ranch Deed Restriction Violations that first occurred prior to Commencement Date of this Lease.

(k)     CP Ranch commences litigation against Landlord and/or Tenant with respect to the alleged CP Ranch Deed Restriction Violations that first occurred prior to Commencement Date of this Lease, and such litigation is not dismissed within ninety (90) days.

**Section 10.04 Remedies for Landlord Event of Default.** Upon the occurrence of a Landlord Event of Default, Tenant may, at its option, (i) give notice to Landlord of the termination of this Lease and, upon ten (10) days after service of such notice, this Lease, the Term shall terminate and shall end with the same force and effect as if that day were the day fixed for the expiration of this Lease; or (ii) require Landlord's specific performance of the terms and conditions of this Lease, including without limitation enforcement of Tenant's Purchase Right Option.

## ARTICLE XI
## NOTICES

**Section 11.01 Notices.** Until a different address is provided in a notice to the other party, all notices, demands, or requests made by either party to the other which are required or permitted by the provisions of this Lease shall be in writing and shall be deemed sufficiently given if: (a) delivered by hand (against a signed receipt); (b) mailed by U.S. certified or registered mail, return receipt requested, postage prepaid; or (c) sent by a nationally recognized commercial overnight delivery service to the following addresses:

| Landlord: | Three Rivers Sand, LLC<br>Attn: Bazil Moore<br>1715 S. University Drive<br>Nacogdoches, Tx 75961<br>bazil@mccllc.net |
|---|---|
| with a copy to: | Stefan Prelevic<br>6004 South First St.,<br>Lufkin, Texas 75901<br>stefan@texastimberjack.com |
| Tenant: | FCI South, LLC<br>Attn: John Nelson and Kevin Collier<br>13201 FM 812<br>Del Valle, Texas 78617<br>jn@fcisand.com<br>kc@fcisand.com |
| with a copy to: | Meagan Martin Powers<br>Martin Powers & Counsel, PLLC<br>1431 Greenway Drive, Suite 950 |

Docusign Envelope ID: 1E4191BD-B56C-4254-9E87-7ED88B24900

| | Irving, TX 75038 |
| | meagan@martinpowers.com |

Notwithstanding anything contained in this Lease to the contrary, any notice required to be given by Landlord or Tenant hereunder shall be deemed to be effective as of the date such notice is received or refused as reflected on said notice.

## ARTICLE XII
## COMPLIANCE WITH ENVIRONMENTAL LAWS

**Section 12.01 Landlord's Warranty, Representation and Disclosure Regarding Environmental Laws.**

(a)     Landlord warrants and represents that at all times prior to and as of the Effective Date of this Lease that Landlord has complied with all Environmental Laws and taken any such Remedial Action that was required by Law to maintain the Premises in compliance with all applicable Environmental Laws.

(b)     Landlord shall—within ten (10) days of the Effective Date of this Lease—provide Tenant with copies of all tests, studies, notices, claims, demands, requests for information, or other communications relating to the presence or Release of any Hazardous Materials at, on, under, over, emanating from, or migrating to the Premises.

**Section 12.02 Tenant Compliance with Environmental Laws.**

(a)     Tenant warrants and agrees that, during the entire Term of this Lease and at its expense, Tenant shall comply with all Environmental Laws. Such compliance shall include Tenant's obligation to take Remedial Action when required by Law and to pay all fines, penalties, interest, or other costs imposed by any Governmental Authorities in connection with any violation or requirement of any Law.

(b)     Tenant shall notify Landlord promptly in writing if: (i) Tenant becomes aware of the presence or Release of any Hazardous Material at, on, under, over, emanating from, or migrating to the Premises in any quantity or manner which could reasonably be expected to violate, in any material respect, any Environmental Law or give rise to any material Liability or the obligation to take Remedial Action; or (ii) Tenant receives any written notice, claim, demand, request for information, or other communication from a Governmental Authority regarding the presence or Release of any Hazardous Material at, on, under, over, emanating from, or migrating to the Premises.

(c)     Tenant shall take and complete any Remedial Action with respect to the Premises in full compliance with all Laws and shall, when such Remedial Action is completed, submit to Landlord written confirmation from the applicable Governmental Authority that no further Remedial Action is required.

(d)     Tenant shall provide Landlord with copies of all tests, studies, notices, claims, demands, requests for information, or other communications relating to the presence or Release of any Hazardous Materials at, on, under, over, emanating from, or migrating to the Premises.

Docusign Envelope ID: 1E4191BD-B56C-4254-8E21-1EB558F2d9e0

## ARTICLE XIII
## BROKERS

**Section 13.01 Brokers.** Landlord and Tenant each represent and warrant to the other that they have not dealt with any broker in connection with this Lease. Landlord and Tenant shall each indemnify and hold harmless the other from and against any and all claims for any brokerage fee or commission with respect to this Lease transaction by any broker with whom either Landlord or Tenant has dealt or is alleged to have dealt.

## ARTICLE XIV
## MEMORANDUM

**Section 14.01 Initial Memorandum of Lease.** Upon execution of the Lease, Tenant shall be entitled to file in the real county records a memorandum of lease, which shall include a notice of a sole and exclusive purchase option vested in Tenant. The memorandum shall not state the economic terms of the Lease or purchase option but shall disclose its existence. The form of memorandum appears at Exhibit D to this Lease.

**Section 14.02 Future Memorandums.** Either Landlord or Tenant may record an additional memorandum of this Lease or a memorandum of any amendment or modification of this Lease, provided the memorandum shall not include the financial terms of this Lease or of any amendment or modification of this Lease. Each party shall, upon the request of the other, join in the execution of a memorandum of this Lease or a memorandum of any amendment or modification of this Lease in proper form for recordation together with any transfer tax returns or forms necessary for such recordation. The party requesting such memorandum of Lease shall be responsible for the payment of any recording fees. Upon the expiration or sooner termination of the Lease, Tenant covenants that it will, at the request of Landlord, execute, acknowledge, and deliver an instrument canceling any memorandum of Lease that is recorded and all other documentation required to record same. If Tenant fails or refuses to execute, acknowledge, and deliver such instrument of cancellation, then Tenant hereby appoints Landlord as Tenant's attorney-in-fact, coupled with an interest, to execute, acknowledge, and deliver such instrument of cancellation on Tenant's behalf.

## ARTICLE XV
## MISCELLANEOUS

**Section 15.01 Landlord and Tenant Representations and Warranties.** Landlord and Tenant each represent and warrant that:

(a)     This Lease has been duly authorized, executed, and delivered by such party and constitutes the legal, valid, and binding obligation of such party.

(b)     There are no actions, suits, or proceedings pending or, to the knowledge of such party, threatened against or affecting such party, at law or at equity or before any Governmental Authority that would impair such party's ability to perform its obligations under this Lease.

16

(c)     The consummation of the transactions hereby contemplated, and the performance of this Lease will not result in any breach or violation of, or constitute a default under, any lease or financing agreement.

**Section 15.02 Attorneys' Fees.** If any action is brought by either party against the other in connection with or arising out of this Lease, the prevailing party shall be entitled to recover from the other party its reasonable out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees, incurred in connection with the prosecution or defense of such action.

**Section 15.03 Provisions Are Binding Upon Successors and Assigns.** It is mutually covenanted, understood, and agreed by and between the parties hereto, that each of the provisions of this Lease shall apply to, extend to, be binding upon, and inure to the benefit or detriment of not only the parties hereto, but also the legal representatives, successors, and assigns of Landlord and Tenant, and shall be deemed and treated as covenants running with the Premises during the term of this Lease. Whenever a reference to the parties hereto is made, such reference shall be deemed to include the legal representatives, successors, and assigns of said party, the same as if in each case expressed.

**Section 15.04 Applicable Law.** This Lease shall be governed, construed, performed, and enforced in accordance with the Laws of the State of Texas.

**Section 15.05 Waiver of Jury Trial.** LANDLORD AND TENANT EACH WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM BROUGHT BY EITHER AGAINST THE OTHER ON ANY MATTER WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, OR TENANT'S USE OR OCCUPANCY OF THE PREMISES.

**Section 15.06 Interpretation and Construction.** This Lease shall be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted. Any captions or headings used in this Lease are for convenience only and do not define or limit the scope of this Lease. The singular of any term, including any defined term, shall include the plural and the plural of any term shall include the singular. Whenever the singular or plural number, or masculine or feminine gender is used in this Lease, it shall equally apply to, extend to, and include the other.

**Section 15.07 Severability.** In the event any provision, or any portion of any provision of this Lease is held invalid, the other provisions of this Lease and the remaining portion of said provision, shall not be affected thereby and shall continue in full force and effect.

**Section 15.08 Time Is of the Essence.** All time limits stated in this Lease are of the essence of this Lease.

**Section 15.09 No Partnership Nor Agency Relationship.** Nothing in this Lease is intended, or shall in any way be construed, so as to create any form of partnership or agency relationship between the parties. The parties hereby expressly disclaim any intention of any kind to create any partnership or agency relationship between themselves. Nothing in this Lease shall be construed to make either party liable for any of the indebtedness of the other, except as specifically provided in this Lease.

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-1D688C4900

**Section 15.10 Entire Agreement.** The making, execution, and delivery of this Lease by Tenant has not been induced by any representations, statements, covenants, or warranties by Landlord except for those contained in this Lease. This Lease constitutes the full, complete, and entire agreement between and among the parties hereto. No agent, employee, officer, representative, or attorney of the parties hereto has authority to make, or has made, any statement, agreement, representation, or contemporaneous agreement, oral or written, in connection herewith modifying, adding to, or changing the provisions of this Lease. No amendment of this Lease shall be binding unless such amendment shall be in writing, signed by both parties hereto and attached to, incorporated in, and by reference made a part of this Lease.

**Section 15.11 Counterparts.** This Lease may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be duly executed in duplicate counterparts each of which shall be deemed to be an original, the day and year first above written.

LANDLORD:

THREE RIVERS SAND, LLC,
a Texas limited liability company

By: _Bazil Moore_
Name: Bazil Moore
Title: Manager
Date: 1/23/2025

TENANT:

FCI SOUTH, LLC,
a Texas limited liability company

By: _____
Name: John Nelson
Title: Manager
Date: 1/23/2025

By: _kevin collier_
Name: Kevin Collier
Title: Manager
Date: 1/23/2025

Docusign Envelope ID: 1E4191BD-B56C-4254-B0D7-1FD68F3489AA

## EXHIBITS

| EXHIBIT IDENTIFICATION | EXHIBIT TITLE |
|---|---|
| Exhibit A | Legal Description of Land |
| Exhibit B | Asset Schedule |
| Exhibit C | Schedule of Base Rent and Allocation Towards Purchase Price |
| Exhibit D | Lease Memorandum |

Docusign Envelope ID: 1E4191BD-B56C-4254-8E07-TED68824900

# Exhibit A

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

|  | Bk | Vol | Pg |
|---|---|---|---|
| 236362 | OR | 451 | 468 |

EXHIBIT A
TRACT 1

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

FIELD NOTE DESCRIPTION OF 30.034 ACRES, MORE OR LESS, BEING PART OF THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, LIVE OAK COUNTY, TEXAS, AND BEING OUT OF THE 4239.14 ACRES DESCRIBED IN DEED TO CUATRO PAISANAS RANCH INC, RECORDED IN VOLUME 243, PAGE 118, OF THE DEED RECORDS OF LIVE OAK COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", in the northwest corner of the herein described tract;

THENCE leaving the POINT OF BEGINNING, along the northwest line of the herein described tract, N 45°10'27" E a distance of 373.55 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the north corner of this description;

THENCE along the northeast line of the herein described tract, S 36°51'36" E a distance of 1371.46 feet to a 1/2" iron rod set with a plastic cap stamped "Payne 6064", for the east corner of this description;

THENCE along the southeast line of the herein described tract, S 41°17'31" W a distance of 1105.67 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the south corner of this description;

THENCE along the southwest line of the herein described tract, N 61°55'20" W a distance of 459.24 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the southwest corner of this description;

THENCE along the west line of the herein described tract, N 1°51'57" E a distance of 1449.35 feet to the POINT OF BEGINNING. There are 30.034 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

Phillip C. Payne        RPLS #6064
Job No. 1008-014
August 9, 2018



Page 1 of 1

Docusign Envelope ID: 1E4191BD-B50C-42E4-8E27-1ED688F28900

|  | Bk | Vol | Pg |
|---|---|---|---|
| 236362 | OR | 451 | 469 |



EXHIBIT B
TRACT 2

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

FIELD NOTE DESCRIPTION OF A 70 FOOT WIDE ACCESS ROAD EASEMENT, BEING 2.592 ACRES, MORE OR LESS, SITUATED IN THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, AND THE CARL STERNBERG SURVEY, ABSTRACT 423, LIVE OAK COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", at the southwest corner of a 30.034 acre tract, said point having Texas State Plane Coordinate System, (NAD 83), South Central Zone values of N: 13333335.79 and E: 2238156.07, for the southeast corner of this description;

THENCE, leaving the POINT OF BEGINNING and said 30.034 acre tract, S 85°54'50" W a distance of 651.00 feet to a point of curvature;

THENCE Along a curve to the left with a delta of 08°03'13", a radius of 865.88 feet, an arc length of 121.71 feet and a chord which bears S 81°53'14" W a distance of 121.61 feet to a point;

THENCE, S 77°51'29" W a distance of 525.23 feet to a point of curvature;

THENCE Along a curve to the left with a delta of 43°40'24", a radius of 417.23 feet, an arc length of 318.03 feet and a chord which bears S 55°51'02" W a distance of 310.39 feet to a point, for the southwest corner of this description;

THENCE, N 06°41'06" W a distance of 98.52 feet to a point of curvature, for the northwest corner of this description;

THENCE Along a curve to the right with a delta of 34°52'05", a radius of 487.23 feet, an arc length of 296.51 feet and a chord which bears N 60°15'57" E a distance of 291.96 feet to a point;

THENCE, N 77°51'29" E a distance of 525.33 feet to a point of curvature;

THENCE Along a curve to the right with a delta of 08°03'13", a radius of 935.88 feet, an arc length of 131.55 feet and a chord which bears N 81°53'14" E a distance of 131.44 feet to a point;

THENCE, N 85°54'50" E a distance of 658.30 feet to a point in the west boundary line of said 30.034 acre tract, for the northeast corner of this description;

THENCE along the west boundary line of said 30.034 acre tract, S 01°51'57" W a distance of 70.38 feet to the POINT OF BEGINNING. There are 2.592 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

Phillip C. Payne     RPLS #6064
Job No. 1008-014
August 9, 2018

Page 1 of 1

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED686F26900



EXHIBIT C
TRACT 3

|  |  | Bk | Vol | Pg |
| --- | --- | --- | --- | --- |
| 236362 |  | OR | 451 | 470 |

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

FIELD NOTE DESCRIPTION OF A 70 FOOT WIDE ACCESS ROAD EASEMENT, BEING 3.827 ACRES, MORE OR LESS, SITUATED IN THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, AND THE CARL STERNBERG SURVEY, ABSTRACT 423, LIVE OAK COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", at the southwest corner of a 30.034 acre tract, said point having Texas State Plane Coordinate System, (NAD 83), South Central Zone values of N: 13333335.79 and E: 2238156.07, for the north corner of this description;

THENCE, leaving the POINT OF BEGINNING, along the southwest boundary line of said 30.034 acre tract, S 61°55'20" E a distance of 73.15 feet to a point, for the northeast corner of this description;

THENCE, leaving said 30.034 acre tract, S 11°12'50" W a distance of 210.62 feet to a point;

THENCE, S 00°04'46" W a distance of 133.15 feet to a point;

THENCE, S 00°09'51" W a distance of 387.77 feet to a point, for the east corner of this description;

THENCE, S 54°10'42" W a distance of 1687.69 feet to a point, for the southwest corner of this description;

THENCE, N 07°05'49" W a distance of 79.82 feet to a point, for the northwest corner of this description;

THENCE, N 54°10'42" E a distance of 1613.65 feet to a point, for the west corner of this description;

THENCE, N 00°09'51" E a distance of 352.04 feet to a point;

THENCE, N 00°04'46" E a distance of 139.92 feet to a point;

THENCE, N 11°12'50" E a distance of 238.67 feet to the POINT OF BEGINNING. There are 3.827 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

Phillip C. Payne        RPLS #6064
Job No. 1008-014
August 9, 2018

Page 1 of 1

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-1FD683F3d900

# Exhibit B

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

**"Tangible Personal Property"**

**Furniture and Fixtures**

| **Main Office** | **Break Room** | **Scale House** |
|---|---|---|
| 3 – CPUs | 1 – Flatscreen TV | 2 – CPUs |
| 8 – Computer Monitors | 1 – Refrigerator | 4 – Computer Monitors |
| 2 – Printers | 1 – Microwave | 2 – Printers |
| 2 – Samsung Flatscreen TVs | 2 – Tables | 3 – Keyboards |
| 4 – Keyboards | 6 – Folding Chairs | 3 – Cyber Power 1500VA UPS Systems |
| 3 – Office Phones | | 2 – Office Chairs |
| 2 – Refrigerators | | 1 - Office Phone |
| 1 – Microwave | | 1 – CB Radio |
| 2 – Tables | | 1 – Window AC Unit |
| 6 – Office Chairs | | |
| 2 – Folding Chairs | | |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

## "Fixed Assets- Dry End"

| Item: | Description: | Purchased from/Manufactured by: |
|---|---|---|
| ASTEC Load Hopper | 11x19x11 (holds approximately 9 tons of sand) | Manufactured by ASTEC |
| Conveyor - Feed Hopper | 36"x25' | Belt – from Lufkin Rubber & Gasket |
| Conveyor - Slinger | 30" x 90' | Belt – from Lufkin Rubber & Gasket |
| Belt - Slinger | 36" x 20' | Belt – from Lufkin Rubber & Gasket |
| ASTEC Dryer - Larger | 10' x 40' | Dryer & Burner Assembly 19CM0378, control software Manufacture ASTEC |
| Havens International Bag House | 29" x 36" | From Tarmac - Holds 1,152 Filter Bags |
| Compressed Air System at Bag House | Sullivan System | Purchased from Air Specialty & Equipment Co. – Is not currently working |
| Conveyor - Drum Discharge | 36" x 29' | Belt - Lufkin Rubber & Gasket |
| Screen Feed Hopper | | |
| Conveyors - Shakers (2) | 30" x 95' | Belt - Lufkin Rubber & Gasket |
| ASTEC Shakers (2) | 22' x 5' x 7' | 3 levels of screens Manufacture ASTEC |
| Conveyor - Reject Discharge | 24" x 75' | Belt - Lufkin Rubber & Gasket |
| Conveyors - Surge Bin (2) | 24" x 75' | Belt - Lufkin Rubber & Gasket |
| Surge Bin | 20' x 10' x 8' | |
| Conveyor - Bottom Surge Bin | 30" x 40' | Belt - Lufkin Rubber & Gasket |
| Conveyor - Bucket Elevator | 42" x 95' | Belt - Lufkin Rubber & Gasket |
| Bucket Elevator Feed | The are files (electronic) that exist for B.W. Sinclair Equipment | Manufactured by B.W. Sinclair |
| Bucket Elevator | 400 TPH x 144'-6" Discharge Height Bucket Elevator Unit Complete with a 100 HP Drive Assembly with 24" Diverter Valve | Manufactured by B.W. Sinclair |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

| | | |
|---|---|---|
| Silos (2) | 2 – Bolted carbon steel rolled, tapered panel "RTP" industrial storage tanks. 29.71' Nominal inside diameter x 10.65' Nominal Eave Heights x 69.13' Approx. straight wall storage height. 45 Degree hopper slope terminating with a 14" diameter flanged outlet. 1:12 Deck slope. Level full capacity of 51,354 cubic feet. Seismic zone per IBC 2012 – Site Class D, I=1 with 123 MPH wind conditions. | Manufactured by Tank Connection |
| Silos Platform | Installation of Landings, Platforms, Stairs, & Elevator | Built by OCC Civil & Mechanical |
| Silo Loading Tube (2) | | Manufactured by Vortex |
| Silo Control Room/Scale House | | Manufactured by OCC Civil & Mechanical |
| Silos Compressed Air System | Refrigeration Dryer Model SPRF580 Compressor Model SP16-100 Open Unit Particulate Prefilter & Coalesce After filter. 500 Gallon Tank 165 PSI | Air System Manufactured by Sullivan and Purchased from Air Specialty & Equipment Co. Manufactured by Manchester |
| Truck Scales (2) | Rice Lake Truck Scales | Purchased from A-1 Scale Service |
| AWS Weighing Software | 2 Interact SE Rev7 Site, 1 Interact SE Rev7 Network, 2 Interact Unattended, 2 Printers, 4 IP Cameras, 2 DataSync, & 1 ASP | Programmed by Advanced Weighing Systems |
| Greenville Plant Equipment | Multiple pieces of equipment | Purchased from shutdown Mississippi Sand Plant. |
| Dryer – Small | 8 x 4- Rotary Dryer (Not connected) | Mayhan Fabricators reworked Dryer from Greenville, MS Sand Plant. |

**"Fixed Assets- Wet Plant"**

| Item: | Description: | Purchased from:/Manufactured by: |
|---|---|---|
| 1440 NC Vertical 2 Phase Separator | 30" x 10' | Purchased from Angelina Tank & Manufacturing |
| JCI 6203-32LP Screen | Triple Shaft Horizontal Low Profile Screen | Purchased from G.W. Van Keppel |
| Flex-Mat 3 D Optimumwire | Flex Mat | Purchased from Salina Vortex Corp |
| Hydrosizer | 12'x12'x10'x16' Cone 18 Bar. 10' FMDS Tank with support stand, Caged Ladder up the side of plant. Work platform with railings on first level at the sand discharge valve. Also work platform at the top of the tank with railings. | Purchased from Westermann Supply Inc, Purvis Industries & Crisp Industries |
| Fresh Water Tank | 500 BBL, 12'x25', 1/4" Flat Bottom, 3/16" Shell & Deck Steel Welded Storage built to API 12F Standard | Manufactured by Angelina Tank & Manufacturing |
| Gator Screen Stand & Sump | 6'x20' 3 deck incline Screen, with Screen Support Stand. 30" wide catwalk with hand rails on 3 sides of screen. Stairway from one side to catwalk is included. | Purchased from Westermann Supply, Inc |
| Settling Tanks (2) | 16'x16'x9' Tapered | |
| Sandscrew | 60" Single Sandscrew | Manufactured by ASTEC |
| Azfab Attrition Mill | DAC Serial #DAC2061 | Purchased Used Equipment |
| Lined Chute | 30"x30"x20' | Purchased Used Equipment |
| Lined Chute | 30"x30"x16' | Purchased Used Equipment |
| Multiple Conveyors & Structural Beams | | Purchased Used Equipment |
| Cyclone | 1 Cyclone 10" Inlet 12" Discharge, 36" Diameter 36" Length 7' Cone | Purchased Used Equipment |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F2890C

**"Fixed Assets- Buildings/Structures"**

| Item: | Description: | Purchased from:/Manufactured by: |
|---|---|---|
| Main Office Building/Shop | 50x100 Metal Building with 23' eve, 1:12 pitch. 25'x100' lean too. Qty 4 framed openings 16' wide x 16' tall. Includes roll up doors. Qty 2 Man doors. Roof and exterior shop walls insulated. Addition of 25' x 50' Lean to on North side of shop similar to south side lean to. | Fate Fabrication, LLC, M&M Quality Builders |
| Electrical Control Room | Contains Electrical Breakers, Disconnects, etc. | Anderson I & E Services, LLC |
| Scalehouse - Building & Foundation | | MCC, LLC General Contractor |
| Dry Plant - Building & Foundation | | Fate Fabrication, LLC |
| Wet Plant - Building & Foundation | | Fate Fabrication, LLC |
| Wet Plant - Settling Ponds | | MCC, LLC General Contractor |
| Mine - Water Ponds | | MCC, LLC General Contractor |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

**"Fixed Assets- Miscellaneous Items"**

| Item: | Description: | Purchased from:/Manufactured by: |
|---|---|---|
| Water Well #1 | Drill 6" bore hole to 220' total depth with 100' of 8" SDR-21 PVC. Located on property that was formerly leased. | James Pawlik Water Well Service |
| Water Well #2 | Drill to depth of 260' total depth. Not hooked up. | James Pawlik Water Well Service |
| 2018 KPI 33-6150 Radial Superstacker | 150' - Serial # 417009 | Purchased from Texas Timberjack |
| 2018 KPI 11-3060 Series II Stacker | 60' - Serial #417394 | Purchased from Texas Timberjack |
| 5.0 Ton AC Unit w/ Heat | TEM4OC60S51SB - Serial #183622SMV3 WEM2002BV 20 KW Heat Kit Condensers 5.0 Ton - Serial #18301R9L5F | Purchased from Brady Wheeler A/C |
| 4.0 Ton AC Unit w/ Heat | TEM4A0C48S41SB - Serial #18353LFS3V WEM1502BV 15 KW Heat Kit Condensers 4.0 Ton - Serial #183230153F | Purchased from Brady Wheeler A/C |
| 2.0 Ton AC Unit w/ Heat | TEM4AOB24S21SB - Serial #18353LWC3V WEM1002B 10 KW Heat Kit Condensers 2.0 Ton - Serial #18332NRUAF | Purchased from Brady Wheeler A/C |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

**"Assigned Contracts"**

| License: | Connected to: | Software |
|---|---|---|
| Astec Software | ASTEC Dryer - Larger | Astec MCIII System |
| Advanced Weighing Systems Software | Scales System | AWS Interact SE 7 |

**"Permits" to be Transferred to Tenant**

| Permits: | Permit Number: | Issuing Agency: |
|---|---|---|
| Permit by Rule | 154828 | Texas Commission on Environmental Quality |
| Storm Water Permit | TXR05FZ47 | Texas Commission on Environmental Quality |

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F2890C

**"Real Property"**

All that certain real property or interest therein situated in the County of Live Oak, Texas as follows:

**TRACT 1:**

30.034 acres of land, more or less, out of the MICHAEL CRONICAN SURVEY, ABSTRACT 135, in Live Oak County, Texas, being a part of a 4,239.14 acre tract conveyed to Cuatro Paisanas Ranch, Inc. by deed recorded in Volume 243, Page 118, Deed Records of Live Oak County, Texas, said 30.034 acre tract being more particularly described in the Deed.

**TRACT 2:**

A 70 foot wide access easement out of the MICHAEL CRONICAN SURVEY, ABSTRACT 135, and the CARL STERNBERG SURVEY, ABSTRACT 423, in Live Oak  County, Texas, being a part of 4,239.14 acre tract conveyed to Cuatro Paisanas Ranch, Inc. by deed recorded in Volume 243, Page 118, Deed Records of Live Oak County, Texas, said 2.592 acre tract being more particularly described in the Deed.

**TRACT 3:**

A 70 foot wide access easement out of the MICHAEL CRONICAN SURVEY, ABSTRACT 135, and the CARL STERNBERG SURVEY, ABSTRACT 423, in Live Oak  County, Texas, being a part of 4,239.14 acre tract conveyed to Cuatro Paisanas Ranch, Inc. by deed recorded in Volume 243, Page 118, Deed Records of Live Oak County, Texas, said 3.817 acre tract being more particularly described in the Deed.

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

**"Equipment_ Excluded (Sold separately)"**

| Item: | Description: | Purchased from:/Manufactured by: |
|---|---|---|
| Doosan 420-7 Wheel Loader | Serial #DWGCWLECEM1010092 | Texas Timberjack, Inc/Doosan |
| Doosan DL550-5 Wheel Loader | Serial #DWGCWLBLPL1010276 | H&V Equipment Services/Doosan |
| Doosan DL280-7 Wheel Loader | Serial #DWGCWLDKLN110178 | Texas Timberjack, Inc/Doosan |
| Sandscrew | 42" Sandscrew | Manufactured by ASTEC[1] |

---

[1] Sold to third party but still located at Premises.

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-1ED688F28900

# Exhibit C

Docusign Envelope ID: 1E4191BD-B56C-42E4-9527-TEDC8852B990

## SCHEDULE A - PAYMENT SCHEDULE

| PMT #- DATE | REVISED PMT # | REVISED DATE | PAYMENT | APPLIED TOWARD PURCHASE PRICE |
|---|---|---|---|---|
| 1 2/10/2025 | 1 | 3/10/25 | 116,028.82 | 85,377.97 |
| 2 3/10/2025 | 2 | 4/10/25 | 116,028.82 | 88,744.85 |
| 3 4/10/2025 | 3 | 5/10/25 | 116,028.82 | 86,267.47 |
| 4 5/10/2025 | 4 | 6/10/25 | 116,028.82 | 87,656.33 |
| 5 6/10/2025 | 5 | 7/10/25 | 116,028.82 | 87,155.95 |
| 6 7/10/2025 | 6 | 8/10/25 | 116,028.82 | 88,520.47 |
| 7 8/10/2025 | 7 | 9/10/25 | 116,028.82 | 88,053.39 |
| 8 9/10/2025 | 8 | 10/10/25 | 116,028.82 | 88,503.21 |
| 9 10/10/2025 | 9 | 11/10/25 | 116,028.82 | 89,830.82 |
| 10 11/10/2025 | 10 | 12/10/25 | 116,028.82 | 89,414.23 |
| 11 12/10/2025 | 11 | 1/10/26 | 116,028.82 | 90,716.88 |
| 12 1/10/2026 | 12 | 2/10/26 | 116,028.82 | 90,334.42 |
| 13 2/10/2026 | 13 | 3/10/26 | 116,028.82 | 90,795.89 |
| 14 3/10/2026 | 14 | 4/10/26 | 116,028.82 | 93,662.25 |
| 15 4/10/2026 | 15 | 5/10/26 | 116,028.82 | 91,738.19 |
| 16 5/10/2026 | 16 | 6/10/26 | 116,028.82 | 92,977.18 |
| 17 6/10/2026 | 17 | 7/10/26 | 116,028.82 | 92,681.81 |
| 18 7/10/2026 | 18 | 8/10/26 | 116,028.82 | 93,894.95 |
| 19 8/10/2026 | 19 | 9/10/26 | 116,028.82 | 93,634.93 |
| 20 9/10/2026 | 20 | 10/10/26 | 116,028.82 | 94,113.26 |
| 21 10/10/2026 | 21 | 11/10/26 | 116,028.82 | 95,287.19 |
| 22 11/10/2026 | 22 | 12/10/26 | 116,028.82 | 95,080.81 |
| 23 12/10/2026 | 23 | 1/10/27 | 116,028.82 | 96,228.23 |
| 24 1/10/2027 | 24 | 2/10/27 | 116,028.82 | 96,058.11 |
| 25 2/10/2027 | 25 | 3/10/27 | 116,028.82 | 96,548.82 |
| 26 3/10/2027 | 26 | 4/10/27 | 116,028.82 | 98,883.70 |
| 27 4/10/2027 | 27 | 5/10/27 | 116,028.82 | 97,547.18 |
| 28 5/10/2027 | 28 | 6/10/27 | 116,028.82 | 98,627.04 |
| 29 6/10/2027 | 29 | 7/10/27 | 116,028.82 | 98,549.33 |
| 30 7/10/2027 | 30 | 8/10/27 | 116,028.82 | 99,601.73 |
| 31 8/10/2027 | 31 | 9/10/27 | 116,028.82 | 99,561.58 |
| 32 9/10/2027 | 32 | 10/10/27 | 116,028.82 | 100,070.19 |
| 33 10/10/2027 | 33 | 11/10/27 | 116,028.82 | 101,080.93 |
| 34 11/10/2027 | 34 | 12/10/27 | 116,028.82 | 101,097.76 |
| 35 12/10/2027 | 35 | 1/10/28 | 116,028.82 | 102,080.35 |
| 36 1/10/2028 | 36 | 2/10/28 | 116,028.82 | 102,135.69 |
| 37 2/10/2028 | 37 | 3/10/28 | 116,028.82 | 102,657.45 |
| 38 3/10/2028 | 38 | 4/10/28 | 116,028.82 | 104,012.69 |
| 39 4/10/2028 | 39 | 5/10/28 | 116,028.82 | 103,713.22 |
| 40 5/10/2028 | 40 | 6/10/28 | 116,028.82 | 104,624.16 |
| 41 6/10/2028 | 41 | 7/10/28 | 116,028.82 | 104,777.51 |
| 42 7/10/2028 | 42 | 8/10/28 | 116,028.82 | 105,659.29 |
| 43 8/10/2028 | 43 | 9/10/28 | 116,028.82 | 105,852.52 |
| 44 9/10/2028 | 44 | 10/10/28 | 116,028.82 | 106,393.26 |
| 45 10/10/2028 | 45 | 11/10/28 | 116,028.82 | 107,230.79 |
| 46 11/10/2028 | 46 | 12/10/28 | 116,028.82 | 107,484.56 |
| 47 12/10/2028 | 47 | 1/10/29 | 116,028.82 | 108,292.18 |
| 48 1/10/2029 | 48 | 2/10/29 | 116,028.82 | 108,586.85 |
| 49 2/10/2029 | 49 | 3/10/29 | 116,028.82 | 109,141.56 |
| 50 3/10/2029 | 50 | 4/10/29 | 116,028.82 | 110,313.07 |
| 51 4/10/2029 | 51 | 5/10/29 | 116,028.82 | 110,262.64 |
| 52 5/10/2029 | 52 | 6/10/29 | 116,028.82 | 110,994.16 |
| 53 6/10/2029 | 53 | 7/10/29 | 116,028.82 | 111,392.92 |
| 54 7/10/2029 | 54 | 8/10/29 | 116,028.82 | 112,093.48 |
| 55 8/10/2029 | 55 | 9/10/29 | 116,028.82 | 112,534.60 |

Docusign Envelope ID: 1E4191BD-B56C-425A-8F37-1EDC85528990

| PMT #- DATE | REVISED PMT # | REVISED DATE | PAYMENT | APPLIED TOWARD PURCHASE PRICE |
|---|---|---|---|---|
| 56  9/10/2029 | 56 | 10/10/29 | 116,028.82 | 113,109.48 |
| 57  10/10/2029 | 57 | 11/10/29 | 116,028.82 | 113,763.02 |
| 58  11/10/2029 | 58 | 12/10/29 | 116,028.82 | 114,268.45 |
| 59  12/10/2029 | 59 | 1/10/30 | 116,028.82 | 114,890.24 |
| 60  1/10/2030 | 60 | 2/10/30 | 116,028.82 | 115,438.81 |
| **TOTAL** | | | $  6,961,729.20 | $  6,000,000.00 |

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-TEDC88F2490D

# Exhibit D

Docusign Envelope ID: 1E4191BD-B56C-42B4-8E2A-1EEC88B2496C

# MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE (this "**Memorandum**"), dated as of January 23, 2025 (the "**Effective Date**"), is entered into between Three Rivers Sand, LLC, a Texas limited liability company ("**Landlord**") and FCI South, LLC, a Texas limited liability company ("**Tenant**") (collectively referred to herein as the "**Parties**" or, individually, as a "**Party**").

Landlord and Tenant hereby acknowledge the following:

1.      Name and Principal Place of Business of Landlord. The name of Landlord is Three Rivers Sand, LLC and its principal place of business is 1715 S. University Drive, Nacogdoches, Texas 75961.

2.      Name and Principal Place of Business of Tenant. The name of Tenant is FCI South, LLC and its principal place of business is 13201 FM 812, Del Valle, Texas 78617.

3.      Lease. Landlord and Tenant have entered into a Lease Agreement, dated January 23, 2025 (the "**Lease**"), whereby Landlord leased to Tenant approximately 30 acres of land and all buildings, facilities, plants, and equipment located thereon (the "**Premises**") with a street address of 254 Eagle Ford Way, Three Rivers, Texas 78071, in Live Oak County, Texas, which is more particularly described in Exhibit A attached hereto (the "**Property**").

4.      Term. The initial term of the Lease starts on January 23, 2025, and expires five years thereafter (the "**Term**").

5.      Tenant's Right of Purchase. During the Term, the Tenant has the sole and exclusive right to purchase the Property subject to the conditions set forth in the Lease.

6.      Notices. Except as specifically outlined in the Lease, all notices, waivers, and demands required or permitted hereunder shall be in writing and delivered to the addresses set forth in Sections 1 and 2 above, as applicable, by one of the following methods: (a) hand delivery, whereby delivery is deemed to have occurred at the time of delivery; (b) a nationally recognized overnight courier company, whereby delivery is deemed to have occurred the business day following deposit with the courier; (c) registered United States mail, signature required and postage-prepaid, whereby delivery is deemed to have occurred on the third business day following deposit with the United States Postal Service; or (d) electronic transmission (facsimile or email) provided that the transmission is completed no later than 4:00 p.m. Central Time on a business day and the original also is sent via overnight courier or United States Mail, whereby delivery is deemed to have occurred at the end of the business day on which electronic transmission is completed.

7.      Conflicts. In the event of any conflict between this Memorandum and the Lease, the provisions of the Lease shall control.

8.      Counterparts. This Memorandum may be executed in multiple counterparts, each of which shall be deemed an original and all of which when taken together shall constitute one and the same document.

[SIGNATURE PAGE FOLLOWS]

Docusign Envelope ID: 1E4191BD-B56C-4254-8E97-1ED688F289C0

**IN WITNESS WHEREOF,** the Parties have caused this Memorandum to be executed as of the Effective Date.

**LANDLORD:**

THREE RIVERS SAND, LLC,
a Texas limited liability company

By:_____
Name: Bazil Moore
Title: Manager
Date: _____

SUBSCRIBED AND SWORN to before me on this ___ day of _____, 2025, by Bazil Moore.

_____

Notary Public, State of Texas

[seal]

2

Docusign Envelope ID: 1E4191BD-B56C-4254-8E27-1FD388F289A0

**TENANT:**

FCI SOUTH, LLC,
a Texas limited liability company


By:_____
Name: Kevin Collier
Title: Manager
Date: _____


SUBSCRIBED AND SWORN to before me on this ___ day of _____, 2025, by Kevin Collier.


_____

Notary Public, State of Texas


[seal]

3

Docusign Envelope ID: 1E4191BD-B56C-4254-8527-1ED638B528990

# Exhibit A

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

|  | Bk | Vol | Pg |
|---|---|---|---|
| 236362 | OR | 451 | 468 |

EXHIBIT A TRACT 1

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

FIELD NOTE DESCRIPTION OF 30.034 ACRES, MORE OR LESS, BEING PART OF THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, LIVE OAK COUNTY, TEXAS, AND BEING OUT OF THE 4239.14 ACRES DESCRIBED IN DEED TO CUATRO PAISANAS RANCH INC, RECORDED IN VOLUME 243, PAGE 118, OF THE DEED RECORDS OF LIVE OAK COUNTY, TEXAS, MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", in the northwest corner of the herein described tract;

THENCE leaving the POINT OF BEGINNING, along the northwest line of the herein described tract, N 45°10'27" E a distance of 373.55 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the north corner of this description;

THENCE along the northeast line of the herein described tract, S 36°51'36" E a distance of 1371.46 feet to a 1/2" iron rod set with a plastic cap stamped "Payne 6064", for the east corner of this description;

THENCE along the southeast line of the herein described tract, S 41°17'31" W a distance of 1105.67 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the south corner of this description;

THENCE along the southwest line of the herein described tract, N 61°55'20" W a distance of 459.24 feet to a 1/2" iron rod set with plastic cap stamped "Payne 6064", for the southwest corner of this description;

THENCE along the west line of the herein described tract, N 1°51'57" E a distance of 1449.35 feet to the POINT OF BEGINNING. There are 30.034 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

Phillip C. Payne        RPLS #6064
Job No. 1008-014
August 9, 2018



Page 1 of 1

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

|  | Bk | Vol | Pg |
|---|---|---|---|
| 236362 | OR | 451 | 469 |

EXHIBIT B
TRACT 2

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

**FIELD NOTE DESCRIPTION OF A 70 FOOT WIDE ACCESS ROAD EASEMENT, BEING 2.592 ACRES, MORE OR LESS, SITUATED IN THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, AND THE CARL STERNBERG SURVEY, ABSTRACT 423, LIVE OAK COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:**

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", at the southwest corner of a 30.034 acre tract, said point having Texas State Plane Coordinate System, (NAD 83), South Central Zone values of N: 13333335.79 and E: 2238156.07, for the southeast corner of this description;

THENCE, leaving the POINT OF BEGINNING and said 30.034 acre tract, S 85°54'50" W a distance of 651.00 feet to a point of curvature;

THENCE Along a curve to the left with a delta of 08°03'13", a radius of 865.88 feet, an arc length of 121.71 feet and a chord which bears S 81°53'14" W a distance of 121.61 feet to a point;

THENCE, S 77°51'29" W a distance of 525.23 feet to a point of curvature;

THENCE Along a curve to the left with a delta of 43°40'24", a radius of 417.23 feet, an arc length of 318.03 feet and a chord which bears S 55°51'02" W a distance of 310.39 feet to a point, for the southwest corner of this description;

THENCE, N 06°41'06" W a distance of 98.52 feet to a point of curvature, for the northwest corner of this description;

THENCE Along a curve to the right with a delta of 34°52'05", a radius of 487.23 feet, an arc length of 296.51 feet and a chord which bears N 60°15'57" E a distance of 291.96 feet to a point;

THENCE, N 77°51'29" E a distance of 525.33 feet to a point of curvature;

THENCE Along a curve to the right with a delta of 08°03'13", a radius of 935.88 feet, an arc length of 131.55 feet and a chord which bears N 81°53'14" E a distance of 131.44 feet to a point;

THENCE, N 85°54'50" E a distance of 658.30 feet to a point in the west boundary line of said 30.034 acre tract, for the northeast corner of this description;

THENCE along the west boundary line of said 30.034 acre tract, S 01°51'57" W a distance of 70.38 feet to the POINT OF BEGINNING. There are 2.592 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

_____
Phillip C. Payne        RPLS #6064
Job No. 1008-014
August 9, 2018

Page 1 of 1

Docusign Envelope ID: 1E4191BD-B56C-42E4-8E27-1ED688F28900

|  | Bk | Vol | Pg |
|---|---|---|---|
| 236362 | OR | 451 | 470 |

EXHIBIT C
TRACT 3

**Land Surveying Company: Payne Industries, LLC**
**Firm Registration No: 10193780**
**Phone: (979) 567-4500**
**Website: www.payne-llc.com**

**FIELD NOTE DESCRIPTION OF A 70 FOOT WIDE ACCESS ROAD EASEMENT, BEING 3.827 ACRES, MORE OR LESS, SITUATED IN THE MICHAEL CRONICAN SURVEY, ABSTRACT 135, AND THE CARL STERNBERG SURVEY, ABSTRACT 423, LIVE OAK COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:**

BEGINNING at a 1/2" iron rod set with plastic cap stamped "Payne 6064", at the southwest corner of a 30.034 acre tract, said point having Texas State Plane Coordinate System, (NAD 83), South Central Zone values of N: 13333335.79 and E: 2238156.07, for the north corner of this description;

THENCE, leaving the POINT OF BEGINNING, along the southwest boundary line of said 30.034 acre tract, S 61°55'20" E a distance of 73.15 feet to a point, for the northeast corner of this description;

THENCE, leaving said 30.034 acre tract, S 11°12'50" W a distance of 210.62 feet to a point;

THENCE, S 00°04'46" W a distance of 133.15 feet to a point;

THENCE, S 00°09'51" W a distance of 387.77 feet to a point, for the east corner of this description;

THENCE, S 54°10'42" W a distance of 1687.69 feet to a point, for the southwest corner of this description;

THENCE, N 07°05'49" W a distance of 79.82 feet to a point, for the northwest corner of this description;

THENCE, N 54°10'42" E a distance of 1613.65 feet to a point, for the west corner of this description;

THENCE, N 00°09'51" E a distance of 352.04 feet to a point;

THENCE, N 00°04'46" E a distance of 139.92 feet to a point;

THENCE, N 11°12'50" E a distance of 238.67 feet to the POINT OF BEGINNING. There are 3.827 acres, more or less, described in these field notes.

All iron rods set are capped with a plastic cap stamped "Payne 6064". The bearing basis for this survey was determined from GPS observations and refers to Grid North. This description was prepared by Payne Industries, LLC from an on the ground survey performed on July 18, 2018 and corresponds to a survey plat referenced as job number 1008-014.

Phillip C. Payne        RPLS #6064
Job No. 1008-014
August 9, 2018

Page 1 of 1