*Draft – 04.22.26*

# STALKING HORSE ASSET PURCHASE AGREEMENT

**by and among**

## FCI SAND OPERATIONS, LLC

**and**

## FCI SOUTH, LLC

**as Sellers,**

**and**

## [GRAYSTREET CREDIT, LLC]

**as Buyer**

**[•], 2026**

v.

**TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINITIONS** ................................................................................................. 2

**ARTICLE II. PURCHASE AND SALE** ............................................................................. 13

    Section 2.1    Purchase and Sale of Purchased Assets .......................................... 13
    Section 2.2    Excluded Assets ............................................................................. 15
    Section 2.3    Assumption of Assumed Liabilities ................................................ 16
    Section 2.4    Excluded Liabilities ....................................................................... 17
    Section 2.5    Consideration ................................................................................. 21
    Section 2.6    Assignment and Assumption of Contracts....................................... 18
    Section 2.7    Closing ........................................................................................... 19
    Section 2.8    Deliveries at Closing...................................................................... 19

**ARTICLE III. SELLERS' REPRESENTATIONS AND WARRANTIES** ............................ 20

    Section 3.1    Organization of Sellers; Good Standing ......................................... 20
    Section 3.2    Authorization of Transaction ......................................................... 21
    Section 3.3    Non-contravention ......................................................................... 21
    Section 3.4    Compliance with Laws ................................................................... 21
    Section 3.5    Title to Purchased Assets ............................................................... 22
    Section 3.6    Contracts ........................................................................................ 22
    Section 3.7    Intellectual Property....................................................................... 23
    Section 3.8    Litigation....................................................................................... 23
    Section 3.9    Employees and Employment Matters ............................................. 23
    Section 3.10   Employee Benefit Plans.................................................................. 24
    Section 3.11   Real Property ................................................................................. 25
    Section 3.12   Permits, Easements and Surface Rights.......................................... 25
    Section 3.13   Environmental................................................................................ 26
    Section 3.14   Taxes ............................................................................................. 26
    Section 3.15   Brokers' Fees ................................................................................. 27
    Section 3.16   No Other Representations or Warranties ......................................... 27

**ARTICLE IV. BUYER'S REPRESENTATIONS AND WARRANTIES**.............................. 29

    Section 4.1    Organization of Buyer.................................................................... 29
    Section 4.2    Authorization of Transaction ......................................................... 29
    Section 4.3    Non-contravention ......................................................................... 30
    Section 4.4    Financial Capacity ......................................................................... 30
    Section 4.5    Adequate Assurances Regarding Executory Contracts..................... 30
    Section 4.6    Good Faith Purchaser..................................................................... 30
    Section 4.7    Brokers' Fees ................................................................................. 31
    Section 4.8    Condition of Business .................................................................... 31

**ARTICLE V. PRE-CLOSING COVENANTS** ................................................................... 31

i

v.

Section 5.1    Certain Efforts; Cooperation.................................................................. 31
Section 5.2    Notices and Consents............................................................................ 32
Section 5.3    Bankruptcy Actions............................................................................... 33
Section 5.4    Conduct of Business ............................................................................. 36
Section 5.5    Certain Restricted Conduct ................................................................... 37
Section 5.6    Notice of Developments ....................................................................... 38
Section 5.7    Access ................................................................................................... 38
Section 5.8    Press Releases and Public Announcements ........................................... 39
Section 5.9    Contracts ............................................................................................... 39
Section 5.10   Casualty, Condemnation, Loss of Lease ............................................... 39

**ARTICLE VI. OTHER COVENANTS** ......................................................................... **40**

Section 6.1    Cooperation........................................................................................... 40
Section 6.2    Further Assurances................................................................................ 40
Section 6.3    Employee Matters ................................................................................. 41
Section 6.4    Recording of Intellectual Property Assignments ................................... 42
Section 6.5    Transfer Taxes...................................................................................... 42
Section 6.6    Wage Reporting..................................................................................... 42
Section 6.7    Collection of Accounts Receivable........................................................ 42
Section 6.8    Use of Name and Marks ....................................................................... 43

**ARTICLE VII. CONDITIONS TO CLOSING**............................................................... **43**

Section 7.1    Conditions to Buyer's Obligations......................................................... 43
Section 7.2    Conditions to Sellers' Obligations ........................................................ 44
Section 7.3    No Frustration of Closing Conditions.................................................... 44

**ARTICLE VIII. TERMINATION**..................................................................................... **45**

Section 8.1    Termination of Agreement .................................................................... 45
Section 8.2    Procedure Upon Termination .................................................................
Section 8.3    Effect of Termination ........................................................................... 46

**ARTICLE IX. MISCELLANEOUS**................................................................................... **47**

Section 9.1    Remedies............................................................................................... 57
Section 9.2    Expenses ............................................................................................... 47
Section 9.3    Entire Agreement.................................................................................. 47
Section 9.4    Incorporation of Schedules, Exhibits and Disclosure Schedule ............. 47
Section 9.5    Amendments and Waivers ..................................................................... 48
Section 9.6    Succession and Assignment................................................................... 48
Section 9.7    Notices .................................................................................................. 48
Section 9.8    Governing Law; Jurisdiction................................................................. 49
Section 9.9    Waivers of Jury Trial............................................................................ 50
Section 9.10   Severability ........................................................................................... 50
Section 9.11   No Third Party Beneficiaries ................................................................ 50
Section 9.12   No Survival of Representations, Warranties and Agreements ................. 50
Section 9.13   Construction.......................................................................................... 50

Section 9.14    Computation of Time ........................................................................ 51
Section 9.15    Mutual Drafting ............................................................................... 51
Section 9.16    Disclosure Schedule........................................................................ 51
Section 9.17    Headings; Table of Contents ............................................................ 52
Section 9.18    Counterparts; Facsimile and Email Signatures............................................ 52
Section 9.19    Time of Essence .............................................................................. 52

EXHIBITS

Exhibit A       Bill of Sale
Exhibit B       Assignment and Assumption Agreement
Exhibit C       Intellectual Property Assignment – Registered Trademarks
Exhibit D       Intellectual Property Assignment – Domain Names
Exhibit E       IP License Agreement

SCHEDULES

Schedule 2.1(b)      Sand Leases
Schedule 2.1(d)      Permits, Easements and Surface Rights
Schedule 2.1(e)      Mineral Interests
Schedule 2.1(h)      Intellectual Property
Schedule 2.1(i)      Motor Vehicle Leases
Schedule 2.5(a)(i)    DIP Obligations
Schedule 2.5(a)(iii)  Operating Costs
Schedule 2.5(a)(iv)   Assumed Liabilities
Schedule 2.6(a)(i)    Contract and Cure Schedule
Schedule 3.14(a)      Tax Returns
Schedule 5.4          Conduct of Business

DISCLOSURE SCHEDULE

Schedule 3.6 – Material Contracts
Schedule 3.7 - Intellectual Property
Schedule 3.8 - Litigation
Schedule 3.9(a) – List of Current Employees
Schedule 3.9(c) – Employee/OSHA Claims
Schedule 3.11(a)(i) – Owned Real Property
Schedule 3.11(a)(ii) – Sub-Leases of Owned Real Property
Schedule 3.11(b) – Leased Real Property
Schedule 3.13 – Reclamation, Financial Assurance, Surety Bonds and Letters of Credit
Schedule 3.14(a) – Tax Returns

v.

## STALKING HORSE ASSET PURCHASE AGREEMENT

This STALKING HORSE ASSET PURCHASE AGREEMENT (as amended or modified, this "Agreement") is entered into as of [•], 2026 (the "Execution Date"), by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, the "Sellers"), and [GrayStreet Credit, LLC], a [⬛⬛⬛⬛] limited liability company (the "Buyer").  The Buyer and each of the Sellers are referred to herein from time to time as a "Party" and collectively as the "Parties". Capitalized terms used but not otherwise defined herein shall have the meanings assigned to them in ARTICLE I.

## RECITALS

WHEREAS, the Sellers own and operate two frac sand facilities located in the Eagle Ford reserve basin of Texas (the "Business"); and

WHEREAS, Sellers have each commenced proceedings under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"), by filing voluntary petitions for relief (collectively, the "Chapter 11 Cases") with the United States Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court"), where Sellers' bankruptcy cases are jointly administered under Case No. 25-80481-mvl-11 (collectively, the "Bankruptcy Cases"); and

WHEREAS, subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to that Bidding Procedures Order and Sale Order (each defined below), Sellers wish to sell, transfer and assign to Buyer, and Buyer wishes to purchase, acquire and assume from Sellers, pursuant to Sections 105, 363, 365, and other applicable provisions of the Bankruptcy Code, the Purchased Assets (as defined below) and the Assumed Liabilities (as defined below) as of the Closing Date (as defined below); and

WHEREAS, on the Closing Date, Buyer will acquire certain assets and assume certain liabilities of the Business (as defined below) in accordance with the terms of this Agreement; and

WHEREAS, pursuant to the *Order Approving Bidding and Auction Procedures for the Sale of Substantially All Assets of the Debtors* [Docket No. 414] entered by the Bankruptcy Court on April 17, 2026 (the "Bidding Procedures Order"), Sellers shall conduct an Auction and sale process to determine the highest or otherwise best offer for the Purchased Assets, as ordered by the Bankruptcy Court in the Bidding Procedures Order; and

WHEREAS, the Contemplated Transactions (as defined below) are subject to the approval of the Bankruptcy Court and will be consummated only pursuant to the Sale Order (as defined below) to be entered by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged by the Parties, the Parties agree as follows:

v.

**AGREEMENT**

**ARTICLE I.**
**DEFINITIONS**

"Accounts Receivable" means (a) all accounts, accounts receivable, Credit Card Receivables, contractual rights to payment, notes, notes receivable, negotiable instruments, chattel paper, and vendor rebates of Sellers, and (b) any security interest, claim, remedy or other right related to any of the foregoing.

"Adverse Consequences" means all Litigations, charges, complaints, demands, injunctions, judgments, orders, decrees, awards, rulings, damages, penalties, fines, costs, reasonable amounts paid in settlement, Liabilities, obligations, Taxes, Liens, losses, expenses and fees, including court costs and reasonable attorneys' fees and expenses.

"Advisors" mean financial advisers, investment advisers, tax advisers, accountants, legal counsel, and any other organization retained by Sellers in connection with the Bankruptcy Cases or otherwise.

"Affiliate" when used with reference to another Person means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person, including those Persons defined and described as an Affiliate or "insider" in Section 101(31) of the Bankruptcy Code.

"Agreement" has the meaning set forth in the introductory paragraph to this Agreement.

"Alternate Agreement" means one or more definitive agreements with respect to one or more Alternate Transactions.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which Sellers, consistent with the Bidding Procedures Order, (a) accept a Qualified Bid other than that of Buyer, as the highest or best offer, or (b) sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a Plan (as defined below) or refinancing, all or substantially all of the Purchased Assets or the equity interests of any Seller (or agree to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Buyer.

"Approved Budget" has the meaning set forth in Section 5.5(d).

"Assigned Contracts" means each Assumed Contract that has been assumed by Sellers and assigned to Buyer pursuant to Section 2.6.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.8(a)(ii).

"Assumed Contract" means each Prepetition Contract marked as "Assumed" in accordance with the requirements of Section 2.6(a)(ii).

2

v.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumed Permits" means all Permits, Easements and Surface Rights relating to the Business that are transferable in accordance with their terms.

"Auction" means an auction for the sale and assumption of the Purchased Assets and the Assumed Liabilities to be held pursuant to the terms of the Bidding Procedures.

"Back-Up Bid" has the meaning set forth in Section 5.3(h).

"Back-Up Bidder" has the meaning set forth in Section 5.3(h).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Baseline Bid" means the consideration constituting the Stalking Horse Bid as set forth in Section 2.5(a), consisting of (i) a credit bid of all DIP Obligations (other than the Repayment Fee) then owed to the DIP Lender, inclusive of principal, accrued interest, fees, and other amounts due under the DIP Credit Agreement and associated DIP Obligations; (ii) the DIP Lender's release of its Liens on the Accounts Receivable of the Sellers; and (iii) the DIP Lender's acceptance and assumption of the administrative liabilities associated with the transfer of the Purchased Assets, including but not limited to accrued post-petition payroll and trade payables, up to a maximum of $2,500,000.00, in each case as set forth in, and subject to adjustment for any additional DIP Obligations incurred between the date of the Stalking Horse Order and the Closing Date in accordance with, the Stalking Horse Order.

"Bid Protections" has the meaning set forth in Section 5.3(b).

"Bidding Procedures" means the procedures approved pursuant to the Bidding Procedures Order that approves, *inter alia*, bidding and auction procedures to be followed by Sellers and all potential bidders for the Purchased Assets and the Assumed Liabilities.

"Bidding Procedures Order" has the meaning set forth in the Recitals.

"Bill of Sale" has the meaning set forth in Section 2.8(a)(i).

"Break-Up Fee" has the meaning set forth in Section 5.3(b).

"Business" has the meaning set forth in the Recitals.

"Business Day" means any day other than a Saturday, a Sunday or a day on which banks located in Dallas, Texas shall be authorized or required by Law to close.

"Buyer" has the meaning set forth in the preamble.

"Cash" means all cash and cash equivalents of Sellers as of the Closing.

v.

"Casualty" has the meaning set forth in Section 5.10(b).

"Casualty Proceeds" has the meaning set forth in Section 5.10(b).

"Chapter 11 Cases" has the meaning set forth in the Recitals.

"Claim" or "claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" has the meaning set forth in Section 2.7.

"Closing Date" has the meaning set forth in Section 2.7.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases.

"Condemnation" has the meaning set forth in Section 5.10(a).

"Condemnation Proceeds" has the meaning set forth in Section 5.10(a).

"Consent" means any approval, consent, ratification, permission, clearance, designation, qualification, waiver or authorization, or an Order of the Bankruptcy Court that deems or renders unnecessary the same.

"Contemplated Transactions" means the sale by Sellers to Buyer, and the purchase by Buyer from Sellers, of the Purchased Assets and the assumption by Buyer of the Assumed Liabilities.

"Contract" means any written or oral agreement, contract, lease, sublease, indenture, mortgage, instrument, guaranty, loan or credit agreement, note, bond, customer order, purchase order, sales order, sales agent agreement, supply agreement, development agreement, joint venture agreement, promotion agreement, license agreement, contribution agreement, partnership agreement, collective bargaining agreement, or other arrangement, understanding, permission or commitment that, in each case, is legally binding.

"Contract and Cure Schedule" has the meaning set forth in Section 2.6(a)(i).

"Control" means, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid" has the meaning set forth in Section 2.5(a).

"Cure Costs" means, for only the Assumed Contracts, all amounts that are determined by a final and non-appealable Order of the Bankruptcy Court must be paid, pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Buyer as provided herein.

4

v.

"Current Employees" means all employees of Sellers employed as of the day before the Closing Date with respect to the Business who are:  (a) on a Seller-approved leave of absence on the Closing Date as a result of military service, pregnancy or parental leave, disability leave, medical leave, jury duty or any other leave under applicable Law; and (b) expected to return to work in the time permitted for such leave under applicable Law and, for any other leave, in accordance with the terms of such leave but not longer than one hundred twenty (120) calendar days following the Closing Date.

"Debtors" means Sellers, as debtors and debtors in possession in the Bankruptcy Cases.

"Default" and "Event of Default" each have the meaning set forth in Section 8.1(e)(ii).

"Designee" has the meaning set forth in Section 5.3(f).

"DIP Credit Agreement" means that certain Senior Secured, Superpriority Debtor-In-Possession Master Credit Agreement, dated as of September 10, 2025, by and among the Sellers and the DIP Lender, as may be amended, restated, supplemented, waived or otherwise modified from time to time in accordance with the terms hereof and thereof.

"DIP Lender" means GrayStreet Credit, LLC.

"DIP Loan Documents" shall have the same meaning given such term in the DIP Orders.

"DIP Obligations" means the total obligations owed to Buyer, in its capacity as DIP Lender, inclusive of principal in the total amount of $13,500,000.00, accrued interest, fees, and other amounts due under the Senior Secured, Superpriority Debtor-In-Possession Master Credit Agreement dated as of September 10, 2025, as amended by the First Amendment to Senior Secured, Superpriority Debtor-in-Possession Master Credit Agreement dated as of December 12, 2025, and as further amended by the Second Amendment to Senior Secured, Superpriority Debtor-in-Possession Master Credit Agreement dated [•], 2026.

"DIP Orders" mean the First DIP Order, the Second DIP Order, and the Third DIP Order.

"Disclosure Schedules" has the meaning set forth in ARTICLE III.

"Employee Health Plan" has the meaning set forth in Section 3.10(b).

"Employee Liabilities" means each of the following:  (a) any Seller's or any of its Affiliates' obligations to contribute to, make payments with respect to or provide benefits under any Employee Health Plan; (b) any and all Liabilities arising out of, relating to or resulting from any Litigation with respect to any Current Employee, Former Employee or Service Provider relating to his/her employment or services, or termination of employment or services, with any Seller or any of its Affiliates; (c) any and all Liabilities arising out of, relating to, or resulting from the engagement or employment, or termination of the engagement or employment, of any Current Employees or Service Providers or any applicant with respect to potential employment or engagement with any Seller or any of its Affiliates, in each case whether arising before, on or after the Closing Date; and (d) any and all other Liabilities arising out of, relating to or resulting from any current, former or prospective Employees with respect to their employment or termination of

5

v.

employment with any Seller or any of its Affiliates, including (i) payments or entitlements that any Seller or any of its Affiliates may owe or have promised to pay to any current, former or prospective Employee, including wages, other remuneration, holiday, bonus, severance pay (statutory or otherwise), commissions, Taxes, or insurance premiums, (ii) any and all Liabilities relating to any employment agreement or the employment practices of any Seller or any of its Affiliates, and (iii) any and all Liabilities relating to workers' compensation claims and occupational health claims against any Seller or any of its Affiliates for accidents or injuries occurring on or prior to the Closing, if any.

"Employee Transfer Date" has the meaning set forth in Section 6.3(a).

"Environmental Laws" has the meaning set forth in Section 3.13.

"Equipment" has the meaning set forth in Section 2.1(d).

"ERISA" means the United States Employee Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Claims" means all causes of action, lawsuits, claims, rights of recovery and other similar rights of each Debtor and its bankruptcy estate, other than Claims associated with Liabilities assumed by Buyer pursuant to Section 2.3.

"Excluded Employee" has the meaning set forth in Section 6.3(c).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the preamble to this Agreement.

"Final DIP Order" means the *Final Order Granting Debtors' Motion for Interim and Final Approval of Superpriority and First Priority Postpetition Financing* [Docket No. 140].

"Final Order" means an order, ruling, decision, verdict, decree, writ, subpoena, mandate, precept, command, directive, consent, approval, award, judgment, injunction or other similar determination or finding by, before, or under the supervision of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by applicable Law and any deadline provided by applicable Law to file any such notice of appeal or petition for certiorari shall have passed without any such notice of appeal or petition for certiorari having been filed.

"Former Employees" means all individuals who have been employed by Sellers or their Affiliates who are not Current Employees.

6

v.

"Governmental Authority" means any United States federal, state, local or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Healthcare Reform Laws" has the meaning set forth in Section 3.10(b).

"Initial Overbid Increment" means an initial overbid increment of $1,500,000 above the sum of the Baseline Bid plus the aggregate amount of the Bid Protections, as established in the Stalking Horse Order.

"Insurance Policy" means each primary, excess and umbrella insurance policy, bond and other form of insurance owned or held by or on behalf of Sellers and their operations, properties and assets, or providing insurance coverage to the Business.

"Intellectual Property" means all of the following and similar intangible property and related proprietary rights, interests and protections, however arising, pursuant to the Laws of any jurisdiction throughout the world: (a) trademarks, service marks, trade names, brand names, logos, trade dress and other proprietary indicia of goods and services, whether registered, unregistered or arising by Law, and all registrations and applications for registration of such trademarks, including intent-to-use applications, and all issuances, extensions and renewals of such registrations and applications; (b) internet domain names, whether or not trademarks, registered in any generic top level domain by any authorized private registrar or Governmental Authority; (c) original works of authorship in any medium of expression, whether or not published, all copyrights (whether registered, unregistered or arising by Law), all registrations and applications for registration of such copyrights, and all issuances, extensions and renewals of such registrations and applications; (d) confidential information, formulas, designs, devices, technology, know-how, research and development, inventions, methods, processes, compositions and other trade secrets, whether or not patentable; and (e) patented and patentable designs and inventions, all design, plant and utility patents, letters patent, utility models, pending patent applications and provisional applications and all issuances, divisions, continuations, continuations-in-part, reissues, extensions, re-examinations and renewals of such patents and applications.

"Intellectual Property License" means:  (a) any Contract that contains any grant by any Seller to any third Person of any right to use, publish, perform or exploit any of the Purchased Intellectual Property; and (b) any Contract (other than a Contract concerning the licensing of commercially available software, including "shrink wrap" and "click wrap" licenses) that contains any grant by any third Person to any Seller of any right to use, modify, copy, publish, perform or exploit any Intellectual Property of such third Person concerning or relating to the Business.

"Intellectual Property Assignments" has the meaning set forth in Section 2.8(a)(iii).

"Inventory" means all of Sellers' tangible property used in the Business, including silica sand mined, processed, and stored at the Plants and other related products included in the Purchased Assets that are permitted to be sold and transferred under applicable Law.

"IP Lease Assignments" has the meaning set forth in Section 2.8(a)(iv).

"IRC" means the United States Internal Revenue Code of 1986, as amended.

7

v.

"IRS" means the Internal Revenue Service.

"Lands" has the meaning set forth in Section 2.1(b).

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or Order of any Governmental Authority.

"Leased Real Property" means all leasehold or sub-leasehold estates and other rights to use or occupy any land, buildings, structures, improvements, fixtures or other interest in real property of any Seller which is used in the Business.

"Leases" means all leases, subleases, unexpired leases, unexpired subleases, licenses, concessions and other Contracts, including all amendments, extensions, renewals, guaranties and other agreements with respect thereto, in each case pursuant to which any Seller holds any Leased Real Property.

"Liability" means all indebtedness, losses, claims, damages, expenses, fines or other penalties, costs, royalties, proceedings, deficiencies, duties, obligations, and other liabilities (including those arising out of any Litigation, such as any settlement or compromise thereof or judgment or award therein) of a Person (whether absolute, accrued, contingent, fixed, liquidated or unliquidated, or otherwise, and whether known or unknown, and whether due or to become due, and whether in contract, tort, strict liability, or otherwise, and whether or not resulting from third-party claims).

"Lien" as applied to any Person means, with respect to any property or asset, any mortgage, deed of trust, lien (statutory or otherwise), encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at Law or in equity and whether before any Governmental Authority or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that has or could reasonably be expected to have a material adverse effect on (a) the condition (financial or otherwise), or results of operations of Sellers, the Business, or the Purchased Assets, in each case taken as a whole, (b) the ability of the Sellers to conduct the Business consistent with recent history, or (c) the ability of Sellers to perform their obligations under this Agreement and the Related Agreements in material compliance with the requirements thereof or to consummate the Contemplated Transactions, but excluding (i) any change or effect to the extent that it results from or arises out of (A) the consequences of the filing of the Chapter 11 Cases and the impact thereof on the condition

8

v.

(financial or otherwise), business, properties, assets, or results of operations of Sellers, the Business or the Purchased Assets, (B) the execution and delivery of this Agreement or the announcement thereof or consummation of the Contemplated Transactions, (C) changes in (or proposals to change) Law, generally accepted accounting principles, or other accounting regulations or principles, or (D) any action contemplated by this Agreement or taken at the request of Buyer: (ii) any change or effect generally applicable to economic or political conditions or the securities or financial markets in any country or region, (iii) any outbreak or escalation of hostilities or war or any act of terrorism, or (iv) any failure by the Business to meet any internal or published projections, forecasts or revenue or earning predictions (provided that the underlying causes of such failures (subject to the other provisions of this definition) shall not be excluded), in the case of clauses (ii) through (iv), which do not disproportionately affect Sellers relative to other industry participants.

"Material Contracts" has the meaning set forth in Section 3.6.

"Mineral Interests" has the meaning set forth in Section 2.1(e).

"MSHA" means the Federal Mine Safety and Health Act of 1977.

"Operating Costs" has the meaning set forth in Section 2.5(c).

"Order" means any judgment, decree, ruling, decision, opinion, injunction, assessment, attachment, undertaking, award, charge, writ, executive order, judicial order, administrative order or any other order issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the ordinary course of business of Sellers consistent with past custom and practice and subject to any modifications of such practice as a result of the filing of the Bankruptcy Cases.

"Owned Real Property" has the meaning set forth in Section 3.11(a).

"Party" or "Parties" has the meaning set forth in the preamble.

"Permit" means any approval, authorization, consent, license, order, permit, waiver, easement, qualification, grant, concession, exception, ruling, waiver, variance, registration, certificate or other form of permission, or similar right issued, granted, given or otherwise obtained from or by any Governmental Authority, under the authority thereof or pursuant to any applicable Law.

"Permits, Easements and Surface Rights" has the meaning set forth in Section 2.1(d).

"Permitted Liens" means: (a) Liens for Taxes not yet delinquent or which are being contested in good faith by appropriate proceedings, (b) with respect to leased or licensed personal property, the terms and conditions of the lease or license applicable thereto to the extent constituting an Assigned Contract, (c) mechanics Liens and similar Liens for labor, materials or supplies provided with respect to real property incurred in the Ordinary Course of Business or otherwise approved by the Bankruptcy Court for amounts which are not delinquent or which are being contested in good faith by appropriate proceedings in an aggregate amount not to exceed

9

v.

$25,000, (d) with respect to real property, zoning, building codes and other land use Laws regulating the use or occupancy of such real property or the activities conducted thereon which are imposed by any Governmental Authority having jurisdiction over such real property which are not violated by the current use or occupancy of such real property or the operation of the Business, except where any such violation would not, individually or in the aggregate, materially impair the use, operation or transfer of the affected property or the conduct of the Business thereon as it is currently being conducted, (e) Liens securing the Senior Secured Prepetition Obligations and the DIP Obligations, and (f) with respect to each tract of real property, easements, covenants, conditions, restrictions and other similar matters affecting such real property and other encroachments that do not or would not materially impair the use or occupancy of such real property or materially interfere with the operation of the Business at such real property.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Authority or any group or syndicate of any of the foregoing.

"Petition Date" means the date of the filing of the Bankruptcy Cases.

"Plan" means a plan of reorganization or liquidation proposed by Sellers and/or any party in interest.

"Plants" means the Sellers' frac sand plant facilities located at (i) 694 IH, 37 North Street, Pleasanton, Texas 78064 (the "FCI North Plant") and (ii) 254 Eagle Ford Way, Three Rivers, Texas 78071 (the "FCI South Plant").

"Prepetition Contracts" means all Contracts to which any Seller is a party that were entered into prior to the Petition Date, including modifications or amendments to any such Contracts entered into on or after the Petition Date.

"Prepetition Loan Documents" has the meaning given such term in the First DIP Order.

"Purchase Price" has the meaning set forth in Section 2.5.

"Purchased Assets" has the meaning set forth in Section 2.1; provided, however, that, notwithstanding the foregoing or anything contained in this Agreement to the contrary, the Purchased Assets shall not include any Excluded Assets.

"Purchased Intellectual Property" means any and all Intellectual Property owned by any Seller or its Affiliates or Subsidiaries, including all rights of action and remedies for past, present and future infringements thereof.

"Qualified Bid" means a qualified bid as determined in accordance with the Bidding Procedures Order.

"Qualified Bidder" has the meaning set forth in Bidding Procedures Order.

"Real Property" means the Leased Real Property and the Owned Real Property.

10

v.

"Records" means the books, records, information, ledgers, files, invoices, documents, work papers, correspondence, lists (including customer lists, supplier lists and mailing lists), plans (whether written, electronic or in any other medium), drawings, designs, specifications, creative materials, advertising and promotional materials, marketing plans, studies, reports, data and similar materials related to the Business.

"Rejected Contracts" means each Prepetition Contract marked as "Rejected" as described in Section 2.6(a)(ii).

"Related Agreements" means the Bills of Sale, the Assignment and Assumption Agreements, the Intellectual Property Assignments, IRS Forms W-9, and any other instruments of transfer and conveyance as may be required under applicable Law to convey valid title of the Purchased Assets to Buyer.

"Repayment Fee" shall have the meaning set forth in the DIP Orders.

"Representative" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"Sale Hearing" means the hearing scheduled with the Bankruptcy Court to consider entry of the Sale Order.

"Sale Order" means an Order of the Bankruptcy Court in the Bankruptcy Cases approving the sale to Buyer consistent with the terms of this Agreement, Sections 363(b) and 363(f) of the Bankruptcy Code, and otherwise in form and substance acceptable to Buyer in its sole discretion.

"Sale Order Deadline" means the outside date set for Closing of the Contemplated Transactions in the Sale Order, which date shall be no later than the DIP Maturity Date as defined in the DIP Orders. "DIP Maturity Date" has the meaning given such term in the DIP Orders.

"Second DIP Order" means the *Order Approving Debtors' Emergency Motion for Approval of Additional Postpetition Financing on First Priority, Priming Basis* [Docket No. 266].

"Seller" or "Sellers" has the meaning set forth in the preamble.

"Seller Transaction Expenses" means the collective amounts payable by Sellers for all out-of-pocket fees and expenses incurred in connection with the preparation, negotiation, execution and consummation of the Contemplated Transactions, including the fees of investment bankers and brokers.

"Sellers' Knowledge" (or words of similar import) means the actual knowledge, after good faith inquiry, of Kevin Collier, John Nelson or Paul Sheperd.

"Senior Secured Prepetition Obligations" has the meaning given such term in the First DIP Order.

v.

"Service Provider" means any consultant or independent contractor who is or has been performing services to any Seller.

"Stalking Horse Bid" means the Purchase Price offered by Buyer for the Purchased Assets in accordance with the terms and conditions set forth in this Agreement.

"Stalking Horse Bidder" means the Buyer.

"Stalking Horse Order" means the *Order Approving the Debtors' Emergency Motion (I) Approving Additional Postpetition Financing on First Priority, Priming Basis, (II) Approving the Debtors' Selection of a Stalking Horse Bidder, (III) Approving Bid Protections in Connection Therewith, and (IV) Granting Related Relief* [Docket No. [•]] entered by the Bankruptcy Court on [•], 2026, approving, among other things, the Buyer as the Stalking Horse Bidder and the Bid Protections.

"Subsidiary" means, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors thereof (or other persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof.  A Person or Persons own a majority ownership interest in a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all direct or indirect Subsidiaries of such Person.

"Surface Rights" means the rights granted to Sellers to use designated surface areas for (a) the mining of silica sand, (b) the pumping and distribution of sub-surface water, (c) the erection of one or more Plants to sort, wash and process silica sand, and (d) erect buildings for the storage of processed silica sand and support mining and Plant operations.

"Tax" or "Taxes" means any United States federal, state or local or non-United States taxes, including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"Taxing Authority" means any government, or agency, instrumentality or employee thereof, charged with the administration of any Law or regulation relating to Taxes.

12

v.

"Tax Returns" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"Third DIP Order" means the *Order Approving the Debtors' Emergency Motion (I) Approving Additional Postpetition Financing on First Priority, Priming Basis, (II) Approving the Debtors' Selection of a Stalking Horse Bidder, (III) Approving Bid Protections in Connection Therewith, and (IV) Granting Related Relief* [Docket No. [•]] entered by the Bankruptcy Court on [•], 2026.

"Transfer Tax" has the meaning set forth in Section 6.5.

"Transferred Employee" has the meaning set forth in Section 6.3(c).

"Trigger Event" has the meaning set forth in Section 5.3(b).

"WARN Act" means the Worker Adjustment and Retraining Notification Act (29 USC § 2101) and any similar Law.

"WARN Liability" means any Liability incurred as a result of a breach of the WARN Act.

"Winning Bidder" means the "Winning Bidder" as defined in the Bidding Procedures Order.

## ARTICLE II.
## PURCHASE AND SALE

**Section 2.1     Purchase and Sale of Purchased Assets**.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer shall purchase, acquire and accept from the Sellers, on an "AS IS, WHERE IS" AND "WITH ALL FAULTS" basis (except with respect to the representations and warranties made in ARTICLE III) and without any representation or warranty on the part of Sellers as to fitness, merchantability, or otherwise, and Sellers shall sell, transfer, assign, convey and deliver to Buyer, all of Sellers' rights, title and interests in and to tangible and intangible real and personal property assets used or held for use by Sellers in the operation of the Business (the "Purchased Assets"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), for the consideration specified in Section 2.5.  Without limiting the generality of the foregoing, the Purchased Assets shall include, without limitation, the following (except to the extent it is included in the definition of Excluded Assets):

(a)     the Real Property;

(b)     the sand leases and operating rights in which Sellers hold any right, title or interest of any kind with respect to silica sand or other minerals as set forth in the agreements listed on Schedule 2.1(b) hereto (the "Sand Leases"), together with any and all other right, title and interest of Sellers in the Lands (or portion thereof) described in the Sand Leases (collectively, the "Lands");

v.

(c)      all facilities, machinery, equipment, field offices, warehouses, towers, silos, weigh scales, conveyors, dryers, screens, motor vehicles, trailers, mobile mining and loader fleet, railroad loadout equipment, computer equipment, hardware and peripherals, process control systems, information technology infrastructure, communications equipment, fixtures, furniture, office supplies, production supplies, spare parts, and tools located at the Plants or any other facility of Sellers and other tangible personal property of any kind owned by Sellers (including any of the foregoing property that is subject to a personal property lease, but only to the extent that Buyer assumes such lease as an Assigned Contract) associated with (1) the mining, blasting, drilling, digging, quarrying, removing, producing, crushing, processing, storing, stockpiling, loading and hauling silica sand from the Lands or (2) the sale and transportation of silica sand to or from the Plants (collectively, the "Equipment");

(d)      all surface easements, rights-of-way, licenses, Permits (including, to the extent transferable, Federal Communication Commission licenses), servitudes, surface leases, surface use agreements, surface fee tracts, and similar rights, obligations and interests applicable to or used in the Business (the "Permits, Easements and Surface Rights"), including those described in Schedule 2.1(d);

(e)      any and all mineral interests in which Sellers hold any right, title or interest of any kind located on or attributable to the Leases or Lands (the "Mineral Interests"), including those described in Schedule 2.1(e) and including all rights and obligations pertaining to the Mineral Interests under any of the Assumed Contracts;

(f)      all Inventory;

(g)      to the maximum extent permitted by the Bankruptcy Code, all Assigned Contracts, the rights and benefits accruing thereunder, and all documents related thereto;

(h)      all Intellectual Property, if any, and all Intellectual Property Licenses listed on Schedule 2.1(h);

(i)      all rights under leases for the motor vehicles listed on Schedule 2.1(i);

(j)      all Records, including Records related to Taxes paid or payable by any Seller related to the Business; *provided*, that Sellers are entitled to retain copies of all Records and Buyer will make all such Records available to any Debtor upon reasonable request and at such Debtor's expense;

(k)      all goodwill associated with the Business and the Purchased Assets, including all goodwill associated with any Intellectual Property owned by Sellers and all rights under any confidentiality agreements executed by any third party for the benefit of any Seller to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

(l)      all rights of Sellers under non-disclosure or confidentiality, noninterference, inventions assignment, non-compete, or non-solicitation agreements with Current Employee, Former Employee, Service Provider or managers and members of Sellers to the extent relating to the Purchased Assets and/or the Assumed Liabilities (or any portion thereof);

14

v.

(m)      the amount of, and all rights to any, insurance proceeds received by any of Sellers after the Execution Date in respect of (i) the loss, destruction or condemnation of any Purchased Assets occurring prior to, on or after the Closing or (ii) any Assumed Liabilities, including the Condemnation Proceeds and the Casualty Proceeds;

(n)      all rights under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers, contractors and any other Person to the extent relating to equipment purchased, products sold, or services provided, to Sellers, to the extent affecting any Purchased Assets and/or Assumed Liabilities;

(o)      all telephone numbers, fax numbers, e-mail addresses, websites, URLs and internet domain names owned by Sellers or otherwise utilized by Sellers in conducting the Business; and

(p)      all other assets that are related to or used in connection with the Business (but excluding all of the Excluded Assets).

**Section 2.2      Excluded Assets**. Notwithstanding Section 2.1, Buyer expressly understands and agrees that Buyer is not purchasing or acquiring, and Sellers are not selling or assigning, any of the following assets, properties and rights of Sellers (the "Excluded Assets"):

(a)      all Cash in the hands of Sellers on the Closing Date;

(b)      all Accounts Receivable due and owing to Sellers as a result of Business operations up to the Closing Date;

(c)      all bank accounts of Sellers, safety deposit boxes, lock boxes and other cash management accounts (including cash amounts in any accounts against which outstanding bank drafts have been written, to the extent of the amount of such bank drafts);

(d)      neither Seller's articles of incorporation, bylaws, company agreements or other organizational documents, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock certificates and other documents relating to the organization, maintenance and existence of either Seller as a limited liability company;

(e)      all equity securities of either Seller and all net operating losses of either Seller;

(f)      all Rejected Contracts;

(g)      the Excluded Claims;

(h)      any loans or notes payable to any Seller or any of its Affiliates from any employee of any Seller or any of its Affiliates (other than Ordinary Course of Business employee advances);

15

v.

(i)     any (1) confidential personnel and medical Records pertaining to any Current Employees or Former Employees to the extent the disclosure of such information is prohibited by applicable Law, (2) other Records that Sellers are required by Law to retain and (3) any Records or other documents relating to the Bankruptcy Cases that are protected by the attorney-client privilege; *provided* that Buyer shall have the right to make copies of any portions of such retained Records referenced in subsection (2) to the extent that such portions relate to the Purchased Assets;

(j)     all Permits other than the Assumed Permits;

(k)     any compensation, including all assets maintained or held (including all deposits) pursuant to or in connection with the Employee Health Plans of Sellers;

(l)     any claim, right or interest to any Tax refund or reimbursement due to Sellers or their Affiliates, except to the extent relating to any Tax period or portion of a Tax period for which Buyer is responsible for the applicable Tax under this Agreement;

(m)     all Insurance Policies (including with respect to directors' and officers' liability insurance) and all rights, claims and proceeds payable thereunder, except to the extent included in the Purchased Assets, or required to be conveyed to Buyer pursuant to Section 5.10, including rights to discounts, credits and refunds arising from such Insurance Policies;

(n)     all retainers held by Sellers' Advisors; and

(o)     the rights of Sellers under this Agreement and the Related Agreements and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement.

**Section 2.3    Assumption of Assumed Liabilities**.  On the terms and subject to the conditions of this Agreement, at the Closing (or, with respect to Assumed Liabilities under Assigned Contracts or Assumed Permits that are assumed by Buyer after the Closing, such later date of assumption as provided in Section 2.6), the following obligations of Sellers, and no others, shall be assumed by Buyer (the "Assumed Liabilities"):

(a)     the Operating Costs assumed by Buyer as part of the Purchase Price;

(b)     all Liabilities arising under the Assigned Contracts that become due and payable after Closing (but not arising out of any breach or default thereof prior to the Closing and not with respect to any obligations thereunder that are required to be performed by Sellers on or prior to the Closing);

(c)     all Liabilities arising from or related to the Purchased Assets from and after the Closing;

(d)     [all Cure Costs payable with respect to the Assigned Contracts, including Cure Costs for the Assigned Contracts that are Leases];

(e)     all property Taxes arising in connection with Leases or other Purchased Assets that are due and owing after the Closing Date;

16

v.

(f)     any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assumed Contracts (as contemplated by Section 365 of the Bankruptcy Code); and

(g)     all Taxes owed to any Tax authority assessed with respect to the Purchased Assets for any period ending after the Closing Date, including, without limitation, all Transfer Taxes.

**Section 2.4     Excluded Liabilities**.  Notwithstanding anything herein to the contrary, except for the Assumed Liabilities, the Parties expressly acknowledge and agree that Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of Sellers whatsoever associated with the Purchased Assets, the Business or with respect to any other properties, rights, contracts or other assets of Sellers, existing on the Closing Date, including but not limited to any of the following Liabilities which, in each case, Sellers shall expressly retain (collectively, the "Excluded Liabilities"):

(a)     all Taxes owed by Sellers to any Tax authority for any period or portion thereof ending on or prior to the Closing Date (except to the extent such Taxes are expressly provided as Assumed Liabilities pursuant to Section 2.3);

(b)     all Liabilities of Sellers related to the Excluded Assets, whether such Liabilities arise before or after the Closing Date (except to the extent such Liabilities are expressly provided as Assumed Liabilities pursuant to Section 2.3);

(c)     all Liabilities of Sellers owing to any Affiliate or Subsidiary;

(d)     any and all Employee Liabilities except for the post-petition payroll costs to be paid by Buyer as a portion of the Purchase Price;

(e)     all Liabilities with respect to Seller Transaction Expenses; and

(f)     all Excluded Claims.

**Section 2.5     Consideration**.

In consideration of the sale of the Purchased Assets to Buyer, and in reliance upon the representations, warranties, covenants and agreements of Sellers set forth herein, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for sale and transfer of the Purchased Assets (the "Purchase Price") shall be composed of the following:

(a)     the aggregate amount of the DIP Obligations (as set forth in Schedule 2.5(a)(i)), which shall exclude the Repayment Fee, by means of a credit bid (the "Credit Bid"), with the amount of the DIP Obligations subject to adjustment for any additional DIP Obligations incurred between the date of the Stalking Horse Order and the Closing Date; *plus*

(b)     the [Cure Costs]; *plus*

17

v.

(c)     the liabilities of the Sellers arising from the operations of the Purchased Assets, including but not limited to, accrued post-petition payroll and trade payables up to a maximum amount of $2,500,000.00 as set forth on Schedule 2.5(a)(iii) (the "Operating Costs"); *plus*

(d)     the Assumed Liabilities listed on Schedule 2.5(a)(iv); and

(e)     the release by the DIP Lender of its Liens on the Accounts Receivable of the Sellers, in accordance with the Stalking Horse Order.

For the avoidance of doubt, the sum of the components of the Purchase Price set forth in this Section 2.5 is projected to equal an approximate amount of $21,000,000.00.

**Section 2.6     Assignment and Assumption of Contracts**.

(a)     Assignment and Assumption of Prepetition Contracts at Closing.

(i)     Schedule 2.6(a)(i) attached hereto sets forth (x) each Prepetition Contract (including each Lease) to which any Seller is a party or by which any Seller is bound and that is used in or related to the Business or any of the Purchased Assets, (y) all Cure Costs (if any) for each such Prepetition Contract, and (z) a description of each such Prepetition Contract (such schedule is referred to herein as the "Contract and Cure Schedule").

(ii)     No later than two (2) Business Days prior to the Sale Hearing, Buyer shall have delivered notice to Sellers (including by e-mail notice from Buyer's legal counsel to Sellers' legal counsel), which Sellers shall then file with the Bankruptcy Court, designating each Prepetition Contract on the Contract and Cure Schedule as "Assumed" or "Rejected." Each Prepetition Contract so designated as "Assumed" is referred to herein as an Assumed Contract; and each Prepetition Contract so designated as "Rejected" is referred to herein as a Rejected Contract. Notwithstanding the foregoing, Buyer shall have the right (in its sole and absolute discretion) to change any such designation and to notify Sellers in writing of any such change until the Closing in which case such Prepetition Contract shall become an Assumed Contract or a Rejected Contract as indicated by such changed designation.

(iii)     Sellers shall provide timely and proper written notice of the procedures for the assumption and assignment of Prepetition Contracts to parties to all Prepetition Contracts and will take all other actions necessary to cause all Assumed Contracts to be assumed by Sellers (to the extent not already assumed pursuant to prior Bankruptcy Court Order(s)) and assigned to Buyer. Buyer shall, at or prior to Closing, comply with all requirements under Section 365 of the Bankruptcy Code necessary to assign to Buyer the Assumed Contracts.

(iv)     Sellers shall be responsible for the verification of all Cure Costs for each Assumed Contract and shall use commercially reasonable efforts to correctly calculate the proper Cure Costs, if any, for each Assumed Contract prior to the filing of the Contract and Cure Schedule.  To the extent that any Assumed Contract requires the payment of Cure Costs in order to be assumed pursuant to Section 365 of the Bankruptcy Code, whether determined prior to or after the Closing, the Cure Costs related to such Assumed Contract, or any portion thereof, shall be paid by Buyer (if the Cure Costs are Assumed Liabilities) on such date that the Assumed

18

v.

Contract is assumed by the applicable Seller and assigned to Buyer or on such other date as agreed to between Buyer and the counterparty to such Assumed Contract.

(v)    At Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents requested by Buyer, assign to Buyer (the consideration for which is included in the Purchase Price), and Buyer shall assume from Sellers (to the extent not already assumed pursuant to prior Bankruptcy Court Order(s)), each of the Assumed Contracts.

(b)    Assigned Contracts. Unless otherwise agreed by Sellers and Buyer, at the Closing, Sellers shall promptly cause all Rejected Contracts to be rejected pursuant to Section 365 of the Bankruptcy Code or as soon after Closing, as practicable. On each date that each Assumed Contract is assumed and assigned to Buyer pursuant to this Section 2.6 (including, without limitation, the approval of the assumption and assignment thereof by the Bankruptcy Court), such Assumed Contract shall constitute an "Assigned Prepetition Contract" and shall be an Assigned Prepetition Contract for all purposes under this Agreement; *provided* that no Assumed Contract shall be assigned or transferred pursuant to this Agreement unless the Bankruptcy Court has previously approved the assumption and assignment thereof to Buyer.

**Section 2.7    Closing**.  The closing of the Contemplated Transactions (the "Closing") shall take place remotely by electronic exchange of counterpart signature pages on the first Business Day on which all conditions to the obligations of Sellers and Buyer to consummate the Contemplated Transactions set forth in ARTICLE VII shall have been satisfied or waived (other than conditions with respect to actions Sellers and/or Buyer will take at the Closing itself, but subject to the satisfaction or waiver of those conditions) provided that the Closing shall take place on or before the Sale Order Deadline (the "Closing Date"). The Closing shall occur at 11:00 a.m. Central Time on the Closing Date, but shall be deemed to have occurred at 12:01 a.m. on the Closing Date, or at such other time or on such other date as shall be mutually agreed upon by Sellers and Buyer prior thereto.

**Section 2.8    Deliveries at Closing**.

(a)    At the Closing, Sellers shall deliver to Buyer the following documents and other items, duly executed by Sellers, as applicable:

(i)    one or more Bills of Sale substantially in the form of Exhibit A attached hereto (each, a "Bill of Sale");

(ii)    one or more Assignment and Assumption Agreements substantially in the form of Exhibit B attached hereto (each, an "Assignment and Assumption Agreement");

(iii)    instruments of assignment substantially in the forms of Exhibit C, and Exhibit D attached hereto for each registered trademark and domain name, respectively, transferred or assigned hereby and for each pending application therefor (collectively, the "Intellectual Property Assignments");

19

v.

(iv)    instruments of assignment substantially in the forms of <u>Exhibit E</u> attached hereto for each Intellectual Property License transferred or assigned hereby (the "<u>IP Lease Assignments</u>");

(v)    a completed and duly executed IRS Form W-9 from each Seller;

(vi)    originals (or, to the extent originals are not available, copies) of all Assigned Contracts (together with all material amendments, supplements or modifications thereto) to the extent not otherwise already made available to Buyer;

(vii)    physical possession of all Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(viii)    certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

(ix)    all other documents, instruments and writings reasonably requested by Buyer to be delivered by Sellers at or prior to the Closing pursuant to this Agreement.

(b)    At the Closing, Buyer shall deliver to Sellers the following documents, cash amounts and other items, duly executed by Buyer, as applicable:

(i)    the Bill(s) of Sale;

(ii)    the Assignment and Assumption Agreement(s);

(iii)    the Intellectual Property Assignments;

(iv)    the IP Lease Assignments;

(v)    Cure Costs by wire transfer of immediately available funds to the accounts designated by the applicable counterparties to the applicable Assumed Contracts; and

(vi)    all other documents, instruments and writings reasonably requested by Sellers to be delivered by Buyer at or prior to the Closing pursuant to this Agreement.

## ARTICLE III.
## SELLERS' REPRESENTATIONS AND WARRANTIES

Each Seller, jointly and severally, represents and warrants to Buyer that except as set forth in the disclosure schedules accompanying this Agreement (the "<u>Disclosure Schedules</u>"):

**Section 3.1    <u>Organization of Sellers; Good Standing</u>**.

(a)    Each Seller is duly formed, validly existing and in good standing under the Laws of its state of formation and has all necessary power and authority to own, lease and operate its properties and to conduct its business in the manner in which its Business is currently being conducted. Each Seller has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on the Business as currently conducted.

v.

(b)      Each Seller is duly authorized to do business and is in good standing as a foreign limited liability company in each jurisdiction where the ownership or operation of the Purchased Assets or the conduct of the Business requires such qualification, except for failures to be so authorized or be in such good standing, as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.2      Authorization of Transaction**.  Subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing:

(a)      each Seller has all requisite power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder; the execution, delivery and performance of this Agreement and all Related Agreements to which such Seller is a party have been duly authorized by such Seller and no other action on the part of such Seller is necessary to authorize this Agreement or the Related Agreements to which it is party or to consummate the Contemplated Transactions; and

(b)      this Agreement has been duly and validly executed and delivered by each Seller, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the Related Agreements to which any Seller is a party will have been duly and validly executed and delivered by each such Seller, as applicable. Assuming this Agreement constitutes a valid and legally binding obligation of Buyer, this Agreement constitutes the valid and legally binding obligations of Sellers, enforceable against Sellers in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that a Seller is a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Buyer, each Related Agreement to which any Seller is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligations of such Seller, as applicable, enforceable against each such Seller, as applicable, in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 3.3      Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements), will, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, (a) conflict with or result in a breach of the certificate of formation, articles of organization, operating agreement, limited liability company agreement, or other organizational documents of any Seller, (b) violate any Law to which any Seller is, or its respective assets or properties are, subject, or (c) subject to the entry of the Sale Order, conflict with, any Assumed Contract, and, in the case of clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 3.4      Compliance with Laws**.  Sellers are, and have been, in compliance in all material respects with all Laws applicable to the Business or the Purchased Assets. To Sellers' Knowledge, no Seller has received any oral or written notice or other written communication from any Governmental Authority or other Person (a) asserting any violation of, or failure to comply

21

v.

with, any requirement of any Law, or (b) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Permit.

**Section 3.5** **Title to Purchased Assets**.  Sellers, as of the Closing, will have good and valid title to, or, in the case of leased assets, will have good and valid leasehold interests in, the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), subject to entry of the Sale Order.  At the Closing, Sellers will transfer, sell, assign and convey, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at such time, good and valid title to, or valid leasehold interests in, all of the Purchased Assets, free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities), to the fullest extent permissible under Section 363(f) of the Bankruptcy Code and subject to the rights of licensees under Section 365(n) of the Bankruptcy Code.

**Section 3.6** **Contracts**.   Schedule 3.6 of the Disclosure Schedule sets forth the following Contracts (all Contracts listed or required to be listed herein are referred to as "Material Contracts") as of the Execution Date:

> (a)    all Leases (including all amendments thereto) that pertain to the Business;

> (b)    all Contracts under which any Seller leases personal property in connection with the Business;

> (c)    all Contracts under which the Sellers have paid in excess of $25,000 over the immediately preceding 12-month period;

> (d)    all Contracts that are material to the operation of the Business, in the reasonable discretion of Sellers, and that Sellers' counterparties may terminate without more than 90 days' prior notice without a breach thereof by Sellers;

> (e)    all Contracts for the sale of any Purchased Assets or for the grant to any Person of any option, right of first refusal or preferential or similar right to purchase any of the Purchased Assets;

> (f)    all employment, confidentiality, and/or non-competition Contracts with employees of any Seller and Contracts with independent contractors or consultants (or similar arrangements for personal services) engaged in connection with the Business that in each case provide for base compensation in excess of $50,000 per year;

> (g)    all Contracts with any material supplier of the Business; and

> (h)    all Contracts with any Governmental Authority related to the Business.

Except as set forth on Schedule 3.6 of the Disclosure Schedule, each of the Material Contracts is in full force and effect and is the legal, valid and binding obligation of the applicable Seller and, to Sellers' Knowledge, of the other parties thereto, enforceable against each of them in accordance with its terms, and upon consummation of the Contemplated Transaction, shall continue in full force and effect without penalty or other adverse consequences.  Except as set

22

v.

forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, no Seller is in material default under any Material Contract, nor, to Sellers' Knowledge, is any other party to any Material Contract in breach of or default thereunder, and no event has occurred that with the lapse of time or the giving of notice or both would constitute a breach or default by any Seller or any other party thereunder.  Except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, no party to any of the Material Contracts has exercised any termination rights with respect thereto, and no party has given notice of any significant dispute with respect to any Material Contract. Sellers have and will transfer to Buyer at the Closing, good and valid title to the Assigned Contracts, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities). To Sellers' Knowledge and except as set forth on <u>Schedule 3.6 of the Disclosure Schedule</u>, Sellers have delivered to Buyer true, correct and complete copies of all of the Material Contracts, together with all amendments, modifications or supplements thereto.

**Section 3.7** **<u>Intellectual Property</u>**.

(a) To Sellers' Knowledge, except for those items of Intellectual Property described in clause (d) of the definition thereof, <u>Schedule 3.7 of the Disclosure Schedule</u> sets forth a true and complete list of all material registered Intellectual Property and material Intellectual Property Licenses (excluding licenses for Off-the-shelf software)that are owned by, or licensed to, any Seller and used in or related to the Business.  To Sellers' Knowledge Sellers own or have valid rights to use all such Intellectual Property free and clear of all Liens (except for Permitted Liens) and Liabilities (other than Assumed Liabilities) and subject to entry of the Sale Order.

(b) To Sellers' Knowledge, the conduct of the Business as currently conducted does not infringe upon or otherwise violate the Intellectual Property of any other Person in any material respect.

**Section 3.8** **<u>Litigation</u>**.   <u>Schedule 3.8 of the Disclosure Schedule</u> sets forth all unresolved material Litigation brought by or against the Business, the Purchased Assets, or any Seller, and to Sellers' Knowledge, there is no other material Litigation threatened in writing, before any Governmental Authority against any Seller which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or delay the Contemplated Transactions.

**Section 3.9** **<u>Employees and Employment Matters</u>**.

(a) <u>Schedule 3.9(a) of the Disclosure Schedule</u> sets forth a list as of the Execution Date of Current Employees of Sellers and their respective (i) name and identification number, (ii) titles, responsibilities, and classification as exempt or non-exempt, (iii) dates of hire, (iv) current base salary or wages, and whether they are paid hourly or salary or another basis, (v) all bonuses, commissions, and incentive compensation paid during 2024 and targeted for 2025, (vi) accrued vacation and sick leave, (vii) the location at which such employee performs services (if other than the Plants), (viii) full or part-time status, and (ix) active or inactive status, including identification of any current paid or unpaid leave of absence.

(b) No Seller is a party to or bound by any collective bargaining agreement covering the Current Employees (as determined as of the Execution Date), nor is there any ongoing

23

v.

strike, walkout, work stoppage, or other material collective bargaining dispute affecting any Seller with respect to the Business. To Sellers' Knowledge, there is no organizational effort being made or threatened by or on behalf of any labor union with respect to the Current Employees (as determined as of the Execution Date).

(c)     To Sellers' Knowledge, except as set forth on Schedule 3.9(c) of the Disclosure Schedule, there are no pending or, to the Sellers' Knowledge, threatened material employment claims, investigations, or actions by any Current Employee or Former Employee, or by any Governmental Authority on behalf of any Current Employee or Former Employee, against any Seller, including with respect to wage and hour, discrimination, harassment, workers' compensation, or occupational safety and health (including any matter pending before the Mine Safety and Health Administration or the Occupational Safety and Health Administration) that would reasonably be expected to result in a Material Adverse Effect.

(d)     No WARN Liability exists as of the Execution Date with respect to the Current Employees, and no event was incurred in the preceding three (3) years that could have resulted in WARN Liability.

**Section 3.10    Employee Benefit Plans**.

(a)     Other than an Employee Health Plan (as defined below), none of Sellers currently or within the past six years has maintained or had an obligation to contribute to or has, within the past six years had or could have any Liability (whether direct or contingent) with respect to (i) a "single employer plan" (as such term is defined in Section 4001(a)(15) of ERISA) or any plan subject to Section 412 of the IRC or Section 302 of Title I of ERISA, (ii) any plan subject to Title IV of ERISA, (iii) a "multiemployer plan" (meaning a plan sponsored by more than one employer within the meaning of ERISA Sections 4063 or 4064 or Section 413(c) of the IRC), (iv) a "multiemployer plan" (as such term is defined in Sections 3(37) or 4001(a)(3) of ERISA), (v) a "multiple employer welfare arrangement" (as such term is defined in Section 3(40) of ERISA), or (vi) a funded welfare benefit plan (as such term is defined in Section 419 of the IRC).

(b)     Sellers and each Employee Benefit Plan that is a "group health plan" as defined in Section 733(a)(1) of ERISA (an "Employee Health Plan") (i) are currently in material compliance with the Patient Protection and Affordable Care Act, the Health Care and Education Reconciliation Act of 2010 and all regulations and guidance issued thereunder (collectively, the "Healthcare Reform Laws"), (ii) have been in material compliance with applicable Healthcare Reform Laws since March 23, 2010, and (iii) no event has occurred and, to Sellers' Knowledge, no condition or circumstance exists, that could reasonably be expected to subject Sellers or any Employee Health Plan to penalties or excise taxes under Sections 4980D, 4980H, or 4980I of the IRC or any other provision of the Healthcare Reform Laws.

(c)     None of Sellers has (i) incurred or reasonably expects to incur, either directly or indirectly, any Liability under ERISA or the IRC or applicable local Law with respect to any Employee Health Plan or with respect to any state mandated employee benefit or compensation program.

24

v.

(d)      There are no Contracts with any professional employer organization providing employment or benefits to Current Employees or for which there is any liability.

**Section 3.11    Real Property**.

(a)      Owned Real Property.  Schedule 3.11(a) of the Disclosure Schedules sets forth each parcel of real property owned by Sellers and used in or necessary for the conduct of the Business as currently conducted (together with all buildings, fixtures, structures and improvements situated thereon and all easements, rights-of-way and other rights and privileges appurtenant thereto, collectively, the "Owned Real Property"), including with respect to each property, the address location.  Sellers have delivered to Buyer copies of the deeds and other instruments (as recorded) by which each Seller acquired such parcel of Owned Real Property, and copies of all title insurance policies, opinions, abstracts and surveys in the possession of Sellers with respect to such parcels. With respect to each parcel of Owned Real Property:

(i)      each Seller has good and marketable fee simple title, free and clear of all Liens, except (A) Permitted Liens and (B) those Liens set forth on Schedule 3.11(a)(i) of the Disclosure Schedules;

(ii)      except as set forth on Schedule 3.11(a)(ii) of the Disclosure Schedules, no Seller has leased or otherwise granted to any Person the right to use or occupy such Owned Real Property or any portion thereof; and

(iii)      there are no unrecorded outstanding options, rights of first offer or rights of first refusal to purchase such Owned Real Property or any portion thereof or interest therein.

(b)      Leased Real Property.  Schedule 3.11(b) of the Disclosure Schedules sets forth the address of each Leased Real Property, and a true and complete list of all Leases for such Leased Real Property.  Except as set forth on Schedule 3.11(b) of the Disclosure Schedules, to Sellers' Knowledge the Leased Real Property has no material defects that would reasonably be expected to cost Sellers $10,000.00 or more to repair, and is otherwise in good operating condition and repair and is adequate and suitable to conduct the Business of Sellers as currently conducted.

**Section 3.12    Permits, Easements and Surface Rights**.  Schedule 2.1(d) contains a list of all material Permits, Easements and Surface Rights that, to Sellers' Knowledge, Sellers hold as of the Execution Date in connection with the operation of the Business.  To Sellers' Knowledge, each Seller is in compliance with, and during the past three (3) years has complied with, all Permits, Easements and Surface Rights in all material respects. No Seller has received any oral or written notice or other written communication from any Governmental Authority or other Person (i) asserting any violation of, or failure to comply with, any requirement of any Assumed Permit, Easement or Surface Right, (ii) notifying such Seller of the non-renewal, revocation, material modification or withdrawal of any Assumed Permit, Easement or Surface Right, or (iii) notifying such Seller that it is under governmental investigation with respect to the violation of any applicable Assumed Permit. As of the Execution Date, there is no Litigation pending or, to Sellers' Knowledge, threatened in writing that seeks the revocation, cancellation, suspension, failure to renew or adverse modification of any material Assumed Permits, Easements and Surface Rights.

25

v.

To Sellers' Knowledge, all required filings with respect to the Assumed Permits, Easements and Surface Rights have been made and all required applications for renewal thereof have been filed.

**Section 3.13   Environmental**.  To Sellers' Knowledge, except as set forth on Schedule 3.13 of the Disclosure Schedule, (a) Sellers are and have been in compliance in all material respects with all applicable Laws relating to the protection of the environment, mining and reclamation, pollution, occupational health and safety (including the Federal Mine Safety and Health Act of 1977 and the Occupational Safety and Health Act), and respirable crystalline silica exposure (collectively, the "Environmental Laws"); (b) Sellers have not received any written notice, demand, claim or request for information alleging that Sellers may be in violation of, liable under or have outstanding obligations under any Environmental Laws; (c) Sellers hold all material Permits required under Environmental Laws to operate the Business as currently conducted, all such Permits are in full force and effect, and no Litigation is pending or, to Sellers' Knowledge, threatened to revoke, suspend or materially modify any such Permit; (d) all reclamation, financial assurance, surety bonds, letters of credit and similar instruments required by any Governmental Authority in connection with the Business and the Purchased Assets as listed on Schedule 3.13 of the Disclosure Schedule, are in full force and effect; and (e) to Sellers' Knowledge, there has been no release (as defined under any Environmental Law) of hazardous substances at, on, under or from any Leased Real Property that has resulted, or would reasonably be expected to result, in any material Liability under Environmental Laws.[1]

**Section 3.14   Taxes**.

(a)      Except as set forth on Schedule 3.14(a), to Sellers' Knowledge, all material Tax Returns required to have been timely filed by Sellers in connection with the Business, the Purchased Assets and the Assumed Liabilities have been filed (taking into account any extension of time to file granted or obtained) and such Tax Returns were true, correct and complete in all material respects.

(b)      To Sellers' Knowledge, all material Taxes required to have been paid by Sellers with respect to the Business, the Purchased Assets, and the Assumed Liabilities have been paid, other than Taxes of Sellers the payment of which is prohibited or stayed by the Bankruptcy Code.

(c)      There are no Liens with respect to Taxes on any of the Purchased Assets, other than Permitted Liens and such Liens that will be released upon entry of the Sale Order, as applicable.

(d)      To Sellers' Knowledge, there are no audits, examinations, investigations, or other proceedings in respect of Taxes or Tax Returns of Sellers with respect to the Business, the Purchased Assets, and the Assumed Liabilities, pending or threatened in writing.

(e)      The representations and warranties set forth in this Section 3.14 are the Sellers' sole and exclusive representations and warranties regarding Tax matters.

---

[1]  Buyer to confirm that Schedule 3.13 is to list outstanding NOVs, reclamation bonds and financial assurance instruments, and any open MSHA/TCEQ matters.

v.

**Section 3.15    Brokers' Fees**.    Except with respect to Piper Sandler & Co., Sellers' investment banker, no Seller has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which Buyer could become liable or obligated to pay.

**Section 3.16    No Other Representations or Warranties**.

(a)    Title Encumbrances.

(i)    AT CLOSING, SELLERS WILL CONVEY THE REAL PROPERTY CONSTITUTING A PART OF THE PURCHASED ASSETS TO BUYER WITHOUT WARRANTY OF TITLE, EXPRESS, STATUTORY OR IMPLIED.   IT IS UNDERSTOOD AND AGREED THAT ANY STATEMENT OF INTERESTS IN IN THE ASSIGNMENT DOCUMENTS TO BE EXECUTED AT CLOSING IS NOT A WARRANTY OR REPRESENTATION BY ANY SELLER REGARDING SUCH SELLER'S OWNERSHIP INTEREST IN THE REAL PROPERTY.   NO SELLER MAKES ANY REPRESENTATION REGARDING, AND SHALL HAVE NO LIABILITY FOR, ANY FAILURE TO MAINTAIN ANY LEASE OR PORTION THEREOF IN ACCORDANCE WITH ITS TERMS.   BUYER HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS OR REMEDIES WITH RESPECT TO ANY DEFECT IN TITLE OR ANY OTHER TITLE MATTER, WITH RESPECT TO THE PURCHASED ASSETS (SUBJECT TO BUYER'S RIGHT TO RECEIVE THE PURCHASED ASSETS FREE AND CLEAR (OTHER THAN PERMITTED LIENS AND BUYER'S ASSUMED OBLIGATIONS) UPON THE TERMS AND SUBJECT TO THE CONDITIONS OF THE SALE ORDER.

(ii)    SPECIFICALLY WITH RESPECT TO THE PERMITS, EASEMENTS AND SURFACE RIGHTS AND EXCEPT AS OTHERWISE SET FORTH IN Section 3.12:   (A) EACH SELLER EXPRESSLY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL WARRANTIES AND REPRESENTATIONS THAT EITHER SELLER OWNS THE PERMITS, EASEMENTS AND SURFACE RIGHTS, THAT THEY ARE IN FORCE AND EFFECT, THAT THEY MAY BE ASSIGNED, THAT THEY ARE CONTIGUOUS, THAT THE EQUIPMENT LIES WITHIN THE PERMITS, EASEMENTS AND SURFACE RIGHTS, OR THAT THEY GRANT THE RIGHT TO LAY, MAINTAIN, REPAIR, REPLACE, OPERATE, CONSTRUCT, OR REMOVE THE EQUIPMENT, AND (B) EACH SELLER EXPRESSLY DISCLAIMS, AND BUYER HEREBY WAIVES, ALL WARRANTIES AND REPRESENTATIONS THAT THERE ARE ANY PERMITS, EASEMENTS AND SURFACE RIGHTS IN FORCE AND EFFECT WITH RESPECT TO THE EQUIPMENT.   Buyer shall secure, at its own expense, rights to operate and maintain any Equipment on third-party property if any of the Permits, Easements and Surface Rights listed in Schedule 2.1(d) necessary to operate and maintain the Equipment are not transferred to Buyer at Closing on account of failure to obtain any required Consent, and such Equipment will continue to be used after Closing in the manner used prior to Closing.

(b)    Condition and Fitness of the Purchased Assets.   AT CLOSING, SELLERS WILL CONVEY THE PURCHASED ASSETS TO BUYER WITHOUT ANY EXPRESS, STATUTORY OR IMPLIED WARRANTY OR REPRESENTATION OF ANY KIND, INCLUDING    WARRANTIES    RELATING    TO    (A)    THE    CONDITION    OR

27

v.

MERCHANTABILITY OF ANY PURCHASED ASSET, (B) THE FITNESS OF ANY PURCHASED ASSET FOR A PARTICULAR PURPOSE, OR (C) FREEDOM FROM OTHER DEFECTS.  BEFORE CLOSING, BUYER HAS INSPECTED, WILL INSPECT OR HAS OR WILL HAVE BEEN GIVEN THE OPPORTUNITY TO INSPECT THE PURCHASED ASSETS, AND WILL ACCEPT THE PROPERTY "AS IS," "WHERE IS," AND "WITH ALL FAULTS" AND IN ITS PRESENT CONDITION AND STATE OF REPAIR.  WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, NO SELLER MAKES ANY REPRESENTATION OR WARRANTY AS TO (I) THE VALUE, QUALITY, RECOVERABILITY, RESERVES, YIELD, OR THROUGHPUT CAPACITY OF ANY SILICA SAND OR OTHER MINERALS OR INVENTORIES THEREOF (IF ANY), (II) THE PHYSICAL, OPERATING, REGULATORY COMPLIANCE, SAFETY OR ENVIRONMENTAL CONDITION OF THE PURCHASED ASSETS, (III) PROJECTIONS AS TO EVENTS THAT COULD OR COULD NOT OCCUR, OR (IV) THE GEOLOGICAL, METALLURGICAL OR ENGINEERING CONDITION OF THE PROPERTY OR ANY VALUE THEREOF.

(c)     Information About the Purchased Assets.  EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, THE PARTIES EACH DISCLAIM ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENTS OR COMMUNICATIONS (ORALLY OR IN WRITING) TO THE OTHER PARTY (INCLUDING ANY INFORMATION CONTAINED IN ANY GEOLOGICAL OR RESERVE STUDY, MINE PLAN, METALLURGICAL OR PROCESSING TEST WORK, ENVIRONMENTAL SITE ASSESSMENT, RAIL OR LOGISTICS STUDY, OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO ANY SUCH PARTY BY ANY EMPLOYEE, OFFICER, DIRECTOR, AGENT, CONSULTANT, ENGINEER OR ENGINEERING FIRM, REPRESENTATIVE, PARTNER, MEMBER, BENEFICIARY, STOCKHOLDER OR CONTRACTOR OF SUCH DISCLAIMING PARTY OR ITS AFFILIATES) WHENEVER, WHEREVER AND HOWEVER MADE, INCLUDING THOSE MADE IN ANY DATA ROOM AND ANY SUPPLEMENTS OR AMENDMENTS THERETO OR DURING ANY NEGOTIATIONS WITH RESPECT TO THIS AGREEMENT OR ANY CONFIDENTIALITY AGREEMENT PREVIOUSLY EXECUTED BY THE PARTIES WITH RESPECT TO THE PURCHASED ASSETS.  NO SELLER MAKES ANY WARRANTY OR REPRESENTATION, EXPRESS OR IMPLIED, AS TO THE ACCURACY, COMPLETENESS, OR MATERIALITY OF ANY DATA, INFORMATION OR RECORDS FURNISHED TO BUYER IN CONNECTION WITH THE PURCHASED ASSETS.  ANY DATA, INFORMATION OR OTHER RECORDS FURNISHED BY SELLERS ARE PROVIDED TO BUYER AS A CONVENIENCE AND BUYER'S RELIANCE ON OR USE OF THE SAME IS AT BUYER'S SOLE RISK.

(d)     Express  or  Implied  Warranties.  EXCEPT  FOR  THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND BUYER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THE BUSINESS, THE PURCHASED ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY PURCHASED ASSET), THE ASSUMED LIABILITIES OR THE CONTEMPLATED TRANSACTIONS, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY

28

v.

SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS OR REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE), EACH SELLER (I) EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT COMMON LAW, BY STATUTE OR OTHERWISE, RELATING TO THE CONDITION OF THE PURCHASED ASSETS (INCLUDING ANY IMPLIED OR EXPRESSED WARRANTY OF TITLE, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, OR OF THE PROBABLE SUCCESS OR PROFITABILITY OF THE OWNERSHIP, USE OR OPERATION OF THE BUSINESS OR THE PURCHASED ASSETS BY BUYER AFTER THE CLOSING), AND (II) DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO BUYER OR ITS AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO BUYER BY ANY DIRECTOR, OFFICER, EMPLOYEE, AGENT, CONSULTANT OR REPRESENTATIVE OF ANY SELLER OR ANY OF THEIR AFFILIATES).

Notwithstanding Section 9.12 or anything to the contrary in this Agreement, the disclaimers and agreements set forth in this Section 3.16 shall survive the Closing or earlier termination of this Agreement and shall be incorporated into the closing documents to be delivered at Closing.

## ARTICLE IV.
## BUYER'S REPRESENTATIONS AND WARRANTIES

Buyer represents and warrants to Sellers as follows:

**Section 4.1** **Organization of Buyer**. Buyer is a limited liability company duly organized, validly existing and in good standing under the Laws of the State of [TBD] and has all requisite limited liability company power and authority to own, lease and operate its assets and to carry on its business as now being conducted.

**Section 4.2** **Authorization of Transaction**.

(a) Buyer has full company power and authority to execute and deliver this Agreement and all Related Agreements to which it is a party and to perform its obligations hereunder and thereunder.

(b) The execution, delivery and performance of this Agreement and all other Related Agreements to which Buyer is a party have been duly authorized by Buyer, and no other limited liability company action on the part of Buyer is necessary to authorize this Agreement or the Related Agreements to which it is a party or to consummate the Contemplated Transactions.

(c) This Agreement has been duly and validly executed and delivered by Buyer, and, upon its execution and delivery in accordance with the terms of this Agreement, each of the

29

v.

Related Agreements to which Buyer is a party will have been duly and validly executed and delivered by Buyer. Assuming that this Agreement constitutes a valid and legally binding obligation of Sellers, this Agreement constitutes a valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity. Assuming, to the extent that they are a party thereto, that each Related Agreement constitutes a valid and legally-binding obligation of Sellers, each Related Agreement to which Buyer is a party, when executed and delivered, constituted or will constitute the valid and legally-binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity.

**Section 4.3      Non-contravention**.  Neither the execution and delivery of this Agreement, nor the consummation of the Contemplated Transactions (including the Related Agreements) will (a) conflict with or result in a breach of the certificate of formation or other organizational documents of Buyer, (b) subject to any consents required to be obtained from any Governmental Authority, to the knowledge of Buyer, violate any Law to which Buyer is, or its assets or properties are subject, or (c) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify or cancel, or require any notice under any Contract to which Buyer is a party or by which it is bound, except, in the case of either clause (b) or (c), for such conflicts, breaches, defaults, accelerations, rights or failures to give notice as would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any Governmental Authority in order for the Parties to consummate the Contemplated Transactions, except where the failure to give notice, file or obtain such authorization, consent or approval would not, individually or in the aggregate, reasonably be expected to prevent, materially delay or materially impair the ability of Buyer to consummate the Contemplated Transactions.

**Section 4.4      Financial Capacity**.  As of the Closing, Buyer (a) will have the resources (including sufficient funds available to pay the Operating Costs and Cure Costs and any other expenses and payments incurred by Buyer in connection with the Contemplated Transactions) and capabilities (financial or otherwise) to perform its obligations hereunder, and (b) will not have incurred any obligation, commitment, restriction or Liability of any kind, that would materially impair or materially adversely affect such resources and capabilities.

**Section 4.5      Adequate Assurances Regarding Executory Contracts**.  Buyer will use commercially reasonable efforts to assure that, as of the Closing, it will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

**Section 4.6      Good Faith Purchaser**.  Buyer is a "good faith" purchaser, as such term is used in the Bankruptcy Code and the court decisions thereunder. Buyer is entitled to the protections of Section 363(m) of the Bankruptcy Code with respect to all of the Purchased Assets. Buyer has negotiated and entered into this Agreement in good faith.

v.

**Section 4.7**     **Brokers' Fees**.  Neither Buyer nor any of its Affiliates has entered into any Contract to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions for which any Seller could become liable or obligated to pay.

**Section 4.8**     **Condition of Business**.  Buyer is an informed and sophisticated purchaser, and has engaged or had the opportunity to engage advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of Liabilities such as the Assumed Liabilities as contemplated hereunder. Buyer has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement. Buyer acknowledges that Sellers have given Buyer reasonable and open access to the key employees, documents and facilities of the Business. Buyer hereby acknowledges and agrees that notwithstanding anything expressed or implied herein to the contrary, except as expressly set forth in ARTICLE III of this Agreement, Sellers (including each of their directors, officers, employees, agents, stockholders, Affiliates, consultants, counsel, accountants and other representatives) make no express or implied representations or warranties whatsoever, including, without limitation, any representation or warranty as to physical condition or value of any of the Purchased Assets or the future profitability or future earnings performance of the Business.  Buyer will accept the Purchased Assets and assume the Assumed Liabilities at the Closing "AS IS," "WHERE IS" AND "WITH ALL FAULTS".

## ARTICLE V.
## PRE-CLOSING COVENANTS

The Parties agree as follows with respect to the period between the execution of this Agreement and the Closing (except as otherwise expressly stated to apply to a different period):

**Section 5.1**     **Certain Efforts; Cooperation**.

(a)     Subject to the terms and conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts, subject to a Bankruptcy Court Order, to make effective the Contemplated Transactions (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the Contemplated Transactions set forth in ARTICLE VII), except as otherwise provided in Section 5.2; provided, however, Sellers shall be entitled to take such actions as are required in connection with the discharge of their fiduciary duties during the Bankruptcy Cases.

(b)     On and after the Closing, Sellers and Buyer shall use their commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done by Sellers and Buyer all things necessary under applicable Law, and to execute and deliver such documents, ancillary agreements and other papers as may be required to carry out the provisions of this Agreement and consummate and make effective the Contemplated Transactions, including in order to more effectively vest in Buyer all of Sellers' right, title and interest to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) expressly contemplated by the Sale Order; provided, however, that Sellers' obligations hereunder shall only continue until the later of the day that (i) material Assumed Permits, Easements and Surface Rights have been transferred to Buyer and/or replacements thereof have

31

v.

been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Bankruptcy Cases are closed or dismissed.  Buyer shall at all times take all appropriate actions necessary to permit, and shall refrain from taking any action that would prevent, the Bankruptcy Court from making findings in the Sale Order that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) the sale of the Purchased Assets contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code, and (iii) Buyer is not a successor to Sellers with respect to the Purchased Assets.

**Section 5.2**      **Notices and Consents**.

(a)      To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and each Seller shall use its commercially reasonable efforts to obtain any third party Consents or sublicenses; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the later of the day that (A) all material Assumed Permits, Easements and Surface Rights have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (B) the Bankruptcy Cases are closed or dismissed.

(b)      Sellers and Buyer shall cooperate with one another in promptly determining whether any filings are required to be or should be made or consents, approvals, permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the Contemplated Transactions and in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers; provided, however, that (i) Sellers shall not incur any costs associated with the obligations hereunder, other than such ordinary and reasonable professional fees and other costs as described in this Agreement as are required for Sellers to comply with the obligations hereunder and (ii) Sellers' obligations hereunder shall only continue until the later of the day that the Chapter 11 Cases are closed or dismissed.

(c)      Subject to the terms and conditions set forth in this Agreement and applicable Law, Buyer and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Authority in respect of any filing, investigation or inquiry concerning this Agreement or the Contemplated Transactions, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers and their respective Subsidiaries or Buyer and its Subsidiaries and/or Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Authority in connection with the Agreement and the Contemplated Transactions and incorporate the other Party's reasonable comments, (iii) not participate in any substantive meeting or discussion with any Governmental Authority in respect of any filing, investigation, or inquiry concerning this Agreement and the Contemplated Transactions unless it consults with the other Party in advance, and, to the extent permitted by such Governmental Authority, gives the other Party the opportunity to participate in and/or attend such meeting and/or discussion, and (iv) furnish the other Party with copies of all correspondences, filings, and written communications

32

v.

between them and their Subsidiaries and/or Affiliates and Representatives, on the one hand, and any Governmental Authority or its respective staff, on the other hand, with respect to this Agreement and the Contemplated Transactions; provided, however, that any materials or information provided pursuant to any provision of this Section 5.2(c) may be redacted before being provided to the other Party (A) to remove references concerning the valuation of Buyer, Sellers, or any of their Subsidiaries, (B) to remove references concerning financing arrangements, (C) as necessary to comply with contractual arrangements, and (D) as necessary to address reasonable privilege or confidentiality issues. Sellers and Buyer may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 5.2(c) as "outside counsel only".  Such materials and the information contained therein shall be given only to the outside legal counsel and any retained consultants or experts of the recipient and shall not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Buyer, as the case may be). Each of Sellers and Buyer shall promptly notify the other Party if such Party becomes aware that any third party has any objection to the Agreement on antitrust or anticompetitive grounds.

Section 5.3      **Bankruptcy Actions**.

(a)      Stalking Horse Bidder.  Buyer has been named the Stalking Horse Bidder pursuant to the authority granted to Sellers by the Final DIP Order.

(b)      Bid Protections.  In consideration of the Buyer's expenditure of time, effort, and resources in negotiating this Agreement and establishing a price floor for the Purchased Assets, and as approved by the Bankruptcy Court in the Stalking Horse Order, Buyer shall be entitled to receive a break-up fee equal to three percent (3%) of the Baseline Bid (the "Break-Up Fee" and, together with all obligations of the Sellers in respect thereof, the "Bid Protections").  The Bid Protections shall be earned by and payable to Buyer upon the occurrence of any of the following (each, a "Trigger Event"): (i) the Stalking Horse Bid is overbid at the Auction and a competing bid is designated as the Winning Bid; (ii) the Sellers consummate any sale, transfer, or other disposition of all or substantially all of the Purchased Assets to any party other than Buyer, whether pursuant to Section 363 of the Bankruptcy Code, a confirmed Plan, or otherwise; (iii) the Sellers withdraw or materially modify the proposed sale process without the prior written consent of Buyer; (iv) Buyer terminates this Agreement pursuant to Section 8.1(d) or any clause of Section 8.1(e) (other than Section 8.1(e)(iii)(E) where Buyer is the Winning Bidder); (v) any Seller files, supports, or consummates a Chapter 11 Plan inconsistent with the Contemplated Transactions; or (vi) any of the Bankruptcy Cases is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code prior to Closing.  The Bid Protections shall constitute an allowed superpriority administrative expense claim of Buyer against the Sellers' estates under Sections 503(b)(1)(A), 507(a)(2), and 507(b) of the Bankruptcy Code, senior to all other administrative expense claims (other than as required under the DIP Orders), and shall be payable, without further order of the Bankruptcy Court, on the earlier of (A) the closing of any Alternate Transaction (from the proceeds thereof at closing) and (B) five (5) Business Days following the date on which the relevant Trigger Event occurs.

(c)      Credit Bid Authorization.  Pursuant to Section 363(k) of the Bankruptcy Code, Paragraph 29 of the First DIP Order, and Paragraph 11 of the Stalking Horse Order, Buyer,

v.

in its capacity as DIP Lender, is expressly authorized to credit bid all or any portion of the DIP Obligations (other than the Repayment Fee) in connection with any sale of the Purchased Assets, whether at Auction or otherwise, and Sellers shall not object to such credit bid.  The right of Buyer to credit bid is in addition to, and not in limitation of, any other rights of Buyer or the DIP Lender under the DIP Orders, the DIP Loan Documents, or applicable Law.

(d)      Minimum Overbid Increment.  In accordance with the Stalking Horse Order, any Qualified Bid must exceed the Baseline Bid, plus the aggregate amount of the Bid Protections, plus the Initial Overbid Increment of $1,500,000.  Subsequent overbids at the Auction shall be in minimum increments of $250,000 or such other amount as Sellers may announce at the Auction.  Notwithstanding the foregoing, when calculating the value of any bid or overbid submitted by Buyer at the Auction, Buyer shall receive a credit equal to the aggregate amount of the Bid Protections, such that Buyer shall not be required to bid against its own Bid Protections. For the avoidance of doubt, all bids shall be evaluated on a net-to-estate basis, with the Bid Protections treated as a cost of any non-Buyer bid.

(e)      Deposit Waiver. Notwithstanding anything to the contrary in this Agreement or the Bidding Procedures, and as provided in Paragraph 14 of the Stalking Horse Order, Buyer, in its capacity as Stalking Horse Bidder, shall not be required to submit a good faith deposit in connection with the Stalking Horse Bid.

(f)      Designation Rights.  In accordance with Paragraph 15 of the Stalking Horse Order, Buyer shall have the right, at or prior to Closing, to designate one or more Affiliates or related entities (each, a "Designee") to acquire some or all of the Purchased Assets at Closing; provided that such designation shall not relieve Buyer of its obligations under this Agreement unless the Designee assumes such obligations in a written instrument reasonably acceptable to Sellers, in which case Buyer shall be released from such assumed obligations to the extent so assumed.

(g)      Alternate Transactions.  From and after the Execution Date, Sellers and their respective Affiliates and Representatives shall be permitted to market and solicit inquiries, proposals, offers or bids from any Person other than Buyer regarding an Alternate Transaction, and may take any other affirmative action in connection therewith (including (i) entering into any Alternate Agreement (or letter-of-intent with respect thereto), (ii) issuing press releases, placing advertisements or making other releases or disclosures in connection therewith, or (iii) seeking approval of the Bankruptcy Court for any Alternate Transaction), and nothing in this Agreement will, or is intended to, in any way be deemed to restrict such actions or efforts. None of Sellers nor any of their respective Affiliates or Representatives shall have any liability to Buyer or any of its Affiliates or Representatives, either under or relating to this Agreement or any applicable Law, by virtue of entering into or seeking Bankruptcy Court approval of such an Alternate Agreement (or letter-of-intent with respect thereto); provided that Buyer is paid the Bid Protections to the extent required to be paid pursuant to Section 5.3(b) and the Bidding Procedures Order at the time provided for therein.

(h)      Auction.  The Auction, if necessary, shall take place at the time and date established by the Bidding Procedures Order.  At the conclusion of the Auction, and in accordance with the Bidding Procedures Order, Sellers will determine the Winning Bid submitted by a

34

v.

Qualified Bidder (as defined in the Bidding Procedures) and the next highest or best Qualified Bid (the "Back-Up Bid") submitted by a Qualified Bidder (the "Back-Up Bidder"). Sellers will seek approval of the Winning Bid at the Sale Hearing.  If for any reason, Buyer is selected as the Back-Up Bidder, and the Qualified Bidder submitting the Winning Bid fails to timely consummate the purchase of the Purchased Assets, Sellers may seek to consummate a sale to Buyer pursuant to this Agreement without further approval by the Bankruptcy Court.  If Buyer is selected as the Back-Up Bidder, its Back-Up Bid and the obligation of Buyer to consummate the Contemplated Transactions shall remain open and in full force until the close of a sale of the Purchased Assets to the Winning Bidder.

(i)     Sale Order.  Sellers shall use commercially reasonable efforts to cause the Sale Order to be entered by the Bankruptcy Court at the Sale Hearing.  The Sale Order shall be in form and substance acceptable to Buyer in its sole discretion and shall expressly approve and reaffirm, without modification, the Bid Protections, the Credit Bid, and Buyer's good faith status under Section 363(m) of the Bankruptcy Code, and provide, among other things, that:

(i)      this Agreement is valid and enforceable;

(ii)     this Agreement and the Contemplated Transactions are approved;

(iii)    on the Closing Date, the Purchased Assets shall be sold to Buyer free and clear of any and all Liens (except for Permitted Liens), including any Liens granted during the Bankruptcy Cases, and Liabilities (other than Assumed Liabilities);

(iv)     on the Closing Date, the Assigned Contracts shall be assumed by Sellers and assigned to Buyer pursuant to Section 365 of the Bankruptcy Code, and, unless a counterparty to an Assigned Prepetition Contract has agreed otherwise in writing, the Buyer shall pay the Cure Costs due in connection with the assumption and assignment of the Assigned Contracts;

(v)      all causes of actions against any counterparty to the Assigned Contracts, related in any way to the Assigned Contracts, shall be forever released and waived by Sellers; provided, however, that Sellers shall be entitled to assert any defenses against any claim asserted by any counterparty to the Assigned Contracts; and

(vi)     all Persons, including, Tax, regulatory and other Governmental Authorities, lenders, trade and other creditors holding interests or claims of any kind or nature whatsoever against Sellers or their assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, liquidated or unliquidated, senior or subordinated), arising under or out of, in connection with or in any way relating to Sellers, the Business, the Purchased Assets, or the operations of Sellers prior to the Closing shall have no claims against Buyer, its Affiliates, or their respective successors or assigns, the Business, or the Purchased Assets, subject to rights of parties or individuals for claims arising out of Assumed Liabilities.

(j)     Sale Order Findings. The Sale Order shall contain findings by the Bankruptcy Court that (i) Buyer is a good-faith buyer under Section 363(m) of the Bankruptcy Code, (ii) Buyer is not a successor to Sellers, and (iii) the sale of the Purchased Assets

35

v.

contemplated hereby did not involve any improper conduct, including collusion, and cannot be avoided under grounds set forth under Section 363(n) of the Bankruptcy Code.

(k)      Cooperation. Sellers and Buyer agree to use commercially reasonable efforts to cooperate, assist and consult with each other to obtain the issuance and entry of the Bidding Procedures Order and Sale Order, including furnishing affidavits, declarations or other documents or information for filing with the Bankruptcy Court. The Sale Order shall also indicate that the transactions set forth in this Agreement may be consummated immediately upon entry of the Sale Order and pursuant to Bankruptcy Rule 6004(h), the sale of the Purchased Assets is not stayed pending the expiration of fourteen (14) days from the date of entry of the Sale Order. In the event the Sale Order is appealed, Sellers shall use their commercially reasonable efforts to oppose any such appeal.

**Section 5.4      Conduct of Business**.  From the Execution Date until the earlier of the termination of this Agreement pursuant to Section 8.1 or the Closing Date, except (a) as disclosed on Schedule 5.4, (b) as may be required by the Bankruptcy Court, (c) for the consequences resulting from the continuation of the Chapter 11 Cases, or (d) as may be required or contemplated by this Agreement, subject to the terms of the DIP Loan Documents, each Seller shall conduct, and shall cause its Affiliates to conduct, the Business and maintain the Purchased Assets in the Ordinary Course of Business and use its commercially reasonable efforts to preserve intact the Purchased Assets (and all goodwill relating thereto) and all respective relationships with customers, vendors, creditors, employees, landlords, agents, each Governmental Authority, and others having business relationships with them. Without limiting the generality of the foregoing, during the period from the date of this Agreement to the Closing, except as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, each Seller shall, and shall cause each of its respective Affiliates to, do the following:

(a)      Subject to necessary approval by the Bankruptcy Court, if applicable, pay all post-petition bills and invoices for post-petition goods or services when due, including rent, Taxes and other amounts due under the Leases that may become part of the Purchased Assets;

(b)      notify Buyer of any material adverse change (financial or otherwise), in its Business condition or of the commencement of or any material development or disposition with respect to any material governmental complaints, investigations, or hearings (or any written threats thereof);

(c)      in the Ordinary Course of Business, maintain and repair all of the material equipment on the premises and the premises themselves;

(d)      use its commercially reasonable efforts to keep and maintain possession of and compliance with the terms of all Permits necessary or required by Law to own, lease and operate the Plants and to carry on the Business or that are material to the operation of the Business or the Purchased Assets, including by taking all actions and submitting all payments, applications, and filings necessary to renew any such Permit due to expire at any time before the Closing Date;

(e)      use commercially reasonable efforts to (i) conduct the Business in substantially the same manner as conducted as of the Petition Date and only in the Ordinary Course

36

v.

of Business, (ii) preserve the existing Business organization and management of the Business intact, (iii) keep available the services of the Current Employees, to the extent reasonably feasible, (iv) use commercially reasonable efforts to maintain the existing relations with customers, carriers, centers, distributors, suppliers, creditors, business partners, and others having business dealings with the Business, and (v) refrain from changing in any material respect any of its product or service prices or pricing policies (e.g., discount policies) for any of its products or services; and

(f)      maintain insurance coverage with financially responsible insurance companies duly licensed in the states in which Sellers are then operating, substantially similar in all material respects to the insurance coverage maintained by the Business and Sellers on the Petition Date.

**Section 5.5    Certain Restricted Conduct**.   Except as in the Ordinary Course of Business or as otherwise consented to in advance in writing by Buyer, during the period from the Execution Date to the Closing, no Seller shall, and each Seller shall cause each of its respective Affiliates not to, with respect to the Purchased Assets:

(a)      sell, lease, license, transfer, or dispose of any Purchased Assets;

(b)      directly or indirectly, (i) enter into any Contract, or (ii) assume, amend, modify, supplement or terminate, or waive any rights under, any Contract to which Seller is a party or by which it is bound and that is used in or related to the Business or the Purchased Assets (including any Assumed Contract) or take any affirmative action not required by the terms of any such Contract;

(c)      dispose of or permit to lapse any rights in, to or for the use of any material Intellectual Property right;

(d)      including maintenance and repair, authorize, undertake, make, or enter into any commitments obligating any Seller to (i) make or accelerate any capital expenditures that cannot reasonably be substantially completed prior to the Closing or (ii) undertake or approve any material renovation, repair or rehabilitation of any Leased Real Property that cannot reasonably be substantially completed prior to the Closing, except pursuant to a budget approved by the DIP Lender under the DIP Loan Documents (the "Approved Budget");

(e)      (i) increase any compensation or enter into or amend, in a way that increases benefits, any employment, severance or other agreement with any of its officers, directors or Current Employees, (ii) adopt any new Employee Benefit Plan or amend or terminate or increase the benefits under any existing Employee Benefit Plan, except for changes which are not more favorable to participants than provisions presently in effect, (iii) hire any employee or individual independent contractor with annual compensation in excess of $50,000 (except to the extent such hire is in replacement of a Current Employee with comparable compensation), or enter into any new employment or severance agreements that would result in post-termination payments that in the aggregate would exceed $5,000 becoming due or payable upon termination of employment or of the individual independent contractor, or (iv) assume or enter into any labor or collective bargaining agreement relating to the Business, any Current Employee or future employee, or any Purchased Asset;

37

v.

(f)     take any action which, if taken, or omit to take any act which, if omitted to be taken, would constitute or result in an "Event of Default" under the Final DIP Order;

(g)     permit, offer, agree or commit (in writing or otherwise) to permit, any of the Purchased Assets to become subject, directly or indirectly, to any Lien, except for Permitted Liens;

(h)     directly or indirectly, cancel, forgive, settle, or compromise any debt or claim or waive or release any right of Sellers with respect to any Purchased Asset;

(i)     do any other act that would, to Sellers' Knowledge, cause any representation or warranty of any Seller in this Agreement to be or become untrue in any material respect or intentionally omit to take any action necessary to prevent any such representation or warranty from being untrue in any material respect;

(j)     terminate the Employee Health Plan; or

(k)     authorize or enter into any Contract, agreement, or commitment with respect to any of the foregoing.

No Seller nor any of its Affiliates shall: (i) renew any Lease nor suffer any Person other than such Seller, its employees, agents, servants and invitees to occupy or use the premises or any portion thereof, without in any case the express written consent of Buyer, which consent shall not be unreasonably withheld, or (ii) terminate, amend, extend, renew, modify, waive or allow any rights to lapse under any Lease. If Sellers request such a consent from Buyer, the request shall be in writing specifying the terms of the renewal, termination, amendment, extension, modification and/or waiver, the identity of the proposed third party, assignee or sub-lessee; the duration of said desired sublease or renewal, the date same is to occur, the exact location of the space affected thereby and the proposed rentals on a square foot basis chargeable thereunder. Such request for Buyer consent shall be submitted to Buyer at least five (5) days in advance of the date on which Sellers desire to make such event occur.

**Section 5.6     Notice of Developments**.  From the Execution Date until the Closing Date, each of Sellers (with respect to itself), as the case may be, shall promptly disclose to Buyer, on the one hand, and Buyer shall promptly disclose to Sellers, on the other hand, in writing (in the form of an updated Disclosure Schedule, if applicable) after attaining knowledge (as applicable to each of Sellers and Buyer) of any material failure of any of Sellers or Buyer to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; provided, however, that the delivery of any notice pursuant to this Section 5.6 shall not limit or otherwise affect the remedies available to the party receiving such notice under this Agreement if such party objects to the disclosures contained in such notice within ten (10) Business Days of receipt of such notice.

**Section 5.7     Access**.  Upon reasonable advance written request by Buyer, Sellers shall permit Buyer and its Representatives to have reasonable access during customary business hours, and in a manner so as not to interfere unreasonably with the regular business operations of Sellers, to all premises, properties, personnel, Records and Contracts related to the Business, in each case, for the sole purpose of evaluating the Business; provided, however, that, for avoidance of doubt,

38

v.

the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

**Section 5.8**     **Press Releases and Public Announcements**.  Provided that Sellers shall provide notice to and consult with Buyer in advance, to the extent permitted by Law or by an Order of the Bankruptcy Court, Sellers shall be entitled to disclose, if required by applicable Law or by an Order of the Bankruptcy Court, this Agreement and all information provided by Buyer in connection herewith to the Bankruptcy Court, the United States Trustee, the Committee, parties in interest in the Bankruptcy Cases and other Persons bidding on assets of Sellers. Other than statements made in the Bankruptcy Court (or in pleadings filed therein), Sellers shall not issue (prior to, on or after the Closing) any press release or make any public statement or public communication regarding Buyer without the prior written consent of Buyer, which shall not be unreasonably withheld or delayed; provided, however, Sellers, without the prior consent of Buyer, may issue such press release or make such public statement as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction. Buyer, without the prior consent of Sellers, may issue such press release or make such public statement, filing or disclosure (x) prior to Closing, as may, upon the advice of counsel, be required by applicable Law or any Governmental Authority with competent jurisdiction and (y) after Closing, as it may wish.

**Section 5.9**     **Contracts**.  If at any time Sellers become aware, on or before the Closing, of any heretofore unrejected Contract to which any of Sellers is a party that satisfies the conditions of Section 3.6, but has not been included on Schedule 3.6 of the Disclosure Schedule, Sellers shall promptly thereafter advise Buyer of the existence of such Contract and provide Buyer with a copy thereof. Buyer shall have the right, for a period of five (5) Business Days following the delivery of any such Contract, to review such Contract and during such period Sellers shall refrain from modifying, terminating or rejecting such Contract without Buyer's express prior written consent. Buyer shall have the option, exercisable by written notice to Sellers given within such five (5) Business Day period, to request that Sellers assume (if applicable), assign and sell such Contract to Buyer. If Buyer timely exercises such option and subject to compliance with Section 365 of the Bankruptcy Code, Sellers shall use commercially reasonable efforts to assume (if applicable), assign and sell such Contract to Buyer, as promptly as reasonably practicable, on the same terms and conditions as would be applicable under this Agreement to the Assumed Contracts or the Prepetition Contracts to be acquired hereunder, as applicable; provided, however, that Buyer shall be responsible for the payment of any Cure Cost in connection with the assumption and assignment of such Assumed Contract (if applicable), except as otherwise provided in Section 2.6 and provided such Cure Cost is an Assumed Liability. If Buyer fails or declines to exercise such option, Sellers shall reject such Contract upon five (5) Business Days' notice to Buyer.

**Section 5.10**   **Casualty, Condemnation, Loss of Lease**.

(a)     If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be subject to a taking by any Governmental Authority through condemnation, eminent domain or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking) (collectively, the "Condemnation"), Buyer shall have the option, but not the obligation, to take title to the Purchased

39

v.

Assets relating to such affected Leased Real Property and improvements notwithstanding such Condemnation. At the Closing, Buyer shall succeed to (x) the rights of Sellers to the Condemnation proceeds, including insurance proceeds, with respect to a Condemnation (the "Condemnation Proceeds"), and (y) the rights to settle any such Condemnation proceeding, and Buyer shall, at Closing succeed to the rights of Sellers to all required proofs of loss, assignments of claims and similar items. If Buyer elects to take title to such Purchased Assets in accordance with the previous sentence, Sellers, at Closing, shall assign to Buyer all right, title and interest to any claims or proceeds Sellers may have. Sellers shall not settle any such proceedings without the consent of Buyer, such consent not to be unreasonably withheld or delayed.

(b)      If, prior to Closing, any Leased Real Property and the associated improvements or any part thereof shall be destroyed or damaged by fire, earthquake, flood or other casualty (collectively, "Casualty"), Buyer shall have the option, but not the obligation, to take title to the Purchased Assets relating to such affected Leased Real Property and improvements. At the Closing, Buyer shall succeed to (x) the rights of Sellers to the Casualty proceeds, including insurance proceeds, with respect to such Casualty (the "Casualty Proceeds"), including without duplication, giving Buyer a credit against the Purchase Price in the amount of the Casualty Proceeds actually received by Sellers and not applied by Sellers to repair prior to Closing, and (y) the rights to settle after Closing any loss under all Insurance Policies applicable to the Casualty, and Buyer shall, at Closing and thereafter, succeed to the rights of Sellers to all required proofs of loss, assignments of claims and other similar items.  If Buyer elects to accept such Leased Real Property in accordance with the previous sentence, Sellers shall, at Closing, assign same to Buyer. Sellers shall not settle any such claims without the consent of Buyer; such consent not to be unreasonably withheld or delayed.

## ARTICLE VI.
## OTHER COVENANTS

The Parties agree as follows with respect to the period from and after the Closing; provided that Sellers' obligations hereunder shall only continue until the later of the day that (i) all material Assumed Permits, Easements and Surface Rights have been transferred to Buyer and/or replacements thereof have been obtained by Buyer, as determined by Buyer in its reasonable discretion, and (ii) the Chapter 11 Cases are closed or dismissed:

**Section 6.1    Cooperation**. Each of the Parties shall cooperate with each other, and shall use their commercially reasonable efforts to cause their respective Representatives to cooperate with each other, to provide an orderly transition of the Purchased Assets and Assumed Liabilities from Sellers to Buyer and to minimize the disruption to the Business resulting from the Contemplated Transactions.

**Section 6.2    Further Assurances**.  In case at any time from and after the Closing any further action is necessary or reasonably required to carry out the purposes of this Agreement, subject to the terms and conditions of this Agreement and the terms and conditions of the Sale Order, at any Party's request and sole cost and expense, each Party shall promptly take such further action (including the execution and delivery to any other Party of such other reasonable instruments of sale, transfer, conveyance, assignment, assumption and confirmation and providing materials and information) as another Party may reasonably request as shall be necessary to

40

v.

transfer, convey and assign to Buyer all of the Purchased Assets, to confirm Buyer's assumption of the Assumed Liabilities and to confirm Sellers' retention of the Excluded Assets and Excluded Liabilities. Without limiting the generality of this Section 6.2, to the extent that either Buyer or Sellers discover any additional assets or properties which the Parties mutually agree should have been transferred or assigned to Buyer as Purchased Assets but were not so transferred or assigned, Buyer and Sellers shall cooperate and promptly execute and deliver any instruments of transfer or assignment necessary to transfer and assign such asset or property to Buyer.

**Section 6.3     Employee Matters**.

(a)     Sellers shall, effective as of the Closing Date, or such other date as mutually agreed upon between Sellers and Buyer (the "Employee Transfer Date"), discharge all Current Employees.

(b)     Following the date on which the execution of this Agreement is made public, whether by a filing with the Bankruptcy Court or otherwise, Sellers shall allow Buyer reasonable access, upon advance notice, to meet with and interview the Current Employees (identified on Schedule 3.9(a) of the Disclosure Schedule) during normal business hours.  Sellers shall provide reasonable cooperation and legally permitted information to Buyer as reasonably requested by Buyer with respect to its determination of appropriate terms and conditions of employment for any Current Employee to which Buyer intends to make an offer of employment (an "Offeree").

(c)     Prior to the Employee Transfer Date, Buyer may, but shall not be obligated to, offer to employ those Current Employees desired to be employed by Buyer, in Buyer's sole discretion, to operate the Purchased Assets as of the Employee Transfer Date. Each Offeree who accepts such offer prior to the Closing shall be referred to herein as a "Transferred Employee". Each Employee of Sellers who is not a Transferred Employee shall be referred to herein as an "Excluded Employee".

(d)     Buyer shall not assume, and Sellers shall retain, any liability or obligation whatsoever relating to the Employee Health Plan and compensation to the Current Employees prior to the Closing Date.

(e)     Sellers shall process the payroll for and pay, or cause to be paid, the base wages, base salary, paid time-off and benefits and any other amounts due under the Employee Health Plan or compensation arrangement or as required under applicable Law that are due and payable on or prior to the Closing Date or in connection with the Contemplated Transactions with respect to all Current Employees no later than the date such wages or salary are due under applicable Law. Sellers shall withhold, fund and remit all applicable payroll Taxes as required by Law that are due and payable on or prior to the Closing Date with respect to all Transferred Employees no later than the date such wages or salary are due under applicable Law.

(f)     Buyer shall process the payroll for and shall pay, or cause to be paid, base wages, base salary and benefits that accrue after the Employee Transfer Date with respect to all Transferred Employees.  Buyer shall withhold and remit all applicable payroll Taxes as required by Law after the Closing Date with respect to Transferred Employees. In addition, as part of the

41

v.

wind-down expenses, Sellers shall (or shall cause its designee to) process all employee and Tax reporting covering the periods prior to the Employee Transfer Date in connection with the Excluded Employees and the Transferred Employees that will be required to be prepared and delivered after the Closing.  Nothing herein shall be construed as requiring, and neither Sellers nor any of their Affiliates shall take any affirmative action that would have the effect of requiring Buyer to continue any specific Employee Benefit Plan or any other employee benefit plan or to continue the employment of any specific person.

(g)     Nothing in this Agreement shall create or be construed as creating any contract of employment or as conferring upon any Transferred Employee or upon any other person, other than the Parties to this Agreement in accordance with its terms, any rights to enforce any provisions of this Agreement under ERISA or otherwise.

(h)     Sellers shall retain all WARN Liability incurred prior to or on the Employee Transfer Date or otherwise in connection with the Contemplated Transactions, including in connection with Buyer's failure to hire any Current Employee on or after the Employee Transfer Date.

**Section 6.4     Recording of Intellectual Property Assignments**.  To the extent the Purchased Assets include any registered Intellectual Property, all of the Intellectual Property Assignments shall be recorded and filed by Buyer with the appropriate Governmental Authorities as promptly as practicable following the Closing.

**Section 6.5     Transfer Taxes**.  To the extent not exempt under Section 1146 of the Bankruptcy Code, Buyer shall pay any stamp, documentary, registration, transfer, added-value or similar Tax (each, a "Transfer Tax") imposed under any applicable Law in connection with the Contemplated Transactions. Each Seller and Buyer shall cooperate to prepare and timely file any Tax Returns required to be filed in connection with Transfer Taxes described in the immediately preceding sentence, with the Parties as required by applicable Law to file any such Tax Returns and the other Parties to join therein to the extent required under applicable Law.

**Section 6.6     Wage Reporting**.  For purposes of payroll taxes with respect to the Transferred Employees, Sellers shall treat the Contemplated Transactions, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes); and as such, Sellers and Buyer shall report on a predecessor/successor basis as set forth under the "Standard Procedure" provided in Section 4 of Revenue Procedure 2004-53, 2004-2 C.B. 320.

**Section 6.7     Collection of Accounts Receivable**.

(a)     As of the Closing Date, each Seller agrees to (i) cooperate with Buyer in promptly redirecting all customer remittance instructions, ACH/wire payment information, lockbox or similar arrangements with respect to Accounts Receivable that are Purchased Assets to accounts designated by Buyer, and (ii) hold in trust for Buyer's benefit any monies, checks or negotiable instruments received by Sellers after the Closing Date with respect to Accounts Receivable that are Purchased Assets or accounts receivable relating to work performed, goods sold or services provided by Buyer after the Closing.

v.

(b)      As of the Closing Date, Buyer shall have the sole authority to bill and collect Accounts Receivable that are Purchased Assets and accounts receivable relating to work performed, goods sold or services provided by Buyer after the Closing.

**Section 6.8      Use of Name and Marks**.  Without limiting Sellers' ability to wind down the Bankruptcy Cases and use their legal names solely for such purposes, neither Sellers nor any of their respective Affiliates or Subsidiaries shall use, license or authorize any third party to use, the trade names "FCI Sand", "FCI Sand Operations" or "FCI South" or any name, slogan, logo or trademark that is confusingly similar to any of the names, trademarks or service marks included in the Intellectual Property included in the Purchased Assets.

**ARTICLE VII.
CONDITIONS TO CLOSING**

**Section 7.1      Conditions to Buyer's Obligations**.  Subject to Section 7.3, Buyer's obligation to consummate the Contemplated Transactions in connection with the Closing is subject to satisfaction or waiver of the following conditions:

(a)      as of the Execution Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 3.1 through Section 3.3 and Section 3.5 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE III shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, has not had, and would not reasonably be expected to have, a Material Adverse Effect; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" and "Material Adverse Effect" contained in such representations and warranties shall be disregarded;

(b)      Sellers shall have performed and complied with their covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Sellers shall have caused the documents and instruments required by Section 2.8(a) to be delivered to Buyer (or tendered subject only to Closing);

(c)      no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order and Bidding Procedures Order shall have been entered by the Bankruptcy Court, which shall include a waiver of the fourteen (14) day stay set forth in Rule 6004(h) of the Federal Rules of Bankruptcy Procedure, and shall be in full force and effect and not subject to any stay pending appeal;

(e)      the Stalking Horse Order shall remain in full force and effect, shall not have been reversed, modified, amended, stayed, vacated or subject to any pending appeal, and the Bid Protections approved thereunder shall remain in effect, and the Sale Order shall expressly approve and reaffirm the Bid Protections without modification;

43

v.

(f)      from the Execution Date until the Closing Date, there shall not have occurred and be continuing any Material Adverse Effect; and

(g)      Sellers shall have delivered a certificate from an authorized officer of each Seller to the effect that each of the conditions specified in Section 7.1(a), Section 7.1(b), and Section 7.1(f) has been satisfied.

**Section 7.2**      **Conditions to Sellers' Obligations**.  Subject to Section 7.3, Sellers' obligation to consummate the Contemplated Transactions in connection with the Closing are subject to satisfaction or waiver of the following conditions:

(a)      as of the Execution Date and as of the Closing Date (in each case, except for any representation or warranty that is expressly made as of a specified date, in which case as of such specified date), (i) each representation or warranty contained in Section 4.1 through Section 4.3 shall be true and correct in all respects, and (ii) each other representation or warranty set forth in ARTICLE IV shall be true and correct in all respects, except where the failure of such representations and warranties referred to in this clause (ii) to be true and correct, individually or in the aggregate with other such failures, would not reasonably be expected to materially prevent, restrict or delay the consummation of the Contemplated Transactions or the transactions contemplated by any Related Agreement; provided, however, that for purposes of determining the accuracy of representations and warranties referred to in clause (ii) for purposes of this condition, all qualifications as to "materiality" contained in such representations and warranties shall be disregarded;

(b)      Buyer shall have performed and complied with its covenants and agreements hereunder to the extent required to be performed prior to the Closing in all material respects, and Buyer shall have caused the documents, instruments and payments required by Section 2.8(b) to be delivered to Sellers (or tendered subject only to Closing);

(c)      no Governmental Authority of competent jurisdiction shall have enacted, issued, promulgated, enforced or entered any Order that is in effect and that has the effect of making the Closing illegal or otherwise prohibiting the consummation of the Closing;

(d)      the Sale Order is entered by the Bankruptcy Court and shall be in full force and effect and not subject to any stay pending appeal; and

(e)      Buyer shall have delivered a certificate from an authorized officer of Buyer to the effect that each of the conditions specified in Section 7.2(a) and Section 7.2(b) has been satisfied.

**Section 7.3**      **No Frustration of Closing Conditions**.  Neither Buyer nor Sellers may rely on the failure of any condition to its obligation to consummate the Contemplated Transactions set forth in Section 7.1 or Section 7.2, as the case may be, to be satisfied if such failure was caused by such Party's failure to use its commercially reasonable efforts with respect to those matters contemplated by the applicable Sections of this Agreement to satisfy the conditions to the consummation of the Contemplated Transactions or other breach of a representation, warranty or covenant hereunder.

44

v.

**ARTICLE VIII.**
**TERMINATION**

**Section 8.1     Termination of Agreement**.  This Agreement may be terminated and the Contemplated Transactions abandoned at any time prior to the Closing:

(a)     by the mutual written consent of Buyer, on the one hand, and Sellers, on the other hand;

(b)     by either Buyer, on the one hand, or Sellers, on the other hand, if there shall be any applicable Law that makes consummation of the Contemplated Transactions illegal or otherwise prohibited or if consummation of the Contemplated Transactions would violate any non-appealable final Order of any Governmental Authority having competent jurisdiction;

(c)     by Sellers by giving written notice to Buyer at any time prior to Closing in (i) the event Buyer has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.2 shall become incapable of being satisfied without cure, Sellers have notified Buyer of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.2 shall become incapable of being satisfied, unless such failure shall be due to the failure of any Seller to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing, and such condition is not waived by Sellers;

(d)     by Buyer by giving written notice to Sellers at any time prior to Closing (i) in the event any Seller has breached any representation, warranty, agreement, or covenant contained in this Agreement such that any condition set forth in Section 7.1 shall become incapable of being satisfied without cure, Buyer has notified Sellers of the breach, and the breach has continued without cure for a period of ten (10) Business Days after the notice of the breach, or (ii) in the event that any condition set forth in Section 7.1 shall become incapable of being satisfied, unless such failure shall be due to the failure of Buyer to perform or comply with any of the covenants hereof to be performed or complied with by it prior to the Closing and such condition is not waived by Buyer; or

(e)     by Buyer if:

(i)     the Closing shall not have occurred by the Sale Order Deadline;

(ii)     an "Event of Default" or "Default" is declared by the applicable administrative agent or lender(s) under the Final DIP Order or the DIP Loan Documents, as applicable;

(iii)     if any of the following occurs:

(A)     the Bankruptcy Court enters an Order for the appointment of a trustee or examiner with managerial powers, other than at the request of Buyer or any of its Affiliates, under Section 1104 of the Bankruptcy Code and such trustee or examiner takes any action to interfere with or impair the Contemplated Transactions;

45

v.

(B)    the Bankruptcy Cases are dismissed or converted to cases under Chapter 7 of the Bankruptcy Code or the Bankruptcy Court enters a Final Order appointing a trustee or an examiner with expanded powers (beyond those set forth under Section 1106(a)(3) of the Bankruptcy Code) in the Bankruptcy Cases prior to the Closing Date;

(C)    any Seller consummates a Chapter 11 Plan;

(D)    any Seller executes an Alternate Agreement or takes affirmative steps to effect an Alternate Transaction; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder;

(E)    Buyer is not the Winning Bidder at the Auction pursuant to the Bidding Procedures Order; *provided* that this Agreement may not be terminated pursuant to this clause if and for so long as Buyer is the Back-Up Bidder;

(F)    the Bankruptcy Court fails to (A) approve the Auction by the date required under the Final DIP Order, or (B) enter the Sale Order by the date required by the Final DIP Order; or

(G)    the Closing has not occurred on or prior to the DIP Maturity Date; provided, however, that solely with respect to a sale to a Person other than Buyer, no such sale shall be consummated unless and until all DIP Obligations (including the Repayment Fee) are indefeasibly paid in full in cash simultaneously with or prior to the closing of such sale, and such payment shall be a condition precedent to the closing of any such Alternate Transaction.  For the avoidance of doubt, Buyer's credit bid of the DIP Obligations shall constitute satisfaction of such repayment requirement upon Closing of the sale to Buyer.

**Section 8.2    Procedure Upon Termination**.  In the event of termination and abandonment by Buyer, on the one hand, or Sellers, on the other hand, or both, pursuant to Section 8.1, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate and the Contemplated Transactions shall be abandoned, without further action by Buyer or Sellers.

**Section 8.3    Effect of Termination**.

(a)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from liability for any breach of covenant occurring prior to any termination of this Agreement.

(b)    No termination of this Agreement pursuant to Section 8.1 shall be effective until written notice thereof is given to the non-terminating Party specifying the provision hereof pursuant to which such termination is made. If the Contemplated Transactions are not consummated (i) this Agreement shall become null and void and of no further force and effect (except that ARTICLE I (Definitions), ARTICLE IX (Miscellaneous), the Bid Protections set forth in Section 5.3(b), and this ARTICLE VIII shall survive any such termination), and (ii) if this Agreement is terminated by Buyer pursuant to a termination right set forth in this ARTICLE VIII or by Sellers for any reason other than under Section 8.1(c), Sellers shall not be entitled to any damages, losses, or payment from Buyer, and Buyer shall have no further liability of any kind to

46

v.

Sellers, any of its Affiliates, or any third party on account of this Agreement; provided that, in the event of a willful breach of this Agreement by Sellers, Buyer's recovery shall not be limited to the Bid Protections and Buyer shall be entitled to pursue all available damages, in each case as an allowed superpriority administrative expense claim against Sellers' estates.

(c)     Nothing herein shall preclude any Party from exercising their respective remedies under Section 9.1.

## ARTICLE IX.
## MISCELLANEOUS

**Section 9.1     Remedies**.  Each of Buyer and Sellers recognize that if it breaches or refuses to perform any covenant set forth in this Agreement, monetary damages alone would not be adequate to compensate the other Party for its injuries.  Each Party shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of, or to enjoin the violation of, the terms of such covenants.  If any Litigation is brought by a Party to enforce such covenants, the other Party against which such Litigation is subject shall waive the defense that there is an adequate remedy at Law.  Buyer and each Seller agrees to waive any requirement for the security or posting of any bond in connection with any Litigation seeking specific performance of, or to enjoin the violation of, such covenants.  Buyer and each Seller agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.

**Section 9.2     Expenses**.  Except for the Bid Protections and as otherwise provided in this Agreement or a Related Agreement, each of Sellers and Buyer shall bear their own expenses, including attorneys' fees, incurred in connection with the negotiation and execution of this Agreement, the Related Agreements and each other agreement, document and instrument contemplated by this Agreement and the consummation of the Contemplated Transactions. Notwithstanding the foregoing, in the event of any action or proceeding by Buyer to enforce the payment of the Bid Protections, the Cure Costs, the transfer of the Purchased Assets, or any other obligation of Sellers under this Agreement, Buyer shall be entitled to recover from Sellers all costs and expenses (including, but not limited to, all court costs and reasonable attorneys' fees) incurred by Buyer in such pursuit, which amounts shall constitute allowed administrative expense claims against the Sellers' estates.

**Section 9.3     Entire Agreement**.   This Agreement and the Related Agreements constitute the entire agreement among the Parties and supersede any prior understandings, agreements or representations (whether written or oral) by or among the Parties, written or oral, with respect to the subject matter hereof.  The recitals set forth above are expressly incorporated herein by reference.

**Section 9.4     Incorporation of Schedules, Exhibits and Disclosure Schedule**.  The schedules to this Agreement (the "Schedules") and the Disclosure Schedule, appendices and exhibits to this Agreement, the documents and other information made available in the Schedules and the Disclosure Schedule are incorporated herein by reference and made a part hereof.

v.

**Section 9.5** **Amendments and Waivers**.  No amendment of any provision of this Agreement shall be valid unless the same shall be in writing and signed by each Party except as expressly provided herein. No waiver of any breach of this Agreement shall be construed as an implied amendment or agreement to amend or modify any provision of this Agreement. No waiver by any Party of any default, misrepresentation or breach of warranty or covenant hereunder, whether intentional or not, shall be valid unless the same shall be in writing and signed by the Party making such waiver, nor shall such waiver be deemed to extend to any prior or subsequent default, misrepresentation or breach of warranty or covenant hereunder or affect in any way any rights arising by virtue of any prior or subsequent default, misrepresentation or breach of warranty or covenant. No conditions, course of dealing or performance, understanding or agreement purporting to modify, vary, explain or supplement the terms or conditions of this Agreement shall be binding unless this Agreement is amended or modified in writing pursuant to the first sentence of this Section 9.5 except as expressly provided herein. Except where a specific period for action or inaction is provided herein, no delay on the part of any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof.

**Section 9.6** **Succession and Assignment**.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns. None of the Parties may assign either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of all Parties; provided, however, that Buyer may elect to have any or all of the Purchased Assets conveyed or transferred to, or any or all of the Assumed Liabilities assumed by, one or more of its Designees without the consent of any of Sellers; provided, however, Buyer shall remain liable for all of its obligations to Sellers under this Agreement after any such assignment; provided, further, that Sellers shall be permitted to assign any of their rights hereunder pursuant to a confirmed Chapter 11 Plan or pursuant to an Order of the Bankruptcy Court.

**Section 9.7** **Notices**.  All notices, requests, demands, claims and other communications hereunder shall be in writing except as expressly provided herein. Any notice, request, demand, claim or other communication hereunder shall be deemed duly given (i) when delivered personally to the recipient, (ii) one (1) Business Day after being sent to the recipient by reputable overnight courier service (charges prepaid), (iii) when sent by email (with written confirmation of transmission), or (iv) three (3) Business Days after being mailed to the recipient by certified or registered mail, return receipt requested and postage prepaid, and addressed to the intended recipient as set forth below:

If to any Seller, then to:

FCI Sand Operations, LLC
13201 FM 812
Del Valle, Texas 78617
Attention: John Nelson
Email: jn@fcisand.com

48

v.

with a copy to (which does not constitute notice):

> Munsch Hardt Kopf & Harr, P.C.
> 500 North Akard Street
> Suite 4000
> Dallas, TX 75201
> Attn: Davor Rukavina
> Email: drukavina@munsch.com

If to Buyer, then to:

> GrayStreet Credit, LLC
> 4515 San Pedro Avenue
> San Antonio, Texas 78212
> Attention: [INSERT NAME AND TITLE]
> Email: _____

with copies (which shall not constitute notice) to:

> Okin Adams Barlett Curry LLP
> 3911 Turtle Creek Blvd., Suite 780
> Dallas, Texas 75219
> Edward Clarkson
> Email: eclarkson@okinadams.com

Any Party may change the mailing address or email address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving the other Party notice in the manner set forth in this Section 9.7.

**Section 9.8** **Governing Law; Jurisdiction**. THIS AGREEMENT SHALL IN ALL ASPECTS BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF THE LAWS OF ANY JURISDICTION OTHER THAN THE STATE OF TEXAS, AND THE OBLIGATIONS, RIGHTS AND REMEDIES OF THE PARTIES SHALL BE DETERMINED IN ACCORDANCE WITH SUCH LAWS. PRIOR TO THE CLOSING OF THE BANKRUPTCY CASES, THE PARTIES HERETO AGREE THAT ANY LITIGATION SEEKING TO ENFORCE ANY PROVISION OF, OR BASED ON ANY MATTER ARISING OUT OF OR IN CONNECTION WITH, THIS AGREEMENT, ANY RELATED AGREEMENT OR THE CONTEMPLATED TRANSACTIONS SHALL BE BROUGHT EXCLUSIVELY IN THE BANKRUPTCY COURT, AND EACH OF THE PARTIES HEREBY IRREVOCABLY CONSENTS TO THE JURISDICTION OF THE BANKRUPTCY COURT (AND OF THE APPROPRIATE APPELLATE COURTS THEREFROM) IN ANY SUCH LITIGATION AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF THE VENUE OF ANY SUCH LITIGATION IN THE BANKRUPTCY COURT OR THAT ANY

v.

SUCH LITIGATION WHICH IS BROUGHT IN THE BANKRUPTCY COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM; *PROVIDED* THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH LITIGATION, THEN THE COURTS OF THE STATE OF TEXAS SITTING IN ATASCOSA COUNTY, TEXAS, AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA SITTING IN ATASCOSA COUNTY, TEXAS, SHALL HAVE EXCLUSIVE JURISDICTION OVER SUCH LITIGATION.

**Section 9.9**    **Waivers of Jury Trial**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE RELATED AGREEMENTS OR THE CONTEMPLATED TRANSACTIONS OR THEREBY.

**Section 9.10**    **Severability**.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

**Section 9.11**    **No Third-Party Beneficiaries**.  This Agreement shall not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

**Section 9.12**    **No Survival of Representations, Warranties and Agreements**.  NONE OF THE PARTIES' REPRESENTATIONS, WARRANTIES, COVENANTS AND OTHER AGREEMENTS IN THIS AGREEMENT, INCLUDING ANY RIGHTS OF ANY OTHER PARTY OR ANY THIRD PARTY ARISING OUT OF ANY BREACH OF SUCH REPRESENTATIONS, WARRANTIES, COVENANTS AND OTHER AGREEMENTS, SHALL SURVIVE THE CLOSING, EXCEPT FOR (I) THOSE COVENANTS AND AGREEMENTS CONTAINED HEREIN THAT BY THEIR TERMS APPLY OR ARE TO BE PERFORMED IN WHOLE OR IN PART AFTER THE CLOSING, (II) THIS ARTICLE IX, AND (III) ALL DEFINED TERMS SET FORTH IN ARTICLE I THAT ARE REFERENCED IN THE FOREGOING PROVISIONS REFERRED TO IN CLAUSES (I) AND (II) ABOVE.

**Section 9.13**    **Construction**.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of names and pronouns shall include the plural and vice versa. The word "including" and "include" and other words of similar import shall be deemed to be followed by the phrase "without limitation." The words "herein," "hereto" and "hereby," and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other

50

v.

subdivision of this Agreement. Unless expressly stated in connection therewith or the context otherwise requires, the phrase "relating to the Business" and other words of similar import shall be deemed to mean "relating to the operation of the Business as conducted as of the Execution Date." Except as otherwise provided herein, references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Exhibits, Appendices and the Disclosure Schedule herein are references to Articles, Sections, clauses, subclauses, subparagraphs, Schedules, Appendices, Exhibits and the Disclosure Schedule of this Agreement. Any reference herein to any Law (or any provision thereof) shall include such Law (or any provision thereof) and any rule or regulation promulgated thereunder, in each case, including any successor thereto, and as it may be amended, modified or supplemented from time to time. Any reference herein to "dollars" or "$" means United States dollars.

**Section 9.14   Computation of Time**.  In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Bankruptcy Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

**Section 9.15   Mutual Drafting**.   Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

**Section 9.16   Disclosure Schedule**.  ALL CAPITALIZED TERMS NOT DEFINED IN THE DISCLOSURE SCHEDULE SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THIS AGREEMENT. THE REPRESENTATIONS AND WARRANTIES OF SELLERS IN THIS AGREEMENT ARE MADE AND GIVEN, AND THE COVENANTS ARE AGREED TO, SUBJECT TO THE DISCLOSURES AND EXCEPTIONS SET FORTH IN THE DISCLOSURE SCHEDULE. THE DISCLOSURE OF ANY MATTER IN ANY SECTION OF THE DISCLOSURE SCHEDULE SHALL BE DEEMED TO BE A DISCLOSURE WITH RESPECT TO ANY OTHER SECTIONS OF THE DISCLOSURE SCHEDULE TO WHICH SUCH DISCLOSED MATTER REASONABLY RELATES, BUT ONLY TO THE EXTENT THAT SUCH RELATIONSHIP IS REASONABLY APPARENT ON THE FACE OF THE DISCLOSURE CONTAINED IN THE DISCLOSURE SCHEDULE. THE LISTING OF ANY MATTER SHALL EXPRESSLY NOT BE DEEMED TO CONSTITUTE AN ADMISSION BY SELLERS, OR TO OTHERWISE IMPLY, THAT ANY SUCH MATTER IS MATERIAL, IS REQUIRED TO BE DISCLOSED UNDER THIS AGREEMENT OR FALLS WITHIN RELEVANT MINIMUM THRESHOLDS OR MATERIALITY STANDARDS SET FORTH IN THIS AGREEMENT. NO DISCLOSURE IN THE DISCLOSURE SCHEDULE RELATING TO ANY POSSIBLE BREACH OR VIOLATION OF ANY CONTRACT OR LAW SHALL BE CONSTRUED AS AN ADMISSION OR INDICATION THAT ANY SUCH BREACH OR VIOLATION EXISTS OR HAS ACTUALLY OCCURRED. IN NO EVENT SHALL THE DISCLOSURE OF ANY MATTER IN THE DISCLOSURE SCHEDULE BE DEEMED OR INTERPRETED TO EXPAND THE SCOPE OF SELLERS' REPRESENTATIONS, WARRANTIES AND/OR COVENANTS SET FORTH IN THIS AGREEMENT. ALL ATTACHMENTS TO THE DISCLOSURE SCHEDULE ARE INCORPORATED BY REFERENCE INTO THE DISCLOSURE SCHEDULE IN WHICH THEY ARE DIRECTLY OR INDIRECTLY REFERENCED.

v.

**Section 9.17**   **Headings; Table of Contents**.   The section headings and the table of contents contained in this Agreement and the Disclosure Schedule are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 9.18**   **Counterparts; Facsimile and Email Signatures**.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile, email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

**Section 9.19**   **Time of Essence**.  Time is of the essence of this Agreement.

[SIGNATURE PAGES FOLLOW]

v.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:

[Signature page to Stalking Horse Asset Purchase Agreement]

v.

**BUYER**:

**GRAYSTREET CREDIT, LLC**
a [STATE] limited liability company


By: _____
Name:
Title:

## EXHIBIT A

## FORM OF BILL OF SALE

This Bill of Sale, dated as of [•], 2026, is made and entered into by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, "Sellers"), and GrayStreet Credit, LLC, a [STATE] limited liability company ("Buyer" and together with Sellers, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement dated as of [•], 2026 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

## RECITALS

A.    Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

B.    Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of Sellers' right, title and interest in and to the Purchased Assets.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties, intending to be legally bound, hereby agree as follows:

## AGREEMENT

1.    In accordance with the Asset Purchase Agreement, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Purchased Assets, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities) at each of the respective locations set forth on Schedule 1 hereto.

2.    This Bill of Sale is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth, and shall be effective as of the date hereof.

3.    No provision of this Bill of Sale, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties and their respective successors and permitted assigns, any remedy or claim under or by reason of this Bill of Sale or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Bill of Sale shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

*[Signature Page to Bill of Sale]*

4.      This Bill of Sale may not, without the prior written consent of all Parties, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Bill of Sale to one (1) or more of its Affiliates. Subject to the foregoing, this Bill of Sale shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      None of the provisions of this Bill of Sale may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party or Parties against whom the waiver is to be effective.

6.      This Bill of Sale is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Bill of Sale is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      EXCEPT AS AND TO THE EXTENT PROVIDED IN THE ASSET PURCHASE AGREEMENT, SELLERS EXPRESSLY AND SPECIFICALLY DISCLAIM ANY AND ALL REPRESENTATIONS AND WARRANTIES, WHETHER EXPRESS OR IMPLIED, WHETHER ORAL OR WRITTEN, AND WHETHER GIVEN OR MADE OR DEEMED TO HAVE BEEN GIVEN OR MADE AT ANY TIME OR TIMES IN THE PAST, PRESENT OR FUTURE, OF, AS TO, OR CONCERNING THE NATURE OR CONDITION OF THE PURCHASED ASSETS, INCLUDING WITHOUT LIMITATION ANY AND ALL WARRANTIES AS TO THE MERCHANTABILITY OF THE PURCHASED ASSETS OR THE SUITABILITY OR FITNESS OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE OR FOR ANY PURPOSE.

8.      Article IX of the Asset Purchase Agreement shall apply to this Bill of Sale *mutatis mutandis*.

9.      This Bill of Sale may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Bill of Sale or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

[*Signature Page to Bill of Sale*]

IN WITNESS WHEREOF, the Parties have caused this Bill of Sale to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:

**BUYER**:

**GRAYSTREET CREDIT, LLC**
a [STATE] limited liability company

By: _____
Name:
Title:

*[Signature Page to Bill of Sale]*

## Schedule 1

[•]

v.

**EXHIBIT B**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement, dated as of [•], 2026 (this "Agreement"), is made and entered into by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, "Sellers"), and GrayStreet Credit, LLC, a [STATE] limited liability company ("Buyer" and together with Sellers, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement dated as of [•], 2026 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of Sellers in and to the Purchased Assets including, without limitation, the Assumed Contracts, free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Pursuant to Section 2.3 of the Asset Purchase Agreement, Buyer has agreed to assume, effective as of the Closing, the Assumed Liabilities.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, Sellers hereby assign the Assumed Contracts set forth on Schedule 1 to this Agreement and delegate all of the Liabilities arising from and after the Closing under such Assumed Contracts to Buyer, and Buyer hereby accepts assignment and delegation of and assumes such Assumed Contracts and the Assumed Liabilities on the terms as set forth in the Asset Purchase Agreement. Buyer assumes none of the Excluded Liabilities (including, without limitation, with respect to the Rejected Contracts) and the Parties agree that all such Excluded Liabilities remain the responsibility of Sellers.

2.      This Agreement is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

3.      No provision of this Agreement, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective successors and permitted assigns, any remedy or claim under or by reason of this Agreement or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and

agreements contained in this Agreement shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Agreement may not, without the prior written consent of all Parties, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; provided that, notwithstanding the foregoing, Buyer may assign this Agreement to one (1) or more of its Affiliates. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      None of the provisions of this Agreement may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party or Parties against whom the waiver is to be effective.

6.      This Agreement is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Agreement shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Agreement as provided and subject to the limitations set forth in the Asset Purchase Agreement. To the extent any provision of this Agreement is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Article IX of the Asset Purchase Agreement shall apply to this Agreement *mutatis mutandis*.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

*[Signature pages follow]*

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:

**BUYER**:

**GRAYSTREET CREDIT, LLC,**
a [STATE] limited liability company

By: _____
Name:
Title:

v.

## **Schedule 1**

Assumed Contracts

v.

**EXHIBIT C**

**FORM OF TRADEMARK ASSIGNMENT AGREEMENT**

This Trademark Assignment Agreement ("Assignment"), dated as of [•], 2026 (this "Agreement"), is made and entered into by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, "Sellers"), and GrayStreet Credit, LLC, a _____ limited liability company ("Buyer" and together with Sellers, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement dated as of [•], 2026 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, each Seller has, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of each Seller in and to the Purchased Assets including, without limitation, each Seller's rights and benefits with respect to all trademarks and trademark applications owned by Sellers, which are set forth on Schedule 1 attached hereto (collectively, the "Marks"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of each Seller's right, title and interest in and to the Marks.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Marks listed on Schedule 1, together with the goodwill of the business symbolized by and associated with the Marks, the right to sue for past, present, and future infringement of, dilution of, or unauthorized use of such Marks and the registrations thereof free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs the United States Patent and Trademark Office, and the corresponding entity or agency in any applicable foreign country, to record Buyer as assignee and owner of the Marks. Sellers own all right, title, and interest in and to the Marks.

2.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and

v.

purposes herein set forth and referred to, and shall be effective as of the date hereof. This Assignment is not confidential and may be publicly disclosed and filed.

3.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Assignment may not, without the prior written consent of all Parties, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party or Parties against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Article IX of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

*[Signature Page Follows]*

v.

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:


**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:


**BUYER**:

**GRAYSTREET CREDIT, LLC**
a [STATE] limited liability company

By: _____
Name:
Title:

v.

v.

## <u>Schedule 1</u>

| Mark | App. No. | Reg. No. |
|------|----------|----------|
|      |          |          |
|      |          |          |
|      |          |          |
|      |          |          |
|      |          |          |
|      |          |          |
|      |          |          |
|      |          |          |

v.

**EXHIBIT D**

**FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT**

This Domain Name Assignment Agreement ("Assignment"), dated as of [•], 2026, is made and entered into by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, "Sellers"), and GrayStreet Credit, LLC, [STATE] limited liability company ("Buyer" and together with Sellers, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement dated as of [•], 2026 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, each Seller has, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of each Seller in and to the Purchased Assets including, without limitation, each Seller's rights and benefits with respect to all domain names (including all sub-domain names and extensions thereof and thereto) owned by Sellers, which are set forth on Schedule 1 attached hereto (collectively, the "Domain Names"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of each Seller's right, title and interest in and to the Domain Names.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the Domain Names free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the Domain Names to Buyer. Each Seller shall provide all information necessary to permit full access to, control of, and use of the Domain Names by the Buyer, including all usernames, passwords, and access or administrative information or codes related to each of the Domain Names. For each Domain Name, Sellers shall also provide Buyer with the renewal deadline. Sellers are the registrant or registrants for each Domain Name.

2.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

v.

3.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Assignment may not, without the prior written consent of all Parties, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party or Parties against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Article IX of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

*[Signature Page Follows]*

v.

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

**SELLERS**:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:

**BUYER**:

**GRAYSTREET CREDIT, LLC**
a [STATE] limited liability company

By: _____
Name:
Title:

v.

v.

## **Schedule 1**

Domain Names

**EXHIBIT E**

**FORM OF IP LICENSE AGREEMENT**

This IP License Assignment Agreement ("Assignment"), dated as of [•], 2026, is made and entered into by and among FCI Sand Operations, LLC, a Texas limited liability company ("FCI Sand") and FCI South, LLC, a Texas limited liability company ("FCI South" and together with FCI Sand, "Sellers"), and GrayStreet Credit, LLC, a [STATE] limited liability company ("Buyer" and together with Sellers, the "Parties"). Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Stalking Horse Asset Purchase Agreement dated as of [•], 2026 (the "Asset Purchase Agreement"), by and among Buyer and Sellers.

**RECITALS**

1.      Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and the Asset Purchase Agreement, Sellers have, among other things, agreed to sell, transfer, assign, convey and deliver to Buyer and Buyer has agreed to purchase, acquire and accept from Sellers, upon the terms and conditions set forth in the Asset Purchase Agreement, all of the right, title and interest of each Seller in and to the Purchased Assets including, without limitation, each Seller's rights and benefits with respect to all licenses to which each Seller is a party and convey rights to use (a) any software (other than off-the-shelf software), (b) inventions, trade secrets, copyrightable works of authorship, or other intellectual property created in whole or part by any employee of Sellers (as transferred to a Seller), and (c) any other intellectual property licensed to Sellers, all of which are set forth on Schedule 1 attached hereto (collectively, the "IP Licenses"), free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities); and

2.      Sellers desire to deliver to Buyer such instruments of sale, transfer assignment, conveyance and delivery as are required to vest in Buyer all of each Seller's right, title and interest in and to the IP Licenses.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and pursuant to the Asset Purchase Agreement, the Parties, intending to be legally bound, hereby agree as follows:

**AGREEMENT**

1.      In accordance with the Asset Purchase Agreement, each Seller hereby sells, transfers, assigns, conveys and delivers to Buyer all of its right, title and interest in and to the IP Licenses free and clear of all Liens (other than Permitted Liens) and Liabilities (other than Assumed Liabilities), and hereby instructs, authorizes and directs any and all registrars thereof to transfer the IP Licenses to Buyer. Each Seller shall provide all information necessary to permit full access to, control of, and use of the IP Licenses by the Buyer.

2.      This Assignment is being executed by Sellers and Buyer and shall be binding upon each of Sellers and Buyer, their respective successors and assigns, for the respective uses and purposes herein set forth and referred to, and shall be effective as of the date hereof.

v.

3.      No provision of this Assignment, express or implied, is intended or shall be construed to confer upon or give to any Person, other than the Parties and their respective successors and permitted assigns, any remedy or claim under or by reason of this Assignment or any term, covenant or condition hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Assignment shall be for the sole and exclusive benefit of each of Sellers and Buyer, their respective successors and permitted assigns.

4.      This Assignment may not, without the prior written consent of all Parties, be assigned, directly or indirectly, by operation of law or otherwise, and any attempted assignment shall be null and void *ab initio*; <u>provided</u> that, notwithstanding the foregoing, Buyer may assign this Assignment to one (1) or more of its Affiliates. Subject to the foregoing, this Assignment shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

5.      None of the provisions of this Assignment may be amended or waived except if such amendment or waiver is in writing and is signed, in the case of an amendment, by Sellers and Buyer, or in the case of a waiver, by the Party or Parties against whom the waiver is to be effective.

6.      This Assignment is subject in all respects to the terms and conditions of the Asset Purchase Agreement. Nothing contained in this Assignment shall be deemed to supersede, enlarge or modify any of the representations, warranties, covenants or other agreements contained in the Asset Purchase Agreement, all of which survive the execution and delivery of this Assignment as provided by, and subject to the limitations set forth in, the Asset Purchase Agreement. To the extent any provision of this Assignment is inconsistent with the Asset Purchase Agreement, the provisions of the Asset Purchase Agreement shall govern and control.

7.      Article IX of the Asset Purchase Agreement shall apply to this Assignment *mutatis mutandis*.

8.      This Assignment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Assignment or any counterpart may be executed and delivered by facsimile or email with scan attachment copies, or other electronic signature method, including DocuSign, each of which shall be deemed an original.

[*Signature Pages Follow*]

[*Signature Page to IP License Assignment Agreement*]

IN WITNESS WHEREOF, the Parties have caused this Assignment to be duly executed by their respective authorized officers as of the date first above written.

<u>**SELLERS**</u>:

**FCI SAND OPERATIONS, LLC,**
a Texas limited liability company

By: _____
Name:
Title:

**FCI SOUTH, LLC**
a Texas limited liability company

By: _____
Name:
Title:

<u>**BUYER**</u>:

**GRAYSTREET CREDIT, LLC**
a [STATE] limited liability company

By: _____
Name:
Title:

[Exhibit E]

v.

v.

**<u>Schedule 1</u>**

<u>IP Licenses</u>

| [•] | [•] |
|-----|-----|
| [•] | [•] |

v.

# **SCHEDULES**

**[to be inserted]**

v.

## DISCLOSURE SCHEDULES

[to be inserted]

v.