IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re:<br><br>FCI SAND OPERATIONS, LLC, et al.,<br><br>Debtors. | **Case No. 25-80481-mvl-11**<br><br>Dallas, Texas<br>June 15, 2026<br>9:30 a.m. Docket<br><br>MOTION TO ASSUME/REJECT FILED BY CREDITOR DEERE CREDIT, INC. (372)<br><br>MOTION TO SELL FILED BY DEBTOR AND JOINTLY-ADMINISTERED DEBTOR (404) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MICHELLE V. LARSON,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

| | |
|---|---|
| For the Debtor: | Davor Rukavina<br>Thomas Berghman<br>Kyle Jaksa<br>MUNSCH HARDT KOPF & HARR, P.C.<br>500 N. Akard Street, Suite 4000<br>Dallas, TX 75201<br>(214) 855-7587 |
| For the Debtor: | Meagan Martin Powers<br>MARTIN POWERS & COUNSEL, PLLC<br>1431 Greenway Drive, Suite 950<br>Irving, TX 75038<br>(214) 612-6474 |
| For RJ Machine Company, Inc.: | Jason S. Brookner<br>GRAY REED & MCGRAW, LLP<br>1601 Main Street, Suite 4600<br>Dallas, TX 75201<br>(469) 320-6132 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For the Official Committee of Unsecured Creditors: | Eric M. English<br>Michael Shane Johnson<br>PORTER HEDGES, LLP<br>1000 Main Street, 36th Floor<br>Houston, TX 77002<br>(713) 226-6612 |
| For Cuatro Paisanas Ranch, Inc.: | Michael G. Colvard<br>MARTIN & DROUGHT, P.C.<br>300 Convent, 25th Floor<br>San Antonio, TX 78205<br>(210) 227-7591 |
| For the United States Trustee: | Meredyth Kippes<br>OFFICE OF THE UNITED STATES TRUSTEE<br>1100 Commerce Street, Room 976<br>Dallas, TX 75242<br>(214) 767-8967 |
| For Cuatro Paisanas Ranch, Inc.: | Michael G. Colvard<br>MARTIN & DROUGHT, P.C.<br>300 Convent, 25th Floor<br>San Antonio, TX 78205<br>(210) 227-7591 |
| For FCI-SLG, LLC, et al.: | Stephen Wayne Lemmon<br>STREUSAND, LANDON, OZBURN & LEMMON, LLP<br>1801 S. Mopac Expressway, Suite 320<br>Austin, TX 78746<br>(512) 2360-9900 |
| For Three Rivers Sand, LLC: | J. Robert Arnett, II<br>Maria Zermeno<br>CARTER ARNETT, PLLC<br>8150 N. Central Expressway, Suite 500<br>Dallas, TX 75206<br>(214) 550-8209 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For GrayStreet Credit, LLC: | David L. Curry<br>Edward A. Clarkson, III<br>OKIN ADAMS, LLP<br>1113 Vine Street, Suite 240<br>Houston, TX 77002<br>(713) 228-4100 |
| For Frac Sand Investments, LLC: | Michael Fishel<br>FISHEL LAW GROUP<br>602 Sawyer, Suite 400<br>Houston, TX 77007<br>(713) 294-0379 |
| For Ramming Materials: | Gregory Getty Hesse<br>HUNTON ANDREWS KURTH, LLP<br>1445 Ross Avenue, Suite 3700<br>Dallas, TX 75202-2799<br>(214) 468-3300 |
| For Deere Credit, Inc.: | Jody Dewayne Jenkins<br>JENKINS & YOUNG, P.C.<br>P.O. Box 420<br>Lubbock, TX 79408<br>(806) 796-7351 |
| For Komatsu Financial Limited Partnership: | Kevin Dale McCullough<br>ROCHELLE MCCULLOUGH, LLP<br>901 Main Street, Suite 3200<br>Dallas, TX 75202<br>(214) 953-0182 |
| For Tex-Con Oil Co.: | Tara T. LeDay<br>HUSCH BLACKWELL, LLP<br>111 Congress Avenue, Suite 1400<br>Austin, TX 78701<br>(512) 479-1141 |
| For Goldstar Investments: | Laura Bach<br>CLEVELAND KRIST, PLLC<br>303 Camp Craft Road, Suite 325<br>West Lake Hills, TX 78746<br>(512) 689-8698 |

APPEARANCES, cont'd.:

| | |
|---|---|
| For Atascosa County: | Don Stecker<br>LINEBARGER GOGGAN BLAIR & SAMPSON, LLP<br>711 Navarro Street, #300<br>San Antonio, TX 78205<br>(210) 225-6763 |
| Recorded by: | Bryon A. Robinson<br>UNITED STATES BANKRUPTCY COURT<br>1100 Commerce Street<br>Dallas, TX 75242<br>(214) 753-2011 |
| Transcribed by: | Kathy Rehling<br>311 Paradise Cove<br>Shady Shores, TX 76208<br>(972) 786-3063 |

Proceedings recorded by electronic sound recording; transcript produced by transcription service.

DALLAS, TEXAS - JUNE 15, 2026 - 9:32 A.M.

THE COURT: Good morning, everyone. We are here on our 9:30 docket. We have one matter on the docket this morning, and that is Case No. 25-80481, FCI Sand Operations, LLC.

I'll take appearances for the record, and I'll start with those folks in the courtroom.

MR. RUKAVINA: Your Honor, good morning. Davor Rukavina, Kyla Jaksa, and Thomas Berghman, should he be needed, here today for the Debtors-in-Possession. I don't see Ms. Meagan Martin Powers on my screen, but I believe that she was going to join us by the WebEx.

THE COURT: Okay. Excellent. Thank you.

MS. MARTIN POWERS: I'm here. Having a video problem. Sorry about that, Your Honor.

THE COURT: That's okay. Thank you very much, Ms. Martin Powers.

MR. ENGLISH: Good morning, Your Honor. Eric English and Shane Johnson from Porter Hedges, LLP on behalf of the Committee.

THE COURT: Good morning.

Mr. Curry?

MR. CURRY: Good morning, Your Honor. David Curry from Okin Adams on behalf of GrayStreet. And I believe my colleague, Edward Clarkson, is appearing on video.

THE COURT: All right. Thank you.

MR. CURRY: Thank you.

MR. FISHEL: Good morning, Your Honor. Michael Fishel on behalf of FSI.

THE COURT: Okay. Good morning.

Mr. Hesse?

MR. HESSE: Good morning, Your Honor. Greg Hesse with Hunton Andrews Kurth on behalf of Ramming Materials.

THE COURT: Thank you.

Ms. Kippes?

MS. KIPPES: Good morning, Your Honor. Meredyth Kippes on behalf of the United States Trustee.

THE COURT: Good morning.

All right. I'll now take appearances on WebEx. I'll try to call those that I see. Mr. Colvard?

MR. COLVARD: Good morning, Your Honor. Mike Colvard for Cuatro Paisanas.

THE COURT: Thank you.

Mr. Brookner?

MR. BROOKNER: (Pause.) Oh, I was muted. I'm sorry. Good morning, Your Honor. Jason Brookner from Gray Reed on behalf of RJ Machine.

THE COURT: All right. Good morning.

All right. Mr. Arnett?

MR. ARNETT: Good morning, Your Honor. Bob Arnett

for Three Rivers Sand. And Your Honor, I'd like to advise the Court that I'm going to be having to exit the hearing like right at 10:00 o'clock, and my colleague, Maria Zermeno, who is also on the WebEx, will actually handle the hearing for Three Rivers Sand.

THE COURT: All right. Thank you very much.

All right. Mr. Jenkins?

MR. JENKINS: Good morning, Your Honor. Jody Jenkins for Deere Credit, Inc.

THE COURT: All right. Thank you.

All right. Is anyone on for the Senior Secured Lender?

MR. LEMMON: Yes, Your Honor. Steve Lemmon for FCI-SLG.

THE COURT: Thank you, Mr. Lemmon.

All right. Mr. McCullough, would you like to make an appearance?

MR. MCCULLOUGH: Yes, Your Honor. Kevin McCullough of Rochelle McCullough on behalf of Komatsu Financial.

THE COURT: All right. Thank you.

All right. I think that's as many that I can see that I recognize has made appearances before. Is there anyone else on WebEx who would like to make an appearance?

MR. STECKER: Good morning.

MS. LEDAY: Yes, Your Honor.

MR. STECKER: Good morning, Your Honor. Don Stecker

for Atascosa County.

THE COURT: Okay. Thank you.

MS. LEDAY: Good morning, Your Honor. Tara LeDay on behalf of Tex-Con Oil Company.

THE COURT: Okay. Thank you.

MS. BACH: Good morning, Your Honor. Laura Bach with Cleveland Krist for Goldstar Investments, Limited.

THE COURT: Thank you.

Anyone else wish to make an appearance?

(No response.)

THE COURT: All right. Hearing no further responses.

All right. So we are here both on the Motion to Assume that's been carried with respect to Deere Credit and the Motion to Sell that has been carried a handful of times.

Just for sake of the record, I did see the UCC's supplemental objection that was filed. I've had an opportunity to review that. I also have with me the proposed form of order that was filed, I believe, last Friday, along with the draft term sheet that was filed at the same time.

So if there's anything else that I have missed that was filed this morning or anything like that, I've missed it.

MR. RUKAVINA: Your Honor, we are prepared to proceed.

THE COURT: All right. Mr. Rukavina?

MR. RUKAVINA: Briefly, by way of background, of course, the Court knows the progress of this case. As the Court is aware, we only had one qualifying bid, which was the GrayStar -- the, I'm sorry, the GrayStreet DIP Lender credit bid. There was some last-second flurry of third parties trying to get together some bids. They asked Mr. Shapiro to postpone the auction some. He did. Ultimately, there was no other bid.

At the same time, production went down quite a bit, partially due to the most severe storms that the San Antonio area has had in many years and partially due to equipment problems. And all that then just led to unfortunate timing, amongst other things, as far as the open market process.

What did happen, however, is that the insiders, Mr. Collier and Mr. Nelson, started working on a potential revised bid with GrayStreet. Your Honor has heard some about that, and Your Honor knows that that's the point of the term sheet.

So the thinking was, on Mr. Shapiro's part, that so long as the estate would not be harmed and so long as there is a benefit to the estate, then he would give the insiders and their new company, FSI, an ability to participate in what is otherwise still a sale to GrayStreet.

So I do think we have an insider transaction, even though the buyer, under Option A or Option B, is not an insider, the

buyer is GrayStreet, but the insider can take up to 75 percent or more equity control of the new company created by GrayStreet, let's call it Newco today, so I do think we are dealing with an insider transaction, and I know that the Court is going to have some heightened scrutiny for that. And Mr. Nelson is here to testify, if need be.

As far as the -- and it's about a maximum of 45 days in order for FSI to secure its financing, which I'm assured is already in place. I'm sorry. In process.

FSI did tender a $1.5 million deposit into my firm's IOLTA account. That is going to go hard. It's going to be unrefundable. And there's other benefits that we'll talk about.

So Mr. Shapiro, at least for now, believes that FSI is real, that there is a feasible likelihood that they will get their funding. There is increased economic consideration to the estate, and there's a backstop in the event we have more losses.

I spoke that May was not a good month, largely due to weather and other issues. We have now, Your Honor, repeated -- I'm sorry, completed a revulcanization of some of those parts. We've put on new belts. We have a new plant manager that has come on board. So we are back to 3,000 tons daily, and hopefully more as of at least this weekend.

So the likelihood that the estate will lose funds in the

next 45 days on an operational basis has been mitigated by increased production. We're back where we should have been and where we need to be. However, because there's still a potential shortfall, as Your Honor might have seen in the term sheet and the proposed order, the buyer will put up $800,000 to true up what the accounts receivable and cash situation should be as of when the sale or the auction could have happened and as of when the alternative transaction with FSI actually occurs. And I'll leave it for the other counsel that know more about this to go through the details. I'm just giving you a high-level background.

Additionally, the assumed liabilities are increased from $2.5 million to $3.3 million. That's additional consideration to the estate.

A lot of the contracts are also assumed. For example, the Three Rivers contract, FSI has made it clear that if Option B, Track B, goes, that it will take that and pay the cure costs. I believe that GrayStreet would do the same. I'm not sure about some of the other equipment lenders. John Deere, FSI would certainly take that, pay the cure claim. I'm not sure about GrayStreet. But we're going to need some more time to figure those issues out.

The royalty claimants, of course, the sand royalties, those are part of the cure costs. They're part of the cure notice. That can be adjudicated today.

So what we want to do today, Your Honor, is approve the sale to GrayStreet on its credit bid. I am not sure that there are any actual objections to the sale. There's certainly objections, like Cuatro Paisanas and others, related to aspects of the sale and the preservation of their rights. But as far as an actual objection to the sale, I'm not sure that we have one today.

And then, at the same time, approve the alternative structure, the Option B in the term sheet, such that if, within the next 45 days, FSI gets its financing together, then it'll still be the same sale, Your Honor, but it'll be to an entity that is then 75 percent owned by the principals of the current Debtor.

I'm sure there's going to be many questions as far as the FSI issues and the DIP Lender. I'd prefer that other counsel address any details so that I don't misspeak. This has come together very quickly. But I think it's beneficial. And as Your Honor knows and has seen, one of the main goals here is that, if FSI comes in, then that they will assume the prepetition secured debt to one degree and as it may be modified as between them.

So we're not seeking like a *sub rosa* plan today compelling anyone to do anything, Your Honor. It's just the goal of the insiders who have a personal guaranty to reach an accommodation with the Senior Secured Lender in hopes that,

in the future, once the problems of bankruptcy and insufficient production are behind us, that the values do get back to where they were or where we thought they were early in the case -- if you'll recall, $140, $150 million.

So, with that as a backdrop, once it's my time to present evidence, I'd like to proffer, unless someone thinks that we need a full evidentiary hearing. But I don't, because I don't think we have a sale objection. I'd like to proffer the relevant testimony, and if the Court is inclined to approve the motion, then it's a lengthy proposed order and maybe we can go through it some today.

THE COURT: Okay. A few questions for you. You said that the $1.5 million will go hard. I thought that, reading my minutes from the prior hearing, that the continuance was conditioned on the new bidder making a nonrefundable deposit on June 5th.

MR. RUKAVINA: Yep.

THE COURT: And so it's gone hard?

MR. RUKAVINA: Well, I'm not -- I'm not sure. The continuance was conditioned on them making the deposit.

THE COURT: Right.

MR. RUKAVINA: And if the Court approves the motion, it goes hard and it's nonrefundable and it's earned upon receipt. I'm not so --

THE COURT: I'm not sure that's what you said at the

last hearing.

MR. RUKAVINA: And I'm not so sure, either. Your Honor will recall that things are moving very quickly. But Mr. Nelson is here and he can explain. It's my understanding that now the $1.5 million is hard. So whatever ambiguity might have been is in the past and we're past it.

THE COURT: Okay. Because I noticed the same thing in the term sheet. Okay.

MR. RUKAVINA: Yeah, no, it's -- no, it's hard. It's --

THE COURT: It's hard now?

MR. RUKAVINA: I apologize, Your Honor. We've been moving quickly. So I'm not --

THE COURT: Fair enough.

MR. RUKAVINA: I'm not my usual --

THE COURT: No, no, no, I'm not -- I'm just, between reading the term sheet, listening to your opening, and reading the UCC's objection, there was certainly a question in my mind.

MR. RUKAVINA: It is -- it is hard.

THE COURT: Okay. Thank you.

MR. RUKAVINA: It is hard, and it is my -- it is in my trust account.

The proposed order would require Mr. Shapiro to open up a new segregated account into which the $1.5 million and an

additional $400,000 would be deposited. The proposed order requires that in one business day. I don't think we can do that in one business day. But it'll be done as soon as possible, --

THE COURT: Okay.

MR. RUKAVINA: -- something like that. But it'll be -- it'll be safe with Mr. Shapiro in a segregated account, subject to all carve-out and other rights under the prior DIP orders.

THE COURT: Okay. And with respect -- I understand that obviously Mr. Collier and Mr. Nelson are two of the insiders that could be part of the Newco. Is there any -- and I understand that essentially they're in the process of getting investors or financing of some measure. Is there any member of FCI-SLG Group that is part of that financing?

MR. RUKAVINA: Uh, --

THE COURT: If that's not a question for you, then I'll ask it to the proper party.

MR. RUKAVINA: I don't -- no. No. And let me tell you. Ultimately, the goal here -- and Mr. Nelson can explain, if need be -- is that there would be a new long-term loan facilitated by the U.S. Department of Agriculture, the USDA.

THE COURT: Agriculture. Uh-huh.

MR. RUKAVINA: To get to there, because that's a

lengthy process, there needs to be a bridge loan.

THE COURT: Okay.

MR. RUKAVINA: As I understand it, it's a high net worth individual who is not affiliated with Gary Martin or, to my understanding, anyone with the prepetition loan group.

THE COURT: You lost him.

MR. RUKAVINA: But it looks like --

MR. FISHEL: And Your Honor, I'll clarify some.

THE COURT: Okay.

MR. RUKAVINA: Okay.

THE COURT: All right.

MR. FISHEL: There's a couple things said in there that aren't a hundred percent, like 75 percent correct. Let me --

THE COURT: Okay.

MR. FISHEL: I'll clarify.

MR. RUKAVINA: Then I should have said I'd defer.

THE COURT: That's okay, Mr. Rukavina.

MR. FISHEL: Yeah.

THE COURT: Thank you.

MR. RUKAVINA: But no, I don't believe that -- Mr. Fishel will answer that question.

THE COURT: Okay.

MR. RUKAVINA: And, again, I apologize. I'm not my usual *Perry Mason* self. There have been more than one driver

of this locomotive the last few days. So --

THE COURT: Fair enough. Well, I understood from the Debtors you're trying to bring in value, so I understand. And with all the different players, I recognize that some information may be silo'd.

MR. RUKAVINA: Okay.

THE COURT: Thank you.

MR. RUKAVINA: May I sit down?

THE COURT: Yes.

MR. RUKAVINA: Thank you.

THE COURT: All right. Mr. Curry?

MR. CURRY: Thank you, Your Honor. David Curry on behalf of GrayStreet. I'm going to be brief and then let Mr. Fishel --

THE COURT: Sure.

MR. CURRY: -- handle the details.

From GrayStreet's perspective, we had an auction process. Well, we made a DIP loan.

THE COURT: Uh-huh.

MR. CURRY: And there were defaults. And at all points during this case, I think I can say with a straight face that my client has tried to be accommodating to allow value to come in when it was possible. And that is our approach here on the sale. And there is compensation certainly going to GrayStreet. That is disclosed. And we

view this as a value-maximizing opportunity.

And if it comes to pass and these individuals are able to work out these subsequent deals down the road, that really may have an ancillary effect on the estate, but it is not a direct effect. It's the ancillary effect.

And we did spend a lot of time thinking about the structure and the potential issues. And obviously I think we came up with a structure that a lot of people have questions about, but I think as we answer them we can get everybody comfortable that we're not doing anything prohibited under the Code.

THE COURT: All right.

MR. CURRY: Thank you.

THE COURT: Thank you, Mr. Curry. One thing that the Court is going to want to understand as we go through, and between you and Mr. Fishel, you'll probably be the best folks to answer these questions: I want to have some clarity by the end of the hearing, because I think that the other parties, especially the executory contract counterparties, deserve it, which is: Where are we at the end of the day? What is being assumed or potentially assumed, if we have to litigate cure objections, under each track? If they differ today, I want to understand better with respect to your client, is there a break fee here? If there's no break fee under either track, okay.

MR. CURRY: No. Your Honor, the way we structured this, the buyer will always be GrayStreet's designee.

THE COURT: Okay.

MR. CURRY: So it's not an alternative transaction --

THE COURT: Okay.

MR. CURRY: -- under the Bid Procedures Order.

THE COURT: That's the way I read it. I just wanted to make sure. Thank you. Okay.

MR. CURRY: On the executory contract issue, it's complicated. So we did identify a set of executory contracts in preparation for the GrayStreet sale hearing. And notices went out, and I believe there's at least one objection, which we're going to ask Your Honor to carry.

THE COURT: Sure.

MR. CURRY: And under the new structure, though, there is an extended period where the schedule of assumed contracts can be modified, contracts can be added on there. But there are provisions in the order that, if that happens, parties are going to get notice and an opportunity to object, and they will have their day in court if there is a disagreement. So that was how we intended to deal with that.

THE COURT: All right. And I've had issues in the past relative to carrying cure objections and notices and things like that. And so I'll want to look very tightly at

that particular language.

And it's not that I want to put my thumb down on any one party; I just want to make sure that everyone is on this same page so that we don't have a parade of horribles, as happened in a prior case.

MR. CURRY: Absolutely.

THE COURT: So all of that. Thank you, Mr. Curry.

MR. CURRY: Thank you.

THE COURT: Mr. Fishel?

MR. FISHEL: Good morning, Your Honor. Michael Fishel on behalf of FSI.

I think this is certainly an atypical structure, for sure. And ultimately what this comes down to, you know, it just kind of dawned on me right as we were sitting down, two things: Optionality, which we are paying for, dearly, in the form of $1.5 million that goes hard, it's gone to the estate; and this period, this transition period. Debtors' counsel said it was 45 days. Technically, specifically, it's six weeks.

THE COURT: Uh-huh.

MR. FISHEL: So 42 days. With the option to buy an additional two weeks' time. Right? Which, again, --

THE COURT: Right.

MR. FISHEL: -- we're paying for. It's not free. So there is quite a bit of consideration coming, some of it

to the estate, some of it to GrayStreet, because GrayStreet was, frankly, ready to proceed. So it cost a pound of flesh for us to insert ourselves into the process.

The second half of this -- because there's been a lot of talk about *sub rosa* and all that -- and it's a complete distraction, really. What the term sheet is ultimately, it's a disclosure document. If you look through the sale order, it's fairly explicit. We are not asking for approval of the term sheet as a whole. Right? This entire process is being done to show every single party in the case -- and Your Honor, of course -- that insiders are involved. There could be a transaction on the back-end. GrayStreet will get compensated for that transaction on the back-end. And certain creditors may receive compensation outside of the bankruptcy case. Right? We're not grouping anybody. We're not classifying anybody. And we're not, most importantly, committing to pay anything to anybody today. Because, frankly, we don't even have our financing today.

But what we do want to put out there is the possibility that certain creditors will get paid and that the principals of FSI will work cooperatively and in good faith to get some of those creditors paid, especially creditors that are going to be part of the go-forward Newco. Right?

But that is not -- we are not asking for an order. This isn't a plan. It's not getting approved by the sale. It's

simply to show everybody that this is the ask, and if anyone comes to either GrayStreet or the Debtors or to FSI after the fact and says, well, wait a minute, we didn't know this was the deal, well, we're eliminating that possibility altogether.

And we thought, because, again, of the heightened scrutiny, it was incredibly important for the Court and for everybody to see that.

So it's -- we spent so much time on this term sheet, but ironically, it's not something we're, like, actually seeking to get approved.

There was one comment Debtors' counsel made about the Senior Secured Lender Group, about their debt getting assumed. I want to correct that. It is -- there's no deal right now. We have, you know, Mr. Lemmon and I have spent quite a bit of time together to discuss if there is a resolution. We are continuing to negotiate. I mean, from counsel to counsel, principals to principals. And there may be a deal. We're hopeful there's a deal.

Really, you know, I kind of regret what I presented the Court last week in that, hey, we'll have a resolution. It's almost as if I -- it was an insinuation that that would be encompassed into this deal and rubber-stamped. I should have clarified that. That was not the deal, right? If we had a resolution, it would still be subject to final documentation,

kicked to the back-end of the financing when Track B was approved.

We don't know what amount is going to get agreed to. We don't know the treatment, whether it's going to be secured, unsecured. We don't know the payment terms. All of that is still being discussed. But what we do know is that we will engage in good faith to try to get deals done.

The same goes, right, for general unsecured claimants. You know, Your Honor did make a comment about -- and Mr. Curry said it's complicated with respect to some of the executory contracts. Again, FSI can't be a part of Newco until they get their financing. I mean, I think the three kind of buckets you'll notice in the term sheet -- the Yellow Iron, the Three Rivers, and the Land Royalty Lease -- those were specifically called out because that's most likely going to happen, right? But, again, not committing to anything.

In terms of -- I don't know if Your Honor has any questions about the call rights or the option rights. We did want to put that in there, because that is important, in that, the way the deal is currently structured is there's a Newco, right? If my clients are able to obtain their financing, they effectively buy 75 percent of Newco.

THE COURT: Right.

MR. FISHEL: They then have the ability to buy an additional 20 percent. GrayStreet can put their 20 percent

to my clients at a certain cost and time frame, and that put is kind of divided into tranches. And if they don't, my clients want the ability to ensure that they can call that, right?

There are mechanics of, you know, how -- what the price is of that at. There are some credits. Ultimately, it's an agreement between GrayStreet and FSI. And, again, we're putting that out into the universe to where people know what the compensation might be for GrayStreet to sell their interest.

But we worked tirelessly with the Committee. I think we've addressed all their concerns. We've worked with the UST.

I do need to make a representation that on -- you'll see the releases are very, very narrowly tailored with respect to FSI. I think it's Paragraph 28(a). We're only asking for a release, and we do think it's appropriate because quite a bit of consideration was given, just with respect to the sale, right? It's honed in on the documentation, the negotiation, of this joint -- quote/unquote joint bid. And we do believe a release is appropriate in light of the consideration given and the -- I guess let's call it a partial backstop of $400,000 that will also be coming into the estate this week, I think within two business days of hopefully a sale order being entered.

THE COURT: And that backstop is for ops?
MR. FISHEL: Correct.
A VOICE: Nope.
A VOICE: No.
THE COURT: Nope?
MR. FISHEL: Nope? Sorry. It's not for ops. For -- not for ops. For a deficiency.
A VOICE: The $400,000 is for the true-up.
MR. FISHEL: The true-up? I apologize.
THE COURT: Okay. Thank you.
MR. FISHEL: For a deficiency between --
THE COURT: Thank you for correcting me. I appreciate it.
MR. FISHEL: Yeah. Yeah. And I do need to make -- I mean, the sale order still needs a couple more tweaks. But we spoke with the UST this morning. We accidentally -- the willfulness conduct proviso.
THE COURT: Wasn't in there?
MR. FISHEL: And it's coming back. It was in there initially. I think the Committee got a little redline-happy, accidentally took it out.
THE COURT: Mr. English just got thrown all the way under the bus.
MR. FISHEL: All under the bus. I'm throwing him. I'm throwing him.

(Laughter.)

THE COURT: He has declined to be thrown under the bus.

MR. FISHEL: Yeah. Yeah. No, they -- I will say, it's been -- it's been, you know, a difficult but ultimately very fair negotiation with the Committee. I think they were actually incredibly helpful to this process, to help us narrow the issues and raise concerns, which frankly, you know, I understand. I'm kind of a newcomer to this case, but I understand there's quite a bit of history. A very difficult case.

So I can appreciate the concerns the Committee has raised, and I think we acquiesced to the overwhelming majority of their requests.

So, with that being said, you know, I don't want people -- I had -- God knows how much time I spent on the phone last week talking to different constituents about this term sheet. And, again, it's not something you would typically see in a sale, like, this isn't the --

THE COURT: Yes. We'd typically be at APA time, yes.

MR. FISHEL: Exactly. But we thought, let's -- there's a short amount of time. What's the best way to do this? Let's get creative.

We tried to break it up in a structure where folks could

appreciate and digest it.

But ultimately, everyone kind of reserves their rights, right? So it's not -- we're not asking the Court to bind -- there aren't any third-party releases, right? There aren't -- we're not asking the Court to bind this deal onto the universe. We're asking the Court to bind the GrayStreet deal, the Newco deal, and for us to come in as an option. Right?

So, with that, Your Honor, I'm happy to answer any questions. I'm happy to, you know, to the extent there's going to be a closing, would obviously reserve my time for that. But I just wanted to kind of get that out there.

THE COURT: All right. Thank you, Mr. Fishel.

What I'll do is, with respect to releases, I think that I will -- obviously, I'll read them before we do any form of order or anything like that or any kind of ruling. But I'd probably rely heavily upon the UCC and the Debtors with respect to the releases. And obviously hear from the UST as well.

So, with that, I'll just kind of keep the train going, and then I'm sure I'll have more questions in closing.

Mr. English?

MR. ENGLISH: Thank you, Your Honor. Eric English for the Committee.

You referenced our objection and having seen it. I'll

just go through these points quickly.

THE COURT: Sure.

MR. ENGLISH: And I don't think that a revised proposed order that incorporates these changes has been filed yet. It would be helpful for that to happen or to go through it today in more detail.

THE COURT: Sure.

MR. ENGLISH: But --

MR. RUKAVINA: Real quick, Your Honor, we have a paper copy for you when the time comes. We're emailing a redline to Ms. Harden.

THE COURT: Sure.

MR. ENGLISH: Excellent.

THE COURT: Thank you.

MR. ENGLISH: Regarding the releases, we did have a concern with them. They've been considerably narrowed. It sounds like maybe we struck so much out of it that we took the willful misconduct. But the idea was we're paring it back. That will come back in.

THE COURT: Sure.

MR. ENGLISH: We do feel like a very, very limited release for FSI is appropriate, just as it relates to literally submitting this bid and executing this transaction, but nothing more than that.

Regarding the uncertainty of the funding, the $400,000 is

going to come into a Debtor account. That partially resolves our concerns there. That I think is the cash that's coming in from FSI during this, or at least it may come in to backstop things during this extended closing period.

The $1.5 million being nonrefundable, I think we've -- we can check that box. That has been committed. That's in the sale order as well.

The breakup fee, as you confirmed and was confirmed by counsel, is not going to be part of this.

And then the funding of the carve-out prior to closing in a segregated account, that language is in this revised order that it sounds like you're going to see imminently.

So, all in all, we feel like this transaction does not make the estate worse off, which was our concern, obviously. There's always some level of risk associated with something like this, and as time goes by, whether the Debtor will be able to meet its obligations or fall further behind, we don't know for sure. But I think that, under the circumstances, we've put enough protections in place to make the Committee feel comfortable that it's appropriate to proceed with this proposal.

THE COURT: Thank you very much, Mr. English.

MR. ENGLISH: Thank you.

THE COURT: Ms. Kippes, would you like to be heard by way of opening?

MS. KIPPES: Sure. Thank you, Your Honor. Meredyth Kippes on behalf of the United States Trustee.

I can confirm that the -- we, too, wanted to make quite sure that the -- any releases that go to insiders did not include just all estate causes of actions.

THE COURT: Right.

MS. KIPPES: And I think that the language in there preserves that and is limited only to what might happen or what has already happened in connection with the sale. And it does exclude -- language will go back in -- fraud, willful misconduct, et cetera.

There was a -- I should have brought the document. I think that there was a box in the term sheet that talked about the releases and what was excluded, and I just asked that those exclusions be included in the form of order in a couple of places.

We have some -- we continue to have some concerns about environmental liability, because I understand -- and I am not at all an environmental law expert, Your Honor -- but I understand that some types of environmental liability run with the land, and that should not be affected. I understand people don't want to be tagged with environmental liability that they didn't necessarily bargain for. But, you know, laws are laws.

With regard to the side deals, this is my understanding,

and I hope that the evidence bears it out. The side deals may resolve some of the Debtors' -- well, it will resolve claims of the insiders with regard to claims that are also claims against the Debtors.

So, in other words, somebody may assert a guaranty liability against the Debtors on a debt that they also assert against -- I'm messing it up -- guaranty liability of the insiders on a debt that is also owed by the Debtors. And if that's resolved in some way or paid down or whatever, the estate would certainly benefit, because nobody -- you can't get paid twice.

I understand that there --

THE COURT: So, if one of the insiders had a claim against the estate and the new entity, the Newco, were to assume that debt, you're saying that that would be a resolution of the claim against the estate?

MS. KIPPES: No. No. I might have said that, but that's not what I meant.

THE COURT: Okay.

MS. KIPPES: So, Creditor A has a claim against Debtor.

THE COURT: Sure.

MS. KIPPES: And the insiders guaranteed --

THE COURT: Right.

MS. KIPPES: -- the debt of Creditor A. The

insiders may wish to pay the debt of Creditor A on their own liability. If that happens, then Creditor A can't assert the full amount of the claim against the estate anymore.

What I also understand is that this order is not going to require that that happen. It's a possibility it could. They might decide not to.

THE COURT: Right.

MS. KIPPES: Again, these are all -- this is all my understanding, and I hope the evidence bears that out. If that's the case, then, and the Court is not ordering it to happen, then --

THE COURT: Today.

MS. KIPPES: -- then I think we're okay. But --

THE COURT: From the *sub rosa* issue?

MS. KIPPES: I think so, Your Honor. But it, you know, I rose last week because I heard things that were concerning. And, again, if my understanding is correct and the evidence bears that out -- that it's a thing that might happen, it might not, it's not being ordered to happen under this order, but it's something that's happening between two nondebtors, maybe -- then I think we're okay.

THE COURT: Okay. Thank you, Ms. Kippes.

All right. Mr. Hesse?

MR. HESSE: Good morning, Your Honor. Greg Hesse again on behalf of Ramming Materials.

I raised a couple things. At our last hearing, you said that there would not be an issue with parties, because this is moving so quickly, to raise oral objections as need be.

THE COURT: Uh-huh.

MR. HESSE: And as has been described to you, this has been something that has been moving all sorts of ways. So I'm reemphasizing that we may have issues here.

I also wanted to rise to just maybe give a little bit of perspective, as Ms. Kippes raised, about issues with guaranties and things of that nature, just to give the Court a perspective as to my client's interest in it.

Ramming Materials is an unsecured creditor that's owed between $5 and $6 million. I don't have the specific number right now. It's in the proof of claim. It's referenced in the term sheet. We also have guaranties from Messrs. Nelson, Collier, and Field Camp Investments. And so we have a very keen interest in the releases that have been discussed so far.

Apparently, the releases have been tinkered with, so we will want to take a look at the releases, release language that is included into the Court's order, as well as the requirements for a good faith -- finding of good faith specifically as to FSI. I don't know if we have -- we're not raising issues with regard to GrayStreet.

This would be wanting to make sure that there has not

been any -- you know, that there's enough disclosure that if there's been things that have been going on, that it's -- there's not a protection that is provided to them. Apparently, there's going to be a carve-out of bad faith types of actions. But no reason to have any releases or any good faith findings for anything from this date forward because we won't have the transparency as to what is going on.

So I wanted to at least raise those issues to begin with, and where we, in our perspective, as far as the releases are concerned. And if you don't -- unless you have any questions, I won't --

THE COURT: So what you are proposing is that GrayStreet and Newco would get the 363(m) finding?

MR. HESSE: Right.

THE COURT: But not anyone that might necessarily invest into Newco?

MR. HESSE: Yeah. Exactly, Your Honor.

THE COURT: Okay. All right. Thank you.

All right. Now I'll hear from anyone on WebEx who wishes to be heard by way of opening. I'll start with Mr. Brookner, if he wishes to be heard.

MR. BROOKNER: Thank you, Your Honor. Good morning. I'm not sure if this is opening or closing.

We continue, being RJ Machine, believe and insist that we

have an enforceable mediated term sheet with SLG and several other parties, and we fully intend to -- we do reserve all rights in that regard, and we fully intend to and expect to seek enforcement, either from you or from Judge Lynn, at the proper time.

I would also mention, as a freelancing matter further to kind of what Ms. Kippes was talking about, the last version of the order that I saw approves the joint agreement and the term sheet provisions in various places, and then in Paragraph 24(b) says, oops, never mind, nothing's really approved except for one specific thing in Paragraph 10(e). And so I just wanted to bring that to Your Honor's attention. As a drafter, it was causing me some heartburn to say everything's approved and then say never mind, I was only kidding. So I just wanted to point that out to Your Honor since ultimately it's your order.

THE COURT: All right.

MR. BROOKNER: Thank you, Your Honor.

THE COURT: Thank you. One question for you, Mr. Brookner.

I must say I'm confused about how Judge Lynn will enforce a mediation agreement. And I recognize that --

MR. BROOKNER: Oh, --

THE COURT: -- Judge Lynn was the mediator. But --

MR. BROOKNER: Yes, Your Honor. The final paragraph

of the mediation agreement at Paragraph 13 specifically says if there's any disputes over definitive documentation, the parties agree to go see Judge Lynn, who makes the final binding decision.

THE COURT: Okay. And --

MR. BROOKNER: If that's problematic, we're happy to come see Your Honor, if and when the time arises. Not a problem for us.

THE COURT: Well, no, I mean, depending on the subject matter of the documents, I still have to, I would assume, approve them at the end of the day.

I'll be honest, Mr. Brookner. I have no problem with you reserving your rights. I don't know how the reservation of the rights necessarily affects this deal. And I'm assuming if anyone has an objection to it, they'll raise it. But I have no problem with the reservation of rights.

MR. BROOKNER: Thank you, Your Honor.

THE COURT: You're welcome.

All right. Mr. Lemmon, would you wish to be heard?

MR. LEMMON: Thank you, Your Honor. My client has no comments at this time. Thank you.

THE COURT: Okay. Thank you, Mr. Lemmon.

Mr. Colvard, do you wish to be heard?

MR. COLVARD: Just briefly, Your Honor. Mike Colvard for Cuatro Paisanas.

As the Court is aware from prior hearings, Cuatro Paisanas is a prior landowner who sold the property to a predecessor that is now the FCI South property. That property is subject to a lease agreement between Three Rivers and the Debtor. And our primary interest is in a reservation of our rights with respect to the underlying deeds which contain some deed restrictions and some covenants.

To some degree, I think some of my concerns have been resolved as a result of an adversary order that was entered on June 4th within the adversary between FCI and Three Rivers. That's Docket No. 11, which basically confirms that the lease is a bona fide lease, not a disguised financing agreement, and it sets the -- it steps for whether or not the lease is going to be assumed, and also reserves rights to exercise the rights of purchase, which means to me that -- well, this implies to me that the sale, if there is a sale or a purchase agreement, it's going to be otherwise in a 363 sale and it wouldn't be affected by this process.

I guess we can get some confirmation from the Debtor as to my interpretation. But primarily I'm here just to seek a reservation of those rights on a going-forward basis with respect to the underlying deed and the restrictions in the deed.

THE COURT: All right. And that's what I understood from the Debtors' opening, is that their rights would be

reserved. I am obviously familiar with the Three Rivers Order and the designation of that contract as a lease rather than a financing.

But that is the same lease agreement where, by the terms of the agreement, Three Rivers agrees, if the Cuatro Paisanas sand royalty runs with the land, that it is the responsibility of the lessee, not the lessor. Correct?

MR. COLVARD: It is provisions to that effect. Yes, Your Honor.

THE COURT: Okay. I just wanted to make sure that I had the right document in my head.

So in terms of the dispute between the parties and Cuatro Paisanas, that would be reserved, and that will depend, I would imagine, on Track A or Track B. But we're going to put a pin in that to determine that later. Am I correct in that, Mr. Colvard?

MR. COLVARD: Yes, Your Honor. But to some degree, there may -- the issue may be moot, and I think we can get Debtors' confirmation as to whether it's moot or not, and that is with respect to the sale transaction between I guess the subsequent buyer would be pursuant to the terms of the lease agreement and the assumption rights, number one. And then, number two, the purchase option under that -- under the lease. And it wouldn't be a 363 process; it'd simply be exercising the rights under the contract once it's assumed,

assuming the contract is assumed as a result of this process.

THE COURT: Mr. Rukavina?

MR. COLVARD: But it nullifies my --

THE COURT: Oh.

MR. COLVARD: -- concern, because the issue from my perspective is not whether or not there's going to be a sale free and clear of our liens or encumbrances or deed restrictions, because that process is going to be determined at some point later, when and if the ultimate buyer exercises a purchase option.

THE COURT: Okay. So it's moot because it's not going to be free and clear of that interest; it'll be determined at a later time?

MR. COLVARD: That's my understanding, Your Honor.

THE COURT: Thank you very much, Mr. Colvard. Appreciate that.

MR. COLVARD: Yes, ma'am.

THE COURT: Mr. Rukavina?

MR. RUKAVINA: Your Honor, generally, I agree with that. What I think is most important is Paragraph 36 of the proposed order, which says that to the extent something is a covenant running with the land, then the sale is not free and clear of it.

So, if memory serves, Cuatro Paisanas claims a one-dollar-a-ton royalty. Of course Your Honor knows why we

disagree with that.

THE COURT: Uh-huh.

MR. RUKAVINA: And ultimately, yes, we are assuming a lease, which then, you know, changes the dynamic.

But as far as the underlying legal question of whether Cuatro Paisanas has a legal right that has survived the prior foreclosure -- Your Honor will recall that there was --

THE COURT: Yes.

MR. RUKAVINA: -- an intervening bank -- all those rights are reserved. And either Cuatro Paisanas and the buyer will work them out, or it'll be decided I think probably by this Court. If it is a covenant running with the land, then we can't sell free and clear of it.

THE COURT: Okay.

MR. RUKAVINA: If it is not, then we can. And there's no need or ability to decide that today, but all rights are preserved, and it may never become an issue, depending on what happens.

THE COURT: Excellent. Okay. Thank you.

MR. COLVARD: And Your Honor, --

THE COURT: Mr. Colvard?

MR. COLVARD: Yes, ma'am. Yes, ma'am. One more thing. It's not only the covenant running with the land. There are deed restrictions contained within the deed with respect to the height restrictions for improvements, as well

as lighting restrictions and then the use of the facility for commercial or industrial use. Those are all part of our concern.

MR. RUKAVINA: And that's correct, Your Honor. All those rights are preserved. I don't think that there's any dispute as to those things.

THE COURT: Yes.

MR. RUKAVINA: It was the -- it was the dollar --

THE COURT: I don't recall, but I appreciate --

MR. RUKAVINA: Yeah.

THE COURT: -- the clarification. Thank you.

MR. COLVARD: Yes, ma'am.

THE COURT: Thank you, Mr. Colvard.

Mr. Arnett, or I think it was Ms. Zermeno?

MS. ZERMENO: Yes, Your Honor. I believe that from our side any objections were resolved by that order that you were just talking about, the Docket Order 11 in the adversary proceeding.

THE COURT: Okay. Thank you.

All right. Mr. McCullough, do you wish to be heard by way of opening, sir?

MR. MCCULLOUGH: Thank you, Your Honor. Komatsu Financial's issues have been resolved by proposed language in the order. Much appreciation to Debtors' counsel on their responsiveness and their efficiency in handling that.

THE COURT: All right. Thank you very much, Mr. McCullough.

MR. MCCULLOUGH: Thank you.

THE COURT: Mr. Jenkins, do you wish to be heard?

MR. JENKINS: Yes, Your Honor, just briefly on it. I got a proposal from Debtors' counsel this morning about extending our motion with adequate protection payments basically under the lease, and I guess our position is that as long as we're getting those, the only question is the lengthy time that we haven't been paid during the course of this.

So we don't want it to drag out too long, but if somebody's going to assume it and pay those past-due lease payments, I think we'd be okay with that.

THE COURT: All right.

Mr. Rukavina?

MR. RUKAVINA: I can confirm that, Your Honor. And thank you, Mr. Jenkins. I apologize for the late notice. So if FCI comes into the picture, they will absolutely assume. And then, of course, there will be the cure claim and John Deere should be satisfied.

THE COURT: FSI?

MR. RUKAVINA: FSI. Yes.

THE COURT: Okay.

MR. RUKAVINA: I don't know why they couldn't have

picked a different name. It's so close to this one.

THE COURT: Yes.

MR. RUKAVINA: But if -- what I don't know is if GrayStreet ultimately is the sole one, so I have asked Mr. Jenkins. We'll -- so if it's -- it sounds like it's 42 plus 14. I thought it was 45. But it sounds like maybe two months. So we will pay the, if we haven't already, the June payment and then the July payment. So the status quo would be preserved. You wouldn't be going any deeper into arrearage. And then we can just pass his motion, or otherwise let the process play out. Again, it's going to be assumed or rejected in the coming weeks no matter what.

THE COURT: All right. So, Mr. Jenkins, if you want to document the payments for June and July into a form of continuance order, you can. Or if you're comfortable with where we are and it being carried, then we'll just figure out that date. Okay?

MR. JENKINS: Okay.

THE COURT: Thank you, Mr. Jenkins.

All right. Ms. Bach, do you wish to be heard?

MS. BACH: Nothing from Goldstar Investments at this time, Your Honor.

THE COURT: All right. Thank you.

Ms. LeDay, do you wish to be heard?

MS. LEDAY: Thank you, Your Honor. Just briefly.

The Debtor has been very helpful and has added some proposed language for Tex-Con that resolves our concern.

And based on my understanding of the sale order, during the transition period Tex-Con will continue to be paid in the ordinary course. So as long as I have that confirmation, then we have no further issues.

THE COURT: All right. Thank you, Ms. LeDay.

All right. Mr. Stecker, do you wish to be heard?

MR. STECKER: Thank you, Your Honor. Don Stecker for Atascosa County.

The ad valorem tax issues have been addressed in the proposed final order, sale order, and it resolves our issues.

THE COURT: Thank you very much.

MR. STECKER: Thank you.

THE COURT: I think that's everyone that made an appearance. Is there anyone else who wishes to be heard by way of opening that may not have made an appearance?

(No response.)

THE COURT: Okay. Hearing no takers, Mr. Rukavina, I'm ready for the evidence.

MR. RUKAVINA: Your Honor, my exhibits are at Docket 521. I'd move to admit Exhibits A through F. A is the APA. B and C are schedules and disclosures to the APA. F is the term sheet. D and E are proposed orders and redlines. They're not really exhibits, but it's just easier perhaps for

the record that they be in.

THE COURT: Just one second.

MR. RUKAVINA: Oh, I have binders, Your Honor.

THE COURT: Oh, okay. Please. Thank you.

MR. RUKAVINA: May I approach?

THE COURT: Of course. Thank you very much, sir. All right. You said A through F?

MR. RUKAVINA: Yes.

THE COURT: All right. Is there any objection to the admission of Debtors' A through F found at Docket 521?

(No response.)

THE COURT: Hearing no objections, Debtors' A through F are hereby admitted.

(Debtors' Exhibits A through F are admitted into evidence.)

MR. RUKAVINA: Your Honor, I'd call by proffer, if that pleases the Court, Mr. Shapiro. Mark Shapiro.

THE COURT: All right. Is there anyone who objects to Mr. Shapiro's direct testimony being presented by proffer? He is in the courtroom and will be subject to cross-examination.

(No response.)

THE COURT: Hearing no objection, please proceed.

MARK SHAPIRO, DEBTORS' WITNESS

DIRECT TESTIMONY BY PROFFER

MR. RUKAVINA: Your Honor, if called to testify, Mark Shapiro would testify as follows:

That he is the court-appointed chief restructuring officer of these Debtors and has been since December. He has personal knowledge of the events, negotiations, and documents that we are here on today -- that being the sale of substantially all business assets to GrayStreet, the DIP Lender.

Your Honor, under 363(b), his business judgment, Mr. Shapiro would testify that it is his business judgment that these assets need to be sold to preserve value for all constituents.

Most particularly, the Debtors are unable to repay the DIP loan when it matures, which threatens a potential foreclosure or other action. The Debtors' sales postpetition, from various things that the Court has heard about before, primarily equipment breakdowns, have been insufficient to pay back the DIP Lender.

Furthermore, pursuant to a mediated agreement from last October, the principal constituents, including the Prepetition Lender and the Committee, agreed that the assets should be put on the market and the market tested.

It is no longer feasible to look for a reorganization in this case, and a straight liquidation or Chapter 7 would not be in the estate's best interest.

As far as the particular sale here, Piper Sandler is the court-approved investment banker since December. Piper Sandler has actively marketed these assets. It has marketed them to who Mr. Shapiro and Piper Sandler believed would be entities most interested in these -- that being private equity that owns frac sands, that being competitive frac sand plants, and others known to Piper Sandler.

There was a multi-month marketing process. There were site visits. And there was some activity and hopes of a robust auction.

That did not come to pass. The sole qualifying bid received is the qualifying bid from GrayStar, GrayStreet, that being the credit bid that was previously approved by the Court as the stalking horse offer.

Mr. Shapiro, not having any other qualified or competitive bids, canceled the auction and informed all parties that we would then proceed with the GrayStreet bid.

At approximately the same time, the principals of the Debtor, Kevin Collier and John Nelson, approached Mr. Shapiro and GrayStreet, offering a solution which is now the part of Exhibit F that is Track B, that being the term sheet. That solution, in a nutshell, is that these principals, if they have time to obtain financing to take out GrayStreet, would purchase 75 percent and potentially more of the equity in Newco, Newco being GrayStreet's designee to be the buyer of

these assets.

These principals are insiders. These principals have tendered a $1.5 million deposit that is being held by Munsch Hardt. It is nonrefundable. And it was intended to show wherewithal, show commitment, and to compensate the estate for any delay as a result of continuances.

GrayStreet and these principals, who have started a company called FSI, have entered into that term sheet, which Mr. Shapiro believes that they did in good faith, through arm's-length dealing.

Nevertheless, the buyer here is Newco. It is still GrayStreet. GrayStreet has negotiated and participated in the auction process in good faith. Mr. Shapiro knows of nothing that GrayStreet has done that would suggest anything other than good faith. All of the discussions and the negotiations regarding purchase price, et cetera, have been done at arm's length, through an auction process approved by this Court.

There are no undisclosed deals between the estate and GrayStreet, and the deals between GrayStreet and FCI have been disclosed. Negotiations, as Your Honor has heard, continue with the Prepetition Lender Group that may or may not give rise to further agreements that would be outside of the bankruptcy process. Nothing has been agreed to, to date.

In Mr. Shapiro's opinion, Exhibit A, B, and C, and F, the

term sheet, the approval of all of the above, to the extent requested, is in the estate's best interest.

Other than a straight liquidation, there is no realistic alternative at this time.

As far as compensation to the estate:

(1) The DIP loan is satisfied in full.

(2) There is $1.5 million, the deposit I referenced that has been received that is free and clear funds.

(3) Accounts receivable, as Your Honor has heard, stay with the estates. Those are not sold. And that will provide additional seven-figure value.

(4) The estates keep their cash. The cash is not being sold.

(5) There is up to three point -- well, there is 3.3 -- there's -- up to $3.3 million of postpetition administrative claims are assumed. It'll probably be $3.3 million, but if the unpaid amount is less, then it will be less. So it's a cap at $3.3 million.

THE COURT: Sure.

MR. RUKAVINA: And finally, there is, as disclosed in the term sheet and as mentioned earlier, an up-to-$800,000 backstop. Should, during this extended closing period, the estate have a loss, mainly from operations, then there is a formula and a true-up that would look at what the estates' position would have been but for the extended closing and

then what it is as a result of the extended closing, if that happens to occur. And then the buyers would compensate for up the $800,000 in a negative delta under that formula.

Mr. Shapiro has referenced the insiders, Mr. Collier and Mr. Nelson. He has participated through this auction and negotiation process throughout. He does not believe that the insiders had any unfair advantage. He does not believe that the insiders had any information, financial information, production information, reserve reports, appraisals, that all other potential bidders had access to equally. All of that was publicly available in the data room created and maintained by Piper Sandler. He is not aware of the principals having any additional information or advantage. No favoritism was given by Mr. Shapiro or anyone else to these insiders.

To Mr. Shapiro's knowledge, these insiders undertook no action to block anyone else from participating. They did not prevent any site visits. They did not refuse to respond to questions. They have done nothing, in his opinion, to either obtain favoritism or block anyone else.

Frankly, in his opinion, the reason why he believes that they're interested is because they're already pregnant, so to speak, having invested tens of millions of dollars, and they're trying to preserve their life's investments.

Mr. Shapiro does believe that the package of

consideration referenced will be enough to satisfy administrative claims, including professional claims, including Piper's fees. And as far as the rest, the estate will maintain its causes of action and other, as I mentioned, other accounts receivable and cash assets as of today. Well, and as of the closing.

Your Honor, that would conclude Mr. Shapiro's proffered direct testimony.

THE COURT: All right. Thank you very much.

Mr. Shapiro, why don't you come up so I can go ahead and swear you in, sir. Good morning.

MR. SHAPIRO: Good morning.

MARK SHAPIRO, DEBTORS' WITNESS, SWORN

THE COURT: Please be seated.

All right. Is there anyone who wishes to cross-examine Mr. Shapiro? I'll start with those folks in the courtroom.

MR. HESSE: I have a couple follow-up questions, Your Honor.

THE COURT: Sure. Mr. Hesse?

CROSS-EXAMINATION

BY MR. HESSE:

Q Good morning, Mr. Shapiro.

A Good morning, Mr. Hesse.

Q I understood from your proffer that you were approached by Mr. Nelson and Mr. Collier about the FSI transaction. Is

that -- was that correct?
A Correct.
Q And what involvement have you had in the formation of FSI?
A None.
Q Have you been involved in trying to find any money for FSI?
A No.
Q Have you been involved in finding the bridge loan for FSI?
A No.
Q Have you been involved in finding any of the permanent financing for FSI?
A No.
Q So you know -- do you know -- to your -- to the best of your knowledge, who are the -- who are the -- who is involved in the transaction on behalf of FSI?
A My understanding is it's Kevin Collier and John Nelson.
Q That's all? That's all you're aware of?
A That's all I'm aware of. Yes.
Q Okay.
MR. HESSE: I have nothing further, Your Honor.
THE COURT: All right. Thank you, Mr. Hesse.
Anyone else in the courtroom wish to be heard?
(No response.)

THE COURT: All right. Anyone on WebEx has any cross-examination for Mr. Shapiro?

(No response.)

THE COURT: Okay. Hearing no takers, just a few questions, Mr. Shapiro.

EXAMINATION BY THE COURT

THE COURT: One of the things that I noted in the proposed term sheet is that if FSI was unable to obtain financing and close within the closing period, that they could purchase an additional two-week extension for $200,000, and that extension payment would be allocated $150,000 to GrayStreet and $50,000 to the estates. At that point of that extension, has the sale not closed?

THE WITNESS: That's my understanding. It has not closed.

THE COURT: Okay. And would $50,000 be sufficient for the estates to continue to operate for two weeks?

THE WITNESS: Not -- not really.

THE COURT: That's my question. All right. That's what I thought. Okay. Let's see. So, --

THE WITNESS: Let me say, under the current operating conditions.

THE COURT: Okay. Thank you. And let me look. So, as part of your proffer, Mr. Rukavina went through the various things that the estate essentially receives. So the

$1.5 million deposit, that's free and clear money?

THE WITNESS: Correct.

THE COURT: Okay. And then the A/R that'll stay with the estate, whatever cash is in the bank, causes of action, $3.3 million of admin claims. The $800,000 backstop, is that on A/R?

THE WITNESS: It's on essentially the operations, which is a combination of A/R and cash.

THE COURT: Okay. And if extended, there's the $50,000.

Is there anything else in the package that you find is a benefit to the Debtor, aside from the very obvious no-Chapter-7 liquidation, et cetera?

THE WITNESS: No. We spent a lot of time on the backstop to make sure that it was sufficient, and it's a combination of the $800,000 of backstop plus the $800,000 increase in the accrued liabilities that that protects the estate.

THE COURT: Okay.

THE WITNESS: Plus the $1.5 million.

THE COURT: All right. Give me one moment with the term sheet.

(Pause.)

THE COURT: All right. Another question for you. It says in the term sheet there's a professional fee cap of

$300,000 for the transition period. Based upon your prior budgeting in the case, do you believe that $300,000 would be sufficient for I guess what could be a -- is it a 42-day period?

THE WITNESS: Correct. And we've talked to all the professionals to understand that it will be capped, and I think everyone is holding hands and making sure that we take a light touch over the next 45 days.

THE COURT: Okay. So can I assume if a plan has to be drafted, it'll have to be drafted probably outside of the 42 days?

THE WITNESS: I would say so.

THE COURT: Okay. Does that include all professional fees? Does that include Stretto, the UCC, the Debtors, and, --

THE WITNESS: Yes.

THE COURT: -- okay, your firm? Got you.

(Pause.)

THE WITNESS: I believe we put the U.S. Trustee into the operating budget, so it's -- does not include UST fees.

THE COURT: For quarterly fees? Thank you.

All right. Anything else to add or amend from your proffer?

THE WITNESS: No.

THE COURT: Okay. Thank you very much.

MR. RUKAVINA: Your Honor, I don't remember if the Court asked him to ratify the proffer.

THE COURT: I just did.

MR. RUKAVINA: Okay.

THE COURT: Thank you.

THE WITNESS: Thank you, Your Honor.

THE COURT: Appreciate it. Thank you.

(The witness steps down.)

MR. RUKAVINA: I still think it's 45 days, because that's what it says in the term sheet. But whether it's 42 or 45, I'm not sure that it's a material difference.

Your Honor, that would rest the Debtors' evidence.

THE COURT: Okay. All right. Does anyone else wish to put on any evidence?

(No response.)

THE COURT: Okay. That's in the courtroom. Anyone else on WebEx wish to put on any evidence?

(No response.)

THE COURT: All right. Okay. Then, with that, I guess, from the Court's perspective, I'll go and take a look at the new form of order that you just sent. And then I'll come back, being armed with that, I'll come back out and hearing closings.

Mr. Curry?

MR. CURRY: Your Honor, on the form of order that

was just sent, Mr. Fishel referenced it in his opening, but I just wanted to remind you when you're reviewing it: On Paragraph 28, we have agreed to add back in the willful misconduct --

THE COURT: Okay.

MR. CURRY: -- and intentional acts. That was always intended to --

THE COURT: Right.

MR. CURRY: So, --

THE COURT: Okay. Are there any other changes?

MR. CURRY: So, there are a couple of changes that will be coming. One's not really a change. It's just that we reference 70 documents for defined terms. That there's a potential ambiguity in the definition of "Permitted Liens."

THE COURT: Okay.

MR. CURRY: So Permitted Liens is as used in the APA, not the DIP Order.

THE COURT: Okay.

MR. CURRY: Two different concepts.

And then in the APA, on the Permitted Liens definition, there was some legacy language that was from another deal. That's Section E. It refers to DIP Liens and Prepetition Liens of the DIP Lender, which there are none. And we're just going to strike that entire provision.

THE COURT: Okay. Thank you.

Anyone else wish to be heard before the Court recesses for review?

MR. HESSE: I've not seen the revised form of order, so I reserve any -- I'll reserve comments. I'll have to have a chance to look at it.

THE COURT: Okay. All right.

Ms. Kippes?

MS. KIPPES: Your Honor, it's a similar comment as Mr. Hesse's. I would ask that the -- whatever has been sent to the Court, if it hasn't already been sent to me and other parties, that it be sent while the Court is off the bench so we can take a look.

THE COURT: Okay. Thank you, Ms. Kippes.

MS. KIPPES: Thank you.

THE COURT: Anyone else?

(Off the record discussion.)

MS. KIPPES: Okay. I am informed that it's the one that Mr. Curry sent to me last night. Then I have it. Thank you.

THE COURT: Okay. Thank you.

All right. So, with that, the Court will stand in recess.

THE CLERK: All rise.

(A recess ensued from 10:41 a.m. until 11:52 a.m.)

THE CLERK: All rise. The United States Bankruptcy

Court for the Northern District of Texas is once again in session, with the Honorable Michelle Larson now presiding.

THE COURT: Please be seated. We're going to go back on the record in Case No. 25-80481, FCI Sand Operations.

All right. So, obviously, we're back after the break. The Court has had an opportunity to go through the term sheet and the proposed form of order with a little bit more detail that follows upon the presentations this morning. Are there any announcements? Again, I'm happy to hear folks in closings if parties wish to be heard and have anything put on the record. I think our time is better spent looking at the term sheet, looking at the proposed form of order, and seeing how we get there, but I'm happy to hear folks out.

Anyone else wish to make any closing before we go through the order and the term sheet?

(No response.)

THE COURT: With that, any deals on the break to announce?

MR. RUKAVINA: No, Your Honor.

THE COURT: Okay. All right. So a few questions for folks, and I'll just allow the appropriate party to respond to the Court's questions. I think I'm going to start in the term sheet, and most of the Court's thoughts are obviously going to be things that would affect what I'll just say the first part of the transactions, things that'll go to

the bigger part of the credit bid, and the sources and uses of funds.

So the first question I have is in what's called the Initial Contribution, the structured payment is $2.5 million, and, as I understand it, that $2.5 million is inclusive of the $1.5 million deposit?

MR. FISHEL: Yes, Your Honor.

THE COURT: Okay. And for the record, that was Mr. Fishel, only because it's going to be hard for things to be picked up here and there.

If you think you're going to get most of the questions, why don't you take the podium, Mr. Fishel. And Mr. Curry, you can pop up as needed.

And then, so it says the initial contribution is allocated $600,000 to GrayStreet, and I assume the remaining $1.9 million will be for the estate. What I was unclear of is -- and again, I recognize that the term sheet might be a little stale based -- and I tried to look hard at the order as well. So the $1.9 million, of that, the estate has already received $1.5 million, and the other $400,000 it says it could be used for a variety of things. Explain that to me.

MR. FISHEL: So what the $400,000 is meant to do with GrayStreet's additional $400,000 as a backstop, $800,000, it's meant to be used to true up any deficiencies

between A/R and A/P during this transition period, --

THE COURT: Okay.

MR. FISHEL: -- which we, again, estimate hopefully less than six weeks, but six weeks, and at --

THE COURT: Right.

MR. FISHEL: -- most eight weeks. And of course, there's the, I guess, additional -- from the $200,000, the $50,000 might come in. That may be used as, you know, --

THE COURT: Okay.

MR. FISHEL: -- some room here, but that's what the $400,000 is for. That, to the extent it's not used, it's coming back.

THE COURT: Okay.

MR. FISHEL: Yeah.

THE COURT: All right. To the extent it's not used for what it's coming back?

MR. FISHEL: For -- for -- if there aren't deficiencies.

THE COURT: Okay.

MR. FISHEL: Let's say only $200,000 of that gets used to true up any deficiencies between A/R and A/P. The $200,000 would be remitted back to FSI. So the $400,000, that is used with GrayStreet's additional $400,000 as a backstop to cover -- that's to make sure the estate comes out of this, at worst, net neutral.

THE COURT: So there's a portion of the true-up obligation as defined as the $800,000 that kind of dips into this $1.9 million as well?

MR. CURRY: Just the $400,000, Your Honor.

THE COURT: Just the $400,000?

MR. FISHEL: Just --

MR. CURRY: David Curry, for the record.

THE COURT: Okay.

MR. CURRY: The division, the $400,000 was initially pledged. There was a lot of concern regarding performance. And so one of the asks had been that the FSI portion of the true-up obligation be held in deposit.

THE COURT: Okay.

MR. CURRY: So that's the $400,000.

THE COURT: Okay.

MR. FISHEL: And that's getting deposited hopefully within two days after the sale order.

THE COURT: Okay.

MR. CURRY: I'll just stay up here with --

MR. FISHEL: Yeah. Perfect.

THE COURT: All right. Then, as I understand on the term sheet, Page 4, in the box it says, Revised Assumption of Postpetition Operating Costs. Purchaser agrees to upwardly revise the cap from $2.5 million to $3.3 million. That happens no matter what, right?

MR. CURRY: Yes, Your Honor.

THE COURT: All right. And --

MR. CURRY: And what we've done there, Your Honor, just for clarity, is where the obligation is not contingent upon FSI's participation, we've designated it as a buyer obligation.

THE COURT: Okay. All right. Obviously, for the additional extension at Page 5, the Court certainly has concerns, because $50,000 is not enough for the estate to function for a couple weeks, based upon everything I've ever heard.

I assume the June 9th deadline is -- will be in the "or such other date" as the Court approves the concept?

MR. CURRY: Yes, Your Honor.

THE COURT: All right. So the next issue that I have, or the concern that I have, and this kind of bleeds into the order as well.

Mr. Curry?

MR. CURRY: Your Honor, we've agreed to flip the ratio on the $200,000.

THE COURT: $50,000/$150,000?

MR. CURRY: So GrayStreet will get the $50,000. The estate will get the $150,000.

THE COURT: Okay. Thank you very much for your accommodation and for your client's accommodation, who's --

All right. So the Court wanted to better understand the FSI Liability Management Agreements at Page 10. And so explain to me what the backdrop of these are.

MR. FISHEL: So, Your Honor, as -- and I don't know if it's been made clear, but my clients obviously also have some personal guaranties on some of the debt. The Liability Management Agreements, I mean, they're kind of like almost LMEs. It's -- I don't even know how we landed there with that term, but -- unfortunate term here. But, again, it's not something that we are asking to approve. It's effectively telling the universe that, during this transition period, we are going to work with certain creditors, and those agreements are subject to final documentation. What those agreements will include, you know, is what a negotiated amount for that claim will be. And in exchange, a release by that party, whether it's -- a broad release, right, whether it's a release of the guaranty, whether it's a release in connection with anything else. But specifically, these Liability Management Agreements are simply disclosures. The concept of them are disclosures, right? We don't have a single agreement in place --

THE COURT: Sure.

MR. FISHEL: -- that's finalized. So, again, I don't know, I guess, how else to say it other than we've put all the creditors on notice that we would like to work with

certain folks. We'll reach out to them as we're running this dual-track process on the financing to enter into these agreements. But we won't be coming back to seek approval of them. These are just independent agreements, ultimately.

THE COURT: Okay. Well, and obviously, to the extent they involve the Debtors' estate, whether that is a reduction of claims against the Debtors and things like that, then just please involve Debtors' counsel --

MR. FISHEL: Yes. Of course.

THE COURT: -- so that they can properly document and, obviously, with --

MR. FISHEL: And of course, the intention is to make sure they don't get a double recovery.

THE COURT: That's exactly --

MR. FISHEL: Yeah. Yeah.

THE COURT: And that's what I'm saying, is because when and if it comes time for claims management, we'll want to know what the remaining claims are.

MR. FISHEL: Yes.

THE COURT: The issue that the Court had, and I think it's something very similar to what we addressed at I think it was the final DIP hearing, or maybe another time, was I just want to make sure that, during this transition period between now and closing, that the insider debt -- I know that there is a great amount of it, and not to pick on

Mr. Nelson, but I know that his particular companies perform services for the Debtor, and I think that he's testified a few times that it is on either a market basis or below market basis. I just want to make sure that insider debt is not being more favorably treated than the other postpetition debt of the estate. To the extent that any insiders are doing services, which would still be a postpetition pre-closing basis, that they're not being -- there's no favoritism of their claims being paid as part of the operating costs. It's been the testimony that that's never occurred, but I just want to make sure that that remains constant.

MR. FISHEL: Understood, Your Honor.

THE COURT: All right. The name came up in the term sheet that I don't think the Court had seen before, which was Yellow Iron. What is the Yellow Iron? I don't think I've seen an objection or anything by Yellow Iron. Mr. --

MR. RUKAVINA: Your Honor, it's industry slang for like bulldozers and stuff that you find --

THE COURT: Oh, okay.

MR. RUKAVINA: Heavy equipment.

THE COURT: I should have known that. I should have known that. Okay. All right. Equipment debt. Okay.

MR. FISHEL: I didn't know that, either.

THE COURT: It was capped. I was like, oh, okay, there's somebody named Yellow --

The other thing that I have in my notes is we did have an objection by Butch's Propane, unless that's industry slang for something other than Butch's Propane.

MR. RUKAVINA: We don't want to know what that is.

MR. JAKSA: We have resolved --

THE COURT: Okay. Thank you very much, Mr. Jaksa.

All right. So those are my questions in the term sheet. Now we go to the proposed form of order itself. All right. First things first. I think we have a definitional mess. I do appreciate a good capitalized terms will be defined somewhere else, but in Footnote 2 we define that they'll be defined in the Bid Procedures Order, in the Sale Motion, in the DIP, and all kinds of places.

One of the things that just really stood out to me was the definition of Buyer. And I understand in this particular instance why there is some confluence of the DIP Lender and the Buyer and things like that. But since we have a Newco involved as well, I really think this needed to be scrubbed. At a minimum, you've got a footnote on Page 4, little -- Footnote 6, that talks about --

MR. FISHEL: Uh-huh.

THE COURT: -- the Newco and stuff like that. I think that that kind of affects what the term of Buyer is. I just think it needs to be moved to the front. Because we really need to kind of be careful, and the reason is because

the DIP Lender obviously, as part of a closing, gets certain releases and things of that nature. I'm not sure if it's the Buyer that's getting the release as much that the DIP Lender is getting the release. So let's just be careful of who we're releasing and who we're talking about.

It's also important because, at the end of the day, I mean, Newco is not getting released from anything. The DIP Lender -- well, that's kind of repetitive. But Newco is going to go forward, --

MR. FISHEL: Right.

THE COURT: -- and so that's what I want to make sure, that we're not -- that we're talking about the right entity.

The next thing is I want to better understand what Footnote 4 means, because I think Footnote 4 is supposed to be one of the two areas that responds to Mr. Brookner's objection, and I think that Mr. Brookner raises a good point, which is, repeatedly in here I approve the joint agreement, and as it was described, it was a disclosure agreement, and so I need to understand what I'm approving and what I'm not.

So, Mr. Curry?

MR. CURRY: And Your Honor, the revision that you have, actually, I'll --

THE COURT: Is still one behind?

MR. CURRY: No. I'll give Mr. Brookner some credit.

We thought we had dealt with this issue sufficiently. He pointed out. I went back and looked at it and saw there was -- so, the old one, the definition of Joint Agreement was just the APA plus the joint bid term sheet. Obviously, that's not what we're asking for.

THE COURT: Sure.

MR. CURRY: So what we -- what I did there, or what we did, and folks have agreed, is to make it more clear that to the extent -- when we say the Joint Agreement, to the extent that the Joint Agreement is different from the APA, it is different solely as we've agreed pursuant to the term sheet.

So the term sheet has certain increased consideration to the estate, and that's the purpose of Footnote 4, is to say, so the changed definition is the APA as modified by the term sheet. So not the term sheet itself, but just the APA as modified by the term sheet. And then Footnote 4 makes that more clear. To the extent the term sheet discusses any agreement between a party other than the buyer and the seller, it is not included in the definition of Joint Agreement.

THE COURT: Okay. All right. That's helpful.

(Pause.)

THE COURT: All right. Well, let me see how that affects my comments going forward. I'm just going to page-

flip this, so if anybody has anything before Page 6, let me know.

All right. And the Court had some questions relative to whether the sale was free and clear or whether the sale was free and clear with reservations. I'm relying upon the third parties who would be affected and the estates and the buyers who care about these issues to make sure that that language is sufficient for their purposes.

One question. This is going to be a Debtor question. Page 7, Paragraph H talks about entities -- the Commission on Environmental Quality, the Railroad Commission, the Texas General Land Office, Mine Safety & Health. Have all these people been served?

MR. JAKSA: I believe that's correct, but we will check.

THE COURT: Okay. If you could check that while we're finishing up. Thank you, Mr. Jaksa. Because I see the purpose of a lot of notice provisions, and I see the purpose of a lot of let's just say injunctive provisions in there. I just want to make sure these folks are being served.

So let's look at Paragraph O, the Heightened Scrutiny and the Insider Participation paragraph.

MR. RUKAVINA: Your Honor, where's -- is this M? It looks like Mary?

MR. CURRY: No, O.

THE COURT: O is at --
MR. CURRY: Page 10.
THE COURT: -- Page 10 of the proposed order.
MR. RUKAVINA: Thank you.
THE COURT: Of course.

So this is the joint agreement, and this is essentially APA as modified. Okay. All right. So I have Mr. Shapiro's testimony there. We are good. Like I was saying, some of this is going to be --

The one thing that, Mr. Curry, if we could get some clarity on in the order. Page 16, Paragraph 3, you've got the addition that "provided that if the sale contemplated by the bid term sheet closes, no breakup fee will be paid." Am I correct that no breakup fee at all --
MR. CURRY: There's no breakup fee at all.
THE COURT: If we could clarify that, I'd appreciate it.
MR. CURRY: Certainly.
THE COURT: And then I'd flip to Page 23, unless somebody has something else. Footnote 8. This is the $400,000. This is that piece of the $1.9 million? Okay. Thank you.

And there's no change here, but at Paragraph 28, where we talk about the substitution of the buyer, in Paragraph 19, Mr. Curry, this is one of the paragraphs that really kind of

highlighted to me that there's got to be a difference between the DIP and the buyer in some way. And so I just want to make sure that, in these, that we're naming the right party.

MR. CURRY: Well, I think on Substitution into the Contracts, Buyer is definitely the correct --

THE COURT: No. I think it's right.

MR. CURRY: Okay. Okay.

THE COURT: It's definitely correct right here.

MR. CURRY: Sure.

THE COURT: That's why I say no changes. But that's why it kind of highlighted to me that --

MR. CURRY: I see. Yes.

THE COURT: -- early on, when we were talking about DIP obligations and Buyer, that it was --

MR. CURRY: We can make it more -- we can make it explicit, --

THE COURT: Yes.

MR. CURRY: -- where, if we're using Buyer to include GrayStreet -- because in our view, GrayStreet is always the buyer under any circumstance. So we can make -- there is -- there was already some clarification later, --

THE COURT: But, again, --

MR. CURRY: -- but we can make it clearer.

THE COURT: -- I thought I understood it as that GrayStreet wasn't going to be the assignee; that no matter

what, GrayStreet is going to assign it to someone.

MR. CURRY: GrayStreet's exercising its designation, --

THE COURT: Okay.

MR. CURRY: -- its rights to designate --

THE COURT: A Newco?

MR. CURRY: -- a Newco.

THE COURT: Right.

MR. CURRY: Look. Let's be honest, that would happen --

THE COURT: Yes.

MR. CURRY: -- regardless.

THE COURT: Exactly.

MR. CURRY: So we're not doing anything different there. And so, from our perspective, the transaction is closing as if we did the credit bid and we went forward. That the additional consideration that's coming in and coming to GrayStreet is to allow them the opportunity. That's why we're not closing right now.

THE COURT: Sure.

MR. CURRY: But I get it, and we'll make it more clear.

THE COURT: And it could very well be that it could be handled by a footnote, maybe at a point in time, right? Maybe Buyer is defined at this --

MR. CURRY: For this --

THE COURT: -- for this purpose, and -- I don't want to do damage. First, I want to do no harm. But I do want to make sure that everyone is getting what they're entitled to and nothing less and nothing more.

MR. CURRY: Well, I do think if we move that footnote --

THE COURT: That Footnote 4 --

MR. CURRY: -- about Buyer up --

THE COURT: -- up? Yes.

MR. CURRY: -- to the front, that'll help a lot.

THE COURT: Gotcha.

Paragraph 21(a) at Page 29. Okay. I want to understand this one, primarily because causes of action are remaining with the estate. So, and maybe this is just part of the deal and that is a perfectly acceptable answer. I just --

MR. CURRY: I got it.

THE COURT: -- want to make sure it's been thought of, that if the estate were to have a cause of action against a party that's essentially going to be assumed and assigned, then the Debtor is waiving that?

MR. CURRY: It -- the Debtor is waiving that, Your Honor.

THE COURT: It's -- that's what --

MR. CURRY: Because if it's a -- if it's a defense

or a claim that follows the contract and we're assuming it, --

THE COURT: Right.

MR. CURRY: -- it's coming with us. And if we're not prosecuting it, we don't want the Debtors prosecuting it.

THE COURT: And I understand it is a deal point. I just want to make sure that the proper parties have thought about it.

MR. CURRY: We did, and if you, Your Honor, if you look at that paragraph, the "provided further," so this was an original deal point --

THE COURT: Yep.

MR. CURRY: -- and then the from "provided further" on, this is negotiated with the Committee --

THE COURT: Right.

MR. CURRY: -- to make -- to address specifically your concern.

THE COURT: Absolutely. Okay. Thank you.

Anyone else wish to be heard on that paragraph?

MR. RUKAVINA: Yes, Your Honor. Just a point of clarification. In that adversary proceeding involving Three Rivers, we have alleged conversion by Three Rivers' principal. We're not releasing that claim.

THE COURT: Okay. Well, then that --

MR. RUKAVINA: But that's not -- but he's not a

contractual counterparty. I just want everyone to understand.

THE COURT: The principal? Okay.

MR. CURRY: Oh, it's -- yeah. Okay.

THE COURT: Yes. Okay. So long as there's no --

MR. RUKAVINA: And we'll make sure that the release of the counterparty doesn't release --

MR. CURRY: Sure.

MR. RUKAVINA: -- other people.

THE COURT: Exactly. Okay.

MR. RUKAVINA: Yeah.

THE COURT: Yes. I'm not accusing you guys of not thinking it through. I just know this is coming together quickly, so I was just highlighting what I saw.

MR. CURRY: It did come together quickly, Your Honor.

THE COURT: So let me look at your 24(b) in connection with the way we've talked about the joint agreement. Can I assume the Filter Press Note and the Ramming Note are defined somewhere?

MR. CURRY: Somewhere. As you referenced, there's a rather large glossary.

(Laughter.)

THE COURT: Let's just make sure we know whether they're defined.

All right. And I know this would be done anyway, but in Paragraph 26, you're reserving the right to modify. Let's just make sure that the final is filed with the Court.

MR. CURRY: Yes, Your Honor.

THE COURT: All right. So Paragraph 28(a) at 34, and I realize this might still be a little bit in flux. So the estate is releasing FSI and its counsel, Mr. Nelson and Mr. Collier, for anything essentially involving the negotiation, documentation, disclosure, and execution of the joint bid.

MR. CURRY: (sotto voce) Joint bid?

THE COURT: Yes, I think that, --

MR. CURRY: Yes.

THE COURT: -- number one, we have a definitional issue there.

MR. CURRY: (sotto voce) Yeah. That's not defined, yeah.

THE COURT: And then what's the execution of -- oh, is that supposed to be the term sheet?

MR. FISHEL: Right. And any additional.

THE COURT: Okay.

MR. FISHEL: Right.

THE COURT: All right.

MR. FISHEL: Yeah. We tried to effectively narrow it as, you know, just to the scope, not even -- initially, we

had asked for the sale process generally.

THE COURT: So this is basically kind of --

MR. FISHEL: This is a condensed version.

THE COURT: All right. And so we're just going to put the Joint Bid Term Sheet right there, and then the fraud proviso, the bad boy proviso is coming back?

MR. FISHEL: Yes.

THE COURT: All right. I think that's all the questions that the Court had. Did anyone else have anything else to add? Mr. Rukavina?

MR. RUKAVINA: Yes, Your Honor. Just briefly. As I previewed before, right now, the order requires the new account and me to wire the $1.5 million within one business day. That's just not possible.

THE COURT: Okay.

MR. RUKAVINA: It'll -- Mr. Shapiro will need a couple days to open the account, and my firm will have to approve a wire that size. I'm sure it can be done within three days, but -- so I'll propose a --

THE COURT: Okay.

MR. RUKAVINA: -- promptly or some looser language so that I'm not in contempt if it's not done tomorrow.

THE COURT: You'll be in contempt anyway.

(Laughter.)

THE COURT: I'm kidding.

All right. Anyone else wish to be heard? Mr. Hesse, any other concerns?

MR. HESSE: No, I think that they were resolved as part of the -- sorry. (louder) Sorry, Your Honor. Greg Hesse on behalf of Ramming Materials. I think as a result of the revised form of order addressing certain concerns and some specific issues there, I had the same confusion about the definition in Footnote 4 that you did, but I think we're resolved.

THE COURT: Okay. Thank you, Mr. Hesse.

And I see somewhere I reserved rights to interpret the order, so that's going to be very helpful on that definition.

A VOICE: Yes.

THE COURT: Ms. Kippes, anything further?

MS. KIPPES: No, Your Honor. Thank you.

THE COURT: Thank you.

All right. Anyone on WebEx wish to be heard with respect to the sale order?

(No response.)

THE COURT: Well, so number one, compliments to the Debtors and Mr. Shapiro for keeping the lights on during what I know is a trying time operationally, and to give some time for at least the potential for this deal and for this framework for a potential deal that would probably more concretely keep operations going.

Hats off and compliments to FSI and its counsel and GrayStreet and its counsel. I know this has been a great deal of work in a short period of time. But, again, I think, number one, it's borne fruit for the estate.

I know this has been a tough one for the Unsecured Creditors' Committee and for the UST to kind of keep on top of and the moving parts. I really, I see your handiwork all throughout and I really appreciate you guys minding the store, together with Debtors' counsel.

All that to say I think that this sale agreement, it's obviously not as robust of an auction and a marketing process as we would have hoped, but I think that it still gives us a greater likelihood of seeing an operating company come out on the back end of this and not something that GrayStreet has to sell a sand mine that's obviously had some operational concerns over the years.

I also, I appreciate that it maintains the optionality and kind of at least puts a pin in the resolution for some things with Three River and Cuatro Paisanas and a few other unsecured creditors or executory contract counterparties that have had a lot of briefing and a lot of time over the course of the case.

So all of that to say I will approve the sale order with the comments that I had. I do believe that once we are past this hearing, that parties can really take a hard look at the

definitions and just make sure that the sale order that's uploaded to the Court is as tight as possible. But recognizing that we still have 42, 45 days to close, we've obviously got some time for the closing and the clean-up.

So I'll approve the sale pursuant to Sections 363, 365, et cetera of the Code, together with the waivers of the 14-day requirements as was requested in the papers.

Do parties have any questions for the Court?

(No response.)

THE COURT: Well, this is as close as you all have come to honoring a time estimate in the history of the case, so hats off. The continuance is the charm. But anyway, the Court will stand adjourned for the day. You all have a good one.

THE CLERK: All rise.

(Conclusion of proceedings at 12:24 p.m.)

--oOo--

CERTIFICATE

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

**/s/ Kathy Rehling** **06/16/2026**

_______________________________________ ________________

Kathy Rehling, CETD-444 Date
Certified Electronic Court Transcriber

INDEX


| | | |
|---|---|---|
| PROCEEDINGS | | 5 |
| WITNESSES | | |
| Debtors' Witnesses | | |
| Mark Shapiro | | |
| - Direct Testimony by Proffer | | 45 |
| - Cross-Examination by Mr. Hesse | | 51 |
| - Examination by the Court | | 53 |
| EXHIBITS | | |
| Debtors' Exhibits A through F (ECF 521) | Admitted | 45 |
| RULINGS | | 79 |
| END OF PROCEEDINGS | | 81 |
| INDEX | | 82 |